# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

FIDELITY NATIONAL FINANCIAL, INC., and

FIDELITY NATIONAL TITLE INSURANCE COMPANY,

    *Plaintiffs,*

    v.

SCOTT BESSENT, in his official capacity as the Secretary of the United States Department of the Treasury,

UNITED STATES DEPARTMENT OF THE TREASURY,

ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network, and

THE FINANCIAL CRIMES ENFORCEMENT NETWORK,

    *Defendants.*

_____/

**Case No. _____**

**Permanent Injunctive Relief Requested**

**Declaratory Relief Requested**

## COMPLAINT FOR PERMANENT INJUNCTIVE

## AND DECLARATORY RELIEF AND VACATUR

1

Fidelity National Financial, Inc. ("FNF") and Fidelity National Title Insurance Company ("FNTIC") bring this civil action for declaratory and injunctive relief and vacatur against Scott Bessent, in his official capacity as the Secretary of the United States Department of the Treasury ("Bessent"), the United States Department of the Treasury (the "Treasury"), Andrea Gacki, in her official capacity as Director of the Financial Crimes Enforcement Network ("Gacki"), and the Financial Crimes Enforcement Network ("FinCEN"), and allege as follows:

## INTRODUCTION

1.      This action challenges a new rule recently promulgated by FinCEN, a bureau within the United States Department of the Treasury.  By demanding wide-ranging and intrusive disclosures, the new rule will impose severe burdens on title insurance companies like Plaintiffs and ride roughshod over the privacy interests of parties involved in routine residential real estate transactions.  The rule, which increases the annual volume of disclosure reports **by *4,000%***, exceeds FinCEN's statutory authority to demand disclosures only of "suspicious" transactions and will create massive costs and intrusions on privacy without any remotely commensurate benefit to FinCEN's stated goal of identifying money laundering transactions.

2.      The new Anti-Money Laundering Regulations for Residential Real Estate Transfers (the "Rule") create unprecedented reporting obligations for an entire category of "non-financed transfers of residential real property to specified

legal entities and trusts on a nationwide basis." 89 Fed. Reg. 70,258 (August 29, 2024). In essence, with certain exceptions, the Rule requires reporting a raft of intrusive information on every residential real estate transaction in the country that does not involve financing (like a mortgage) and that transfers real estate to a trust or certain other legal entities. Millions of perfectly lawful transactions are swept into FinCEN's dragnet.

3. The Rule suffers from a host of fatal legal defects. To start, the statutory authority on which FinCEN relied under the Bank Secrecy Act ("BSA"), authorizes FinCEN to impose reporting obligations only as to "suspicious transactions relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). The Rule on its face exceeds that restriction, because it eliminates any requirement of specific indicia of suspicious activity and instead requires reporting on an entire category of transactions without any basis for the agency to conclude that they are *all* "suspicious" and relevant to a possible violation of law. Indeed, although FinCEN has operated a more limited and targeted program for years requiring reporting on similar transactions in key geographic areas, the agency failed to cite any data from that program justifying a nationwide rule indiscriminately demanding reporting on *all* transactions. Instead, FinCEN relied on the vague assertion that "such transfers can be and have been exploited by illicit actors." 89 Fed. Reg. 70,259. The mere fact that a type of transaction "can be" used by "illicit actors" does not render the

entire category of transactions suspicious. That reasoning reads the word "suspicious" out of the statute. The Rule also violates the mandate set forth in 31 U.S.C. § 5318(g)(5)(D)(ii)(I) that streamlined Suspicious Activity Reports—which the Rule purports to call for—may be required only for "suspicious transactions relevant to potential violations of law."

4.     The Rule is also arbitrary and capricious because, among other reasons, FinCEN failed to conduct a proper cost-benefit analysis. The Rule imposes a massive new burden on the industry. FinCEN itself estimates that the Rule will require approximately 800,000 to 850,000 reports annually at a cost (on the low side) of between $428.4 and $690.4 million in the first year and between $401.2 and $663.2 million annually thereafter. *See* ¶¶ 54, 56, 69 & 118, *infra*. Those staggering figures do not even include many of the costs that entities like Plaintiffs will incur to establish and operate new IT systems and train personnel to implement the Rule. *See* ¶ 119, *infra*. That translates into a projected added cost of $472.00 to $829.00 for every covered residential real estate transaction.

5.     Given the likely outcome of how the Rule allocates responsibility for filing reports, Plaintiffs estimate that they will incur significant compliance costs in the first year alone.

6.     In addition, the proposed implementation of the Rule adds massive red-tape to the report-filing process. The proposed form for compliance with the Rule,

issued for comment by FinCEN and published in the Federal Register in November 2024, 89 Fed. Reg. 89700 (Nov. 13, 2024), provides for 111 fields to be addressed, many with numerous subparts. While not all fields apply to every transaction, for the fields that do apply, the responding party is not even permitted to say they do not have the information to give a response. *Id.* at 89,705; *id.* at 70,204 ("FinCEN notes that there is no exception from reporting under the final rule should a transferee fail to cooperate in providing information about a reportable transaction. The final rule does not authorize the filing of incomplete reports, and a reporting person who fails to report the required information about a reportable transfer could be subject to penalties.")

7.    On the other side of the scale, FinCEN made no serious effort to estimate the economic benefits of adopting the Rule and failed to offer any explanation as to why it is not possible to estimate the anticipated reduction in illicit activity and the associated economic benefit of doing so. Thus, it has failed to make any meaningful cost-benefit analysis justifying the imposition of the massive new burden on the industry. *See* ¶¶ 113-125, *infra*.

8.    In addition to economic costs, the Rule contemplates massive intrusions on the privacy rights of individuals and entities. With some exceptions, the Rule requires obtaining and reporting to FinCEN detailed identifying information on all persons and entities involved in the covered transactions and the beneficial owners

of the legal entities and trusts involved in the transactions.  For example, in addition to information about transferee entities and transferee trusts, the Rule requires reporting of legal name, current address, date of birth, citizenship, and unique identifying number (such as an IRS Taxpayer Identification Number) for each beneficiary of such entities or trusts who meet certain criteria.  That would require reporting, for the first time to FinCEN, the real beneficiary of certain trusts.  Under some circumstances, this would even require reporting the identities of minor children.  89 Fed. Reg. 70,274.

9.    The absence of any connection to indicia of suspicious activity or connection to illegal activity and the indiscriminate expansion to cover all transactions throughout the country also render the Rule unconstitutional.

10.    The Rule calls for collecting private information without any articulable suspicion or connection to illegal activity.  This violates the Fourth Amendment's prohibition of unreasonable searches without a warrant.  Indeed, the Rule's indiscriminate requirement of reporting private information about transactions without pre-compliance judicial review for the presence of articulable suspicion or connection to illegal activity constitutes an illegal general warrant.

11.    The Rule also violates the First Amendment's prohibition on compelled speech by requiring covered persons to collect and disclose far more information than is reasonably necessary to advance the Government's objective of deterring and

punishing illegal financial transactions.  The Rule is a wildly overinclusive means of advancing these interests because it requires reporting persons to disclose personal identifying information and sensitive financial information in *all* covered transactions, regardless of whether any indicia of criminal activity is present.

12.     Finally, the Rule exceeds any authority Congress could have delegated to the Executive Branch under the Commerce Clause or its other Article I powers. The Rule does not regulate interstate commerce—it requires financial institutions to engage in a particular activity, namely reporting.  And to the extent the Rule regulates underlying real-estate transactions, it regulates purely intrastate transactions without apparent connection with interstate or foreign commerce. However, Congress never delegated authority to the Department of the Treasury that would authorize it to make findings to regulate intrastate transactions based on a purported substantial effect on interstate or foreign commerce.

13.     Plaintiffs are entitled to a declaration that the Rule is unlawful and unconstitutional and thus is invalid and unenforceable, vacatur of the rule, an injunction against its enforcement, and the other relief sought herein.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1346 because this action against the United States arises under the Constitution and laws of the United States, and under 5 U.S.C. §§ 701-706 because it challenges a

final agency action on grounds set forth in 5 U.S.C. § 706(2). This Court has jurisdiction to render declaratory relief because an "actual controversy" exists between the parties within the meaning of 28 U.S.C. § 2201(a).

15.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because no real property is involved, Plaintiffs reside in this district, and Defendants are agencies or officers of the United States sued in their official capacities.

## PARTIES

16.    Plaintiff Fidelity National Financial, Inc. ("FNF") is a Delaware corporation with its principal place of business in Jacksonville, Florida, which is located in this District. FNF is a leading provider of title insurance and transaction services to the real estate and mortgage industries. FNF is the nation's largest title insurance company through its title insurance underwriters—Fidelity National Title, Chicago Title, Commonwealth Land Title, Alamo Title and National Title of New York—that collectively issue more title insurance policies than any other title company in the United States.

17.    Plaintiff Fidelity National Title Insurance Company ("FNTIC") is a Florida corporation with its principal place of business in Jacksonville, Florida, which is located in this District. Through its nationwide network of direct operations and agents, FNTIC provides title insurance, underwriting, escrow and closing services to residential, commercial and industrial clients, lenders, developers,

attorneys, real estate professionals and consumers. FNTIC and Chicago Title are the largest of FNF's title insurance subsidiaries.

18.    Defendant Scott Bessent is the Secretary of the United States Treasury and is named as a party in his official capacity.

19.    Defendant United States Department of the Treasury is an executive branch department of the federal government headquartered in Washington, D.C., responsible for the administration and enforcement of the BSA, pursuant to which the Rule at issue in this lawsuit purports to be authorized.

20.    Defendant Andrea Gacki is the Director of FinCEN and is named as a party in her official capacity.

21.    Defendant the Financial Crimes Enforcement Network is a bureau within the United States Department of Treasury. FinCEN is an "agency" of the United States within the meaning of 28 U.S.C. § 451.

## STATEMENT OF FACTS

22.    FinCEN promulgated the Anti-Money Laundering Regulations for Residential Real Estate Transfers (the "Rule") on August 29, 2024. 89 Fed. Reg. 70,258-94. The effective date of the Rule is December 1, 2025. *Id.* at 70,258.

23.    The articulated purpose of the Rule is "to assist the U.S. Department of the Treasury, law enforcement, and national security agencies in addressing illicit finance vulnerabilities in the U.S. residential real estate sector, and to curtail the

ability of illicit actors to anonymously launder illicit proceeds through transfers of residential real property, which threatens U.S. economic and national security." *Id.*

24.    FinCEN purported to promulgate the Rule pursuant to the BSA, as amended by the Annunzio-Wylie Anti-Money Laundering Act, 31 U.S.C. § 5318(g)(1). *See* 89 Fed. Reg. 70,262.

25.    Section 5318(g)(1), entitled "Reporting of Suspicious Transactions," authorizes the Secretary to "require any financial institution, any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

## A.    <u>Background</u>

26.    Among other provisions, the BSA requires certain financial institutions to maintain anti-money laundering policies and policies designed to counter the financing of terrorism ("AML/CFT") programs. 31 U.S.C. § 5318(a)(2). Specifically, the Secretary of Treasury is authorized to "require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with

this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance." *Id.*

27.    Pursuant to 31 U.S.C. § 5318(a)(1), the Secretary of Treasury has delegated its authority "to implement, administer, and enforce compliance with the BSA" to the Director of FinCEN. 89 Fed. Reg. 70,258 n.5.

28.    The BSA definition of financial institutions to which the § 5318(a)(2) AML/CFT program requirement applies includes "persons involved in real estate closings and settlements." 31 U.S.C. § 5312(a)(2)(U).

29.    FinCEN has historically exempted this category of persons from "comprehensive regulation under the BSA." 89 Fed. Reg. 70,258.

30.    Instead of categorically targeting all "persons involved in real estate closings and settlements," since 2016, FinCEN has used targeted Residential Real Estate Geographic Targeting Orders (**"GTOs"**) to "require certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States." *Id.* at 70,259-60.

31.    These GTOs are focused on a subset of non-financed purchases of residential real estate thought by FinCEN to present a high risk of money laundering. *Id.* GTOs are intended to be temporary and under the statute may be implemented for only 180 days, although they may be renewed. *Id.* at 70,259 n.14.

32.    On February 16, 2024, FinCEN published a notice of proposed rulemaking proposing a nationwide and permanent regulatory scheme to require "consistent reporting of information" about what FinCEN characterized as "certain high-risk real estate transfers." *Id.* After a comment period, FinCEN adopted the Proposed Rule with some modifications in response to public comments and issued it as the Final Rule.  89 C.F.R. § 70,258.

## B.  Streamlined Suspicious Activity Reports

33.    The Anti-Money Laundering Act of 2020 amended the BSA to require the Secretary (and thus FinCEN) to "establish streamlined, including automated processes to, as appropriate, permit the filing of noncomplex categories of reports." 31 U.S.C. § 5318(g)(5)(D)(i)(I).  The streamlined SAR requirements adopted pursuant to the amended provisions must "reduce burdens imposed on persons required to report" while not "diminish[ing] the usefulness of the reporting to Federal law enforcement agencies, national security officials, and the intelligence community in combating financial crime, including the financing of terrorism." *Id.* at § 5318(g)(5)(D)(i)(I)(aa)-(bb).

34.    In exercising its authority to adopt a streamlined SAR rule, FinCEN must comply with two requirements, which the BSA refers to as "Standards."

35.    Standard (I) mandates that in establishing a streamlined SAR process, FinCEN "shall establish standards to ensure that streamlined reports relate to

suspicious transactions relevant to potential violations of law (including regulations)." *Id*. at § 5318(g)(5)(D)(ii)(I).

36.    Standard (II) provides that, in establishing such standards, FinCEN "shall consider transactions, including structured transactions, designed to evade any regulation promulgated under this subchapter, certain fund and asset transfers with little or no apparent economic purpose, transactions without lawful purposes, and any other transactions that the Secretary determines to be appropriate." *Id.* at § 5318(g)(5)(D)(ii)(II).

### C.    Overview of the Rule

37.    As explained by FinCEN, the Rule "imposes a streamlined suspicious activity report (SAR) filing requirement under which reporting persons, as defined, are required to file a 'Real Estate Report' on certain non-financed transfers of residential real property to legal entities and trusts." 86 Fed. Reg. 70,258. The Rule purports to build on FinCEN's experience employing the Residential Real Estate GTOs to collect information on certain "high risk" residential real-estate transactions. *Id.* at 70,259.

38.    The Rule defines "reportable transfer" to include any "non-financed transfer to a transferee entity or transferee trust of an ownership interest in residential real property," subject to the exceptions set forth in paragraph (b)(2) of the Rule. 31 C.F.R. § 1031.320(b).

39.    The Rule defines "residential real property" to mean:  "(i) Real property located in the United States containing a structure designed principally for occupancy by one to four families; (ii) Land located in the United States on which the transferee intends to build a structure designed principally for occupancy by one to four families; (iii) A unit designed principally for occupancy by one to four families within a structure on land located in the United States; or (iv) Shares in a cooperative housing corporation for which the underlying property is located in the United States.  31 C.F.R. § 1031(b)(1)(i)-(iv).

40.    The term "non-financed transfer" refers to "a transfer that does not involve an extension of credit to all transferees that is: (i) Secured by the transferred residential real property; and (ii) Extended by a financial institution that has both an obligation to maintain an anti-money laundering program and an obligation to report suspicious transactions under this chapter."  *Id.* § 1031.320(n)(5).

41.    Paragraph (b)(2) of the Rule creates exceptions for transactions that involve: (i) a grant, transfer, or revocation of an easement; (ii) transfer resulting from the death of an individual; (iii) transfer incident to divorce or dissolution of a marriage or civil union; (iv) transfer to a bankruptcy estate; (v) transfer supervised by a court in the United States; (vi) transfer for no consideration made by an individual, either alone or with the individual's spouse, to a trust of which that individual, that individual's spouse, or both of them, are the settlor(s) or grantor(s);

(vii) transfer to a qualified intermediary for purposes of 26 C.F.R. § 1.1031(k)-1; or

(viii) transfer for which there is no reporting person.  31 C.F.R. § 1031(b)(2)(i)-

(viii).

42.    The "reporting person" for any transfer is "one of a small number of

persons who play specified roles in the real estate closing and settlement, with the

specific individual determined through a cascading approach," unless that

"cascading" order is superseded by a designation "agreement among persons in the

reporting cascade."  86 Fed. Reg. 70,258.

43.    The cascade runs as follows: (i) the person listed as the closing or

settlement agent on the closing or settlement statement for the transfer;[1] (ii) the

person that prepares the closing or settlement statement for the transfer; (iii) the

person that files with the recordation office the deed or other instrument that transfers

ownership of the residential real property; (iv) the person that underwrites an

owner's title insurance policy, such as a title insurance company; (v) the person that

disburses the greatest amount of funds in connection with the residential real

property transfer; (vi) the person that evaluates the status of the title; or (vii) the

---

[1] The Rule defines "closing or settlement agent" to mean "any person, whether or not acting as an agent for a title agent or company, a licensed attorney, real estate broker, or real estate salesperson, who for another and with or without a commission, fee, or other valuable consideration and with or without the intention or expectation of receiving a commission, fee, or other valuable consideration, directly or indirectly, provides closing or settlement services incident to the transfer of residential real property." 31 C.F.R. § 1031(n)(2).

person that prepares the deed or, if no deed is involved, any other legal instrument that transfers ownership of the residential real property. 31 C.F.R. § 1031(c)(i)-(vii).

44.    For "transferee entities," the reporting person must report the entity's (A) legal name; (B) trade name or "doing business as" name; (C) current address; and (D) unique identifying number, such as an Internal Revenue Service Taxpayer Identification Number (IRS TIN). 31 C.F.R. § 1031(e)(1)(i).

45.    The reporting person must also provide the same information for each beneficial owner of the transferee entity, as well as the beneficial owner's date of birth and citizenship. *Id.* § 1031(e)(1)(ii). The Rule provides a complex, multi-part definition of "beneficial owner." 31 C.F.R. § 1031(n)(1).

46.    For each signing individual, the reporting person must provide their name, date of birth, address, and unique identifying number, as well as a description of the capacity in which the individual is authorized to act as the signing individual, and if the signing individual is acting as an employee, agent, or partner, the name of their employer, principal, or partnership. *Id.* § 1031(e)(1)(iii).

47.    For transferee trusts, the reporting person must provide the trust's (A) legal name, such as the full title of the agreement establishing the transferee trust; (B) date the trust instrument was executed; (C) unique identifying number, and (D) whether the transferee trust is revocable. 31 C.F.R. § 1031(e)(2)(i). If a trustee

is a legal entity, the report must include legal name, trade name or "doing business as" name, address, and unique identifying number. *Id.* § 1031(e)(2)(ii).

48.    For each beneficial owner of the trust, the reporting person must provide essentially the same information, as well as their date of birth, citizenship and a statement of which "category of beneficial owner, as determined in paragraph (j)(1)(ii)" of the Rule the listed person belongs to. *Id.* § 1031(e)(2)(iii).

49.    Reports on transferee trusts are also required to include the same information on signing individuals as reports about legal entity transferees. *Id.* § 1031(e)(2)(iv).

50.    In addition to these requirements for transferee legal entities and trusts, the Rule requires the reporting person to provide similar information about transferors, regardless of whether they are individuals, legal entities, or trusts. 31 C.F.R. § 1031(f).

51.    The report must also include the address, a legal description, and the date of closing for the property. *Id.* § 1031(g).

52.    The reporting person must report the total consideration paid in the transaction, the method by which the payment was made, the name of any financial institution from which a payment was drawn, the name of the payor on any wire, check, or other payment, and any hard money or private loans involved in the transaction. *Id.* § 1031(h)-(i).

53.    FinCEN incorporated a "reasonable reliance" standard into the Rule under which the reporting person may "rely upon information provided by other persons, absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person."    31 C.F.R. § 1031(j)(1).  But for purposes of reporting beneficial ownership information, the person providing the information must also "certif[y] the accuracy of the information in writing to the best of the person's knowledge" for the reporting person to rely on their representations for purposes of complying with the Rule.  *Id.* at § 1031(j)(2).

### D.    Impact of the Rule

54.    Under the GTOs, the reporting obligations placed on those involved in real estate transactions were targeted and limited.  The current GTOs cover limited markets (primarily major metropolitan areas) in 13 States and the District of Columbia.  The GTOs also are limited to sales involving consideration of at least $300,000.[2]  89 Fed. Reg. 70,269.  The GTOs exclude transactions in which the purchasing entity is a family trust.  As FinCEN noted, "the Residential Real Estate GTOs are narrow in that they are temporary, location-specific, and limited in the transactions they cover."  89 Fed. Reg. 70,279.  FinCEN used GTOs "to collect

---

[2] Except in the City or County of Baltimore in Maryland, wherein the minimum purchase price needed to trigger a GTO is $50,000.  89 Fed. Reg. 70,269 n.38.

information on a subset of transfers of residential real estate that FinCEN considers to present a high risk for money laundering." 89 Fed. Reg. at 70,259.

55.    Under the Rule, the reporting obligations on those involved in real estate transactions have been vastly expanded to include all sales in the United States and its territories that meet the Rule's broadened criteria. The minimum dollar threshold has been eliminated. Consequently, even the sale of a vacant plot of land intended for development in a rural area for $1,000 might require intrusive and costly reporting. Some trusts also are now included in the reporting obligation.

56.    The consequence of the changes from the GTOs to the Rule is a massive expansion in the number of reports required each year and the financial burden imposed on the reporting entities to comply. In 2023, 20,411 reports were made to FinCEN under the GTOs.[3] FinCEN estimates "the number of potentially reportable transfers under the Rule will be between approximately 800,000 and 850,000 annually," *id.* at 70,283—*a whopping 4,000% increase in reporting*.

---

[3] Notice by FinCEN, Agency Information Collection Activities; Proposed Renewal; Comment Request; Renewal Without Change of Bank Secrecy Act Regulations Requiring Reports of Certain Domestic Transactions (Feb. 23, 2024), https://www.federalregister.gov/documents/2024/02/23/2024-03681/agency-information-collection-activities-proposed-renewal-comment-request-renewal-without-change-of#footnote-9-p13803.

57.    In 2023, FNF direct operations and wholly-owned agencies filed 6,751 Currency Transaction Reports in compliance with the GTOs.  FNF estimates that under the Rule, those FNF companies will be required to file 56,000 to 78,000 reports annually.

58.    FinCEN has estimated that the costs to the real estate sector of compliance with the Rule for the first compliance year will be "between approximately $428.4 and $690.4 million (midpoint $559.4 million)" and in subsequent years "between approximately $401.2 and $663.2 million (midpoint $532.2) (current dollar value)."  89 Fed. Reg. 70,284.  But although regulated parties raised concerns that "this would result in increased costs for businesses, and, ultimately, consumers," FinCEN never addressed consumer costs in its regulatory impact analysis. *Id.* at 70,261.

59.    FNF estimates that it will incur significant compliance costs in the first year alone. FinCEN's figures **translate to an estimated $164.4 million to $271.9 million in compliance costs annually for FNF in subsequent years.**

60.    In addition to imposing high costs, the Rule will impact the privacy rights of individuals and entities.  Settlement agents will now have to collect non-public information not previously obtained in real estate closings.  This includes personal identifiable information from trustees of family trusts and signers on behalf of legal business entities.

20

61.    FinCEN, itself, acknowledged that the requirement to collect and report IRS Taxpayer Identification Numbers "are subject to heightened privacy concerns and that the collection of such information could entail cybersecurity and operational risks."  89 Fed. Reg. 70,265.

62.    While the Final Rule imposes fewer record retention obligations than the Proposed Rule, it still requires the Reporting Person to retain for five years "a copy of any beneficial ownership certification form" and all parties to a designation agreement to retain a copy of that agreement for five years.  89 Fed. Reg. at 70,276. The beneficial ownership certification form will contain sensitive personal information about all beneficial owners.

63.    In response to these issues, and others raised in comments in response to the February 16, 2024 Notice of Proposed Rule, FinCEN stated that it "believes that the regulatory requirements set out in this final rule reflect the appropriate balance between ensuring that reports filed under the rule have a high degree of usefulness to law enforcement and minimizing the compliance burden incurred by businesses, including small businesses."  39 Fed. Reg. 70,261.  In this regard, FinCEN states that it "regularly receives feedback from law enforcement partners that they use the information [received from GTO reporting] to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts."  However, since 2016 FinCEN has not

provided any data or specific feedback to the industry in response to requests as to the quality, necessity, or utility of the information FinCEN would collect under the Rule with respect to law enforcement needs.

<u>COUNT I</u>

<u>Violation of 5 U.S.C. § 706</u>

<u>The Rule Exceeds FinCEN's Statutory Authority.</u>

64.    Paragraphs 1-63 are incorporated herein.

65.    The APA requires courts to "hold unlawful and set aside agency action…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

66.    The Rule exceeds FinCEN's statutory authority to impose reporting requirements on financial institutions.  FinCEN relied on Section 5318(g)(1) to promulgate the Rule.  *See* 89 Fed. Reg. 70,262 (Aug. 29, 2024) ("FinCEN is issuing this final rule pursuant to its BSA authority to require 'financial institutions' to report 'suspicious transactions' under 31 U.S.C. 5318(g)(1)."). Section 5318(g)(1) authorizes the Secretary to impose SAR reporting duties by adopting rules that "require any financial institution, and any director, or officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation."  31 U.S.C. § 5318(g)(1).

67.    Section 5318(g)(1) does not authorize the Rule.  By its plain terms, Section 5318(g)(1) allows the Secretary (and thus FinCEN) to impose SAR requirements only on transactions that are both "suspicious" and "relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).  But the Rule makes no effort to cabin its sweep to transactions that are "suspicious" or connected with a "possible violation of law or regulation."

68.    FinCEN further explained that the Rule "is instituting a streamlined suspicious activity report (SAR) filing requirement" pursuant to FinCEN's authority under 31 U.S.C. § 5318(g)(5)(D).  89 Fed. Reg. 70,262.  As a result, the Rule must comply with the streamlined SAR standards.  But FinCEN made no attempt to comply with Standard (I), which requires that streamlined SAR standards must "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law."  31 U.S.C. § 5318(g)(5)(D)(ii)(I).  The Rule is facially overinclusive, and does not even attempt to ensure that reportable transactions are suspicious or relevant to potential violations of law.  Thus, the Rule is invalid and must be vacated and set aside.

69.    FinCEN cannot salvage the Rule by belatedly pointing to the general authority provided by Section 5318(a)(2). Section 5318(a)(2) empowers the Secretary to "require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and

reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). But FinCEN did not purport to promulgate the Rule pursuant to Section 5318(a)(2) and cannot rely on that authority for the first time now under *Securities Exchange Commission v. Chenery Corp.*, 318 U.S. 80 (1943). Moreover, Section 5318(a)(2) empowers the Secretary only to require "appropriate *procedures*" to ensure compliance with the BSA, 31 U.S.C. §§ 5311-36, and to "guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). The authority granted in Section 5318(a)(2) does not authorize FinCEN to impose substantive reporting requirements, or to avoid compliance with the specific requirements for SAR filing requirements that are articulated in Section 5318(g)(1).

A.    **The Rule Exceeds FinCEN's Authority under 31 U.S.C. § 5318(g).**

70.    By its terms, Section 5318(g)(1) authorizes the Secretary and FinCEN to regulate only "suspicious transactions relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). This means each reportable transaction under a SAR rule must be both "suspicious" and have a nexus with a "possible violation of law or regulation." Unless both of those requirements are satisfied by each

transaction made reportable by a FinCEN SAR rule, the rule necessarily exceeds the scope of the Secretary and FinCEN's delegated authority under Section 5318(g)(1).

71.    The Rule regulates transactions that are neither "suspicious" nor connected with "a possible violation of law or regulation."  The Rule imposes a categorical reporting requirement under which financial institutions must report virtually all non-financed residential real-estate transfers to legal entities or trusts, with few exceptions.  The Rule does not require that reporting persons have any particularized basis for believing that a transaction is "suspicious."  Nor does the Rule require that the reporting person have any reason to believe that any given transaction is connected with a potential violation of a legal or regulatory duty.  Transferring property to a trust or legal entity without obtaining financing is not illegal or inherently suspicious.  Nor is there any reason to believe that such transactions necessarily involve any nexus with potential legal or regulatory violations.

72.    FinCEN has never claimed that all (or even most) of the 800,000 to 850,000 transactions that must be reported annually pursuant to the Rule are likely connected with illegal activity.  *See* 89 Fed Reg 70,283.  Indeed, FinCEN's own findings as to the GTO program show that the Rule is overinclusive.  FinCEN found that "from 2017 to early 2024, approximately 42 percent of non-financed real estate

transfers captured by the Residential Real Estate GTOs were conducted by individuals or legal entities on which a SAR has been filed."  68 Fed. Reg. 70,260.

73.    In other words, a majority of the transactions studied through the Residential Real Estate GTOs—a limited program that operates with thresholds absent from the Rule—had no apparent connection with any potential legal or regulatory violation.  The new Rule sweeps even broader, and because it is not targeted based on indicia of suspicious transactions, it will very likely be far more overinclusive in the range of transactions it regulates.

74.    Because the Rule regulates transactions that are neither suspicious nor connected with potential legal or regulatory violations, the Rule exceeds FinCEN's statutory authority to require SAR filing pursuant to Section 5318(g)(1).

**B.    The Rule Violates Standard (I) for the Streamlined SAR Requirements.**

75.    FinCEN expressly announced that the Rule was "instituting a streamlined SAR filing requirement."  89 Fed. Reg. 70,262.  Accordingly, the Rule must comply with the statutory requirements for streamlined SARs. The Rule is invalid, however, because it violates Standard (I) of the BSA's standards for streamlined SAR filing.

76.    Standard (I) imposes a mandatory duty on FinCEN to ensure that transactions made reportable by a streamlined SAR rule are both suspicious and related to a potential violation of law or regulation.  The Standard explicitly requires

that FinCEN "*shall* establish standards that *ensure* that streamlined reports relate to suspicious transactions relevant to potential violations of law," 31 U.S.C. § 5318(g)(5)(D)(ii)(I) (emphasis added). This means the Secretary and FinCEN may adopt a streamlined SAR rule only if that rule is tailored so that it regulates only transactions that are both suspicious and "relevant to potential violations of law."

77.    The Rule is not designed to ensure that reportable transactions are suspicious and relevant to potential legal or regulatory violations. The Rule imposes a categorical requirement that necessarily includes a substantial number of transactions that do not exhibit any particular indicia of illegality or a nexus with any potential violation of law or regulation.

78.    Thus, the Rule violates Standard (I) and must be held invalid and set aside as unlawful under the APA.

**C.    The Rule Exceeds FinCEN's Authority under 31 U.S.C. § 5318(a)(2).**

79.    FinCEN does not have statutory authority to adopt the Rule under Section 5318(a)(2), either. Although FinCEN references Section 5318(a)(2) in a footnote, it never offered any substantive explanation concerning how that provision authorizes the Rule and expressly relied on Section 5318(g)(1) instead. Thus, under the *Chenery* doctrine, FinCEN cannot present Section 5318(a)(2) as a *post hoc* justification for the Rule. Moreover, by its terms, Section 5318(a)(2) authorizes the Secretary and FinCEN to adopt only rules that require financial institutions "to

*maintain appropriate procedures*, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2) (emphasis added). Section 5318(a)(2) does not authorize the Secretary and FinCEN to adopt substantive reporting requirements like that imposed by the Rule.

1. **FinCEN Never Invoked Section 5318(a)(2) As Statutory Authority and Cannot Do So Now.**

80.    FinCEN cannot invoke Section 5318(a)(2) as statutory authority for the Rule. FinCEN expressly relied on Section 5318(g)(1), not Section 5318(a)(2), as the statutory authorization of the Rule.

81.    In the section of the Rule entitled "Authority," FinCEN specifically stated that it was "issuing this final rule pursuant to its BSA authority to require 'financial institutions' to report 'suspicious transactions' under 31 U.S.C. 5318(g)(1)." 89 Fed. Reg. 70,262. FinCEN also claimed that the Streamlined SAR provisions in "a more recent amendment to the BSA at 31 U.S.C. 5318(g)(5)(D) provide FinCEN with additional flexibility to tailor the form of the SAR reporting requirement." *Id.*

82.    FinCEN's only reference to Section 5318(a)(2) in the Rule appeared in a footnote attached to a comment about amendments made to Section

28

5318(g)(D)(i)(1).  *Id.* at 70,259 n.11.  The footnote provides no substantive analysis of Section 5318(a)(2) as a source of statutory authority for the Rule.  If FinCEN were to rely on Section 5318(a)(2) to defend the rule in litigation, that argument would constitute an illegitimate *post hoc* justification of the Rule under *Chenery*.

### 2. <u>Section 5318(a)(2) Authorizes FinCEN to Adopt Only Procedural Requirements.</u>

83.    In any event, Section 5318(a)(2) does not give FinCEN substantive authority to impose reporting requirements.  Throughout the BSA, there is a clear distinction between provisions that authorize the Secretary and FinCEN to impose (i) substantive reporting requirements that impose a duty to report specific transactions, such as Sections 5318(g) and (n); and (ii) procedural rules that require financial institutions to adopt internal policies, procedures, and controls to ensure that officers and employees of the institution comply with their collection and reporting duties in a systematic manner.  *See* 31 U.S.C. § 5318(h) (requirement to establish anti-money laundering program); *id.* § 5318(i) (due-diligence procedures for correspondent accounts involving foreign persons); *id.* § 5318(l) (procedures for identifying customers opening an account).  The procedural requirements the Secretary and FinCEN may impose under the latter category of provisions govern *when* and *how* an institution will carry out its collection and reporting duties—not *which* transactions must be reported.

29

84.    Section 5318(a)(2) falls on the "procedural" side of the line.  By its terms, Section 5318(a)(2) authorizes FinCEN to require financial institutions to "maintain *appropriate procedures*" to "ensure compliance" with the BSA, its implementing regulations, and other regulations adopted "to guard against money laundering, the financing of terrorism, or other forms of illicit finance."  31 U.S.C. § 5318(a)(2) (emphasis added).  This provision authorizes FinCEN to require financial institutions to implement internal policies, controls, and other procedures designed to ensure compliance with substantive requirements established by the BSA or other regulations.  It does not authorize the Secretary and FinCEN to impose substantive reporting requirements, which can be imposed only pursuant to the specific grants of authority Congress has provided in Sections 5318(g) and (n).

85.    Indeed, interpreting Section 5318(a)(2) to authorize the Secretary and FinCEN to impose substantive reporting requirements would render the specific grants of authority in Sections (g) and (n) superfluous.  Congress would have no reason to enumerate specific authorizations to impose reporting requirements if Section 5318(a)(2) already provided the Secretary and FinCEN with that authority.

### 3.  Section 5318(a)(2) Cannot Override the Specific Limitations in § 5318(g).

86.    An agency "'cannot rely on its general authority to make rules necessary to carry out its general functions when a specific statutory directive defines the relevant functions'" of the agency "'in a particular area.'"  *Michigan v.*

*EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001) (quoting *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995)); *see also Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress…does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.").  This is particularly true when Congress restricts the agency's rulemaking authority in a particular area.  An agency cannot use "general rulemaking authority" to "trump specific portions" of the statute it is tasked with administering and "expand its authority beyond the aims and limits" established by Congress.  *Am Petroleum Inst.*, 52 F.3d at 1119-20.

87.    Two provisions of the BSA expressly authorize the Secretary and FinCEN to impose reporting requirements on financial institutions:  Section 5318(g) and Section 5318(n).  In both provisions, Congress has defined a specific statutory standard that reporting rules must satisfy.  Section 5318(g)(1) explicitly limits FinCEN's authority to impose SAR reporting requirements to transactions that are both "suspicious" and "relevant to a possible violation of law or regulation."  Section 5318(n) similarly allows FinCEN to adopt rules requiring financial institutions to report cross-border transmittals of funds only when "reasonably necessary" to combat "money laundering and terrorist financing."  31 U.S.C. § 5318(n)(1).

88.    Section 5318(a)(2) does not contain any comparable requirements on rules adopted by the Secretary and FinCEN.  Section 5318(a)(2) simply states that the Secretary and FinCEN may require "appropriate procedures" involving "the

collection and reporting of *certain information* as the Secretary of the Treasury may prescribe by regulation." 31 U.S.C. § 5318(a)(2) (emphasis added).

89.    Interpreting Section 5318(a)(2) to allow the Secretary and FinCEN to impose substantive reporting requirements would effectively override the specific limitations Congress incorporated into Sections 5318(g) and (n).  FinCEN would be able to use its general authority under 5318(a)(2) to impose reporting requirements for transactions that are neither "suspicious" and "relevant to a possible violation of law or regulation," as required by Section 5318(g), nor "reasonably necessary" for purposes of cross-border enforcement, as required by Section 5318(n).

### 4.  Interpreting Section 5318(a)(2) to Authorize Substantive Reporting Requirements Violates the Nondelegation Doctrine.

90.    Article I, § 1 of the Constitution states, "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  The nondelegation doctrine recognizes that the Vesting Clause of Article I prohibits Congress from delegating its "essential legislative functions" to another branch of Government.  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  Under the nondelegation doctrine, "'Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it.'"  *Jarkesy v. SEC*, 34 F.4th 446, 460-61 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488

U.S. 361, 373 n.7 (1989) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928))).

91.    Section 5318(a)(2) violates the nondelegation doctrine if it authorizes the Secretary and FinCEN to impose substantive reporting requirements. If Section 5318(a)(2) authorizes the Secretary and FinCEN to simply require "the reporting of *certain information*" as "prescribe[d] by regulation," there is no intelligible principle in that provision by which to determine which "information" should be reported. FinCEN could conceivably require financial institutions to report *any* "information" the Secretary deems reportable in a regulation. This total absence of guidance would violate Article I and separation-of-powers principles.

92.    On the other hand, if Section 5318(a)(2) only authorizes the Secretary and FinCEN to adopt procedural requirements tailored "to ensure compliance" with substantive requirements established elsewhere in the BSA, its implementing regulations, or other relevant regulations, Section 5318(a)(2) would not violate the nondelegation doctrine. On that interpretation, FinCEN's exercise of discretion is guided by an intelligible principle, namely, that the agency should adopt procedural requirements that will facilitate compliance with those statutory and regulatory obligations. But under this interpretation, Section 5318(a)(2) could not be the source of authority for the Rule, because the Rule is a substantive requirement, not a

procedural rule adopted to ensure compliance with other statutory and regulatory duties.

**D.    Interpreting either Section 5318(g) or Section 5318(a)(2) to Authorize the Rule Cannot be Squared with Congress's Statutory Authorization for the GTOs.**

93.    Subsequent to the enactment of Section 5318(g) and Section 5318(a)(2) of the BSA, Congress enacted the statute providing for the Secretary of the Treasury to designate targeted GTOs.  These were limited to geographic areas and to be effective for no more than 180 days, subject to renewal.  31 U.S.C. § 5326.

94.    If Congress intended that Sections 5318(g) and/or 5318(a)(2) authorized the Rule, it would have had no need to enact the statute providing for the GTOs, as the Secretary and FinCEN could have adopted the GTO program under the broad authority they now claim for these sections.  Congress's enactment of the GTO statute indicates its understanding and intent that these sections did not convey such sweeping authority.

## COUNT II

## Violation of 5 U.S.C. § 706

## The Rule Is Arbitrary and Capricious.

95.    Paragraphs 1-63 are fully incorporated herein.

96.    The APA requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 USC § 706(2)(A).

97.    The Rule must be set aside as arbitrary and capricious because: (A) FinCEN failed to meaningfully apply the streamlined SAR standards in adopting the Rule; (B) FinCEN failed to meaningfully evaluate and respond to comments proposing (i) that trusts should be excluded from the Rule's coverage, and (ii) that the Rule should have a monetary threshold, like every Residential Real Estate GTO previously adopted by FinCEN; and (C) FinCEN's cost-benefit analysis for the Rule was seriously flawed.

**A.    FinCEN Failed to Meaningfully Apply the Streamlined SAR Standards.**

98.    FinCEN applied Standards (I) and (II) for streamlined SAR reporting in an arbitrary and capricious manner.

99.    At minimum, Standard (I) requires FinCEN to adopt streamlined reporting requirements that are narrowly tailored to address transactions that are highly likely to relate to potential legal violations, and to consider whether less-restrictive alternatives could be employed to achieve the same objectives.

100.    FinCEN's own findings show that the Rule is overinclusive.  Under Standard (I), an appropriately tailored regulation will target only transactions that are both suspicious and relevant to a potential violation of law.  A rule will be

35

overinclusive relative to that benchmark level of tailoring to the extent that it regulates transactions that do not satisfy one or both of those criteria. Here, FinCEN's own findings as to the GTO program show that only "42 percent of non-financed real estate transfers captured by the Residential Real Estate GTOs were conducted by individuals or legal entities on which a SAR has been filed." 68 Fed. Reg. 70,260. If a majority of the transactions studied through this limited program—which operates with thresholds absent from the Rule—had no connection with potential illegal activity, the Rule's even broader reporting requirement is necessarily overinclusive in the range of transactions it regulates.

101.   Because the Rule is overinclusive, Standard (I) required FinCEN to consider a streamlined SAR requirement that was more narrowly tailored to ensure that reportable transactions will have a nexus with a potential legal violation.

102.   The most obvious alternative would have been a streamlined SAR rule that requires financial institutions to report non-financed real-estate transactions only when the characteristics of the transaction at issue support a particularized suspicion that it is related to a potential violation of law. FinCEN has adopted a similar individualized approach in other SAR contexts. *See* 12 C.F.R. § 353.3 (SAR rule for FDIC-supervised institutions); 12 C.F.R. § 748 (credit unions); 31 C.F.R. § 1023.320(a)(2) (broker-dealers). But FinCEN has never addressed the feasibility of a residential real-estate rule that requires a similar individualized assessment. *See*

68 Fed. Reg. 70,288-89 (considering only an alternative version of the "reporting cascade," an alternative that would "impose the full traditional SAR filing obligations and AML/CFT program requirements," and a more-restrictive alternative that would eliminate reasonable reliance in reporting beneficial ownership).

103.    FinCEN also failed to satisfy its duty under Standard (II) to "consider transactions, including structured transactions, designed to evade any regulation promulgated under this subchapter, certain fund and asset transfers with little or no apparent economic purpose, transactions without lawful purposes, and any other transactions that the Secretary determines to be appropriate" when assessing whether the Rule is suitably calibrated to "ensure" reportable transactions relate to potential violations of law.  31 U.S.C. § 5318(g)(5)(D)(ii)(II).

104.    FinCEN's explanation of the Rule nowhere addresses whether, in the agency's judgment, an overinclusive standard is necessary to combat the kinds of transactions singled out for consideration in Standard (II).  Indeed, FinCEN never mentions Standard (II) at all, even though the statute expressly requires it to "consider" the types of transactions enumerated in Standard (II) when applying Standard (I).

### B.    FinCEN Failed to Meaningfully Evaluate Several Comments.

105.   FinCEN's adoption of the Rule was also arbitrary and capricious because FinCEN failed to rationally explain why it rejected comments calling for the Rule to:  (1) exclude transfers to trusts from the Rule's reporting requirements regarding beneficial ownership; and (2) to retain a monetary threshold for reportable transactions, like the thresholds included in every Residential Real Estate GTO previously adopted by FinCEN.

### 1.   FinCEN Failed to Adequately Consider the Burdens Imposed by Including Trusts Within the Rule's Coverage Scheme.

106.   FinCEN acknowledged that commenters "were not supportive of the inclusion of trusts, arguing that trusts are: complicated arrangements for which the paperwork would not be easily understood by reporting persons; used for probate avoidance; and inherently low risk."  89 Fed. Reg. 70,269.  FinCEN rejected these comments because "non-financed residential real estate transfers to certain trusts present a high risk for money laundering" and  "the potential difficulties described by commenters, such as the need to review complex trust documents to determine whether a trust is reportable, will be minimized by the addition of new exceptions and by the reasonable reliance standard adopted in the final rule which is discussed in Section III.B.4."  89 Fed. Reg. 70,270.

107.   But neither the exceptions nor the reasonable-reliance standard addresses the fundamental problem posed by determining the beneficial-ownership structure of a transferee trust, which is that applying the Rule's definition of

"beneficial owners of transferee trusts" calls for a complex legal analysis that goes well beyond the competence of closing and settling agents. *See* 31 C.F.R. § 1031.320(n)(1)(ii). In many transactions involving transferee trusts, applying this definition in an accurate manner demands careful legal analysis—and may not even produce decisive answers. Among other things, a reporting person may need to consider choice-of-law questions about which state's trust law governs a particular question as well as the answer to that question under the relevant state's law. The reporting person would need to review relevant trust documents, and, in the case of an oral trust, would need to confirm its existence and structure through a factual investigation. And for virtually all the questions posed by the definition, there can be "hard cases" involving disputed legal questions which will not have a definitive answer.

108.    FinCEN did not offer a reasoned response to this problem.

109.    The exceptions to the Rule's reporting requirement adopted by FinCEN do not respond to this problem in any way, except by modestly reducing the number of transactions for which financial institutions will need to conduct this analysis.

110.    The Rule adds exceptions for: (1) transfers "required under the terms of a trust," 89 Fed. Reg. 70,268; (2) transfers supervised by a court in the United States, 31 C.F.R. § 1031.320(b)(2)(v); and (3) transfers in which an individual transferor (alone or with their spouse) transfers an interest to a trust for no

consideration if the settlor or grantor of the trust is the transferor individual, that individual's spouse, or both of them, *id.* § 1031.320(b)(2)(vi).  These exceptions apply to three narrow classes of transactions, which does nothing to alleviate the burden of ascertaining the beneficial-ownership structure of a transferee trust in the overwhelming majority of transactions covered by the Rule.

111.   The Rule's "reasonable reliance" standard does not address the problem, either.   Under that standard, "the reporting person may rely upon information provided by the transferee or a person representing the transferee in the reportable transfer, absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person."   31 C.F.R. § 1031.320(j)(2).  FinCEN concluded that this standard is "significantly less burdensome than an alternative full verification standard, while still ensuring that obviously false or fraudulent information would not be reported" because it reduces "the time and effort it would take for the reporting person to verify each piece of information independently."  89 Fed. Reg. 70,263-64.

112.   But the process of verifying whether any facts known to the reporting person reasonably call into question the answers provided by the transferee would feature the same complexities as the process for applying the Rule's definition of "beneficial owner."

113.  For a reporting person to ensure he can use the "reasonable reliance" standard, the reporting person will still need to investigate whether there is any accessible information about the transferee trust that would suggest to a person with an objectively reasonable understanding of the law that there were any legal or factual errors in the trust's answers.  For instance, the Rule requires settlement agents or title officers to review complicated legal documents to explore the layers and parties involved in a covered transaction or to fully understand the trust beneficiary arrangement.  Thus, the standard does nothing to resolve the core problem: that closing and settling agents are not competent to answer the *legal* questions that must be answered to verify the beneficial-ownership structure of a trust.

**2.  FinCEN Failed to Articulate a Reasoned Explanation of Its Decision to Forego a Monetary Threshold.**

114.  FinCEN did not offer a reasoned explanation of its decision to forego any monetary threshold for reportable transactions.

115.  FinCEN rejected a monetary threshold because "[l]ow value non-financed transfers to legal entities and trusts, including gratuitous ones for no consideration, can present illicit finance risks and are therefore of interest to law enforcement."  86 Fed. Reg. 70,269.

116.  In support, FinCEN relied primarily on its experience administering the Residential Real Estate GTO Programs, explaining that "[a]lthough the Residential Real Estate GTOs have had an evolving dollar threshold over the course of the

program, ranging from over $1 million to the current threshold of $300,000, FinCEN's experience with administering the program and discussions with law enforcement shows that money laundering through real estate occurs at all price points." 86 Fed. Reg. 70,269.

117.  FinCEN never explained how its experience operating a program that *used a monetary threshold* for reporting could possibly give it insight into whether money laundering occurs at all price points in the real-estate market.

118.  Moreover, agencies cannot rely on references to their experience to justify a regulation when they fail to explain what their experience was and how that experience supports the promulgated regulation.  FinCEN neither explained what experience it acquired through the GTO Programs nor how that experience supported the "no threshold" approach adopted in the Rule.

119.  FinCEN also said that "incorporation of a dollar threshold could move illicit activity into the lower priced market, which would be counter to the aims of the rule." 89 Fed. Reg. 70,269.  But FinCEN did not cite any data or other relevant information to support this speculation.

120.  FinCEN claimed that the "additional exceptions" contained in the Rule would "focus the reporting requirement on higher-risk low-value transfers," but it never explained why a monetary threshold would not further improve the focus of the Rule.  89 Fed. Reg. 70,269.

C.    **FinCEN Conducted a Seriously Flawed Cost-Benefit Analysis.**

121.    FinCEN also conducted a fatally flawed cost-benefit analysis. "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012); *see also City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (Courts cannot "tolerate rules based on arbitrary and capricious cost-benefit analyses."). Here, FinCEN undertook a regulatory impact analysis to evaluate the anticipated effects of the Rule "in terms of its expected costs and benefits to affected parties, among other economic considerations." 89 Fed. Reg. 70,277. Thus, FinCEN had a duty to conduct that analysis in a reasonable manner.

122.    FinCEN identified the benefits of the Rule as its ability to enable law enforcement to combat "two problematic phenomena": (i) the use of the residential real estate market to facilitate money laundering and illicit activity; and (ii) the difficulty of determining who beneficially owns legal entities or trusts that engage in non-financed transfers of residential real estate, "either because this data is not available to law enforcement or access is not sufficiently centralized to be meaningfully usable for purposes of market level risk-monitoring or swift investigation and prosecution." 89 Fed. Reg. 70,278.

123.   FinCEN concluded "that the reporting of non-financed residential real estate transfers required by this rule would generate benefits by mitigating those two phenomena." *Id.* In other words, the Rule's benefits are supposed to derive from what it does to make law enforcement investigations of illicit activity and money laundering "less costly and more effective," "thereby generat[ing] value by reducing the social costs associated with related illicit activity to the extent that it is more effectively disciplined or deterred." *Id.*

124.   FinCEN did not, however, attempt to generate any quantitative estimate of the expected benefits of the Rule, whether measured in terms of the number of crimes deterred or punished, or even in terms of the expected economic value of deterring and punishing additional crimes.  At no point in the notice-and-comment process did FinCEN indicate how often FinCEN data from the current GTOs is accessed or used by law enforcement. Nor did FinCEN demonstrate that its data led to open investigations, indictments, or convictions.

125.   Instead, FinCEN concluded that there was no need to quantify the expected value of the benefits of the Rule because "the ability to successfully detect, prosecute, and deter crimes—or other illicit activities that rely on money laundering to be profitable—is not readily translatable to dollar figures."  89 Fed. Reg. 70,284-85.  Despite disclaiming any intent to quantify the Rule's benefits, FinCEN added a cryptic remark indicating that "it might be inferred that a tacit expectation underlying

this rulemaking is that the rule will generate intangible benefits worth over $500 million per year." *Id.* at 70,285.  Nothing in the final rule explains, let alone supports, that assertion.  An unexplained methodology of cost-benefit analysis cannot support a rule.  *See Owner–Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007).

126.  Alongside this unquantified explanation of the Rule's benefits, FinCEN offered an "accounting cost estimate only" estimate of the Rule's costs—which determined that, under certain assumptions, the aggregate cost of compliance would be between approximately $267.3 million and $476.2 million in the first compliance year and $245.0 million and $453.9 million annually in subsequent years.  89 Fed. Reg. 70,284.  In response to public comments, FinCEN offered revised estimates that "reflect more conservative expectations about the cost of labor." *Id.*  In the revised estimates, the anticipated costs of the Rule are between $428.4 and $690.4 million (midpoint $559.4 million) in the first compliance year and between $401.2 and $663.2 million (midpoint $532.2 million) in subsequent years. *Id.*

127.  Both estimates understate the economic burden associated with the Rule.  FinCEN admitted that its "accounting cost estimate only" approach could not produce figures that "represent either the full economic costs of the rule nor the net cost of the rule as measured against the components of expected benefits that may become quantifiable." 89 Fed. Reg. 70,284.  FinCEN also acknowledged that it had

no generalizable way of accounting for incremental expected IT costs associated with updating software for tracking and internal controls processes, and admitted that, "as a consequence, its aggregate burden estimates can, at best, function as a lower-bound expectation of the total costs of the rule." *Id.* at 70,286.

128.  FinCEN's comparison of an incomplete estimate of the expected costs with the vague benefits of the Rule suffered from several serious flaws that undermine the Rule's reasonableness.  To begin, even FinCEN's initial determination that it did not need to quantify the Rule's anticipated benefits was arbitrary, because FinCEN never offered any explanation of why it is impossible to arrive at even a rough approximation of the expected economic value of the Rule's reduction of illicit activity.  FinCEN noted that "agencies may consider and discuss qualitatively values that are difficult or impossible to quantify," 89 Fed. Reg. 70,288, but it is not self-evident that the number of convictions achieved and crimes deterred by the Rule cannot be approximated in rough terms.  Nor is it obvious that it is impossible to estimate the expected economic value of a conviction for money laundering or similar activity, or the value of deterring such a crime.

129.  Indeed, FinCEN's disclaimer of its ability to provide any form of quantified analysis was equivocal and self-contradictory.  As noted, FinCEN said that "it might be inferred that a tacit expectation underlying this rulemaking is that the rule will generate intangible benefits worth over $500 million per year."  89 Fed.

46

Reg. 70,285.  But this remark assumes that FinCEN had some reason to believe that the expected benefits of the Rule would exceed $500 million a year—which cannot be squared with FinCEN's assumption that there was no need even to consider whether the Rule's benefits could be quantified.  Yet FinCEN never offered that explanation—leaving regulated parties to guess how it concluded that the Rule's benefits likely exceeded the $500 million per year threshold required for the benefits of the Rule to comfortably outweigh its costs as projected by FinCEN.  Moreover, FinCEN's *own estimates of the annual cost of compliance* are between $401.2 and $663.2 million (with a midpoint of $532.2 million). That estimate of costs **exceeds FinCEN's $500 million *estimated benefits*.    Therefore, rather than demonstrating the program's benefits, their own data show that the costs outweigh benefits**.

130.   Further, even if FinCEN was right that the benefits of the Rule were completely nonquantifiable, it still had a duty to explain, in qualitative terms, how the "intangible benefits" of the Rule would plausibly justify its very real costs.  But apart from gesturing at the notion that more reporting means more convictions and more deterrence, FinCEN never offered any systematic qualitative explanation of why the Rule is likely to result in sufficiently significant gains in law-enforcement efficiency to justify the burden it imposes on the real estate industry.  It did not explain what gaps in the existing regulatory framework and law-enforcement would

be closed by the Rule, why the Rule would not simply channel money laundering into other forms of transactions, or how these marginal gains in the prevention of money laundering and other forms of illicit finance are sufficiently valuable to offset the Rule's compliance costs.

131.  Finally, FinCEN's cost-benefit analysis was further compromised by its consideration of an unduly circumscribed range of policy alternatives.  FinCEN's economic analysis considered only three alternative versions of the Rule: (i) one that eliminates the designation option; (ii) full traditional SAR filing obligations and AML/CFT program requirements; and (iii) a version that eliminates the reasonable-reliance standard and requires the reporting person to certify the transferee's beneficial ownership information.

132.  Given the Rule's substantial compliance burden and FinCEN's failure to articulate a quantitative or qualitative method of comparing the Rule's anticipated benefits with the costs of that burden, FinCEN should have considered alternatives that would reduce compliance costs.

133.  In particular, FinCEN never considered the obvious alternative:  a streamlined SAR requirement that is nonetheless appropriately tailored to focus on "suspicious transactions" relevant to potential "violations of law," as the BSA requires.  Such an alternative potentially could have maintained the individualized approach of traditional SAR obligations without imposing unduly burdensome

compliance obligations on real estate, which is not nearly as central to the operation of the financial system as the kinds of financial institutions ordinarily subject to full traditional SAR filing obligations.  FinCEN's failure to consider such an approach in its cost-benefit analysis of the Rule was arbitrary and capricious.

## COUNT III

## Violation of 5 U.S.C. § 706

### The Rule Violates the Fourth Amendment Prohibition Against Warrantless Searches.

134.   Paragraphs 1-63 are fully incorporated herein.

135.   As noted, the Rule relies on the BSA, as amended by the Annunzio-Wylie Anti-Money Laundering Act, 31 U.S.C.§ 5318(g).  89 Fed. Reg. 70,262.

136.   The Bank Secrecy Act was found constitutional in *California Bankers Association v. Shultz*, 416 U.S. 21 (1974), but the Supreme Court recognized that regulations must be sufficiently tailored to single out transactions that have "the greatest potential" for circumvention of the law and which involve "substantial amounts of money." *Id.* at 63.

137.   The "mere disclosure of a specific transaction to the government implicates the Fourth Amendment bar on unreasonable searches." *Carmen v. Yellen*, 112 F.4th 386, 405 (6th Cir 2024).

49

138.   The Rule imposes an unprecedented dragnet that requires Plaintiffs to submit reports and keep records on non-financed transfers of residential property on a nationwide basis, regardless of the value of the transaction.

139.   FinCEN considered and rejected proposals for a minimum dollar threshold for reporting requirements under the Rule. 89 Fed Reg. 70,269.

140.   The Rule requires Plaintiffs to submit detailed information about the transaction and the individuals involved.

141.   The Rule requires Plaintiffs to report information on the reporting person, the transferee and (with some exceptions) any beneficial owner, the transferor, transferor entities, transferee entities, the property being transferred, and certain payment information.   Information includes names, dates of birth, citizenship, residential street addresses, business address, tax identification numbers, the amount of payments, method of payments, and total consideration paid. 89 Fed. Reg. 70,291-92.

142.   The Rule is an expansion of FinCEN's GTO program established in 2016 that targeted "high risk" real estate transactions.[4]

---

[4] FinCEN has expanded the program over the years, such as when it "identified additional regions that present greater risks for illicit finance activity through non-financed purchases of residential real estate" and added those regions to the program. *See* FinCEN Press Release, "FinCEN Renews Real Estate Geographic Targeting Orders" (Oct. 20, 2023), https://www.fincen.gov/news/news-releases/fincen-renews-and-expands-real-estate-geographic-targeting-orders-

143.   The current GTO program provides standards targeting higher risk transactions by limiting reporting to transactions that involve over $300,000[5] and that occur in fourteen targeted jurisdictions identified by FinCEN as higher risk areas.[6]

144.   FinCEN received 20,411 reports in 2023 under the GTO program.[7] FinCEN estimates that the new Rule will require between 800,000 and 850,000 reports annually. 89 Fed Reg 70.283.

145.   The Rule gathers more detailed information than the GTO program. FinCEN explained: "The rule is wider in scope of coverage and will collect additional useful and actionable information *previously not available* through the Residential Real Estate GTO's."  89 Fed Reg. 70,279 (emphasis added).

---

#:~:text=FinCEN%20renewed%20the%20GTOs%20that,%2C%20Maryland%2C%20and%20Northern%20Virginia%20(.

[5] Over $50,000 in the City or County of Baltimore, Maryland. *See* n.2, *supra.*

[6] *See* Geographic Targeting Order Covering Title Insurance Company (Apr. 19, 2024), https://www.fincen.gov/sites/default/files/shared/RRE-GTOs-Phase-18-Order.pdf; *see also* 89 Fed Reg 70,269 n.38.

[7] Notice by FinCEN, Agency Information Collection Activities; Proposed Renewal; Comment Request; Renewal Without Change of Bank Secrecy Act Regulations Requiring Reports of Certain Domestic Transactions (Feb. 23, 2024), https://www.federalregister.gov/documents/2024/02/23/2024-03681/agency-information-collection-activities-proposed-renewal-comment-request-renewal-without-change-of#footnote-9-p13803.

146.   The Rule expands information reporting requirements on non-financed transactions without geographic limits, without financial limits, and includes no standards or limits focusing on suspicious transactions.  *See* 89 Fed Reg 70,258-94.

A.    **The Rule violates the Fourth Amendment standard applicable to agencies exercising their investigatory authority over certain regulated industries.**

147.   Agencies, such as FinCEN, are accorded broad authority under the Fourth Amendment to collect information without a warrant, so long as "[t]he inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Shultz*, 416 U.S. 21 at 66-67.

148.    FinCEN's authority extends over illegal transactions or suspicious financial transactions relevant to a possible violation of law or regulation.  *See* 31 USC § 5318 (g)(1); 89 Fed Reg 70,262.

149.   The standard does not permit the collection of private information that is neither based on *articulable suspicion* nor reasonably relevant to *illegal activity*, as defined by statute.  *See United States v. Morton Salt Co*., 338 U.S. 632, 652 (1950); *see also In re McVane*, 44 F.3d 1127, 1139 (2d Cir. 1995).

150.   The Rule violates Plaintiffs' reasonable expectations of privacy under the Fourth Amendment because it requires them, as reporting persons, to share sensitive details of ***all*** covered transactions, even transactions that are not based on articulable suspicion or reasonably relevant to potential illegal activity.  *See Airbnb,*

*Inc. v. City of New York*, 373 F.Supp.3d 467, 489 (S.D.N.Y. 2019) (invalidating a blanket requirement that operators of short-term booking rentals report each host's name, address, advertising website, and transaction data on a monthly basis). For example, Plaintiffs would be required to report, for the first time to FinCEN, information pertaining to the true beneficiary of certain trusts.

**B.**    **The Rule as written authorizes collection of information that is so broad as to be an unconstitutional general warrant in violation of the Fourth Amendment.**

151.    The Fourth Amendment prohibits the broad warrantless collection of information that constitutes a "general warrant." *See Stanford v. Texas*, 379 U.S. 476, 510 (1965).

152.    The Rule requires collection and reporting of private information as background for criminal prosecution without targeting suspicious transactions and with no requirement for pre-compliance judicial review.

153.    Collection of private information that enables modern analytical tools to create a profile for criminal investigatory purposes may be a Fourth Amendment violation because the Constitution must "assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter v. United States*, 585 U.S. 296, 297 (2018).

154.    Although a more relaxed standard applies to searches of "closely regulated industries," regulatory schemes that require routine searches of such

industries must still advance a substantial government interest, "be necessary to further [the] regulatory scheme," and provide "a constitutionally adequate substitute for a warrant" in terms "of the certainty and regularity of its application." *City of Los Angeles v. Patel*, 576 U.S. 409, 424-26 (2015).

155.   The Rule mandates reporting of a wide range of financial information, business records, and personal identifying information, such as name, residential address, date of birth and tax identification number.

156.   The Rule does not limit this reporting requirement by location or transaction size.

157.   Accordingly, under the Rule, Plaintiffs are required to disclose sensitive information on every covered transfer, in every state and territory, of every value, even if such transfer has no indicia of illegality and no reasonable connection to criminal activity.

158.   The Rule therefore eliminates the warrant requirement that would otherwise exist for collection of information about the newly covered transactions, in violation of the Fourth Amendment. *See Patel*, 576 U.S. at 426; *Shultz*, 416 U.S. at 79 (recognizing that "at some point government intrusion upon these areas would implicate legitimate expectations of privacy") (Powell, J., concurring).

159.   Compliance with the Rule will cause immediate, irreparable harm to Plaintiffs' privacy and Fourth Amendment rights, as well as the privacy and security

of its customers. Plaintiffs are thus entitled to a declaration, pursuant to 28 U.S.C. § 2201, that FinCEN cannot enforce the Rule against Plaintiffs because such enforcement would violate the Fourth Amendment to the U.S. Constitution.

## COUNT IV

### Violation of 5 U.S.C. § 706

### The Rule Violates the First Amendment's Prohibition on Compelled Speech

160. Paragraphs 1-63 are fully incorporated herein.

161. The First Amendment's guarantee of "freedom of speech" also prohibits the government from compelling speech.

162. The Rule compels the collection and disclosure of far more information than necessary to advance the Government's objective of preventing or punishing illegal financial transactions.

163. The Rule compels Plaintiffs, as reporting persons, to disclose customers' personal identifying information and sensitive financial information in *all* covered transactions, not merely those with an indicia of criminal activity or reasonable nexus to potentially illegal acts.

164. The Rule also imposes reporting requirements on Plaintiffs—such as determinations of beneficial ownership of trusts—that involve the exercise of legal judgment.

165.    These disclosures violate Plaintiffs' protected First Amendment right against compelled speech because they require Plaintiffs to report information to the Government they would not otherwise choose to report.

166.    The Rule also imposes an unjustified burden on Plaintiffs' First Amendment right against compelled speech because it mandates reporting on a broader array of transactions than are actually necessary to advance the Government's interest.

167.    Compliance with the Rule will cause immediate, irreparable harm to Plaintiffs' privacy and First Amendment rights, as well as the privacy and security of its customers.  Plaintiffs are thus entitled to a declaration, pursuant to 28 U.S.C. § 2201, that FinCEN cannot enforce the Rule against Plaintiffs because such enforcement would violate the First Amendment to the U.S. Constitution.

## COUNT V

### Violation of 5 U.S.C. § 706

### The Rule Exceeds Any Authority Congress Could Have Delegated Under the Commerce Clause or Its Other Article I Powers.

168.    Paragraphs 1-63 are fully incorporated herein.

169.    Congress may regulate three broad categories of activity under its commerce power: (1) the channels of interstate and foreign commerce; (2) the instrumentalities of, and things and persons in, interstate and foreign commerce; and

(3) activities that have a substantial effect on interstate and foreign commerce. *See United States v. Morrison*, 529 U.S. 598, 608-09 (2000).

170.    The Rule does not regulate interstate commercial activity. It requires regulated financial institutions to engage in the activity of filing reports with FinCEN and then regulates how the reporting activity it compels is carried out. But neither Congress nor an agency exercising delegated authority has any power under the Commerce Clause to compel regulated parties to engage in activity that would not otherwise exist.

171.    The transactions targeted by the Rule do not substantially affect the channels or instrumentalities of interstate or foreign commerce, and many do not have a substantial effect on interstate commerce.  Nor did Congress make any findings regarding the effects of the category of transactions regulated by the Rule on interstate or foreign commerce, nor did Congress delegate authority to the Department of Treasury or FinCEN to make such findings. Therefore, the Rule exceeds any authority Congress could have granted FinCEN under the Commerce Clause. *See generally Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5049220 (E.D. Tex. Dec. 5, 2024) (holding reporting obligations of the Corporate Transparency Act and implementing regulations exceed Congressional authority under the Commerce and Necessary and Proper Clauses), *stayed pending appeal by McHenry v. Texas Top Cop Shop*, 604 U.S. ___, 2025 WL 272062 (Jan. 23, 2025)

(Mem.); *Nat'l Small Bus. United v. Yellen*, 721 F.Supp.3d 1260 (N.D. Ala. 2024), *appeal docketed*, No. 24-10736 (11th Cir. Mar. 11, 2024).

172.    To the extent that the Rule regulates underlying transactions in addition to the reporting activity it compels financial institutions to engage in, the Rule regulates local real-estate transfers.

173.    The real property transferred in this regulated process does not move physical locations or cross state or international lines once transferred.

174.    The Rule does not regulate any interstate or foreign transportation route through which persons or goods might move.

175.    The Rule does not regulate any instrumentality that moves persons or goods through commerce.

176.    The Rule covers a significant number of purely intrastate transactions.

177.    These legitimate transactions between citizens of the same state, concerning property in that same state, are purely local in nature—they have no aggregate impact on interstate or foreign commerce, let alone on interstate or international criminal activity.

178.    As applied to these purely intrastate transactions, the Rule exceeds any authority Congress could have delegated to FinCEN under the Commerce Clause.

179.   The Rule is not rationally related to the implementation of any other constitutionally enumerated power, as is required to invoke the Necessary and Proper Clause.

180.   Compliance with the Rule will cause immediate, irreparable harm to Plaintiffs because they will be unduly burdened by the monetary cost of reporting these purely intrastate transactions to FinCEN.   Plaintiffs are thus entitled to a declaration, pursuant to 28 U.S.C. § 2201, that FinCEN cannot enforce the Rule against Plaintiffs because such enforcement would violate the United States Commerce Clause.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs Fidelity National Financial, Inc. and Fidelity National Title Insurance Company request entry of judgment:

a.   Declaring, ordering and adjudging that the Rule exceeds the statutory authority on which it purports to be based and thus is invalid and unenforceable;

b.   Declaring, ordering and adjudging that the Rule is arbitrary and capricious and thus is invalid and unenforceable;

c.   Declaring, ordering and adjudging that the Rule is unconstitutional in that it violates the Fourth Amendment;

d.  Declaring, ordering and adjudging that the Rule is unconstitutional in that it violates the First Amendment;

e.  Declaring, ordering and adjudging that the Rule is unconstitutional in that it exceeds the authority of Congress under the Commerce Clause, other Article I power, or the Necessary and Proper Clause;

f.  Enjoining Defendants from enforcing the Rule against the Plaintiffs or from assisting any other federal agency in doing the same;

g.  Vacating and setting aside the Rule;

h.  Awarding Plaintiffs their costs and attorneys' fees and grant such other relief as the Court may deem just and proper.


Dated:      May 20, 2025                    Respectfully submitted,


                                            */s/ Stuart H. Singer*
                                            Stuart H. Singer (FBN 377325)
                                            Jesse Panuccio (FBN 31401)
                                            Jon L. Mills (FBN 148286)
                                            Eric M. Palmer (FBN 1050210)
                                            Lauren Amos (FBN 1026073)
                                            **Boies Schiller Flexner LLP**
                                            401 E. Las Olas Blvd., Suite 1200
                                            Fort Lauderdale, FL 33301
                                            (954) 356-0011
                                            ssinger@bsfllp.com
                                            jpanuccio@bsfllp.com
                                            epalmer@bsfllp.com
                                            lamos@bsfllp.com

David Boies
(*pro hac vice* forthcoming)
Alan B. Vickery
(*pro hac vice* forthcoming)
**Boies Schiller Flexner LLP**
55 Hudson Yards, 20th Floor
New York, N. Y. 10001
(212) 446-2300
dboies@bsfllp.com
avickery@bsfllp.com


William P. Barr
(*pro hac vice* forthcoming)
Patrick F. Philbin
(*pro hac vice* forthcoming)
Jeff Jensen
(*pro hac vice* forthcoming)
**Torridon Law PLLC**
801 Seventeenth St., NW, Suite 100
Washington, D.C. 20006
202-249-6900
wbarr@torridonlaw.com
pphilbin@torridonlaw.com
jjensen@torridonlaw.com


*Counsel for Fidelity National
Financial, Inc.
and Fidelity National Title Insurance
Company*

61