UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


FIDELITY NATIONAL FINANCIAL,
INC. and FIDELITY NATIONAL
TITLE INSURANCE COMPANY,

        Plaintiffs,

v.                           Case No.: 3:25-cv-554-WWB-SJH

SCOTT BESSENT, UNITED STATES
DEPARTMENT OF THE TREASURY,
ANDREA GACKI, and THE FINANCIAL
CRIMES ENFORCEMENT NETWORK,

        Defendants.

_____/


**<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................iii

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................. 2

ARGUMENT ................................................................................................. 4

I.  The Rule Exceeds FinCEN's statutory authority. ................................... 4

    A.  Section 5318(g)(1) does not authorize the Rule. ....................... 4

    B.  The Rule violates Standard (I) of the streamlined SAR requirements...... 11

    C.  FinCEN cannot belatedly rely on Section 5318(a)(2) to save the Rule. ... 12

II.  The Rule is arbitrary and capricious in violation of the APA. ............... 14

    A.  FinCEN failed to provide any rationale to show the Rule is tailored to reach transactions relevant to potential violations of law. ........................ 15

    B.  The Rule is arbitrary and capricious because FinCEN failed to conduct any rational cost-benefit analysis. ............................................ 19

    C.  The Rule is arbitrary and capricious because FinCEN failed to meaningfully address significant comments.............................. 21

        1.  FinCEN failed to adequately consider comments calling for a monetary threshold. .................................................. 22

        2.  FinCEN failed to adequately consider and respond to comments regarding the inclusion of trusts within the Rule. ......... 23

III.  FinCEN's Rule violates the Fourth Amendment because it compels disclosure of unnecessary and intrusive personal information from innocent private persons without the requirement of a warrant......................... 24

    A.  The Rule violates even the relaxed Fourth Amendment standards applicable to agencies investigating regulated industries. ...................... 25

    B.  The Rule constitutes an unconstitutional general warrant in violation of the Fourth Amendment. .......................................... 27

IV.  The Rule violates the First Amendment's prohibition on compelled speech....... 29

CONCLUSION ....................................................................................... 30

CERTIFICATE OF SERVICE ............................................................... 31

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) ....................................................... 14

*Airbnb, Inc. v. City of New York,*
    373 F.Supp.3d 467 (S.D.N.Y. 2019) ....................................... 27

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
    594 U.S. 758 (2021) ....................................................... 10

*Am. Petrol. Inst. V. U.S. EPA.,*
    52 F.3d 1113 (D.C. Cir. 1995) ............................................. 13

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health,*
    145 F.4th 39 (1st Cir. 2025) .............................................. 21

*Am. Secs. Ass'n. v. SEC,*
    2025 WL 2092054 (11th Cir. July 25, 2025) .............................. 12

*Andreas-Moses v. Hartford Fire Ins. Co.,*
    326 F.R.D. 309 (M.D. Fla. 2018) .......................................... 18

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ....................................................... 10

*Bidi Vapor LLC v. Food & Drug Admin.,*
    47 F.4th 1191 (11th Cir. 2022) ........................................... 22

*Bittner v. United States,*
    598 U.S. 85 (2023) ........................................................ 13

*Cal. Bankers Ass'n v. Shultz,*
    416 U.S. 21 (1974) .............................................. 9, 25, 26, 27

*Cal. Pac. Bank v. FDIC,*
    885 F.3d 560 (9th Cir. 2018) ............................................... 9

*Carmen v. Yellen,*
    112 F.4th 386 (6th Cir. 2024) ............................................. 25

*Carpenter v. United States,*
    585 U.S. 296 (2018) ....................................................... 28

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ....................................................... 30

*Chamber of Com. of U.S. v. Secs. & Exch. Comm'n,*
    412 F.3d 133 (D.C. Cir. 2005) ......................................................................... 20

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) ..................................................................................... 27

*Clean Air Council v. Pruitt,*
    862 F.3d 1 (D.C. Cir. 2017) ........................................................................... 13

*D.C. v. U.S. Dep't of Agric.,*
    496 F. Supp. 3d 213 (D.D.C. 2020) ............................................................... 22

*Env't Def. Fund, Inc. v. EPA,*
    898 F.2d 183 (D.C. Cir. 1990) ...................................................................... 13

*FTC v. American Tobacco Co.,*
    264 U.S. 298 (1924) ....................................................................................... 9

*Gilmore v. Ga. Dep't of Corr.,*
    144 F.4th 1246 (11th Cir. 2025) ..................................................................... 8

*Heating, Air Conditioning & Refrigeration Dist. Int'l v. EPA,*
    71 F.4th 59 (D.C. Cir. 2023) ......................................................................... 15

*Hewitt v. Comm'r of IRS,*
    21 F.4th 1336 (11th Cir. 2021) ..................................................................... 22

*In re McVane,*
    44 F.3d 1127 (2d Cir. 1995) ......................................................................... 26

*In re Sealed Case,*
    932 F.3d 915 (D.C. Cir. 2019) ........................................................................ 8

*Jarkesy v. Secs. & Exch. Comm'n,*
    34 F.4th 446 (5th Cir. 2022) ......................................................................... 14

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .................................................................................. 4, 8

*Lopez v. First Union Nat'l Bank of Fla.,*
    129 F.3d 1186 (11th Cir. 1997) ............................................................... 5, 6, 8

*Major League Baseball v. Crist,*
    331 F.3d 1177 (11th Cir. 2003) ...................................................................... 9

*Marshall v. Barlow's, Inc.,*
    436 U.S. 307 (1978) ..................................................................................... 27

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001) ................................................................ 13, 14

*Michigan v. EPA*,
  576 U.S. 743 (2015) .................................................................................... 12

*Miranda de Villalba v. Coutts & Co. (USA) Int'l*,
  250 F.3d 1351 (11th Cir. 2001) ............................................................... 5, 6

*Mistretta v. United States*,
  488 U.S. 361 (1989) .................................................................................... 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................. 14, 21

*Mozilla Corp. v. Fed. Commc'ns Comm'n*,
  940 F.3d 1 (D.C. Cir. 2019) ....................................................................... 13

*Murphy v. Smith*,
  583 U.S. 220 (2018) .................................................................................... 11

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) .................................................................................... 11

*Nat'l Inst. Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) .............................................................................. 29, 30

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ................................................................... 29

*New York v. Burger*,
  482 U.S. 691 (1987) .................................................................................... 27

*Patel v. City of Los Angeles*,
  738 F.3d 1058 (9th Cir. 2013) .................................................................... 27

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004) ........................................................... 15, 20

*Pub. Interest Legal Found., Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024) ......................................................................... 11

*Real Alts., Inc. v. Sec'y Dep't of Health & Human Servs.*,
  867 F.3d 338 (3d Cir. 2017) ......................................................................... 6

*Reid v. Georgia*,
  448 U.S. 438 (1980) ...................................................................................... 7

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ............................................................................. 29

*Sec. & Exch. Comm'n v. Alpine Secs. Corp.*,
    982 F.3d 68 (2d Cir. 2020).............................................................. 8, 9

*Sialoi v. City of San Diego*,
    823 F.3d 1223 (9th Cir. 2016)................................................................ 7

*Small Bus. Assoc. of Mich. v. Yellen*,
    769 F. Supp. 3d 722 (W.D. Mich. 2025) ......................................... passim

*St. James Hosp. v. Heckler*,
    760 F.2d 1460 (7th Cir. 1985)............................................................... 18

*Stanford v. Texas*,
    379 U.S. 476 (1965) ............................................................................. 28

*Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*,
    684 F.3d 1127 (11th Cir. 2012).......................................................... 15, 16

*Sunshine State Reg'l Ctr., Inc. v. Dir.*
    143 F.4th 1331 (11th Cir. 2025).............................................................. 5

*United States v. Bittner*,
    19 F.4th 734 (5th Cir. 2021)................................................................ 13

*United States v. Foster*,
    634 F.3d 243 (4th Cir. 2011)................................................................ 10

*United States v. Gordon*,
    231 F.3d 750 (11th Cir. 2000)................................................................ 8

*United States v. Johnson*,
    171 F.3d 601 (8th Cir. 1999)................................................................ 10

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) .......................................................................... 9, 26

*United States v. Solomon ex rel. Solomon*,
    570 F. Supp. 3d 1195 (S.D. Fla. 2021)................................................. 13

*United States v. Williams*,
    808 F.3d 238 (4th Cir. 2015)................................................................. 7

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ....................................................................... 10, 13

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ................................................................. 29

**Statutes**

5 U.S.C. § 706(2)(C) ................................................................... 30

31 U.S.C. § 5318 .................................................................. passim

31 U.S.C. § 5326 ........................................................................ 3

**Regulations**

12 C.F.R. § 225.4 ....................................................................... 9

12 C.F.R. § 353.1 ....................................................................... 9

31 C.F.R. § 1010.380 .............................................................. 23, 24

31 C.F.R. § 1020.320 ................................................................... 9

31 C.F.R. § 1021.320 ................................................................... 9

31 C.F.R. § 1022.320 ................................................................... 9

31 C.F.R. § 1023.320 ................................................................... 9

31 C.F.R. § 1024.320 ................................................................... 9

31 C.F.R. § 1025.320 ................................................................... 9

31 C.F.R. § 1026.320 ................................................................... 9

31 C.F.R. § 1029.320 ................................................................... 9

31 C.F.R. § 1030.320 ................................................................... 9

31 C.F.R. § 1031.320 .................................................................. 24

*Amendment to the Bank Secrecy Act Regulations; Requirement To Report Suspicious
Transactions*,
  61 Fed. Reg. 4,326 .................................................................... 8

*Anti-Money Laundering Regulations for Residential Real Estate Transfers*,
  89 Fed. Reg. 70,258 (August 29, 2024) .......................................... passim

**Other Authorities**

Acres of Money Laundering: Why U.S. Real Estate is a Kleptocrat's Dream" (Aug.
    2021), p. 26, *available at* https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-
    Money-Laundering-Final-Version-2021.pdf ............................................................... 17

*Possibility*, Black's Law Dictionary (12th ed. 2024) ......................................................... 6

*Relevant*, Black's Law Dictionary (12th ed. 2024) ........................................................... 6

*Suspicious*, Merriam-Webster, https://www.merriam-webster.com/dictionary/
    suspicious................................................................................................................... 6

## <u>INTRODUCTION</u>

This case presents a stark example of regulatory overreach. In the Bank Secrecy Act ("BSA"), Congress gave FinCEN limited authority to require financial institutions to report "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). Those restrictions demanding that reporting rules must be tailored to reach only "suspicious" transactions relevant to potential legal violations were so important that when Congress also gave FinCEN authority to require "streamlined" suspicious activity reports ("SARs"), it reinforced those limits, expressly instructing that FinCEN must "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law." 31 U.S.C. § 5318(g)(5)(D)(ii)(I). Here, FinCEN completely ignored those limits and instead issued a rule demanding blanket and intrusive reporting on virtually every non-financed transfer of residential real estate to a legal entity across the country—more than 800,000 transactions a year. *See* Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 70,258 (August 29, 2024) (the "Rule"). The Rule far exceeds FinCEN's statutory authority because there is no basis whatsoever to think that all such transactions are in any way suspicious or that they relate to even potential violations of the law.

The Rule also suffers from a host of additional defects. It is arbitrary and capricious because FinCEN gave no rationale to explain how the transactions swept up in the Rule's dragnet were either "suspicious" or related to potential violations, and FinCEN also failed to conduct a statutorily required cost-benefit analysis. FinCEN recognized that the Rule will impose massive costs of over $500 million a year on residential real estate sales— billions of dollars in a few years—but flatly refused to even estimate any purported benefits from its unprecedented reporting requirements.

Worse, the Rule violates the Constitution. It violates the Fourth Amendment by demanding intrusive reporting on a blanket basis untethered to a reasonable suspicion of illegal activity. And it violates the First Amendment by compelling speech across a swath of legitimate transactions without any tailoring to reach an important government interest.

## BACKGROUND

Plaintiffs are leading providers of title insurance and settlement services for real estate transactions. Joint Stip. of Agreed Facts and Law ¶¶ 1-4 (Doc. 31) ("Stip."). Purporting to act under the authority of the BSA, Defendant FinCEN has promulgated a sweeping new Rule that will impose expansive reporting requirements on Plaintiffs to keep records and submit reports on a large majority of non-financed transfers of residential property on a nationwide basis—a number FinCEN has estimated at up to 850,000 reports annually. Stip. ¶ 71. These reports are required regardless of the value or location of the transaction, or the transaction's potential connection to crime. *See* 89 Fed. Reg. 70258-94. The Rule is scheduled to take effect December 1, 2025. Stip. ¶ 21.

FinCEN stated that it promulgated the Rule pursuant to the BSA, in particular, 31 U.S.C. § 5318(g)(1). *See* 89 Fed. Reg. at 70,262. That section authorizes FinCEN to impose reporting requirements of any "**suspicious** transaction relevant to a **possible violation** of law or regulation." Stip. ¶ 23 (emphasis added). FinCEN also explained that the Rule is a form of SAR filing requirement. Stip. ¶ 24. It thus is governed by SAR Standards, which require FinCEN to "ensure that streamlined reports relate to **suspicious** transactions **relevant to potential violations of law** (including regulations)." 31 U.S.C. § 5318(g)(5)(D)(ii)(I) (emphasis added).

At present, there is a targeted program to collect information on certain "high risk" residential real-estate transactions. 89 Fed. Reg. at 70,259. These requirements, called

Residential Geographic Targeting Orders ("GTOs"), are geographically limited and temporary. They last for 180 days, subject to renewal. 31 U.S.C. § 5326; *see also* 89 Fed. Reg. at 70,259 n.14. The GTO program is narrowly focused on transactions "above a specific price threshold by certain legal entities in select metropolitan areas." 89 Fed. Reg. 70,259-60. The Rule, by contrast, has no minimum dollar threshold, Stip. ¶ 65, no geographic limitation, and does not limit reporting requirements to transfers that are illegal, suspicious, or contain indicia of potential illegal activity. The Rule also requires reporting persons to provide more detailed information than the GTO program, including private information in business records that would not normally otherwise be made available to the government. 89 Fed. Reg. at 70,279. FinCEN acknowledged that some required information is "subject to heightened privacy concerns and that the collection of such information could entail cybersecurity and operational risks." *Id.* at 70,265.

FinCEN sought public comment on the Rule and received several suggestions that would have limited the scope of the Rule, including: (1) a minimum dollar threshold to require reporting a transaction, and (2) excluding transfers to trusts. Stip. ¶¶ 78, 81. FinCEN rejected these suggestions. 89 Fed. Reg. at 70,269-70. FinCEN did not generate any quantitative estimate of the expected benefits of the Rule in terms of the number of crimes deterred or punished, or in terms of the expected economic value of deterring and punishing additional crimes.

FinCEN has estimated the costs of compliance with the Rule to have a "midpoint" value of $559.4 million in the first year and $532.2 million in subsequent years. Stip. ¶ 72. FinCEN acknowledged that this "accounting cost estimate" did not "represent either the full economic costs of the rule nor the net cost of the rule as measured against the

components of expected benefits." 89 Fed. Reg. at 70,284. FinCEN also acknowledged that it had no way to accurately account for increased IT and software costs and admitted that its "burden estimates can, at best, function as a lower-bound expectation of the total costs of the rule." *Id.* at 70,286. FinCEN did not address the feasibility of an individualized residential real-estate rule that requires financial institutions to report only non-financed real-estate transactions that support a particularized suspicion of a connection to a potential violation of law. *Id.* at 70,288-89.

## ARGUMENT

### I.     The Rule Exceeds FinCEN's statutory authority.

The Rule cannot survive review because it **exceeds FinCEN's authority** under the BSA. FinCEN's interpretation of the BSA is "**not** entitled to deference," and as a result the Court must "set aside" any action by FinCEN "inconsistent with the law as [the Court] interpret[s] it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (emphasis in original). Here, FinCEN cited two BSA provisions to justify the Rule: its power to require suspicious transaction reporting under Section 5318(g)(1), and its mandate to create "streamlined SAR filing requirement[s]" under Section 5318(g)(5)(D). 89 Fed. Reg. 70,262. In a footnote, FinCEN made a passing reference to its power to require regulated entities to adopt procedures under Section 5318(a)(2), but did not identify that provision as a basis for the Rule in its discussion of "Authority." *Contrast id.* at 70,259 n.11, *with* 70,262. None of those provisions authorize the new Rule demanding intrusive reporting on virtually every non-financed real-estate transfer to a legal entity or trust in America.

### A.     Section 5318(g)(1) does not authorize the Rule.

Section 5318(g)(1) authorizes FinCEN to require financial institutions to report "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C.

§ 5318(g)(1). By its terms, this provision requires that every "transaction" subject to a SAR reporting duty must be both "suspicious" and "relevant to a possible violation of law or regulation." *Id.* The Rule fails those requirements because there is no basis for saying that virtually **all** non-financed residential real-estate transfers to legal entities or trusts are inherently suspicious or involve any nexus with potential legal or regulatory violations.

Begin with the text. Section 5318(g)(1) authorizes FinCEN to impose SAR duties on "transactions" that are "suspicious" and "relevant to a possible violation of law or regulation." Stip. ¶ 23. A transaction is relevant to "a possible violation of law or regulation" for purposes of the safe-harbor provision in Section 5318(g)(3) only if the financial institution had a "good faith suspicion that a law or regulation may have been violated." *Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1192–93 (11th Cir. 1997); *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353–54 (11th Cir. 2001) (requiring "reasonable suspicion of illegal activity" for a provision "sufficiently similar" to Section 5318(g)(3)). This requires a reasonable "good faith basis for believing there is a nexus between the suspicion of illegal activity" and the particular transactions or accounts about which "information is disclosed." *Lopez*, 129 F.3d at 1195. The same language occurs in Section 5318(g)(1), and courts "presume that word[s] or phrase[s] … bear the same meaning throughout a text when a statute uses materially the same language." *Sunshine State Reg'l Ctr., Inc. v. Dir.*, 143 F.4th 1331, 1341–42 (11th Cir. 2025) (citation modified). Thus, Section 5318(g)(1) should be interpreted to authorize FinCEN to impose SAR reporting duties on transactions that support a "reasonable basis" for believing that the particular transaction has a "nexus" with illegal activity. *Lopez*, 129 F.3d at 1196.

**Every** transaction subject to a SAR duty must be **both** "suspicious" **and** "relevant to a possible violation" to fall within FinCEN's regulatory authority. Section 5318(g) uses the adjective "suspicious" to restrict the category of "transactions" FinCEN is authorized to regulate to the subcategory of transactions that "tend[] to arouse suspicion." *Suspicious*, Merriam-Webster, https://www.merriam-webster.com/dictionary/suspicious. The adjective phrase "relevant to a possible violation of law or regulation" further limits the category of "suspicious transactions" on which FinCEN can impose a reporting duty to those that are "[l]ogically connected" with conduct that "might plausibly" violate a statute or regulation. *Relevant*, Black's Law Dictionary (12th ed. 2024); *Possibility*, Black's Law Dictionary (12th ed. 2024). Thus, as a matter of plain statutory language, FinCEN can impose a SAR duty on a transaction only if it exhibits characteristics that are both "suspicious" and "relevant to a potential violation of law or regulation."

But the Rule requires reporting transactions that are neither "suspicious" nor even potentially "relevant to a possible violation of law or regulation." Nothing about a non-financed real-estate transaction with a trust or legal entity inherently supports "a reasonable suspicion of illegal activity." *Miranda de Villalba*, 250 F.3d at 1354. It is not illegal to engage in a non-financed transfer to a transferee entity or trust of an ownership in residential real estate. Yet the Rule covers transactions such as a nominal-value transfer of wetlands to a conservation organization, or a $5,000 transfer of a farm to the trust of a family friend. And "[t]hose who desire to follow prohibitions on usury in the Torah and Quran often avoid traditional banking." *Real Alts., Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 378 n.22 (3d Cir. 2017) (Jordan, J., concurring).

Beyond that, FinCEN has never claimed that all (or even most) of the 800,000 to 850,000 transactions that the Rule will cover annually are connected with probable illegal activity. Indeed, FinCEN found that "approximately 42 percent of non-financed real estate transfers captured by the [GTOs] were conducted by individuals or legal entities on which a SAR has been filed." 89 Fed. Reg. at 70,260. In other words, a majority of transactions covered by the GTOs—a limited program containing monetary thresholds absent from the Rule—had no apparent connection with any potential legal or regulatory violation. The wider category of transactions regulated by the Rule will encompass even more innocent transactions that FinCEN has no mandate to regulate under Section 5318(g)(1).

FinCEN claims Section 5318(g)(1) authorizes the Rule because the category of non-financed residential real-estate transactions it covers are "high-risk for illicit finance." *Id.* at 70,262. This argument assumes every transaction covered by the Rule is both "suspicious" and "relevant to a possible violation" because transactions of the same general type "have been conducted by persons also engaged in other activity that financial institutions have characterized as suspicious." *Id.* at 70,260. But "a determination that a certain fact is suspicious in one case does not compel the conclusion that the same fact is suspicious in other cases." *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015). And ordinarily, "reasonable suspicion may not be based on broad profiles which cast suspicion on entire categories … without any individualized suspicion of the particular person." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016) (citation modified); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (reasonable suspicion cannot be imputed to a "large category of presumably innocent" persons).

Indeed, deciding whether a transaction is "suspicious" and "relevant to a possible violation" almost invariably requires an individualized inquiry. "[W]hether reasonable suspicion exists must be determined on a case-by-case basis in view of the totality of the circumstances," *United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000), and it requires "more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1256 (11th Cir. 2025) (en banc) (citation modified). Similarly, a transaction is "relevant to a possible violation of law or regulation" only if there is "basis for believing there is a nexus between [a] suspicion of illegal activity" and the particular transactions or accounts about "which information is disclosed." *Lopez*, 129 F.3d at 1195; *see also In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019) (interpreting "related to" language in Section 5318(k)(3) to encompass "records that have a 'connection with'" a particular account).

For this reason, FinCEN's own "longstanding practice," *Loper Bright*, 603 U.S. at 386, has been to define "suspicious transaction" so that "each SAR must … be examined individually," not using "a mechanical or bright-line test" like the Rule adopts. *Sec. & Exch. Comm'n v. Alpine Secs. Corp.*, 982 F.3d 68, 84 (2d Cir. 2020) (citation modified). The first SAR regulations defined "suspicious transaction" to mean those where the financial institution "knows, suspects, or has reason to suspect" that the transaction: (i) "involves funds derived from illegal activities or is intended … to hide or disguise funds … derived from illegal activities"; (ii) "is designed to evade … the Bank Secrecy Act"; or (iii) "has no business or apparent lawful purpose." Amendment to the Bank Secrecy Act Regulations; Requirement to Report Suspicious Transactions, 61 Fed. Reg. 4,326, 4,331-32 (Feb. 5, 1996). Since then, FinCEN's other SAR regulations have uniformly required a financial

institution to "file an SAR if it 'knows, suspects, or has **reason to suspect**' that a transaction is suspicious"—and not otherwise. *Alpine*, 982 F.3d at 84 (quoting 31 C.F.R. § 1023.320(a)(2) (broker-dealer SAR regulation)); *see also Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 580–81 (9th Cir. 2018) (interpreting 12 C.F.R. § 353.1)).[1]

FinCEN's newfound categorical approach also threatens to override "protections baked into the BSA" to ensure it "satisfies the Fourth Amendment." *Small Bus. Assoc. of Mich. v. Yellen*, 769 F. Supp. 3d 722, 734 (W.D. Mich. 2025). BSA reporting rules must, at minimum, meet the Fourth Amendment standard applicable to administrative subpoenas under *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), and *FTC v. American Tobacco Co.*, 264 U.S. 298 (1924). Under that standard, an agency demand is permissible only if "[t]he inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 67 (1974) (citation modified). This standard does not require probable cause, but the agency "must have more than a mere intuition that illegal activity is afoot." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003). And crucially, the agency's request must be relevant to "whether there is a probable violation of the law." *Morton Salt*, 338 U.S. at 643. "[A]n investigation predicated solely upon legal activity does not pass muster." *Major League Baseball*, 331 F.3d at 1188.

---

[1] *See* 31 C.F.R. § 1020.320 (banks); *id.* § 1021.320 (casinos and card clubs); *id.* § 1022.320 (money services businesses); *id.* § 1023.320 (brokers or dealers in securities); *id.* § 1024.320 (mutual funds); *id.* § 1025.320 (insurance companies); *id.* § 1026.320 (futures commission merchants and introducing brokers in commodities); *id.* § 1029.320 (loan or finance companies); *id.* § 1030.320 (housing government sponsored enterprises); 12 C.F.R. § 225.4 (bank and financial holding companies).

This is not to say that Section 5318(g)(1) precludes FinCEN from ever adopting categorical SAR reporting requirements. But, to satisfy the requirement that "transactions" subject to such requirements be both "suspicious" and "relevant to a possible violation," any categorical rule would have to be tailored to reach only transactions that exhibit both of those characteristics. Here, the transactions covered by the Rule are not "inherently suspicious, and each can be readily characterized as conduct typical of a broad category of innocent people." *United States v. Johnson*, 171 F.3d 601, 605 (8th Cir. 1999) (citation modified). And "the Government must do more than simply label a behavior as 'suspicious' to make it so." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011).

Finally, any contrary reading of Section 5318(g)(1) would raise "major questions" about the section's scope. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). The major-questions doctrine teaches that the "history and the breadth of the authority that the agency has asserted," and the "economic and political significance" of that assertion, may provide a "reason to hesitate before concluding that Congress" meant to confer such authority. *Id.* at 721 (citation modified). Here, FinCEN has historically identified suspicious transactions using tailored targeting orders and individualized inquiries, *supra* Background. And as discussed, FinCEN concedes that its Rule will cost the real-estate sector **billions** over its lifetime, *supra* Background, which echoes "economic impact[s]" that the Court has found sufficient to raise major questions, *see Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) ($50 billion). As a result, the Court "[sh]ould not assume that Congress entrusted" FinCEN with the authority to enact such a sweeping reporting rule "without a clear statement to that effect." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

**B.**    **The Rule violates Standard (I) of the streamlined SAR requirements.**

FinCEN also claims its mandate to "establish streamlined … processes" that "permit the filing of noncomplex categories of reports" justifies the Rule. *See* 89 Fed. Reg. at 70,259 (citing 31 U.S.C. § 5318(g)(5)(D)). But that provision expressly provides that FinCEN "**shall** establish standards to **ensure** that streamlined reports *relate to suspicious transactions relevant to potential violations of law*." 31 U.S.C. § 5318(g)(5)(D)(ii)(I) (emphasis added). This language incorporates Section 5318(g)(1)'s central requirement that all transactions subject to SAR duties must be both "suspicious" and "relevant to a potential violation of law or regulation." And by using the words "shall" and "ensure," that provision imposes a mandatory duty on FinCEN to "guarantee" that streamlined SAR rules comply with those requirements. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 667 (2007); *see Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("shall" creates "a mandate, not a liberty"); *Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36, 46 (1st Cir. 2024) ("[E]nsure" means "'to make certain' or 'guarantee.'"). As discussed, the Rule does nothing to "make certain" or "guarantee" that the transactions subject to reporting are suspicious or relevant to a potential violation.

FinCEN noted that "the BSA affords the Secretary flexibility" because Section 5318(g)(5)(B) "directs the Secretary to consider 'the means by or form in which the Secretary shall receive such reporting,' including … 'burdens imposed by such means or form of reporting,' 'the efficiency of the means or form,' and the 'benefits derived by the means or form of reporting.'" 89 Fed. Reg. at 70,259 (quoting 31 U.S.C. § 5318(g)(5)(B)(i)-(iii)). But by providing that FinCEN "shall consider" these factors in Section 5318(g)(5)(B), Congress did not grant FinCEN any additional power—it imposed an **obligation** on FinCEN to consider those additional factors "[i]n imposing any

11

requirement to report any suspicious transaction." 31 U.S.C. § 5318(g)(5)(B). And if Section 5318(g)(5)(B) confers discretion on FinCEN at all, that discretion is textually limited to the "**means or form of reporting**," and clearly does not authorize FinCEN to disregard its mandatory duty "to ensure" that all streamlined standards "relate to suspicious transactions relevant to potential violations of law." *Id.* § 5318(g)(5)(D)(ii)(I).

## C.    FinCEN cannot belatedly rely on Section 5318(a)(2) to save the Rule.

In a footnote, *see* 89 Fed. Reg. at 70,259 n.11, FinCEN also cited Section 5318(a)(2), which sets forth FinCEN's "general power[]" to require financial institutions "to maintain appropriate procedures, including the collection and reporting of certain information … to ensure compliance with [the BSA] … or to guard against money laundering, the financing of terrorism, or other forms of illicit finance," 31 U.S.C. § 5318(a)(2). But any attempt by FinCEN to rely on Section 5318(a)(2) now would "run into [the] 'bedrock principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action.'" *Am. Secs. Ass'n. v. Secs. & Exch. Comm'n*, 2025 WL 2092054, at *7 (11th Cir. July 25, 2025) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). In the section of the Rule titled "Authority," FinCEN identified Sections 5318(g)(1) and 5318(g)(5)(D) as authority for the Rule and never mentioned Section 5318(a)(2). *See* 89 Fed. Reg. at 70,262. FinCEN's lone reference to Section 5318(a)(2) came in a footnote attached to a comment in the Rule's "Background" section, which simply notes that FinCEN "believes this authority also

provides an additional basis for the reporting requirement adopted in this final rule." *Id.* at 70,259 n.11. That unsupported statement is not a reasoned basis for the Rule.[2]

Even if FinCEN could rely on Section 5318(a)(2), that provision authorizes FinCEN only to require financial institutions to "maintain **appropriate procedures**" to "ensure compliance" with the BSA. Read in "context and with a view toward [the provision's] place in the overall statutory scheme," *West Virginia*, 597 U.S. at 735, that language at most allows FinCEN to adopt rules about "the procedural mechanism by which the regulated person complies with her legal duty … to 'report'" a "transaction," not rules imposing a "substantive duty to disclose information." *United States v. Solomon ex rel. Solomon*, 570 F. Supp. 3d 1195, 1204–05 (S.D. Fla. 2021); *see also United States v. Bittner*, 19 F.4th 734, 745 (5th Cir. 2021), *rev'd on other grounds by Bittner v. United States*, 598 U.S. 85 (2023) (the BSA and its regulations "consistently implement [a] distinction" between "substance" and "procedure").

Even if Section 5318(a)(2) did authorize FinCEN to impose substantive reporting duties, Section 5318(g)(1) specifically governs SARs, and FinCEN "cannot rely on its general authority to make rules necessary to carry out its general functions when a specific statutory directive defines the relevant functions" of the agency "in a particular area." *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001) (citation modified). Nor can it use broad, non-substantive rulemaking authority to circumvent an express congressional limitation on the agency's authority. *Am. Petrol. Inst. V. U.S. EPA.*, 52 F.3d

---

[2] *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 189 (D.C. Cir. 1990); *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 82 (D.C. Cir. 2019) (considering only sources referenced "under the heading '*Legal Authority*'"); *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (*Chenery* limited agency to provisions on which it "expressly" relied).

1113, 1117–19 (D.C. Cir. 1995). Section 5318(g) includes "specific statutory directive[s]" that define FinCEN's authority to impose SAR requirements, *Michigan*, 268 F.3d at 1084, and FinCEN cannot use Section 5318(a)(2) to override those limitations.

Finally, if Section 5318(a)(2) authorizes the Rule, it violates the non-delegation doctrine because it fails to provide any "intelligible principle" guiding FinCEN's exercise of power delegated by Congress. *Jarkesy v. Secs. & Exch. Comm'n*, 34 F.4th 446, 460–61 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). If Section 5318(a)(2) authorizes FinCEN to adopt any rule that requires "the reporting of certain information," no intelligible principle controls what "information" the agency can require financial institutions to report. Under that view, Section 5318(a)(2) would authorize FinCEN to require reporting of **any** "information" regarding **any** transaction. Such absolute discretion would violate Article I and the separation of powers. *Jarkesy*, 34 F.4th at 460–61; *A.L.A. Schechter*, 295 U.S. at 541 (invalidating statute because "[i]nstead of prescribing rules of conduct, it authorizes the making of codes to prescribe them").

## II.    The Rule is arbitrary and capricious in violation of the APA.

The Rule is arbitrary and capricious because FinCEN has failed to comply with the basic requirement that it provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and has also "entirely failed to consider an important aspect of the problem" by failing to respond to significant comments and failing to conduct any rational cost-benefit analysis, as required by the statute. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified).

**A.      FinCEN failed to provide any rationale to show the Rule is tailored to reach transactions relevant to potential violations of law.**

The Rule is arbitrary and capricious because FinCEN failed to provide any rationale showing that the Rule met the requirement—or that FinCEN had even seriously considered the requirement—that the agency must "ensure" that its reporting rules reach only "transactions relevant to potential violations of law." 31 U.S.C. § 5318(g)(5)(D)(ii)(I).

As explained, *see supra* Section I.B, SAR Standard (I) requires that streamlined SAR reporting shall "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law." 31 U.S.C. § 5318(g)(D)(ii)(I). That direction makes clear that FinCEN must support its Rule with a rationale showing that the reporting requirements are tailored to reach only transactions "relevant to potential violations of law." *See Heating, Air Conditioning & Refrigeration Dist. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) (a "shall ensure" clause means the agency "should guarantee that result"); *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133 (11th Cir. 2012) (rule is arbitrary and capricious if it is not "supported by substantial evidence"). Failure to adequately consider that statutory requirement is, by definition, arbitrary and capricious action. *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (rule is arbitrary and capricious where agency failed to consider a "factor the agency must consider under its organic statute"). Here, FinCEN provided no rational basis for thinking that its new reporting requirements were properly tailored.

*First,* FinCEN failed to point to any data demonstrating that the type of transactions swept in by the Rule actually had a high incidence of being connected to money laundering. Instead, the only data FinCEN cited was twenty-one enforcement actions that took place **over a nineteen-year period**, which it says show that "[n]on-financed transfers

15

to legal entities and trusts heighten the risk that such transfers will be used for illicit purposes." 89 Fed. Reg. at 70,259, 70,259 n.12. But given that (according to FinCEN) over 800,000 transfers that would be reportable under the Rule take place every year—over 15,000,000 in the span of nineteen years, *id.* at 70,283—twenty-one enforcement actions in that period translate into only 0.00014% of the transfers having any demonstrated connection to illegal activity. That figure provides no justification at all for the sweeping dragnet cast by the Rule.

*Second,* FinCEN generally pointed to the success of GTOs as support for the Rule. *Id.* at 70,260. GTOs, however, are narrowly targeted "to collect information on a subset of transfers of residential real estate that FinCEN considers to present a high risk for money laundering." *Id.* at 70,259-60. They have monetary thresholds, geographic limits, and limits on the types of entity involved. *Id.* Even if data showed that program was successful in identifying transactions "relevant to a possible violation of law or regulation," that could provide no reasoned support for thinking that the vastly expanded reporting regime in the Rule would be similarly tailored. *Id.* at 70,258. The rationale that "targeted reporting has been good; therefore, broader, un-targeted reporting must be better" simply does not follow. And it is certainly not "evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Stone & Webster*, 684 F.3d at 1133 (citation modified).

FinCEN does not cite any "feedback"—much less reliably collected and analyzed statistical data—identifying transactions relevant to violations of law that are being missed. And FinCEN acknowledges that it has been able to respond to requests "to expand the [GTOs] to new geographic areas," noting that it has done so "multiple times."

89 Fed. Reg. at 70,260. Again, that merely shows that if the targeted approach works as the government alleges, it can be expanded to meet the government's needs.

Moreover, FinCEN's reliance on vague "feedback" highlights what is entirely missing from its rationale for the Rule: data about the GTOs and their success (or lack of success) in identifying transactions connected to violations of law. *Id*. Despite numerous requests, "title insurance companies have **never** been provided by FinCEN with the number of apprehensions, arrests or convictions resulting from the reporting required under the GTO." Administrative Record ("AR") J00528 (Doc. 19-23 at 528) (emphasis added). In fact, FinCEN has not made **any** attempt to provide data derived from experience showing how the expanded rules will meet the requirement of being targeted to transactions "relevant to potential violations of law." 31 U.S.C. § 5318(g)(D)(ii)(I).

*Third*, failing to provide any data of its own, FinCEN points to a study by Global Financial Integrity ("GFI"), which looked at fifty-six U.S. money laundering cases and "found that … nearly 61 percent involved at least one transfer in a county not covered by the [GTOs]."[3] But that study provides no rational basis supporting the Rule. To start, GFI provided no information about how it selected those cases beyond noting that they were publicly reported and that GFI relied on "news reports." GFI Report at 2, 14. Based on that, there is no way to account for selection bias in the sample or to assess whether the study has any statistical validity, and FinCEN could not rationally rely on it to justify the

---

[3] 89 Fed. Reg. at 70260 (citing Global Financial Integrity, "Acres of Money Laundering: Why U.S. Real Estate is a Kleptocrat's Dream" (Aug. 2021), p. 26, *available at* https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-Money-Laundering-Final-Version-2021.pdf ("GFI Report")).

massive expansion of reporting requirements in the Rule.[4] More important, the study

concluded that only 39% of the cases involved real estate transfers solely in counties **not**

covered by the GTO Program. GFI Report at 26. The majority of cases raised a flag in a

county **covered** by the GTO Program. And GFI provided no further analysis of the cases

wholly **outside** GTO Program counties to assess whether there were other criteria—

dollar thresholds, links to metropolitan areas, etc.—that identified transactions linked to

illegal activity. If anything, the GFI data showed that the GTO Program is correctly tailored

to capture **most** residential real estate transfers that might have a link to illegal activity.

*Fourth,* FinCEN invoked a rationale even less justified under the statute. FinCEN

pointed out that reports under the GTO Program go into the same database as other

SARs and that this had a "benefit" because FinCEN found that 42% of the transactions

reported in the GTO Program involved people who were also the subject of other SARs—

that is, "persons also engaged in other activity that financial institutions have

characterized as suspicious." 89 Fed. Reg. at 70,260. That does not mean that those

transactions actually involved money laundering. FinCEN's only point was that the **people**

involved in the transactions also had **another** transaction flagged somewhere else as

**suspicious** (not necessarily illegal). But that rationale fails to address the standard set

by Congress, which requires FinCEN to provide a reasoned analysis showing that its

reporting requirements target transactions "relevant to a possible violation of law or

---

[4] *See*, *e.g.*, *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1467 n.5 (7th Cir. 1985) ("[I]t is an agency's duty to establish the statistical validity of the evidence before it prior to reaching conclusions based upon that evidence[.]"); *Andreas-Moses v. Hartford Fire Ins. Co.*, 326 F.R.D. 309, 318 (M.D. Fla. 2018) ("Relying on a conveniently available sample … will likely lead to selection bias and may produce inferences that are misleading when applied to a larger population.").

regulation." *Id.* at 70,258. The data point FinCEN identified does not come close to meeting that standard. The mere fact that people involved in 42% of transactions flagged by the GTO Program were the subject of another SAR does not show that even those transactions were relevant to potential violation of law. One SAR on one transaction does not make **every** transaction that a person engages in relevant to a potential violation of the law. And data showing that **less than half** the transactions flagged by the GTO Program have even that tenuous connection to other SARs provide no support whatsoever for **expanding** reporting requirements and eliminating the restrictions on the GTO Program. At bottom, the 42% figure FinCEN identified does not establish that even the targeted GTO Program is tailored to reach transactions involving potential violations of the law, much less provide a basis for expanding that program.

**B.    The Rule is arbitrary and capricious because FinCEN failed to conduct any rational cost-benefit analysis.**

The Rule is also arbitrary and capricious because FinCEN failed to do a cost-benefit analysis. The BSA directs that, in creating any streamlined SAR requirement, FinCEN must consider "the burdens imposed . . . on persons required to provide such reporting" and "the benefits derived ... by Federal law enforcement agencies and the intelligence community in countering financial crime." 31 U.S.C. § 5318(g)(5)(B)(iii). FinCEN failed to conduct any rational weighing of those costs and benefits.

*First,* FinCEN made no estimate of the benefits of the Rule at all. FinCEN broadly asserted (without citing any evidence) that the rule would yield benefits by aiding criminal investigations and "reducing the social costs associated with ... illicit activity." 89 Fed. Reg. at 70,278. But FinCEN quickly abandoned any actual analysis by simply announcing that "the extent to which" the Rule would "ameliorate the economic problems ... is

generally inestimable," and as a result "no attempt is made to quantify the net benefit of

the rule." *Id.* at 70,284-85. That is, FinCEN threw up its hands and refused even to **try** to

estimate expected benefits. That is the opposite of a reasoned cost-benefit analysis.

Difficulty in determining the precise benefits of the Rule "does not excuse the [agency]

from its statutory obligation to determine as best it can the economic implications of the

rule it has proposed." *Chamber of Com. of U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133,

143 (D.C. Cir. 2005). *See also Pub. Citizen*, 374 F.3d at 1221 (agency must conduct cost-

benefit analysis even where an "estimate will be imprecise" and "uncertainty" does not

provide "an excuse to ignore a congressional command" to do a cost-benefit analysis).

FinCEN only made matters worse with the bizarre suggestion that "it might be

inferred that a tacit expectation underlying this rulemaking is that the rule will generate

intangible benefits worth over $500 million per year." 89 Fed. Reg. at 70,285. The citation

FinCEN provided shows that the $500 million figure reflects FinCEN's ***cost estimates***.

*See id.* at 70,285 n. 77 (referring to "midpoint" value figures of $559.4 million and $532.2

million that reflect the **cost** estimates from the previous page, *see id.* at 70,284). In other

words, FinCEN was saying that a reader might "infer" that FinCEN had the "tacit

expectation" that the benefits of the rule would at least equal the costs—even though

FinCEN provided no analysis to arrive at that conclusion. That is, once again, the opposite

of reasoned decision making. Where a statute directs an agency to consider costs and

benefits, the agency may not merely invite others to "infer" that it must have "tacitly"

reached a cost-benefit conclusion and expect to survive judicial review. The agency must

provide an actual cost-benefit analysis, which FinCEN wholly failed to do. Beyond that,

FinCEN's effort to turn its estimates of the **cost** of the Rule into an estimate of the **benefits**

is the sort of "circular reasoning" that is a "hallmark[] of arbitrary and capricious decision-making." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 54 (1st Cir. 2025).

*Second*, FinCEN failed to conduct a reasonable cost-benefit analysis by failing to consider obvious alternatives that would have vastly reduced the costs of the Rule. FinCEN considered only three alternatives: (i) eliminating the "designation option" for determining a reporting person and instead requiring the reporting person to be identified purely based on the reporting cascade; 89 Fed. Reg. at 70,288, (ii) imposing "the full traditional SAR filing obligations and AML/CFT program requirements on the various real estate professionals," which FinCEN acknowledged would have created costs that far exceed any benefits, *id.*; and (iii) eliminating the reasonable-reliance standard and requiring the reporting person to certify the transferee's beneficial ownership information, *id.* FinCEN's analysis was necessarily incomplete because it failed to consider an obvious alternative: including restrictions that would tailor the reporting requirement to focus on "suspicious transactions" relevant to potential "violations of law," as the BSA requires. Such an alternative might have maintained the individualized approach of traditional SAR obligations without imposing unduly burdensome compliance obligations across the entire industry. Because FinCEN did not consider significant alternatives to the course it ultimately chose, its decision cannot be regarded as rational. *State Farm*, 463 U.S. at 48.

### C. The Rule is arbitrary and capricious because FinCEN failed to meaningfully address significant comments.

The Rule is also arbitrary and capricious because FinCEN failed to adequately evaluate and respond to comments relating to both (i) requiring a monetary threshold for reporting, and (ii) including trusts under the Rule. Comments on these points from Fidelity

and others were "significant and required a response by [FinCEN] to satisfy the APA's procedural requirements." *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1351 (11th Cir. 2021).

### 1. FinCEN failed to adequately consider comments calling for a monetary threshold.

FinCEN offered no adequate response to comments urging the agency to "not eliminate the monetary threshold for a reportable transfer." AR J000530. As Fidelity explained, a monetary threshold vastly reduces burdens by "allow[ing] the reporting entity to immediately eliminate some transactions, while removing the threshold greatly expands the reporting burden unnecessarily." *Id.* FinCEN rejected this request based on the assertion that "[l]ow value non-financed transfers to legal entities and trusts ... can present illicit finance risks." 89 Fed. Reg. 70,269.

But FinCEN never supported that assertion with any record evidence. Instead, it pointed again to the GTO program—which **has** monetary thresholds. FinCEN asserted that its "experience" and "discussions with law enforcement shows that money laundering through real estate occurs at all price points." *Id.* This conclusory statement—suggesting that FinCEN needs no monetary threshold because FinCEN says so, based on vague "discussions" not memorialized anywhere in the record—is exactly the kind of "vague invocation[] of 'operational experience,'" *D.C. v. U.S. Dep't of Agric.*, 496 F. Supp. 3d 213, 233, 244 (D.D.C. 2020), that courts reject as insufficient. Although agencies "have expertise and experience in administering their statutes that no court can properly ignore … reviewing courts must ensure an agency considered … the relevant factors and made no clear error of judgment." *Bidi Vapor LLC v. Food & Drug Admin.*, 47 F.4th 1191, 1204 (11th Cir. 2022) (citation modified) (vacating FDA orders where the government offered "its experience as its primary excuse for its refusal to consider" marketing and sales data).

### 2.  FinCEN failed to adequately consider and respond to comments regarding the inclusion of trusts within the Rule.

FinCEN also provided no adequate response to commenters' concerns related to including trusts in the reporting requirements. As Fidelity and others explained, determining whether a particular trust triggers reporting and identifying the beneficial owner(s) of the trust is not within the expertise of settlement agents. *See*, *e.g.*, AR J00529. Yet the Rule makes settlement agents responsible for reporting on those matters and bearing the risk of errors. Indeed, applying the Rule's definition of "beneficial owners of transferee trusts" calls for a complex legal analysis. The Rule identifies six different subgroups that must be analyzed for ownership or beneficiary status under relevant state law. 31 C.F.R. § 1010.380(n)(1)(ii). Making such determinations demands careful legal analysis, assuming it is even clear **which** state's law applies. Those are matters simply outside the expertise and abilities of most settlement agents.

Worse, the required analysis under the Rule is even more complex. The fifth and sixth subgroups listed in Section 1010.380(n)(1)(ii) create exceptions to the first four.[5] As a result, the Rule effectively requires a settlement agent not only to analyze beneficial ownership under state law, but also to determine whether an **exception** applies under a separate legal analysis. For example, exceptions to the reporting requirement exist for "[a] depository institution holding company [as] defined in 31 C.F.R. § 1010.380(c)(2)(v)," *id.* § 1010.380(n)(10)(ii)(E), and "[a] State-licensed insurance producer [as] defined in 31 C.F.R. § 1010.380(c)(2)(xiii)," *id.* § 1010.380(n)(10)(K).

---

[5] For example, the fifth category provides an exception for determining a beneficial owner of a trust whenever "the legal entity meets the criteria set forth in paragraphs (n)(10)(ii)(A) through (P) of this section." *Id.* §1010.380(n)(1)(ii)(E).

Despite Fidelity drawing attention to this problem, FinCEN failed to meaningfully address it. FinCEN merely acknowledged the comments, *see* 89 Fed. Reg. 70,269, and summarily cast them aside, asserting that "difficulties ... such as the need to review complex trust documents to determine whether a trust is reportable, will be minimized by the addition of new exceptions and by the reasonable reliance standard." *Id.* at 70,270. That response is wholly insufficient. FinCEN fails to explain why the three narrow exceptions it identifies—(i) transfers "required under the terms of a trust," *id.* at 70,268; (ii) transfers supervised by a court in the United States, 31 C.F.R. § 1031.320(b)(2)(v); and (iii) transfers in which an individual transferor (alone or with their spouse) transfers an interest to a trust for no consideration, *id.* § 1031.320(b)(2)(vi)—will meaningfully alleviate the burdens created by the Rule, given that the overwhelming majority of trust transactions will not fall under these categories.

Nor does the Rule's "reasonable reliance" standard fix the problem. A reporting person must still "certif[y] the accuracy of the information in writing to the best of the person's knowledge." *Id.* § 1031.320(j)(2). Thus, to rely on information from a trust about its ownership, a reporting person must still investigate whether there is any information in the transaction documents that would indicate to a person with a reasonable understanding of the law that the trust's answers were wrong. That does not materially alleviate the burden on the reporting person. Pointing to the reasonable reliance standard thus provides no reasonable response to Fidelity's comments.

### III. FinCEN's Rule violates the Fourth Amendment because it compels disclosure of unnecessary and intrusive personal information from innocent private persons without the requirement of a warrant.

The Rule also violates the Fourth Amendment—both facially and as applied to Plaintiffs—due to its highly intrusive and standardless demand for information without any

connection to illegal activity. The "mere disclosure of a specific transaction to the government implicates the Fourth Amendment bar on unreasonable searches." *Carmen v. Yellen*, 112 F.4th 386, 405 (6th Cir. 2024). Here, the Rule demands sweeping disclosures of sensitive personal information without any rationale connecting the transactions to suspicious or unlawful activity that might render a search reasonable. As a result, the Rule violates the constitutional boundaries set by the Supreme Court's interpretation of the BSA in *Shultz*, 416 U.S. 21, violates Fourth Amendment standards even for highly regulated industries, and is so broad as to constitute a general warrant.

### A. The Rule violates even the relaxed Fourth Amendment standards applicable to agencies investigating regulated industries.

Even under the relaxed Fourth Amendment test applied to agencies investigating pervasively regulated entities like banks,[6] the Rule is unconstitutional for two reasons.

*First,* the Rule mandates collection of information beyond what the Supreme Court held constitutional in *Shultz*, which articulated Fourth Amendment boundaries under the BSA. *Shultz* held the warrantless collection of information under the BSA consistent with the Fourth Amendment **if** "[t]he inquiry is within the authority of the agency, the demand is not too indefinite **and** the information sought is reasonably relevant." *Shultz*, 416 U.S. 21 at 66–67 (emphasis added). FinCEN's authority is limited to investigating suspicious and potentially unlawful activity. As *Shultz* pointed out, the BSA was enacted to combat "customers thought to be engaged in [illegal] activities," and was designed to obtain financial information having "a high degree of usefulness in criminal, tax, or regulatory

---

[6] *See Small Bus. Ass'n of Mich.*, 769 F. Supp. 3d at 735–36 (banks have reduced expectation of privacy due to a "comprehensive scheme that puts [them] on notice that their property will be subject to periodic inspections") (citation omitted).

investigations or proceedings." *Id.* at 26. Accordingly, *Shultz* held that, to meet Fourth Amendment requirements, regulations must be sufficiently tailored to single out transactions that have "**the greatest potential**" for circumventing the law and that involve "**substantial amounts of money**." *Id.* at 63 (emphasis added).

The Rule here contains **no such limitations.** That is impermissible. The agency cannot operate outside its authority and cannot demand information that lacks demonstrated relevance to investigating unlawful activity. *Shultz*, 416 U.S. 21 at 66–67; *see also Morton Salt*, 338 U.S. at 652; *In re McVane*, 44 F.3d 1127, 1139 (2d Cir. 1995). Simply put, the BSA empowers FinCEN to investigate suspicious and unlawful activity. Under that statute, the agency may not constitutionally demand the prophylactic, blanket, and warrantless collection of personal information from up to 850,000 transactions a year where there is no indication whatsoever that those transactions have any connection to unlawful activity.

By requiring disclosure of private information even where there are no indicia of illegality or connections to criminal activity, the Rule exceeds constitutional bounds. "What this amounts to is a broad, grab-everything collection of suspicionless data because some day, some way, somehow, someone in law enforcement might find it useful"; this fails the "sufficiently described" and "limited" test under *Shultz. See Small Bus. Ass'n of Mich.*, 769 F. Supp. 3d at 734–35. Reporting requirements are unreasonable under the Fourth Amendment where they fail to adequately limit the search to suspicious or illicit activity. *Id.* at 735 (reporting requirement violated Fourth Amendment because "[t]he scope is essentially unlimited and in no way tries to home in on a subset of entities that, like the subset of high-dollar transactions, are more likely to trigger legitimate concerns").

26

*Second*, **even if** residential real estate transfers were a "closely regulated" industry,[7] the Rule would still be unconstitutional because it falls outside the scope of constitutionally permissible inquiry in such industries. Even in such industries, routine searches must still provide "a constitutionally adequate substitute for a warrant" in terms "of the certainty and regularity of its application." *Patel*, 576 U.S. at 426 (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)). The Rule fails this requirement because it fails to limit reporting demands to transactions that have any likely connection to illegal activity. 89 Fed. Reg. 70,262. Instead, the Rule imposes an unprecedented dragnet that requires Plaintiffs to submit reports and keep records on all non-financed transfers of residential property on a nationwide basis. *Id.* at 70,258-94.[8] By forcing Plaintiffs to disclose sensitive details of **all** covered transactions, even those with no articulable connection to potential illegal activity, the Rule violates Plaintiffs' reasonable expectations of privacy under the Fourth Amendment. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 489 (S.D.N.Y. 2019) (preliminarily enjoining a blanket reporting requirement as likely to be invalid).

### B.    The Rule constitutes an unconstitutional general warrant in violation of the Fourth Amendment.

The absence of **any** limiting standards in the Rule's reporting requirement also creates an unconstitutional "general warrant" that violates the Fourth Amendment. The

---

[7] The Supreme Court has defined only four industries as "closely regulated," such that they enjoy no expectation of privacy: liquor sales, firearms dealing, mining, and running an automobile junkyard. *See City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015) (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313 (1978)).

[8] There can be no question that Plaintiffs have a reasonable expectation of privacy in such business records, which are their property in which they have "both a possessory and an ownership interest" that allows them "right to exclude others." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013); *see also Shultz*, 416 U.S. at 65–66.

Fourth Amendment prohibits the broad warrantless collection of information amounting to a "general warrant." *See Stanford v. Texas*, 379 U.S. 476, 481 (1965). Indeed, the amendment was designed "as a 'response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed ... an unrestrained search for evidence of criminal activity," and it protects against a "permeating police surveillance." *Carpenter v. United States*, 585 U.S. 296, 303, 305 (2018) (citation omitted).

The FinCEN Rule typifies the sort of broad, standardless intrusion that threatens "permeating surveillance" prohibited by the Fourth Amendment. FinCEN rejected all sensible limits to target its information requests, such as monetary thresholds or restrictions to transactions with particular characteristics. *Supra* Section II.C. The result is a Rule of unlimited sweep that will gather information (according to FinCEN) on 800,000-850,000 transactions a year (compared to only 20,411 reports under targeted GTOs). 89 Fed. Reg. 70,283. Because the Rule fails to apply any limits at all, a gift through a trust from parents to an adult child of an acre of land in rural Florida worth $5,000 would trigger the full reporting requirement. As requiring such pointless reporting shows, the Rule is simply a standardless regulatory fishing expedition.

In *Small Business Association of Michigan,* the court expressed the fear of allowing permeating police surveillance under a FinCEN program that "compels citizens to disclose private information they are not required to disclose anywhere else just so the government can sit on a massive database to satisfy future law enforcement requests." 769 F. Supp. 3d at 739. That concern applies equally here. The Fourth Amendment was drafted to prevent standardless dragnet searches, and the Rule's sweeping and intrusive demand for personal information is so extreme as to constitute a general warrant.

28

**IV.    The Rule violates the First Amendment's prohibition on compelled speech.**

The Rule should also be vacated because it compels speech in violation of the First Amendment. The First Amendment "includes both the right to speak freely and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Because it requires the regulated parties to report information they would otherwise choose not to report, the Rule is content-based compulsion of speech and triggers strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (laws compelling speech normally trigger strict scrutiny because they "necessarily alter[] the content of … speech"). Thus, the Rule must be "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018).

FinCEN cannot defend the Rule by arguing that it regulates commercial speech and is thus subject to a lower level of scrutiny. Because the Rule requires the exercise of legal judgment (such as determining beneficial ownership), it does not regulate purely commercial speech and is not subject to intermediate scrutiny. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (rejecting arguments that a regulation governed commercial speech when it required evaluative assessments rather than pure factual disclosures). For the same reason, FinCEN cannot argue that the Rule is subject to rational basis review, which governs disclosures of commercial speech that contain "purely factual and uncontroversial information." *Becerra*, 585 U.S. at 768-69.

Regardless, the Rule fails under any level of scrutiny. As explained above, FinCEN failed to show that the Rule was in any way tailored to identify transactions that were likely connected to money laundering. *Supra* Section II.A. As a result, the Rule cannot satisfy intermediate scrutiny, which would require showing that "the regulation directly advances"

a "substantial" government interest, and "is not more extensive than is necessary to serve

that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S.

557, 566 (1980). Nor could it even survive rational basis review. Because FinCEN failed

to establish any connection between the broad sweep of transactions covered by the Rule

and illegal activity, the Rule's "unjustified and unduly burdensome" disclosure

requirements are not in any way "reasonably" related to the State's interest. *Becerra*, 585

U.S. at 776, 778. The Rule should be vacated.

## CONCLUSION

Plaintiffs therefore respectfully request the Court grant summary judgment holding

the Rule as unlawful and must be "set aside," as provided under 5 U.S.C. § 706(2)(C).

Dated: August 25, 2025

Patrick F. Philbin (DCBN 453620)
Jeff Jensen (DCBN 1765723)
William P. Barr (DCBN 951202)
**Torridon Law PLLC**
801 Seventeenth Street NW, Suite 801
Washington, DC 20006
Telephone: (202) 249-6900
pphilbin@torridonlaw.com
jjensen@torridonlaw.com
wbarr@torridonlaw.com
*Admitted Pro Hac Vice*

Respectfully submitted,

By: */s/ Stuart H. Singer*
Stuart H. Singer (FBN 377325)
Jesse Panuccio (FBN 31401)
Jon L. Mills (FBN 148286)
Eric M. Palmer (FBN 1050210)
Lauren Amos (FBN 1026073)
**Boies Schiller Flexner LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
ssinger@bsfllp.com
jpanuccio@bsfllp.com
jmills@bsfllp.com
epalmer@bsfllp.com
lamos@bsfllp.com

Alan Vickery (NYBN 1917590)
David Boies (NYBN 2296333)
**Boies Schiller Flexner LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone:  (212) 446-2300
avickery@bsfllp.com
DBoies@bsfllp.com
*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2025, I filed the foregoing document via the

CM/ECF system which will send notification of such filing to all parties and their counsel

of record in this case.

By: */s/ Stuart H. Singer*
Stuart H. Singer