UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FIDELITY NATIONAL FINANCIAL,
INC. and FIDELITY NATIONAL
TITLE INSURANCE COMPANY,

        Plaintiffs,

v.                            Case No.: 3:25-cv-554-WWB-SJH

SCOTT BESSENT, UNITED STATES
DEPARTMENT OF THE TREASURY,
ANDREA GACKI, and THE FINANCIAL
CRIMES ENFORCEMENT NETWORK,

        Defendants.

_____/

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ii

MEMORANDUM OF LAW ............................................................................... 1

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 2

I.      Plaintiffs are leading title insurance companies. ................................... 2

II.     The Bank Secrecy Act cabins the authority of the Financial Enforcement
        Network. ................................................................................................ 3

III.    FinCEN's historical use of geographic targeting orders. ....................... 5

IV.     The Rule. ............................................................................................... 5

ARGUMENT ................................................................................................... 7

I.      Fidelity is likely to succeed on the merits. ............................................ 8

II.     Plaintiffs will suffer irreparable harm absent preliminary relief. ............. 9

III.    The balance of equities and public interest prongs favor issuance of a stay or
        preliminary injunction. ......................................................................... 12

IV.     Universal relief without security is appropriate. ................................... 18

CONCLUSION .............................................................................................. 19

CERTIFICATE OF SERVICE ......................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Airlines for Am. v. DOT*,
  110 F.4th 672 (5th Cir. 2024) .................................................................. 14, 15

*Alabama v. U.S. Sec'y of Educ.*,
  2024 WL 3981994 (11th Cir. 2024) .................................................... 11, 14, 17

*Am. Council of Life Insurers v. U.S. Dep't of Labor*,
  2024 WL 3572297 (N.D. Tex. July 26, 2024) ............................................. 18

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
  425 F.3d 964 (11th Cir. 2005) ..................................................................... 18

*Boggs Contracting, Inc. v. Freismuth*,
  2021 WL 6755466 (M.D. Fla. Dec. 27, 2021) ............................................... 8

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................................... 9

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ........................................................................ 16

*Cabrera v. U.S. Dep't of Lab.*,
  2025 WL 2092026 (D.D.C. July 25, 2025) .................................................... 2

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) .................................................................. 15, 18

*Coal. for Humane Immigrant Rights v. Noem*,
  2025 WL 2192986 (D.D.C. Aug. 1, 2025) ..................................................... 2

*Complete Angler, LLC v. City of Clearwater*,
  607 F. Supp. 2d 1326 (M.D. Fla. 2009) ...................................................... 19

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
  661 F.2d 328 (5th Cir. Unit B 1981) ........................................................... 12

*Dep't of Educ. v. Career Colls. & Schs. of Tex.*,
  145 S. Ct. 1039 (2025) ................................................................................. 15

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ....................................................................................... 9

*Florida v. Dep't of Health & Hum. Servs.*,
  739 F. Supp. 3d 1091 (M.D. Fla. 2024) ............................................ 8, 14, 16

*Florida v. Nelson*,
    576 F. Supp. 3d 1017 (M.D. Fla. 2021)........................................................ 14

*Georgia v. President of U.S.*,
    46 F.4th 1283 (11th Cir. 2022) ............................................................... 9, 11

*Gonzalez v. Governor of Ga.*,
    978 F.3d 1266 (11th Cir. 2020) ........................................................... 7, 8, 12

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ................................................................. 12

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)...................................................................... 14

*Lebron v. Wilkins*,
    820 F. Supp. 2d 1273 (M.D. Fla. 2011) ......................................... 12, 14, 18

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................. 8

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ........................................................ 9, 12, 16

*Props. of the Villages, Inc. v. Fed. Trade Comm'n*,
    2024 WL 3870380 (M.D. Fla. Aug. 15, 2024)............................................ 17

*Scott v. City of Daytona Beach*,
    689 F. Supp. 3d 1160 (M.D. Fla. 2023).......................................... 12, 16, 19

*Scott v. City of Daytona Beach*,
    740 F. Supp. 3d 1205 (M.D. Fla. 2024) ..................................................... 8, 13

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ................................................................. 13

*Smith v. U.S. Dep't of Treasury*,
    761 F. Supp. 3d 952 (E.D. Tex. 2025) ................................................. 11, 16

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) .................................................................. 8

*State v. Becerra*,
    544 F. Supp. 3d 1241 (M.D. Fla. 2021).............................................. 13, 14

*Transcon. Gas Pipe Line Co., LLC v. 6.04 acres*,
    910 F.3d 1130 (11th Cir. 2018) ................................................................. 12

iii

*Trump* v. CASA,
   145 S. Ct. 2540 (2025).......................................................................... 2

*Yorktown Sys. Grp. Inc. v. Threat Tec LLC*,
   105 F.4th 1287 (11th Cir. 2024) ............................................................ 9

## **Statutes**

5 U.S.C. § 553(d) ...................................................................................... 16

5 U.S.C. § 705............................................................................... 1, 2, 8, 18

5 U.S.C. § 706............................................................................................. 2

31 U.S.C. § 5318.................................................................................. 3, 4, 6

## **Rules**

Fed. R. Civ. P. 65 ................................................................................. 1, 18

## **Regulations**

*Anti-Money Laundering Regulations for Residential Real Estate Transfers*,
   89 Fed. Reg. 70,258 (the "Rule") ....................................................passim

*Delivering Emergency Price Relief for American Families and Defeating the Cost-of-Living Crisis.*",
   90 Fed. Reg. 8,245 (Jan. 28, 2025) ...................................................... 15

## **Other Authorities**

FinCEN Renews Real Estate Geographic Targeting Orders" (Oct. 20, 2023),
   https://www.fincen.gov/news/news-releases/fincen-renews-and-expands-real-estate-geographic-targeting-orders-2................................................................ 17

Plaintiffs Fidelity National Financial, Inc. ("FNF") and Fidelity National Title Insurance Company ("FNTIC"), (collectively, "Fidelity"), pursuant to 5 U.S.C. § 705, Federal Rule of Civil Procedure 65, and Middle District of Florida Local Rule 6.02, respectfully move this Court for a stay of the effective date of FinCEN's August 29, 2024, rule entitled "Anti-Money Laundering Regulations for Residential Real Estate Transfers," 89 Fed. Reg. 70,258 (the "Rule", attached herein as Exhibit A), pending resolution of the parties' cross-motions for summary judgment. Alternatively, Fidelity respectfully requests that this Court enter a preliminary injunction enjoining enforcement of the Rule against Fidelity, pending resolution of the parties' cross-motions for summary judgment.

## MEMORANDUM OF LAW

## INTRODUCTION

Fidelity and its subsidiaries are leading providers of title insurance and settlement services for real estate transactions. FinCEN's new Rule, entitled "Anti-Money Laundering Regulations for Residential Real Estate Transfers," 89 Fed. Reg. 70,258, imposes sweeping, burdensome requirements that would force these companies to collect and disclose sensitive personal information from hundreds of thousands of Americans involved in perfectly lawful real estate transactions. Rather than targeting suspicious activity, the Rule mandates blanket reporting on nearly all non-financed residential real estate transfers to trusts or legal entities, regardless of any indication of wrongdoing.

As set forth in the complaint and Fidelity's motion for summary judgment, filed today, the Rule exceeds the lawful authority provided by the statute under which it was promulgated, was not adopted in compliance with the Administrative Procedure Act ("APA"), and violates the Fourth and First Amendments. The Rule will impose extremely high compliance costs—estimated by FinCEN at up to $690.4 million in the first year

1

alone—and disrupt real estate closings. FinCEN adopted the Rule without a meaningful cost-benefit analysis and without clear congressional authorization to require such extensive data collection from real estate professionals.

Fidelity has challenged the Rule in this Court, and the parties have agreed to an expedited schedule under which summary judgment briefing shall be completed by October 24, 2025. The Rule, however, takes effect on December 1, and the Department of the Treasury has not acted on an administrative petition filed by Fidelity on June 23, 2025, asking the Department to stay the effective date pending determination of this case. Fidelity here seeks a limited stay or preliminary injunction, preserving the status quo, while the matter is awaiting decision by this Court.[1]

## FACTUAL BACKGROUND

### I.    Plaintiffs are leading title insurance companies.

Plaintiff FNF provides title insurance and transaction services to the real estate and mortgage industry. Joint Stip. of Agreed Facts and Law (Doc. 31) ("Stip.", attached

---

[1] Under 5 U.S.C. § 706, a court may "set aside agency action" found to be in violation of the APA, and under 5 U.S.C. § 705, a reviewing court of agency action "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." To be clear, "the scope of relief under the APA is not party-restricted." *Cabrera v. U.S. Dep't of Lab.*, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025). "[V]acatur of the agency action— not merely exempting plaintiffs from the agency action— is the normal remedy under APA section 706," and courts around the country "have applied that same rule to section 705 stays." *Coal. for Humane Immigrant Rights v. Noem*, 2025 WL 2192986, at *37 (D.D.C. Aug. 1, 2025) (collecting cases). Thus, the Supreme Court's recent decision in *Trump v. CASA*, which held that universal preliminary injunctions likely exceed a court's **equitable** authority, has no effect on the Court's authority to stay the Rule's effective date under the APA. *See* 145 S. Ct. 2540, 2554 n.10 (2025); *see also id.* at 2567 (Kavanaugh, J., concurring) ("To be sure, in the wake of the Court's decision, ... in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule."). A universal stay is appropriate here, as Fidelity is likely to succeed on its APA claims. Alternatively, Fidelity respectfully requests a preliminary injunction enjoining enforcement of the Rule as to Fidelity specifically.

herein as Exhibit B) at ¶ 2. FNF is the nation's largest title insurance company through its title insurance underwriters—Fidelity National Title, Chicago Title, Commonwealth Land Title, Alamo Title, and National Title of New York. Stip. at ¶ 2. Likewise, Plaintiff FNTIC, through its nationwide network of direct operations and agents, provides title insurance, underwriting, escrow, and closing services to residential, commercial, and industrial clients, lenders, developers, attorneys, real estate professionals, and consumers. Stip. at ¶ 4. FNTIC and Chicago Title are the largest of FNF's title insurance subsidiaries. Stip. at ¶ 4.

## II.    The Bank Secrecy Act cabins the authority of the Financial Enforcement Network.

The Bank Secrecy Act ("BSA") requires certain financial institutions to maintain anti-money laundering practices and policies designed to counter the financing of terrorism ("AML/CFT programs"). Stip. at ¶ 27.

The Secretary of the Treasury has delegated its authority "to implement, administer, and enforce the compliance with the BSA" to the Director of FinCEN. Stip. at ¶ 11. The BSA definition of financial institutions to which the § 5318(a)(2) AML/CFT program requirement applies includes "persons involved in real estate closings and settlements." Stip. at ¶ 31 (quoting 31 U.S.C. § 5318(a)(2)(U)). For over twenty years, FinCEN has exempted this category of persons from "comprehensive regulation under the BSA." Stip. at ¶ 31.

Additionally, Section 5318(g)(1), entitled "Reporting of Suspicious Transactions," authorizes the Secretary (and by delegation, the FinCEN Director) to "require any financial institution, any director, officer, employee, or agent of any financial institution, to

report any suspicious transaction relevant to a possible violation of law or regulation." Stip. at ¶ 23.

The Anti-Money Laundering Act of 2020 amended the BSA to require the Secretary (and thus the FinCEN Director by delegation) to "establish streamlined … processes to, as appropriate, permit the filing of noncomplex categories of reports" of suspicious financial activity. Stip. at ¶¶ 14, 35 (quoting 31 U.S.C. § 5318(g)(5)(D)(i)(I)). The streamlined suspicious activity report ("SAR") requirements adopted pursuant to the amended provisions should "reduce burdens imposed on persons required to report" while not "diminish[ing] the usefulness of the reporting to Federal law enforcement agencies, national security officials, and the intelligence community in combating financial crime, including the financing of terrorism." Stip. at ¶ 36 (quoting 31 U.S.C. § 5318(g)(5)(D)(i)(I)(aa)-(bb)).

In exercising its authority to adopt a streamlined SAR rule, FinCEN must comply with two requirements, which the BSA refers to as "Standards." Standard (I) mandates that in establishing a streamlined SAR process, FinCEN "shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law (including regulations)." Stip. at ¶ 37. (quoting 31 U.S.C. § 5318(g)(5)(D)(ii)(I)). Standard (II) provides that, in establishing such standards, FinCEN "shall consider transactions, including structured transactions, designed to evade any regulation promulgated under this subchapter, certain fund and asset transfers with little or no apparent economic purpose, transactions without lawful purposes, and any other transactions that the Secretary determines to be appropriate." Stip. at ¶ 38 (quoting 31 U.S.C. § 5318(g)(5)(D)(ii)(II)).

4

III.    **FinCEN's historical use of geographic targeting orders.**

Instead of categorically targeting all "persons involved in real estate closings and settlements," since 2016, FinCEN has issued Residential Real Estate Geographic Targeting Orders ("GTOs") to "require certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States." Stip. at ¶ 32 (quoting 89 Fed. Reg. at 70,259-60). These GTOs are focused on a subset of non-financed purchases of residential real estate thought by FinCEN to present a high risk of money laundering. Stip. at ¶ 33.  GTOs were intended to be temporary and under the statute may be implemented for only 180 days subject to renewal.  Stip. at ¶ 30. The current GTOs are "narrow in that they are temporary, location-specific, and limited in the transactions they cover." Stip. at ¶ 63 (quoting 89 Fed. Reg. at 70,279). They cover limited markets (primarily major metropolitan areas) in 13 States and the District of Columbia.  Stip. at ¶ 63.  The GTOs also are limited to sales involving consideration of at least $300,000.[2] Stip. at ¶ 63.  A transaction in which a trust is the purchasing entity would not be covered under the GTOs. Stip. at ¶ 63.

IV.    **The Rule.**

Despite the limitations clearly set out in the BSA, FinCEN exceeded its statutorily granted authority with the stroke of a pen. As already noted above, FinCEN promulgated the Rule on August 29, 2024. Stip. at ¶ 20. The Rule becomes effective on December 1, 2025. Stip. at ¶ 21. FinCEN "expect[s] [the Rule] to assist the U.S. Department of the

---

[2] Except in the City or County of Baltimore in Maryland, wherein the minimum purchase price needed to trigger a GTO is $50,000.  Stip. at ¶ 63 n.3.

Treasury, law enforcement, and national security agencies in addressing illicit finance vulnerabilities in the U.S. residential real estate sector, and to curtail the ability of illicit actors to anonymously launder illicit proceeds through transfers of residential real property, which threatens U.S. economic and national security."  Stip. at ¶ 22.

In the section of the Rule entitled "Authority," FinCEN stated that it was "issuing this final rule pursuant to its BSA authority to require 'financial institutions' to report 'suspicious transactions' under 31 U.S.C. 5318(g)(1)." 89 Fed. Reg. at 70,262. FinCEN also explained that the Rule "is instituting a streamlined [SAR] filing requirement" pursuant to FinCEN's authority under 31 U.S.C. § 5318(g)(5)(D).  Stip. at ¶ 24.  FinCEN further noted that the streamlined SAR provisions in "a more recent amendment to the BSA at 31 U.S.C. 5318(g)(5)(D) provide FinCEN with additional flexibility to tailor the form of the SAR reporting requirement." Stip. at ¶ 25 (quoting 89 Fed. Reg. at 70,262).

The Rule requires "reporting persons" to file a "Real Estate Report" for "certain non-financed transfers of residential real property to legal entities and trusts." Stip. at ¶ 39 (quoting 89 Fed. Reg. at 70,258). The Rule defines "reportable transfer" broadly, with limited exceptions, and applies nationwide—thereby eliminating the minimum dollar threshold and geographic limits that characterized prior GTOs. *See* Stip. at ¶¶ 42-43, 65-67. Responsibility for filing a report falls to the "reporting person," determined through a cascading approach: first, the listed closing or settlement agent; then, if none, the preparer of the closing or settlement statement; the person filing the deed or transfer instrument; the title insurance underwriter; the funds disburser; the evaluator of title status; or the preparer of the deed or other legal instrument transferring the residential real property. Stip. at ¶¶ 46-47.

The Rule requires reporting of detailed information on the reporting person, the transferee and (with some exceptions) any beneficial owner, the transferor, transferor entities, transferee entities, the property being transferred, and payment details. Stip. at ¶ 49. This includes, but is not limited to, names, dates of birth, citizenship, residential and business addresses, tax identification numbers, payment amounts and methods, and total consideration paid. Stip. at ¶ 49. For transferee entities and trusts, the reporting person must provide information on legal names, addresses, unique identifying numbers, and, for beneficial owners, additional personal details. Stip. at ¶¶ 50-59.

Unlike the prior GTOs—which were temporary, location-specific, and limited to higher-value transactions—the Rule has no minimum dollar threshold or geographic limitations. Stip. at ¶¶ 65-67. In 2023, FinCEN received 20,411 reports under the GTOs. Stip. at ¶ 69. Under the new Rule, FinCEN estimates 800,000 to 850,000 reports annually, an approximately 40-fold increase, with astronomical compliance costs for the real estate sector projected between $428.4 and $690.4 million in just the first year, and between $401.2 and $663.2 million in subsequent years. Stip. at ¶¶ 71-72.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish that "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). "The district court has substantial discretion in weighing the four relevant factors to determine whether preliminary injunctive relief is warranted." *Id.* at 1271 n.13. Further, the third and fourth factors "merge when, as here, a government entity is the opposing

party." *Scott v. City of Daytona Beach*, 740 F. Supp. 3d 1205, 1218 (Berger, J.) (M.D. Fla. 2024).

5 U.S.C. § 705 provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "The showing required for a stay under section 705 of the APA is not materially different than that required for a preliminary injunction." *Florida v. Dep't of Health & Hum. Servs.*, 739 F. Supp. 3d 1091, 1101 (M.D. Fla. 2024); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009).

Here, all four factors strongly support the issuance of a stay or preliminary injunction to prevent irreparable harm and preserve the status quo.

## I.    Fidelity is likely to succeed on the merits.

Considering the likelihood of success on the merits "is generally the most important of the four factors." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022). "A substantial likelihood of success on the merits requires a showing of only **likely** or probable, rather than **certain**, success." *Gonzalez*, 978 F.3d at 1271 n.12 (emphasis in original) (citation omitted). "When plaintiffs assert multiple claims as a basis for a preliminary injunction, they need only establish a substantial likelihood of success on one claim." *Boggs Contracting, Inc. v. Freismuth*, 2021 WL 6755466, at *2 (M.D. Fla. Dec. 27, 2021) (internal quotations and citation omitted). Here, the Rule exceeds FinCEN's statutory authority, violates the APA, and violates the Constitution, as set forth in Plaintiffs' Motion for Summary Judgment filed today, which is incorporated herein.

## II.    Plaintiffs will suffer irreparable harm absent preliminary relief.

Absent a stay or preliminary injunction, Fidelity will suffer irreparable harm. To demonstrate irreparable harm, the movant must show it would suffer "irreparable injury if the injunction didn't issue." *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 105 F.4th 1287, 1296 (11th Cir. 2024). "The injury must be actual and imminent, not remote or speculative." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013). Additionally, an injury is irreparable "only if it cannot be undone through monetary remedies." *Yorktown Sys. Grp. Inc.*, 105 F.4th at 1296. Here, because the Rule imposes severe, unrecoverable costs and violates fundamental rights, Fidelity easily satisfies this standard.

**1.** Enforcement of the Rule will cost Fidelity hundreds of millions of dollars in compliance costs. Fidelity has already begun to incur such costs in research and development of systems designed to gather the required information and report it to the government; implementation of the Rule will cause these costs to mushroom. These costs constitute irreparable harm, as they cannot be recovered from the government: "This Circuit has recognized that unrecoverable monetary loss is an irreparable harm." *Georgia v. President of U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022). "That includes situations where there is no adequate remedy at law to recover damages for the harm suffered." *Id.* (citation modified). Here, FinCEN is immune from suit for monetary damages, and no sovereign immunity waiver applies to Fidelity's claims. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (noting that the APA does not waive sovereign immunity for actions for damages).

FNF is the nation's largest title insurance company through its title insurance underwriters, including FNTIC, which collectively issue more title insurance policies than any other title insurance company in the United States. Stip. at ¶ 2. In 2023, FNF's direct operations and wholly owned subsidiaries filed 6,751 Currency Transaction Reports in compliance with the current GTOs that are in place. Niemczyk Decl. Ex. C, at ¶ 2. Further, FNF and its companies, including FNTIC, have approximately 41% of market share within the title industry, and they stand to bear an equally substantial share of the costs that the Rule will impose on the industry. Niemczyk Decl. Ex. C, at ¶ 3.

Against that backdrop, the Rule imposes significant compliance costs onto Fidelity. For instance, FinCEN estimates that the Rule will result in a **4,000% increase** in reports required to be filed annually with FinCEN.[3]  Clearly, FNF and its companies will face the burden of a substantial increase in the number of reports required to be made under the new Rule. Even if the FinCEN estimate were high, Fidelity will be required to file many thousands of additional reports beginning December 1, 2025, while this case is being decided. FinCEN has also explained that the "rule is wider in scope of coverage and will collect ... information **previously not available** through the Residential Real Estate GTOs." Stip. at ¶ 48 (emphasis added). Fidelity will be required to collect non-public information not regularly obtained in real estate closings, including personally identifiable information from trustees and signers on behalf of legal businesses, as well as trust beneficiaries and owners of legal entities, which Fidelity must then retain for five years. Stip. at ¶¶ 49, 51-54, 74-75. Hence, Fidelity and industry members must prepare for this

---

[3] The Final Rule estimates that the number of reportable transfers will increase to approximately 800,000 to 850,000 annually, from the 20,411 reports filed with FinCEN in 2023. Stip. at ¶¶ 71, 69.

sea change in obligations, including the adoption of secure information technology systems and protocols, implementation of internal policies and trainings, hiring of compliance personnel, and deployment of new technology applications to carry out their new obligations. Niemczyk Decl. Ex. C, at ¶ 4.

These new obligations are far from incidental: FinCEN itself estimates that the costs to the real estate sector for the first compliance year will be "between approximately $428.4 and $690.4 million (midpoint $559.4 million)" and in subsequent years "between approximately $401.2 and $663.2 million (midpoint $532.2 million) (current dollar value)." 89 Fed. Reg. at 70,294; Stip. at ¶¶ 72, 88. Given FNF and its companies' 41% market share and FinCEN's own estimates, the Rule will cause FNF and its companies to incur between $175.6 million and $283 million during the first compliance year—approximately $481,000 to $775,000 in compliance costs **per day**. Niemczyk Decl. Ex. C, at ¶ 5. And in subsequent years, implementation of the Rule will cost it and its companies an estimated $164.4 million to $271.9 million annually. Niemczyk Decl. Ex. C, at ¶ 5.

Accordingly, a stay or preliminary injunction is necessary here to prevent irreparable harm. *See Smith v. U.S. Dep't of Treasury*, 761 F. Supp. 3d 952, 973 (E.D. Tex. 2025) (irreparable harm where "Plaintiffs must expend money to comply with the reporting requirements of the CTA, which is unlikely to be recovered"); *Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *6 (11th Cir. 2024) (irreparable harm where plaintiffs faced "substantial compliance costs in the form of time and money if the rule went into effect" and the agency "acknowledged the rule would lead to increased compliance costs"); *Georgia*, 46 F.4th at 1302 (irreparable harm where employers would lose employees and would devote "time and effort" to comply with government mandate);

*Odebrecht Constr., Inc.*, 715 F.3d at 1289 (irreparable harm where plaintiff would suffer
lost revenues, profits, and bidding rights and had no monetary recourse against the
agency); *Transcon. Gas Pipe Line Co., LLC v. 6.04 acres*, 910 F.3d 1130, 1166 (11th Cir.
2018) (irreparable harm where plaintiff's economic damages estimated to be in the
hundreds of thousands of dollars per day of construction delay and could not be
recovered).

**2.** Fidelity will also suffer violations of their First and Fourth Amendment rights, the
loss of which constitutes irreparable harm. *Scott v. City of Daytona Beach*, 689 F. Supp.
3d 1160, 1169 (M.D. Fla. 2023) (Berger, J.) ("[I]t is well established that '[t]he loss of First
Amendment freedoms, for even minimal periods of time, unquestionably constitutes
irreparable injury.'" (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–
72 (11th Cir. 2006))); *Lebron v. Wilkins*, 820 F. Supp. 2d 1273, 1292 (M.D. Fla. 2011),
*aff'd sub nom. Lebron v. Sec'y, Fla. Dep't of Child. & Fams.*, 710 F.3d 1202 (11th Cir.
2013) ("The right to be free from unreasonable searches and seizures under the Fourth
Amendment is a fundamental constitutional right, the violation of which is enough to
demonstrate irreparable harm."); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328, 338 (5th Cir. Unit B 1981) ("[T]he right of privacy must be carefully guarded
for once an infringement has occurred it cannot be undone by monetary relief.").

### III.   The balance of equities and public interest prongs favor issuance of a stay or preliminary injunction.

The last two criteria of the stay and preliminary injunction analysis favor Fidelity.
Specifically, the Court must consider whether the threatened harm to Fidelity outweighs
any harm the injunction may cause to FinCEN, and whether an injunction would be
"adverse to the public interest." *Gonzalez*, 978 F.3d at 1270–71. Further, when a plaintiff

seeks an injunction against a government entity, the balance of the equities and public interest prongs merge. *See Scott*, 740 F. Supp. 3d at 1218; *see also State v. Becerra*, 544 F. Supp. 3d 1241, 1302 (M.D. Fla. 2021). In other words, "the third and fourth considerations are largely the same." *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).

Here, absent a stay or injunction, both Fidelity and the public face irreparable harm, while FinCEN will suffer little, if any, if the stay or injunction is granted. Therefore, a stay is not only in Fidelity's interest, but also directly serves the public interest.

**1.** The Rule unquestionably inflicts irreparable harm on Fidelity, including hundreds of millions of dollars in compliance costs—costs that are beginning to accrue as Fidelity undertakes research and development for the implementation of the complex and novel systems required to comply with the Rule—as well as violations of Fidelity's First and Fourth Amendment rights.

Moreover, in this instance the public interest is aligned with Fidelity, because of the violation of the First and Fourth Amendment rights of all the individuals who engage in non-financed residential real estate transactions, without any demonstrable evidence of benefit to FinCEN. With some exceptions, the Rule requires obtaining and reporting to FinCEN detailed identifying information on all persons and entities involved in the covered transactions and the beneficial owners of the legal entities and trusts involved in the transactions. Stip. at ¶ 49. For example, in addition to information about transferee entities and transferee trusts, the Rule requires reporting of legal name, current address, date of birth, citizenship, and unique identifying number for each beneficiary of such entities or trusts who meet certain criteria. Stip. at ¶¶ 50-51, 54. That would require reporting, for

the first time to FinCEN, the real beneficiary of certain trusts. Stip. at ¶¶ 48-51, 53-55. Under some circumstances, this would even require reporting the identities of minor children. 89 Fed. Reg. at 70,274. Essentially, the Rule calls for collecting private information without any articulable suspicion or connection to illegal activity. "Perhaps no greater public interest exists than protecting a citizen's rights under the constitution." *Lebron*, 820 F. Supp. 2d at 1292 (internal quotation and citation omitted). Thus, "preliminarily enjoining what appears likely to be deemed to be an unconstitutional intrusion on the Fourth Amendment rights of" the public engaging in non-financed real estate transactions "**serves the public interest** and outweighs whatever minimal harm a preliminary injunction might visit upon" FinCEN. *Id.* at 1293 (emphasis added).

Further, "the public has no interest in enforcing a regulation that likely violates the APA and raises First Amendment concerns." *U.S. Sec'y of Educ.*, 2024 WL 3981994 at *7. In turn, courts routinely find that where a plaintiff is likely to succeed on the merits of an APA or constitutional claim against agency action, enjoining the action inherently serves the public interest. *See id.*; *Becerra*, 544 F. Supp. 3d at 1304 ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016))); *Florida v. Dep't of Health & Hum. Servs.*, 739 F. Supp. 3d 1091, 1110 (M.D. Fla. 2024) ("HHS and the public have an interest in HHS rules being legal."); *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1040 (M.D. Fla. 2021) (preliminary injunction furthered the public interest, which supports protecting individuals from "likely-unlawful government action"); *Airlines for Am. v. DOT*, 110 F.4th 672, 677 (5th Cir. 2024) ("[T]here is generally no public interest in the perpetuation of unlawful agency action."). This case is no different.

A stay or injunction would also help lower costs associated with housing purchases, consistent with the President's January 20, 2025, Memorandum "Delivering Emergency Price Relief for American Families and Defeating the Cost-of-Living Crisis." *See* 90 Fed. Reg. 8,245 (Jan. 28, 2025). That Memorandum lists "lower[ing] the cost of housing" first among a list of actions agencies should pursue to lower costs for American households. *Id.*

For all these reasons, a stay will directly advance the public interest by preserving the long-standing, narrowly focused GTOs while the Court determines whether FinCEN's new sweeping Rule is lawful. During this interim, the public will be spared from the stifling of ordinary, non-financed real estate transactions nationwide. A stay will also forestall the unprecedented collection and maintenance of sensitive data—thereby protecting the First and Fourth Amendment rights of countless Americans. Once such sensitive information is disclosed, the resulting harm cannot be undone. Conversely, allowing the Rule to take effect would compel title and settlement companies to recalibrate their systems at great, unrecoverable expense, inundate FinCEN with up to 850,000 reports, and chill legitimate market activity—all while the legality of the Rule remains in serious doubt. *See Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 254–55 (5th Cir. 2024) (staying rule because the "burden imposed on the public favors a stay" and the "almost certainly unlawful provisions of the [r]ule … apply to all … participants and are thus almost certainly unlawful as to all … participants"), *cert. granted in part sub nom.*, *Dep't of Educ. v. Career Colls. & Schs. of Tex.*, 145 S. Ct. 1039 (2025); *Airlines for Am.*, 110 F.4th at 675, 677 (staying agency rule that "mandates … a host of disclosure practices" pending review).

**2.** On the other side of the scale, FinCEN cannot claim any legitimate interest in enforcing a regulation that violates the APA or Constitution. *See Dep't of Health & Hum. Servs.*, 739 F. Supp. 3d at 1110 ("Any interest [the government] may claim in enforcing an unlawful [rule] is illegitimate." (quoting *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (alteration in original))); *Scott*, 689 F. Supp. 3d at 1170 (Berger, J.) ("Defendant has no legitimate interest in enforcing an unconstitutional ordinance." (internal quotations and citation omitted)); *Smith*, 761 F. Supp. 3d at 973 ("[T]he government has no interest in enforcing a law that violates the Constitution.").

Legality aside, Defendants are "not harmed much, if at all, by the injunction" or by a stay of the Rule. *Odebrecht Constr.*, 715 F.3d at 1289. Generally, the APA requires only a thirty-day buffer between a rule's publication and effectiveness. 5 U.S.C. § 553(d). Yet here, FinCEN published the Rule on August 29, 2024, and delayed its effective date until December 1, 2025—**459 days later**. Stip. at ¶¶ 20-21. If FinCEN found a fifteen-month pause acceptable, it cannot now claim that a brief delay in the Rule's enforcement pending resolution of this case would cause harm. To be sure, this litigation is primed for swift resolution; it is proceeding on an expedited schedule, with summary judgment briefing to be completed by October 24, 2025. Doc. 27. Thus, the government "faces at most a modest delay in receiving the beneficial ownership information." *Smith*, 761 F. Supp. 3d at 973. Given FinCEN's own 459-day grace period and this Court's expedited schedule, any additional delay from a stay or injunction is negligible in comparison to the equities favoring such preliminary relief. Notably, the government has not shown any exigent reason or danger that would necessitate the immediate implementation of the Rule. It still retains its right to fight crime through the existing, fully functional system of

16

GTOs that has served FinCEN's needs for nearly a decade. The public's interest is coincident with Fidelity's in staying the implementation of this Rule while this Court considers its legality.

Overall, a stay or preliminary injunction fits this case hand-in-glove. The purpose of such relief is to preserve the status quo until the merits are fully and fairly adjudicated. *U.S. Sec'y of Educ.*, 2024 WL 3981994 at *7; *Props. of the Villages, Inc. v. Fed. Trade Comm'n*, 2024 WL 3870380, at *10 (M.D. Fla. Aug. 15, 2024). For nearly a decade, FinCEN has relied on targeted GTOs to "require certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States."[4] Stip. at ¶ 32 (quoting 89 Fed. Reg. at 70,259-60). The current GTOs cover limited markets (primarily major metropolitan areas) in 13 States and the District of Columbia, and "are narrow in that they are temporary, location-specific, and limited in the transactions they cover." Stip. at ¶ 63.

Maintaining this longstanding status quo while the parties resolve the merits will not harm FinCEN or the public but will protect Fidelity and the public from irreparable injury. Thus, a stay or preliminary injunction is appropriate. *See U.S. Sec'y of Educ.*, 2024 WL 3981994 at *7 (holding that preliminary injunction would maintain longstanding status quo of agency's interpretation of statutory term pending appeal); *Props. of the Villages*, 2024 WL 3870380 at *10 (preliminary injunction granted where there was substantial

---

[4] FinCEN has expanded the program over the years, such as when it "identified additional regions that present greater risks for illicit finance activity through non-financed purchases of residential real estate" and added those regions to the program. *See* FinCEN Press Release, "FinCEN Renews Real Estate Geographic Targeting Orders" (Oct. 20, 2023), available at https://www.fincen.gov/news/news-releases/fincen-renews-and-expands-real-estate-geographic-targeting-orders-2.

likelihood that the agency was not operating within its statutory authority, and the agency would "not be substantially harmed by the maintenance of the status quo until a final decision on the validity of the final rule is reached"); *Lebron*, 820 F. Supp. 2d at 1292 ("The State has operated TANF without drug testing since 1996, and preliminary injunctive relief would merely require the State revert to the status quo ante until there is a final adjudication of the rights afforded its citizens."); *Am. Council of Life Insurers v. U.S. Dep't of Labor*, 2024 WL 3572297, at *7 (N.D. Tex. July 26, 2024) (issuing "a stay that would simply preserve the status quo until a full decision on the merits is reached" because there was no "pressing need for the Rule to take effect immediately").

## IV.    Universal relief without security is appropriate.

*First*, to the extent the Court issues a stay pursuant to section 705 of the APA, "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex.*, 98 F.4th at 255 (5th Cir. 2024), *cert. granted in part sub nom.*, 145 S. Ct. 1039 (2025). Therefore, to the extent Fidelity is likely to succeed in its APA challenges, this Court should stay the Rule's effective date universally, pending resolution of the cross-motions for summary judgment. Under this relief, Section 705 does not contain a bond requirement.

As to Fidelity's alternative request for a preliminary injunction under Federal Rule of Civil Procedure 65, "it is well-established that the amount of security required by the rule is a matter within the discretion of the trial judge …[, and] the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (alterations in original) (internal quotations and citation omitted). "Waiving the bond requirement is particularly appropriate

where a plaintiff alleges the infringement of a fundamental constitutional right." *Scott*, 689
F. Supp. 3d at 1170 (Berger, J.) (quoting *Complete Angler, LLC v. City of Clearwater*, 607
F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Considering that Fidelity is likely to succeed
on the merits of their claims, the First and Fourth Amendment violations stemming from
the Rule, and the lack of harm to Defendants if a preliminary injunction is entered, the
Court should waive any security requirement. Alternatively, Fidelity respectfully requests
that the Court set a nominal bond amount.

## CONCLUSION

For these reasons, the Court should stay the effective date of the Rule, pending
resolution of the parties' cross-motions for summary judgment. Alternatively, this Court
should enter an injunction preliminarily enjoining enforcement of the Rule as to Fidelity,
pending resolution of the parties' cross-motions for summary judgment.

Dated: August 25, 2025                           Respectfully submitted,

Patrick F. Philbin (DCBN 453620)         By: */s/ Stuart H. Singer*
Jeff Jensen (DCBN 1765723)               Stuart H. Singer (FBN 377325)
William P. Barr (DCBN 951202)            Jesse Panuccio (FBN 31401)
**Torridon Law PLLC**                    Jon L. Mills (FBN 148286)
801 Seventeenth Street NW, Suite 801     Eric M. Palmer (FBN 1050210)
Washington, DC 20006                     Lauren Amos (FBN 1026073)
Telephone: (202) 249-6900               **Boies Schiller Flexner LLP**
pphilbin@torridonlaw.com                 401 E. Las Olas Blvd., Suite 1200
jjensen@torridonlaw.com                  Fort Lauderdale, FL 33301
wbarr@torridonlaw.com                    Telephone:  (954) 356-0011
*Admitted Pro Hac Vice*                  ssinger@bsfllp.com
                                         jpanuccio@bsfllp.com
                                         jmills@bsfllp.com
                                         epalmer@bsfllp.com
                                         lamos@bsfllp.com

Alan Vickery (NYBN 1917590)
David Boies (NYBN 2296333)
**Boies Schiller Flexner LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone:  (212) 446-2300
avickery@bsfllp.com
DBoies@bsfllp.com
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025**,** I filed the foregoing document via the

CM/ECF system which will send notification of such filing to all parties and their counsel

of record in this case.

By: */s/ Stuart H. Singer*
Stuart H. Singer