**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FIDELITY NATIONAL FINANCIAL, INC. and
FIDELITY NATIONAL TITLE INSURANCE
COMPANY,

    Plaintiffs,

v.                                                   Case No. 3:25-cv-554-WWB-SJH

SCOTT BESSENT, UNITED STATES
DEPARTMENT OF THE TREASURY,
ANDREA GACKI, in her official capacity as
Director of the Financial Crimes Enforcement
Network, and THE FINANCIAL CRIMES
ENFORCEMENT NETWORK,

    Defendants.

---

**BRIEF OF AMICUS CURIAE AMERICAN LAND TITLE ASSOCIATION
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**IDENTITY AND INTERESTS OF PROPOSED AMICUS CURIAE**

The American Land Title Association ("ALTA") is the national voice of the title insurance and settlement services industry. ALTA represents title insurers, title agents and attorneys that provide peace of mind to Americans by insuring their property rights and closing their real estate transactions. Our mission is to improve the skills and knowledge of providers in the real property transaction industry, effectively advocate member concerns, and standardize products for industry use. ALTA has approximately 5,700 company members, ranging from very small, one-county operations to larger, national title insurers. According to Small Business Administration data cited by the Financial Crimes Enforcement Network ("FinCEN"), almost all title companies are considered "small" businesses. Anti-Money Laundering Regulations for Residential Real Estate Transfers, Notice of Proposed Rulemaking, 89 Fed. Reg. 12424 (Feb. 16, 2024) ("NPRM"), at 12459 (Table 6).[1] ALTA seeks to file this brief to provide information on the substantial burdens which the new Anti-Money Laundering Regulations for Residential Real Estate Transfers, Final Rule, 89 Fed. Reg. 70258 (Aug. 29, 2024) ("the Rule"), will impose upon ALTA's membership—particularly small businesses—and the speculative nature of the Rule's purported benefits. ALTA currently estimates that its members will file well over half of the reports which FinCEN projects will need to be filed under the Rule.

**ARGUMENT**

I. **FinCEN Severely Underestimated the Rule's Costs to Industry**

The Rule estimated three types of compliance costs: (1) costs for both the reporting and non-reporting person(s) to determine who should report, and to perform the

---

[1] According to ALTA's internal membership data, roughly 93% of its member title companies have $1 million or less in annual gross revenue.

1

reporting itself (inclusive of costs to collect and review the necessary information); (2) costs for reporting persons to train employees on the Rule's general requirements; and (3) costs related to recordkeeping. FinCEN set forth several cost estimates, including a midpoint estimate of $559.4 million in the first compliance year. 89 Fed. Reg. 70258, 70284. Unfortunately, FinCEN did not even propose an actual reporting form ("the Report") until *after* publishing the Rule, thereby making fully-informed comments on the Rule impossible. When it finally proposed the Report, it estimated that costs should be increase by $45.3 million. Agency Information Collection Activities; Proposed Collection; Comments Request, Real Estate Reports, 89 Fed. Reg. 89700, 89704 (Nov. 13, 2024).

Even accepting FinCEN's estimates, these significant costs are overly burdensome, particularly when weighed against the Rule's speculative benefits. Small businesses—the bulk of ALTA's membership—are ill-equipped to absorb these additional costs and regulatory burdens, which will erode already thin profit margins. Moreover, these estimates are deeply flawed because they understate the true costs.

### A. The Nature of Title Insurance and Settlement Services

The Rule has a "cascading" approach to who must file a Report. 31 C.F.R. §§ 1031.320(c)(1)(i)-(vii). Title and settlement companies will shoulder the brunt of reporting.

To appreciate the full regulatory burdens which the Rule will impose on ALTA's membership, it is important to understand what title and settlement companies do and do *not* do during a real estate transaction. They do not typically get involved until a purchase and sale agreement is executed. They constitute a third party independent to the transaction whose only interest is to ensure the integrity of the transaction. A title company's due diligence is focused on ownership and other interests related to the land. It will review public land records and work with the parties to obtain evidence

2

suggesting the seller is the owner of the real property and has the capacity to transfer it to the buyer and information regarding outstanding debts or liens that must be resolved prior to the transfer.  This process is focused on determining whether a title is marketable.  Thus, the only data relevant to the completion of the transaction is either contained in sales and purchase agreements or obtained from public land records.  The only identity verification performed is through the notarial process to determine the authenticity of signatures on a document as needed under state law.  They do not collect beneficial ownership information ("BOI") of an entity acquiring title for the purpose of underwriting the title insurance policy, because there is no need to collect BOI in the absence of the Rule.  (*See* Doc. 19-23 at PageID 10781-83 (ALTA Comment on the NPRM).)  Thus, ALTA's members lack both experience with the Rule's new processes and the power to obtain some of the information it requires.

### B. FinCEN's Reporting Cost Analysis Is Severely Flawed

FinCEN estimated, prior to even publishing a proposed Report, that a reporting party will need to spend an average of three hours on reporting, with 2.75 hours devoted to collecting information and filling out the report.  89 Fed. Reg. 70258, 70286 (Table 3).  These numbers are irrationally low for several reasons.  First, the Rule is incredibly complex.  A review of the regulations and its many dense subparts, *see* 31 C.F.R. §§ 1031.320(a) to (n), confirms this.  The proposed Report (which FinCEN has not finalized, thereby creating great uncertainty for ALTA's members) exacerbates this complexity by setting forth no less than 111 fields for a reporting person to complete—and some fields must be filled out several times, because, for example, there will be multiple beneficial owners.  *See* 89 Fed. Reg. 89700, 89706-16.  This is the minefield which FinCEN expects a small business with only a handful of employees to understand and fill out accurately

3

and completely within the space of a few hours, at the risk of potential civil or even criminal penalties. Likewise, FinCEN never accounted for the costs to industry for hiring new and more compliance staffing, whether in-house or outsourced, which surely will be necessary. (*See* Doc. 19-23 at PageID 10613 (MBL Title Comment on the NPRM).) Some of the Rule's complexities will prove daunting to a lawyer, whom many of ALTA's members cannot afford. For example, FinCEN's estimates do not account for any costs to determine whether a transaction is even reportable. Even this supposedly simple predicate question may prove difficult for many small businesses, and the four corners of a purchase and sale agreement often will not reveal whether a transaction is reportable.

Perhaps the clearest example of the Rule's breadth and complexity, which FinCEN completely glosses over, is its definition of "beneficial owner," 31 C.F.R. § 1031.320(n)(1)(i)(A), which incorporates by reference the beneficial owner definition from the Corporate Transparency Act regulations at 31 C.F.R. § 1031.380(d). This definition is fantastically opaque and broad. It can involve all sorts of possible "control" persons. *Id*. at § 1031.380(d)(1). This slippery definition is one of the main reasons why FinCEN largely scrapped its CTA regulations, as discussed *infra*. Yet ALTA's members, no matter how small, still are expected to understand and apply this key definition within a few hours.

Second, FinCEN has lowballed the difficulties of collecting information—especially BOI. Many commentators—including ALTA (*see* Doc. 19-23 at PageID 10789 (Comment on the NPRM))—implored FinCEN to allow reporting persons, such as neutral title and settlement agents, to indicate on the Report that they could not provide certain information because they could not obtain it from the parties conducting the sale. FinCEN declined to implement this sensible request and so imposed additional compliance costs and time,

4

not to mention unfair legal risk, on reporting persons struggling to provide required information.  FinCEN gave industry short shrift: "[T]here is no exception from reporting under the [Rule] should a transferee fail to cooperate in providing information about a reportable transfer.  The [Rule] does not authorize the filing of incomplete reports, and a reporting person who fails to report the required information about a reportable transfer could be subject to penalties."  89 Fed. Reg. 70258, 70264.  FinCEN instead offered a facile "solution": "Real estate professionals are encouraged to cooperate and provide information in their possession[,]" despite the lack of any legal duty to do so.  *Id*. at 70280.

Third, FinCEN glaringly ignores technology costs.  FinCEN ascribes "no line item of incremental expected IT costs" because FinCEN expects that reporting persons will "generally be able to rely on technology previously purchased and already deployed in the ordinary course of business (namely, computers and access to the internet) to comply[.]"  *Id.* at 70286.  It is inconceivable that *any* business newly subject to the Rule will incur no additional technology costs merely because it has a computer and Internet access.  As ALTA pointed out in part, "industry likely will need new code and technology to flag potentially reportable transactions and to collect sensitive data from customers.  Since settlement agents will need to rely on real estate agent partners to collect much of the data, new technologies and processes will likely be necessary to reduce the risk of sensitive information being shared via potentially unsecured email."  (Doc. 19-23 at PageID 10783 (ALTA Comment on the NPRM).)  FinCEN brushed off such comments by blaming industry for not quantifying the technology costs associated with a Report, which FinCEN proposed *only* after publishing the Rule.  89 Fed. Reg. 70258, 70286.  Ignoring the costs associated with the critical issue of technology is arbitrary.

5

### C.     FinCEN's Training Costs Analysis Is Severely Flawed

Prior to publishing the proposed Report, FinCEN estimated that it would take 75 minutes for an initial training and 30 minutes for an annual refresher training. *Id.* at 70285 (Table 2). This estimate was the same as the initial estimate in the NPRM. 89 Fed. Reg. 12424, 12453. FinCEN fashioned its training model after its 2016 training estimates for the Customer Due Diligence ("CDD") Rule and added a slight increase. The CDD Rule, described *infra*, requires banks and other financial institutions to identify and verify the beneficial owners of legal entity customers when they open accounts. Thus, FinCEN based the Rule's cost estimate on an estimate (itself also low) developed for sophisticated banks highly experienced with anti-money laundering ("AML") reporting requirements, not title and settlement professionals with no such experience or institutional focus. ALTA responded to the NPRM with a more realistic estimate driven by actual experience:

> Industry experience with implementing new rules, specifically TILA-RESPA Integrated Disclosures (TRID) in 2015,[2] is that the employees will need two levels of training. First, employees will need at least 75 minutes to 120 minutes of training to learn the requirements of the [R]ule. Then, depending on staffing decisions around completing reports, some staff will need specific hands-on training of at least two hours to learn how to complete the report properly. Additionally, the industry will need to conduct several one-hour training sessions for real estate agents both prior to the [R]ule and within the first year to help smooth out the process. When factoring in these realities, the cost of upfront training is likely to more than double.

(Doc. 19-23 at PageID 10783 (ALTA Comment on the NPRM).) Further, ALTA offered the above estimate before FinCEN issued the proposed Report or made clear that it would not permit filers to indicate that they could not report certain information because they could not obtain it from third parties (a requirement which will demand more training).

---

[2] TRID is a rule integrating the mortgage forms required under the Truth-in-Lending Act and the Real Estate Settlement and Procedures Act. *See* 12 C.F.R. § 1026.19.

6

FinCEN slightly increased the Rule's training time from its CDD Rule estimate because it admitted that the only group with some experience with FinCEN reporting are persons who previously filed the much more limited real estate Geographic Targeting Orders ("GTOs"). 89 Fed. Reg. 70258, 70285.  FinCEN did not explain *how* it determined its slight adjustment, nor did it explain how it converted the CDD Rule's high- and low-cost estimates for training into a flat training estimate for Rule.  Regardless, the adjustment plainly fails to capture the true trainings costs for small businesses with no prior AML compliance experience, and who—unlike banks opening customer accounts—cannot effectively require third parties to provide sensitive information.  Further, the GTO forms have about only half of the fields required by the Report and have monetary thresholds.  Moreover, *only 17,794 GTOs were filed from February to September 2024*. (Doc. 19-17 at PageID 9934.)  The GTOs have been limited and serve as a poor guide for the costs of the 850,000 complex Reports required annually under the Rule.

Noting that commenters urged that "the amount of time needed for—and frequency of—training needed to adequately prepare staff for compliance would be higher," FinCEN still declined to adjust its estimates.  89 Fed. Reg. 70258, 70285.  FinCEN instead stated that its estimates "pertain only to those contemplated activities identified (developing general understanding of the rule and firm-specific compliance policies and procedures)[,]" and that it would estimate training costs for the preparation of the Report later.  *Id*. at 70286.  Putting aside that FinCEN later only estimated another 30 minutes of training for the Report, 89 Fed. Reg. 89700, 89703, FinCEN failed to acknowledge the simple, basic point of the commentators: the lack of AML reporting experience coupled with the complexity of the Rule and Report will require many hours of training.

7

### D.     FinCEN's Recordkeeping Cost Analysis Is Severely Flawed

The Rule does not require a reporting person to keep copies of the filed Report. 89 Fed. Reg. 70258, 70276. FinCEN therefore considers recordkeeping costs to include only "those associated with creating and/or collecting the necessary documents, storing the records in an accessible format, and securely disposing of the records after the required retention period has elapsed." *Id*. at 70286. FinCEN's recordkeeping cost estimate for a transfer has three components: (1) an average of one-hour cost by the reporting person over the full recordkeeping lifecycle (of 5 years); (2) a five-minute cost per side (for a total of 10 minutes) to sign and read the designation agreement; and (3) "a ten-cent record processing and maintenance cost per transfer." *Id*. at 70286-87.

FinCEN believes that no requirement to retain a Report will obviate risks relating to data security and costs associated with the retention of records. *Id.* at 70276. FinCEN likewise restricted its recordkeeping analysis to only costs related to "low risk" records, i.e., designation agreements and certifications as to BOI. FinCEN relied on this belief to dismiss commentator concerns about the technological costs associated with new or upgraded software and "certain non-monetary costs in the form of increased technology and cybersecurity related risk." *Id*. at 70287. Under FinCEN's reasoning, by not being *required* to store "high risk" information, such as copies of filed Reports containing BOI, a small business facing the Rule's new requirements has only marginal recordkeeping costs. This prediction is baseless. Many reporting persons invariably will retain sensitive information, *particularly if they wish to defend against downstream FinCEN claims of failure to file required Reports*. They therefore will incur substantial costs to ensure that customer information is safely obtained and stored. FinCEN's estimates are arbitrary.

8

Ultimately, FinCEN fundamentally misunderstands data collection. The Rule envisions that reporting persons may obtain a "certification form" from the transferee or its representative regarding the BOI of the transferee, upon which a reporting person may rely "absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person, if the person providing the information certifies the accuracy of the information in writing to the best of the person's knowledge." 31 C.F.R. § 1031.320(j)(2). Thus even if a filer does not retain the filed Report (which makes little sense) it still will retain the certification with all the same BOI data because the Rule requires the filer to retain the certification for five years. 31 C.F.R. § 1031.320(l). The BOI information that must be certified is *the most sensitive information* because it includes full legal name, address, citizenship and an IRS identifier (which usually will be a Social Security Number). Thus the Rule in fact requires reporting persons to retain information that identity thieves and other criminal hackers find to be most valuable.

## II.     The Rule's Claimed Benefits Are Speculative and Cannot Justify the Costs

FinCEN's justifications for the Rule are arbitrary and capricious because, not only are its cost estimates irrationally low, but the purported benefits of the Rule suggested by FinCEN to justify these costs are entirely speculative.  Indeed, FinCEN itself has contradicted the Rule's claimed benefits through its recent findings in a similar context.

### A.     FinCEN's Claims Regarding the Rule's Benefits Have No Support

FinCEN attempts to justify the burdens of its industry cost estimates by purportedly quantifying the Rule's otherwise intangible value to law enforcement and the public. Specifically, FinCEN states that "it might be inferred that a tacit expectation underlying this rulemaking is that the rule will generate intangible benefits worth over $500 million

9

per year." 89 Fed. Reg. 70258, 70285. That number is untethered to any concrete reality or analytical process. FinCEN's own words acknowledge as much.

The Federal Register reflects no attempt by FinCEN to provide *any* explanation as to the claimed benefits of the Rule, much less any objectively defensible reasons. ALTA understands that it is often not possible for a regulator to quantify with precise accuracy the societal benefits of a proposed regulation. Nonetheless, it is not permissible—even in the context of anti-crime or national security issues—for a regulator to announce, with no analysis, a round, massive monetary value assigned to the regulations. *Cf. Tex. Ass'n of Money Servs. Bus. v. Bondi*, No. SA-25-CA-00344-FB, 2025 U.S. Dist. LEXIS 100489, *39 (W.D. Tex. May 19, 2025) (granting preliminary injunction because FinCEN reporting requirement seeking to combat Mexican drug cartels likely violates the APA, explaining that "[t]o act reasonably, the agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made'" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Here, FinCEN did not engage in an "analysis" in any traditional sense. Rather, FinCEN's claimed number of $500 million in benefits appears to be an outcome-oriented pronouncement creating a large, round plug figure which seeks to justify FinCEN's flawed estimate of the costs, the mid-point of which is roughly equal to this $500 million plug figure. Even worse, the NPRM contained nothing on the Rule's quantitative benefits, which means that industry could not assess or comment on the newly-announced $500 million plug figure in the Rule.

FinCEN's Advance Notice of Proposed Rulemaking (ANPRM) did cite a study finding that a total of $2.3 billion was laundered through the *entire* U.S. real estate market

10

between 2016 and 2021.  89 Fed. Reg. 69589, 69591 (Dec. 8, 2021).  However, because the total combined residential and commercial real estate sales in 2021 alone was valued at $3.409 trillion (*see* Doc. 19-22 at PageID 10348 (National Association of Realtors' Comment on the ANPRM)), the money laundered through the entire real estate industry during the five years leading up to 2021, according to FinCEN, made up less than .07 of one percent of 2021's total sales, even without consideration of the preceding five years.  Neither the NPRM nor the Final Rule make any findings on the estimated total amount of funds laundered through the U.S. real estate market for any period of time, nor do they make any findings on the estimated amount of funds which might be laundered through the 800,000 to 850,000 transactions estimated by FinCEN as subject to annual reporting.

**B.     FinCEN Has Acknowledged that BOI Reporting Has Marginal Value**

Although the Report makes detailed requests, FinCEN has made it clear that the heart of the Rule—its core mechanism to address money laundering—is, of course, the reporting of BOI of transferee entities.  *See, e.g.*, 89 Fed. Reg. at 12424, 12426 (emphasizing the use of "shell companies" to "mask true beneficial ownership").  This reporting is the true motive behind the Rule.  However, FinCEN recently acknowledged that BOI reporting, in fact, yields only "marginal" and "speculative" benefits, especially when BOI reporting is imposed on law-abiding small businesses.  That is exactly what the Rule unfortunately seeks to do, at the expense of ALTA members.

FinCEN originally issued very broad and costly regulations for BOI reporting for the CTA (the "CTA Regulations").  87 Fed. Reg. 59498 (Sept. 30, 2022).  The CTA Regulations required millions of small businesses to report their beneficial owners.  Like the Rule, the CTA Regulations stated that they sought to combat money laundering and enhance national security.  Like the Rule, the CTA Regulations were complex.

11

FinCEN ultimately acknowledged that the purported benefits of BOI reporting had been overstated, and that the costs for domestic small businesses were not acceptable:

> The Secretary . . . has determined for purposes of this interim final rule that the reporting of BOI by domestic reporting companies and their beneficial owners "would not serve the public interest" and "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." The Secretary is aware that most domestic reporting companies that are not already covered by a statutory exemption are small businesses and that any regulations affecting them must recognize this fact.

FinCEN, *Beneficial Ownership Information Reporting Requirement Revision and Deadline Extension*, 90 Fed. Reg. 13688, 13691 (March 26, 2025).

Using language directly applicable to the Rule and ALTA's membership—the vast majority of which are, as FinCEN acknowledges, small businesses—FinCEN explained:

> As the preamble to the Reporting Rule states, "[s]mall businesses are a backbone of the U.S. economy, accounting for a large share of U.S. economic activity, and driving U.S. innovation and competition." **The vast majority of domestic small businesses are legitimate and owned by hard-working American taxpayers who are not engaged in illicit activity.** The Secretary has assessed that exempting them would ensure that the Reporting Rule is appropriately tailored to advance the public interest, considering the burdens imposed by the regulations without **sufficient benefits**.

*Id*. at 13691 (emphasis added). Importantly, FinCEN conceded that its previously sweeping claims as to the benefits of BOI reporting—which, like the preamble to the Rule, stressed the perils of so-called "shell companies"—in fact lacked any robust analysis:

> [I]t is unclear that the **marginal benefits** of the BOI that will no longer be reported would be comparable to the value of similar [foreign] entities to which the reporting requirements still apply. **As FinCEN has not yet been able to conduct the kinds of robust quantitative analysis necessary to estimate the incremental value of such intelligence, it recognizes that its estimated values to date have been partially speculative**, albeit informed by feedback from both domestic and international partners in law enforcement and national security.

12

*Id*. at 13694 (emphasis added).

These recent and frank acknowledgements by FinCEN directly contradict the Rule's "possible inference" of a "tacit expectation" that the Rule's BOI reporting requirements might have "intangible benefits" worth over $500 million per year. When publishing the Rule, FinCEN did not perform any "robust quantitative analysis" on its benefits, but instead merely noted a handful of enforcement cases which involved real estate, *see* 89 Fed. Reg. 70258, 70259 n.12, to speculate about $500 million in benefits.

Thus, not only is the Rule arbitrary because FinCEN's cost estimates are severely flawed, but it is arbitrary for FinCEN to admit that BOI reporting in fact yields only "marginal" benefits and yet continue here to defend the substantial costs of the Rule which ALTA's membership—law-abiding, small businesses—will have to bear.

### C.  **FinCEN Fails to Admit that the CDD Rule Attains the Rule's Goals**

FinCEN also overstates the Rule's purported benefits by grossly understating the importance and functionality of the existing CDD Rule, referenced *supra*, which already accomplishes much of the main goal of the Rule: the collection of BOI for most entities, including the vast majority of the same real estate transaction transferees covered by the Rule. *See* FinCEN, *Customer Due Diligence Requirements for Financial Institutions*, 81 Fed. Reg. 29398 (May 11, 2016); 31 C.F.R. § 1010.230. The CDD Rule, effective since 2018, is a key component of the U.S. AML regulatory scheme. It is a broad requirement for banks and other financial institutions to identify and verify the identity of beneficial owners of their legal entity customers, subject to certain limited exceptions, when the entities open new accounts. *Id*. The CDD Rule also requires covered financial institutions to understand the nature and purpose of customer relationships to develop customer risk profiles, conduct ongoing monitoring to identify and report suspicious transactions and,

on a risk basis, maintain and update customer information. *Id.* FinCEN has estimated that the CDD Rule applies to about eight million new accounts annually, 81 Fed. Reg. 29398, 29437, and the gathered BOI is available to regulators and law enforcement. Now, to inflate the purported value of the Rule, FinCEN glosses over the key role of the CDD Rule, which already provides the government with access to the very same BOI.

First, FinCEN states that the Rule is necessary because it "covers non-financed transfers of residential real estate that do not involve financial institutions covered by the CDD Rule." 89 Fed. Reg. 70258, 70280. That is a red-herring. Funds obtained from real estate transactions covered by the Rule necessarily will go into a bank account. Those accounts will be held, of course, by the transferee entities covered by the Rule, and therefore will be subject to the CDD Rule. Moreover, the exceptions offered by the Rule and the CDD Rule largely overlap, because both are aimed at collecting BOI from "small" entities. *Compare* 31 C.F.R. §§ 1031.320(n)(10)(ii)(A) to (P) (exceptions to the Rule) *with* 31 C.F.R. §§ 1010.230(e)(2)(i) to (xxi) (exceptions to the CDD Rule).

Second, FinCEN states that the Rule "would also collect additional information relevant to the real estate transfers that is currently not collected under the CDD Rule." *Id*. Although it is true that the Rule would collect details such as the price of the residence being sold, that sort of information is already easily accessible to the government or available for purchase. More importantly, the CDD Rule already collects the information that is at the heart of the Rule and its stated necessity: the BOI regarding smaller entities.

Finally, FinCEN may argue that the Rule's heavy costs are still justified because it seeks the BOI of trust entities not already covered by the CDD Rule. First, the CDD Rule *does* apply to any trust entity created through a filing with a State, Tribal or foreign

government. 31 C.F.R. § 1010.230(e)(1). Although the Rule also applies to certain trusts not created through such filings, the number of such trusts covered by the Rule is marginal, thereby rendering the benefits of their reporting marginal. Indeed, FinCEN relied on a study that found that single-property residential purchases identified *any* type of trust as the buyer in *only 3.3 percent* of the observed transactions. 89 Fed. Reg. 70258, 70281. FinCEN stated that it "is not revising or updating its baseline estimates at this stage [on trusts] because the [Rule] has adopted certain broad exceptions that materially limit the reporting of transfers to trusts." *Id*. at 70282. The Rule forces ALTA's members to expend costs to try to obtain BOI which it cannot compel third parties to provide, at the risk of penalties threatened by FinCEN, even though such BOI is already collected.

## **CONCLUSION**

Accordingly, the Court should grant Plaintiffs' motion for summary judgment. The Court should grant summary judgement because FinCEN arbitrarily and capriciously estimated the Rule's compliance costs and supposed benefits, all of which will impact ALTA's membership, as well as for all of the other reasons set forth in Plaintiffs' motion.

*Originally filed September 2, 2025*  
*Re-filed September 4, 2025*

Respectfully submitted,

| | |
|---|---|
| */s/ Laura B. Renstrom* | */s/ Peter D. Hardy* |
| Laura B. Renstrom (Fla. Bar No. 108019) | Peter D. Hardy (admitted *pro hac vice*) |
| laura.renstrom@hklaw.com | peter.hardy@hklaw.com |
| Daniel Mahfood (Fla. Bar No. 94879) | Siana Danch (admitted *pro hac vice*) |
| daniel.mahfood@hklaw.com | siana.danch@hklaw.com |
| HOLLAND & KNIGHT LLP | HOLLAND & KNIGHT LLP |
| 50 North Laura Street, Suite 3900 | 1650 Market Street, Suite 3300 |
| Jacksonville, Florida 32207 | Philadelphia, Pennsylvania 19103 |
| Telephone: (904) 353-2000 | Telephone: (215) 252-9600 |
| Facsimile: (904) 358-1872 | Facsimile: (215) 867-6070 |
| | |
| *Counsel for Amicus Curiae, the American Land Title Association* | *Counsel for Amicus Curiae, the American Land Title Association* |