UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FIDELITY NATIONAL FINANCIAL, INC.
and FIDELITY NATIONAL TITLE
INSURANCE COMPANY,

        Plaintiffs,                        Case No. 3:25-cv-00554-WWB-SJH

v.

SCOTT BESSENT, in his official capacity
as the Secretary of the United States
Department of the Treasury; UNITED
STATES DEPARTMENT OF THE
TREASURY; ANDREA GACKI, in her
official capacity as Director of the Financial
Crimes Enforcement Network; and THE
FINANCIAL CRIMES ENFORCEMENT
NETWORK

        Defendants.
_____/

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INUNCTION AND MEMORANDUM OF LAW

Defendants hereby respond in opposition to Plaintiffs' Motion for Stay or Preliminary Injunction (ECF 36, and hereafter the "Motion") and request that the Court deny the Motion.

## INTRODUCTION

Criminals, corrupt officials, and terrorists have long exploited the ability to launder illicit funds through anonymous, cash purchases of residential real estate. By using shell companies and trusts, these actors can convert criminal gains into seemingly legitimate assets, threatening national security and potentially distorting the housing market. To address this vulnerability, the Financial Crimes Enforcement Network ("FinCEN") issued

the Rule, entitled "Anti-Money Laundering Regulations for Residential Real Estate Transfers," on August 29, 2024, with an effective date of December 1, 2025. The Rule is a modest and targeted measure that requires real estate professionals to file a streamlined report on certain non-financed residential real estate transfers to legal entities or trusts. Plaintiffs now seek to delay the effective date of the Rule by seeking the extraordinary remedy of injunctive relief nearly a year to the day after the Rule was published but just months before its effective date.

## BACKGROUND

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, generally referred to as the Bank Secrecy Act ("BSA"), to combat money laundering in the United States.[1] The BSA, in 31 U.S.C. § 5318(g)(1), permits the Secretary of the Treasury ("Secretary") to "require any financial institution" or any of its agents "to report any suspicious transaction relevant to a possible violation of law or regulation." The Secretary has delegated his authority to the Director of FinCEN to implement, administer, and enforce the provisions of the BSA. See Treasury Order 180-01, ¶ 3(a) (Jan. 14, 2020).

In response to new and emerging threats of illicit finance, Congress amended various provisions of the BSA—through the Anti-Money Laundering Act of 2020 ("AML Act")—to strengthen and "modernize" federal "anti-money laundering" laws and those "countering the financing of terrorism." National Defense Authorization Act ("NDAA"), Division F of Pub. L. No. 116-283, §6002(2), 134 Stat. 3388, 4604 (2021). Among

---

[1] Parts of the Currency and Foreign Transactions Reporting Act of 1970, Pub. L. No. 91-508 § 121, 84 Stat. 1114 (1970), its amendments, and other statutes relating to the subject matter of that Act are codified at 12 U.S.C. §§ 1829b, 1951–60 and 31 U.S.C. §§ 5311–14, 5316–36.

Congress's purposes in passing the AML Act was to support FinCEN's mission "to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence." *Id.* § 6102(a) ("Strengthening FinCEN."). Congress directed FinCEN to "establish streamlined . . . processes to, as appropriate, permit the filing of noncomplex categories of reports" of suspicious financial activity. *Id.* § 6202 (codified at 31 U.S.C. § 5318(g)(5)(D)(i)(1)). Congress also amended the BSA to authorize FinCEN (through its delegated authority from the Secretary) to "require a class of domestic financial institutions" to collect and report information that it "may prescribe by regulation, to . . . guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). FinCEN is required to establish standards to ensure SARs relate to suspicious transactions relevant to potential violations of law, which it has done here. *See* 31 U.S.C. § 5318(g)(5)(D)(ii)(I). Thus, contrary to Plaintiffs' contention, the BSA does not require that each transaction subject to a SAR be based on an individualized finding by the filer that the transaction is suspicious and relevant to a potential violation of law to be reportable.

### FinCEN's Use of Geographic Targeting Orders

Real estate transactions have long been an area of concern for their vulnerability to abuse for purposes of money laundering, terrorist financing, and other illicit economic activity. Since 2016, in response to law enforcement concerns about money laundering, FinCEN has used Geographic Targeting Orders ("GTOs") to gather information about vulnerabilities in the non-financed purchase of residential real estate above a specific

3

price threshold by certain legal entities; GTOs require title insurance companies to report and maintain information about the legal entity's beneficial ownership. *See* Stip. at ¶¶ 29, 33; 89 Fed. Reg. at 70,259-260. GTOs last for up to 180 days, requiring renewal after such time, and are limited to select counties and metropolitan areas. However, the GTOs' limited geographic reach is a "significant shortcoming." 89 Fed. Reg. at 70,260. Because the evidence shows that money laundering through real estate is a "nationwide problem," FinCEN determined that the "jurisdictionally limited reporting requirements" of the GTOs are "insufficient." *Id.* With the limitations of GTOs, they are simply a substitute for a "more comprehensive and permanent regulatory approach" needed for the wide scope of the issue. *Id.*

### FinCEN's Final Rule

FinCEN issued its Rule on residential real estate reporting on August 29, 2024. The Notice of Proposed Rule Making was issued February 16, 2024. *See* 89 Fed. Reg. 12424 (NPRM). FinCEN invoked its statutory authority under the BSA to require "persons involved in real estate closings and settlements," 31 U.S.C. § 5312(a)(2)(U), to report "suspicious transactions relevant to a possible violation of law or regulation." And, in crafting the scope of the Rule, FinCEN further invoked its authority to tailor that reporting requirement, *id.* § 5312(g)(1), (g)(5)(D), as well as its authority—provided through the AML Act (codified at 31 U.S.C. § 5318(a)(2))—to require reporting of certain information prescribed by regulation that would be useful to guard against money laundering and other forms of illicit finance. 89 Fed. Reg. at 70,259, n.11.

The Rule requires certain "reporting persons," "to file a 'Real Estate Report' on certain non-financed transfers of residential real property to legal entities and trusts." 89

4

Fed. Reg. at 70,258.  Unlike GTOs, the Rule is not limited by geographic area within the United States or by a specific dollar threshold for the transaction, because money laundering occurs at all price points.  *See* Stip. at ¶ 82-83.  The Rule—which requires a reportable transfer be reported to FinCEN by the reporting person—defines, *inter alia*, what constitutes a reportable transfer, residential real property, a non-financed transfer, and identifies exceptions to the Rule.  Stip. at ¶¶ 40-46.

Although different types of real estate professionals may be involved in any given transfer of real estate, only the "reporting person" is required to file a Real Estate Report.  Whether a real estate professional is the reporting person in a given real estate transfer is primarily determined by their role in the transfer.  89 Fed. Reg. at 70,290, 31 C.F.R. § 1031.320(c)).  The reports required by the Rule must include general identifying information about the reporting person, the transferor, and the transferee entity or trust.  89 Fed. Reg. at 70,290-92, 31C.F.R. § 1031.320(d), (f).  The report also must contain basic information regarding the residential real property (such as the street address and the legal description of any real property) and certain transactional information about the transfer (including the amount of the payment and the method by which it was made).  89 Fed. Reg. at 70,292, 31 C.F.R. § 1031.320(g), (h).

## PROCEDRAL HISTORY

Plaintiffs filed their complaint on May 20, 2025 (ECF 1). Plaintiffs submitted an agency petition to stay the Rule on June 23, 2025 ("Agency Petition").  Plaintiffs filed a Motion for Summary Judgment (ECF 35) and the instant Motion (ECF 36) on August 25, 2025.  Under the Court's July 30, 2025 Order, full merits briefing will end on October 24, 2025 (ECF 27).

## LEGAL STANDARDS

"To justify a preliminary injunction, the plaintiff must plainly establish four preconditions (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a showing that plaintiff will suffer irreparable injury if an injunction does not issue, (3) proof that the threatened injury to plaintiff outweighs any harm that might result to the defendants, and (4) a showing that the public interest will not be disserved by grant of a preliminary injunction." *Northeastern Fla. Chapter of the Ass'n. of General Contractors of America v. City of Jacksonville, Fla.*, 896 F. 2d 1283 (11th Cir. 1990). Injunctive relief is an "extraordinary and drastic remedy" and should not be granted unless "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *Id.* (internal citations omitted). Failure to meet even one of the four prerequisites "dooms" any request for such relief. *Wreal, LLC v. Amazon.com, Inc.*, 840 F. 3d 1244, 1248 (11th Cir. 2016).

## ARGUMENT

Plaintiffs have failed to meet their burden. In their Motion, Plaintiffs fail to advance or develop any argument whatsoever as to their likelihood of success on the merits. Instead, they improperly incorporate by reference their 30-page motion for summary judgment, which is clearly prohibited by the Local Rules. And, even if their merits argument had been properly included, it would fail. Plaintiffs' significant delay in seeking relief undermines any claim of irreparable harm. Also, Plaintiffs fail to provide sufficient evidence of actual or irreparable harm. Further, an injunction would undermine the public interest in detecting, investigating, and prosecuting illicit activity in the country's residential real estate market and, thus, the balance of equities does not support an injunction. Plaintiffs seek universal relief that would apply to non-parties which is

improper under recent Supreme Court precedent and a bond should be required under Fed. R. Civ. P. 65(c).  For these reasons, their Motion should be denied.

## I. Plaintiffs have not demonstrated a likelihood of success on the merits.

In their Motion, Plaintiffs must demonstrate a showing of likely, but not certain, success on the merits.  *Home Oil Co., Inc. v. Sam's East, Inc.*, 199 F.Supp.2d 1236, 1249 (11th Cir. 2002).  A failure to demonstrate a substantial likelihood of success on the merits can defeat a party's claim, regardless of its ability to establish other elements.  *Id.* (internal citations omitted).  Plaintiffs have failed here.  In addressing this factor, Plaintiffs incorporate by reference their 30-page motion for summary judgment (ECF 35).  Pltf. Mot. at 8.  The entirety of the argument on this factor is one sentence incorporating the motion for summary judgment.  *Id.*  Because Plaintiffs fail to develop the argument on this factor, and because incorporation by reference is prohibited under the Local Rules, they have failed to plainly establish a likelihood of success on the merits.

"NO INCORPORATION BY REFERENCE.  A motion or other legal memorandum, or brief may not incorporate by reference all or part of any other motion, legal memorandum, or brief."  Local. R 3.01(f).  The court should consider only those arguments developed in the motion on this factor and, put simply, there are none.  *See, e.g,. Anoushfar v. Lexington Ins. Co.*, No. 2:23-CV-1003-SPC-NPM, 2025 WL 1158658, n.1 (M.D. Fla. Apr. 21, 2025) (stating "Defendant did not develop this argument in its opposition or objection, deciding instead to incorporate by reference this argument from its then pending motion for judgment on the pleadings.  So the Court easily rejects this argument [citing Local R. 3.01(f)].").  *See also Hamad v. Frontier Airlines, Inc.*, 6:23-cv-1209-WWB-LHP, 2024 WL 4117235, *2 (M.D. Fla. Sept. 9, 2024) (rejecting plaintiff's

7

arguments in support of objection to report and recommendation where incorporated by reference, citing Local R. 3.01(f).); *Transamerica Life Ins. Co. v. Lawrence E. White and P'ship Mgmt. Svcs. Group, LLC*, No. 6:23-cv-452-ACC-DCI, 2024 WL 4905399, n. 2 (M.D. Fla. Oct. 8, 2024) (refusing to consider arguments incorporated by reference when considering cross-motions for summary judgment, citing Local R. 3.01(f)); *Riley v. Marceno*, No. 2:23-cv-981-JLB-KCD, 2024 WL 5678928, *4 (M.D. Fla. Sept. 5, 2024) (refusing to consider arguments that were merely incorporated by reference, citing Local R. 3.01(f)).

Furthermore, incorporation by reference should not be allowed because it avoids the page limitations set by the Local Rules and places the burden on Defendants and the Court to find the relevant arguments.  Here, allowing incorporation by reference would disadvantage Defendants by forcing Defendants to address both the legal merits and the equities of Plaintiffs' case in the limited pages allowed in this response, while permitting Plaintiffs to spread their merits and equitable arguments between their motions for summary judgment and for a preliminary injunction.

Defendants are under no obligation to respond to any argument that is not made in the Motion, particularly when the only substance on this factor was improperly incorporating by reference a 30-page motion for summary judgment in violation of Local Rule 3.01(f).  Nonetheless, though unnecessary, Defendants will briefly address several key aspects of the merits here, before more fully addressing the merits of Plaintiffs' claims in Defendants' cross-motion for summary judgment on September 26, 2025.

The Rule is a valid exercise of the broad discretionary authority that Congress granted FinCEN under two distinct provisions of the BSA.  The Rule lawfully implements

31 U.S.C. § 5318(g) by identifying a specific category of high-risk real estate transactions as a "suspicious" class and relevant to potential legal violations, as well as the streamlined suspicious activity report (SAR) filing provisions at section 5318(g)(5)(D).  Through the Rule, FinCEN imposes reporting requirements on persons involved in real estate closings and settlements, a group Congress included in the BSA's definition of "financial institution."  31 U.S.C. § 5312(a)(2)(U).  The Rule describes the circumstances in which a report must be filed, who must file a report, what information must be provided, and when a report is due.  The Rule also articulates why non-financed transfers of residential real property to certain legal entities and trusts are a class of suspicious transactions relevant to a possible violation of law or regulation.  *See, e.g.,* 89 Fed. Reg. at 70,259.  Contrary to Plaintiffs' argument, the Rule does not need to establish that all such transactions are likely linked to criminal activity to consider these transactions—as a class—suspicious.  Plaintiffs also incorrectly analyze the requirements of the streamlined SAR provisions at section 5318(g)(5)(D)(ii), requirements the Rule readily satisfies.

Further, the Rule is also independently authorized by 31 U.S.C. § 5318(a)(2), which empowers FinCEN to require reporting to ensure compliance with the BSA and to "guard against money laundering, the financing of terrorism, or other forms of illicit finance."  That 31 U.S.C. § 5318(a)(2) provides broad authority as opposed to section 5318(g)'s more targeted authority—and that FinCEN relied primarily on section 5318(g) in the Rule—does not prevent section 5318(a)(2) from authorizing the Rule or preclude FinCEN from having relied, in parallel, on that authority.  The authority granted by section 5318(a)(2) is complementary to, not exclusive or inconsistent with, FinCEN's authority to promulgate the Rule under section 5318(g).

9

The Rule is not arbitrary or capricious under the Administrative Procedure Act (APA). FinCEN provided ample rationale for its determinations in finalizing the Rule, accepting and considering a wide range of comments with different viewpoints, including from Plaintiffs themselves. AR at J00528-535 (ECF 19). Despite Plaintiffs' claims to the contrary, FinCEN discussed and analyzed a wide range of comments regarding applying the Rule's requirements to trusts. *See, e.g.*, 89 Fed. Reg. at 70,269–70. FinCEN also clearly articulated a rationale for declining to adopt a dollar threshold for reporting. *Id.* at 70,269. FinCEN conducted a lengthy regulatory impact analysis that considered training and IT costs, as well as anticipated benefits and the considerations related to determining those estimates. *Id.* at 70,277–88. And, as discussed above, FinCEN provided ample basis for connecting reportable transfers to issues of money laundering.

The Rule does not violate the First Amendment. Reporting requirements like those in the Rule are treated by courts as either not implicating the First Amendment at all or as triggering, and satisfying, rational-basis review. *See, e.g., Full Value Advisors, LLC v. Securities & Exch. Comm'n*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (SEC disclosures). It is only when a reporting requirement has "the practical effect 'of discouraging' the exercise of constitutionally protected political rights" that it may trigger heightened First Amendment scrutiny. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958). Where a law regulates "commercial associations" that generally "do not engage in expressive association," such First Amendment scrutiny is not implicated. *See Sullivan v. University of Wash.*, 60 F.4th 574, 580 (9th Cir. 2023). Here, as described above, the Rule clearly established as rational basis for its reporting requirements.

Finally, the Rule also does not violate the Fourth Amendment. "[R]eporting

10

requirements are by no means per se violations of the Fourth Amendment." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-60 (1974). Like the banks in *Shultz*, Plaintiffs cannot "plead an unqualified right to conduct their affairs in secret." *Id.* at 65 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)); *cf. New York v. Burger*, 482 U.S. 691, 700 (1987) (the "expectation [of privacy] is particularly attenuated in commercial property employed in 'closely regulated' industries"); *United States v. Chuang*, 897 F.2d 646, 650 (2d Cir. 1990) (holding banking to be heavily regulated for Fourth Amendment purposes). The Rule accordingly does not intrude upon a reasonable expectation of privacy, especially as it pertains to Plaintiffs' expectation of privacy in information provided by its customers. *See United States v. Miller*, 425 U.S. 435, 442 (1976).

Moreover, the Court in *Shultz* specifically upheld BSA reporting obligations under the Fourth Amendment because the information sought by the relevant reporting requirement was "sufficiently described and limited in nature and sufficiently related to a tenable congressional determination as to improper use of transactions of that type." *Id.* at 67. Similarly, the Rule only requires reporting of limited to discrete real estate, transactional, and ownership data related to a narrow set of transactions, in keeping with FinCEN's congressional mandate to regulate financial institutions, including real estate professionals.

Consequently, Plaintiffs have not shown a likelihood of success on the merits—both because they failed to properly make any merits argument in the Motion and because the merits argument in their summary judgment motion fails—and the Court should deny the instant Motion.

## II. Plaintiffs' delay of 361 days to seek injunctive relief severely undermines any claim of irreparable harm.

FinCEN published the Rule on August 29, 2024, which was after the NPRM issued on February 16, 2024 and after Plaintiffs submitted a comment dated March 27, 2024 (AR at J00528). Plaintiffs knew, as of August 29, 2024, the Rule would become effective on December 1, 2025—459 days after the Rule was published. Rather than promptly and reasonably seeking relief, Plaintiffs waited until less than seven months before the Rule takes effect to file this action and then waited another three months to seek injunctive relief. Plaintiffs sat on their rights and delayed seeking injunctive relief. Also, Plaintiffs did not submit their Agency Petition to stay the rule until approximately one month after filing this action. On August 25, 2025, barely three months before the Rule becomes effective, Plaintiffs now seek injunctive relief. In so doing, Plaintiffs have created an emergency of their own making, and any alleged irreparable harm is self-inflicted. Furthermore, Plaintiffs' delay has required Defendants and this court to scramble and decide whether Plaintiffs are entitled to this extraordinary relief.

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "Two time periods are relevant including (1) delay in filing a complaint and (2) moving quickly for a preliminary injunction once a complaint has been filed." *Torres v. Zingale*, Case No. 6:22-cv-1298-WWB-LHP, 2023 WL 11891990, *1 (M.D. Fla. Jul. 28, 2023). Plaintiffs' delay fails both categories here because they waited **264 days** (8 months and 21 days) to file their Complaint (ECF 1) and then waited another

12

**97 days** (3 months and 5 days) to file the instant Motion.  Plaintiffs waited **361 days** (11 months and 27 days) to seek injunctive relief after the Rule was published and **298 days** (9 months and 25 days) to file the Agency Petition for a stay.  Plaintiffs have not moved with alacrity.

In this District, delays such as this have resulted in denial of preliminary injunctions. *See, e.g., Cousins v. School Bd. of Orange Cty., Fla.*, 636 F. Supp. 3d 1360, 138-83 (M.D. Fla. 2022) (a three month delay militated against a finding of irreparable harm); *Panamerica Trade, Inc. v. Boys*, Case No. 3:25-cv-473-MMH-SJH, 2025 WL 1726231, *7, n. 10 (M.D. Fla. Jun. 20, 2025) (denying injunctive relief solely based on delay and not considering any other factors); *Torres*, 2023 WL 11891990 at *2 (delay of nearly one year) (Berger, J); *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Assoc., Inc.*, 6:22-cv-47-WWB-DAB, 2022 WL 18107602, *2 (M.D. Fla. Nov. 22, 2022) (finding failure to demonstrate irreparable harm due to delay of six months to over a year); *Partners Insight, LLC v. Gill*, Case No. 2:22-cv-739-SPC-KCD, 2023 WL 2958073, *2-3 (M.D. Fla. Apr. 14, 2023) (any presumption of irreparable harm rebutted by delay of six months); *InVue Security Products, Inc. v. Vanguard Products Group, Inc.*, Case No. 8:18-cv-2548-33SPF 2019 WL 4671143, *7 (M.D. Fla. Jul. 1, 2019), *rep. and recommendation adopted* 2019 WL 4673774 (Aug. 15, 2019) (plaintiff's delay of 18 months "severely undermines" a finding of irreparable harm despite explanations).

Plaintiffs may have explanations for waiting nearly a year to seek injunctive relief. However, "[a]n explanation, in and of itself, will not justify a significant delay; it must be a good explanation."  *InVue Security Products, Inc.*, 2019 WL 4671143 at *6-7. *citing High Tech Med. Instrumentation, Inc. v. New Images Indus., Inc.*, 49 F.3d 1551, 1557 (Fed.

13

Cir. 1995)). Based upon comments by Plaintiffs during recent hearings, it appears they were attempting to address the Rule through relationships and networks in an informal manner. Rather than simultaneously using informal and more formal measures, Plaintiffs simply waited to take any concrete administrative or legal action until many months after the Rule was published and only a handful of months before it is set to go into effect. Whatever the reason, Plaintiffs sat on those rights until the last minute and cannot now complain of irreparable harm after such a significant delay in seeking the extraordinary relief of a preliminary injunction. *Alabama v. U.S. Dept. of Commerce*, 546 F. Supp. 3d 1057, 1073-74 (M.D. Ala. 2021) ("[b]y sitting on his or her rights for even a few months, a plaintiff has squandered any corresponding entitlement to injunctive relief.") (internal citations omitted).

### III.   Plaintiffs' evidence of economic harm is insufficient and contradicted by their own comments in the administrative record.

Plaintiffs' argument of alleged irreparable harm relies on the claim that they will incur "hundreds of millions of dollars in compliance costs." Pltf. Mot. at 9. While compliance costs can constitute an irreparable harm, the Eleventh Circuit has only found that where the cost of compliance "could imperil the financial viability" of the company or would require the plaintiff to "make decisions which would significantly alter their ability to perform federal contract work that is critical to their operations." *Ga. v. Pres. of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022). Here, not only have Plaintiffs not made such an allegation, they affirmatively stated that compliance costs "[w]ill not be absorbed into the company's budget." AR at J00533. Thus, Plaintiffs will not actually suffer any economic harm, much less an irreparable economic harm, and the Rule regulates all similarly

14

situated title agents so there is no basis to claim customers will take their business elsewhere.

Furthermore, "[a] plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business . . .'" *California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170–71 (D.D.C. 2018) (*citing Coal. for Common Sense in Gov't Procurement v. United States*, 576 F.Supp.2d 162, 168 (D.D.C. 2008)). "The standard also requires more than conclusory assertions of potential loss." *Id.* Plaintiffs' burden is to "present 'specific details regarding the extent to which [its] business will suffer.'" *Id.* (internal citation omitted).

Plaintiffs provide neither specific facts nor evidence of any actual costs incurred by them nor any specific calculation of what they actually expect to pay in the future if the Rule takes effect. Rather, Fidelity engages in an unsound calculation based on its purported share (41%) multiplied by FinCEN's total projected costs. Pltf. Mot. p. 11.[2] Plaintiffs attach a declaration—from Todd Niemczyk, Compliance and Privacy Counsel for Fidelity National Financial, Inc. (FNF)—containing no facts as to what FNF has spent or has projected it will actually spend. The only internal analysis referenced in the declaration concerns FNF's 41% market share. *See* Pltf. Mot., Ex. C., ¶3. Rather than provide any facts or data in FNF's possession as to what it has spent or projects to spend, Mr. Niemczyk simply applies FNF's market share of 41% to FinCEN's projected costs.

---

[2] Plaintiff is a title insurance company and claims to have a 41% market share "within the title industry." As the Rule notes, however, the projected costs of the Rule will be borne by a variety of different actors, not just title insurance companies: "[T]he distribution of potential reporting persons as identified by primary occupation is: settlement agents (3.6 percent of potential reporting persons, 9.8 percent of the potentially affected labor force), *title insurance companies (0.5 percent, 6.6 percent)* . . . ." 89 Fed. Reg. at 70,282 (emphasis added).

15

*Id.* at ¶5. Far from providing evidence of actual harm, Plaintiffs engage in a simplistic, non-specific assumption premised on a cost figure that is not tailored to Plaintiffs' operations specifically.

Even if Plaintiffs' back-of-the-envelope calculation of costs was reliable evidence (it is not), Plaintiffs have acknowledged that the costs of compliance will not be borne by them but instead by customers. Specifically, in the FNF Family of Companies comment (AR at J00528-00535), FNF stated that the compliance costs "[***w***]***ill not be absorbed into the company's budget; instead, the cost of reporting will be spread across all transactions through increased pricing*** . . . ***These substantial increased costs will be passed on to consumers*** . . ." AR at J00533-34 (emphasis added). Plaintiffs again noted in their comment that "[i]*n the end, the costs will have to be passed on to **and ultimately borne by the consumer** . . .*" *Id.* (emphasis added). By Fidelity's own admission, the costs "will not be absorbed into the company's budget" but will be passed along to their customers after being spread across <u>all</u> transactions, not just non-financed ones, through increased pricing. *Id.* at J00533. And, to the degree that Fidelity believes that such price increases will harm their business, they have not demonstrated any such harm. Hence, Plaintiffs have shown no actual harm, much less irreparable harm, here.

While Plaintiffs provide no actual evidence of what they have expended to date in anticipation of complying with the Rule, injunctive relief would not repair any such harm, regardless of extent, because the relief would not result in recovering those costs. Moreover, assuming the merits issues are decided by, at the latest, January or February 2026, the costs incurred will be for a short period of time, perhaps 1-3 months.

16

### IV. Plaintiffs will suffer no First or Fourth Amendment harm.

In the instant motion, Plaintiffs make the following conclusory statement: "Fidelity will also suffer violations of their First and Fourth Amendment rights, the loss of which constitute irreparable harm." ECF 36 at pg. 17 of 25. As discussed above, however, Plaintiffs constitutional arguments fail on the merits, and thus they cannot show that they will suffer any harm through the violation of the First or Fourth Amendment rights. *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) ("Without [Plaintiffs'] alleged constitutional injury, [they] ha[ve] failed to show that [they] will suffer irreparable harm.").

### V. The alleged injury to Plaintiffs does not outweigh the harm to Defendants and vacating the rule would not be in the public interest.

The public harm from money laundering is "obvious." *United States v. Waked Hatum*, 969 F. 3d 1156, 1169 (11th Cir. 2020). Granting the preliminary injunction, even for a few months, will cause substantial harm to the Defendants and the public, as compared to Plaintiffs. "The 2022 [National Money Laundering Risk Assessment] identifies a lack of transparency in non-financed real estate transfers in particular as a key weakness in the U.S. Anti-Money Laundering and Countering the Financing of Terrorism (AML/CFT) regulatory regime." NPRM, 89 Fed. Reg. at 12,424. Through the Rule, FinCEN seeks to address the gaps in regulations targeting real estate money laundering risks with a more effective tool than GTOs. That is, without this Rule in place as planned, Defendants, as well as law enforcement, will continue to lack the ability to investigate criminals and terrorists who launder illicit funds through non-financed residential real estate transactions.

On the other hand, the Rule will apply to a small segment of the residential real estate market—approximately 11% of residential real estate transactions involve non-financed

purchases by legal entities.[3] Plaintiffs have been complying with GTOs for nearly a decade in the largest metropolitan counties in the United States, and Plaintiffs do not intend to incur any costs themselves. Any administrative burdens to Plaintiffs pales in comparison to combatting potential money laundering and other illicit financial activity that may take place while the injunction is in place. Consequently, Plaintiffs have failed to advance any persuasive "proof that the threatened injury to plaintiff outweighs any harm that might result to the defendants" nor have they shown "that the public interest will not be disserved by grant of a preliminary injunction." *Northeastern Fla. Chapter of the Ass'n. of General Contractors of America*, 896 F. 2d at 1283.

Further, the harm to the Government is exacerbated by the last-minute request for a nationwide universal injunction. A buzzer-beater injunction with only a few months between any ruling on the Motion and the effective date of the Rule would force FinCEN to halt efforts related to the Rule only to restart again if Plaintiffs' challenge is unsuccessful. An injunction at this late stage would upend the move toward a comprehensive reporting requirement and away from a temporary and geographically restricted system of GTOs. FinCEN projected operating costs of $8.5 million in the first year, 89 Fed. Reg. at 70,287. If the rule is enjoined or stayed only to be deemed lawful after full merits consideration, FinCEN will incur costs and other burdens responding to the last-minute starting, stopping, and restarting enforcement. If Plaintiffs wanted to merely preserve the status quo, they should not have waited until the last minute.

---

[3] FinCEN cited to a study (AR—D01437) showing that out of 39 million transactions occurring in 2,777 U.S. counties from 2015 through 2019, only 11 percent involved non-financed purchases by legal entities. 89 Fed. Reg. at 70,281. The same study identified a trust as the buyer in 3.3 percent of observed transactions. *Id*. The Rule also excepts certain non-financed transfers by such entities from being reported. *Id*. at 70,267–68.

### VI.   Universal injunctive relief or a stay is improper and a bond is required.

Universal nationwide injunctive relief is not proper. In *Trump v. CASA*, 606 U.S. ---, 145 S. Ct. 2540 (2025) the Supreme Court addressed "universal injunctions," *id.* at 2548, which are injunctions that bar the defendant from enforcing "a law or policy against *anyone*," *id.*, in contrast to an injunction that bars the defendant from enforcing the challenged law or policy against the plaintiff. The Supreme Court explained that "Congress has granted federal courts no such power," *id.* at 2551, as universal injunctions have no historical analogue in equity practice, *id.* at 2554.

Instead, the governing principle is that a court granting equitable relief "may administer complete relief *between the parties*." *Id.* at 2557 (quotation omitted). "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 2558. Thus, "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* (quotation omitted). These principles demonstrate the error of the relief requested by Plaintiffs here, which extends beyond the plaintiffs to preclude the government from acting with respect to all non-parties in the reporting cascade of the Rule.

As to any request for stay of the Rule, the Supreme Court explained that "[w]hen a federal court enters a universal injunction against the Government, it improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties […]" *Id.* at 2561. And because limiting an injunction to Plaintiffs causes them no harm, "the balance of equities does not counsel

19

against awarding the Government interim relief." *Id.* at 2562. The decision to issue a bond is a matter within the discretion of the trial court. Because Plaintiff have neither shown likelihood of success on their claims nor irreparable harm, their motion should be denied. However, should the Court grant the requested relief, a bond should be required here under Fed. R. Civ. P. 65(c).

## CONCLUSION

Plaintiffs have failed to meet their burden for such extraordinary relief. Thus, based on the foregoing arguments and citations of authority, Defendants respectfully request that the Court deny Plaintiffs' Motion for Stay or Preliminary Injunction (ECF 36).

Dated: September 17, 2025.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

*/s/ Richard L. Lasseter*
RONNIE S. CARTER
Florida Bar No. 0948667
KYESHA R. MAPP
Florida Bar No. 0113006
RICHARD L. LASSETER
Florida Bar No. 0060365
300 North Hogan Street, Suite 700
Jacksonville, FL 32202-4270
Telephone No. (904) 301-6324/6300
Facsimile No. (904) 301-6240
Emails: Ronnie.Carter@usdoj.gov
Kyesha.Mapp@usdoj.gov
Richard.Lasseter@usdoj.gov
*Attorneys for Defendants*