UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


FIDELITY NATIONAL FINANCIAL,
INC. and FIDELITY NATIONAL
TITLE INSURANCE COMPANY,

        Plaintiffs,

v.                         Case No.: 3:25-cv-554-WWB-SJH

SCOTT BESSENT, UNITED STATES
DEPARTMENT OF THE TREASURY,
ANDREA GACKI, and THE FINANCIAL
CRIMES ENFORCEMENT NETWORK,

        Defendants.

_____/


**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................................ii

I.    The Rule Exceeds FinCEN's Statutory Authority...................................................... 2

    A.    FinCEN Had No Authority to Promulgate the Rule Under Section
        5318(g)............................................................................................................... 2

    B.    FinCEN Cannot Rely on § 5318(a)(2) to Save the Rule............................... 5

II.   The Rule Is Arbitrary and Capricious....................................................................... 7

    A.    FinCEN Failed to Provide Any Rationale to Show the Rule Is Tailored to
        Target Transactions Relevant to Potential Violations of Law. ...................... 7

    B.    FinCEN Failed to Conduct Any Rational Cost-benefit Analysis. ................ 11

    C.    FinCEN Failed to Meaningfully Address Significant Comments. ............... 13

III.  The Rule Violates the Fourth Amendment............................................................. 14

IV.   The Rule Violates the First Amendment's Prohibition on Compelled Speech. ... 17

CONCLUSION ........................................................................................................... 19

CERTIFICATE OF SERVICE ..................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Cal. Bankers Ass'n v. Shultz*,
    416 U.S. 21 (1974) ................................................................. 14, 15

*Carpenter v. United States*,
    585 U.S. 296 (2018) ................................................................. 17

*Chamber of Commerce v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005) ................................................. 11, 12

*Chem. Mfrs. Ass'n v. U.S. EPA*,
    870 F.2d 177 (5th Cir. 1989) ................................................... 12

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ................................................................. 15

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017) .................................................... 5

*Env't Def. Fund, Inc. v. EPA*,
    898 F.2d 183 (D.C. Cir. 1990) ................................................. 5

*Full Value Advisors, LLC v. SEC*,
    633 F.3d 1101 (D.C. Cir. 2011) ............................................... 18

*G. M. Leasing Corp. v. United States*,
    429 U.S. 338 (1977) ................................................................. 16

*Gilmore v. Georgia Dep't of Corr.*,
    144 F.4th 1246, 1256 (11th Cir. 2025) ..................................... 3

*Hewitt v. Commissioner of IRS*,
    21 F.4th 1336 (11th Cir. 2021) ................................................ 5

*In re TextNow, Inc.*,
    2024 WL 2804704 (D. Del. May 31, 2024) ................................ 18

*Interfaith Ctr. on Corp. Resp. v. SEC*,
    786 F. Supp. 3d 97 (D.D.C. 2025) ........................................... 11

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ................................................... 6

*Leopold v. Dep't of Just.*,
    94 F.4th 33 (D.C. Cir. 2024) ................................................... 7

*Lopez v. First Union Nat. Bank of Fla.*,
    129 F.3d 1186 (11th Cir. 1997)......................................................................... 2

*Major League Baseball v. Crist*,
    331 F.3d 1177 (11th Cir. 2003)....................................................................... 3

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ...................................................................... 6

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................ 8

*Miranda de Villalba v. Coutts & Co. (USA) Int'l*,
    250 F.3d 1351 (11th Cir. 2001)....................................................................... 2

*Mistretta v. United States*,
    488 U.S. 361 (1989) ........................................................................................ 6

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................... 5

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ...................................................................................... 19

*Nat'l Wildlife Fed'n v. EPA*,
    286 F.3d 554 (D.C. Cir. 2002) ...................................................................... 12

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024)...................................................................... 18

*New York v. Burger*,
    482 U.S. 691 (1987) ...................................................................................... 15

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) ........................................................................................ 2

*Patel v. City of Los Angeles*,
    738 F.3d 1058 (9th Cir. 2013), *aff'd sub nom. City of Los Angeles v. Patel*, 576 U.S.
    409 (2015) ................................................................................................. 16,17

*Pharm. Care Mgmt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005) ........................................................................ 18

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
    2025 WL 2448851 (9th Cir. Aug. 26, 2025)................................................. 18

*SEC v. Alpine Secs. Corp.*,
    982 F.3d 68 (2d Cir. 2020) ............................................................................. 3

*Safe Extensions, Inc. v. FAA*,
   509 F.3d 593 (D.C. Cir. 2007) ................................................................. 7

*SEC v. Chenery Corp. ("Chenery I")*,
   318 U.S. 80 (1943) ................................................................. 5, 8, 13

*Sialoi v. City of San Diego*,
   823 F.3d 1223 (9th Cir. 2016) ................................................................. 2

*Skinner v. Ry. Labor Execs. Ass'n*,
   489 U.S. 602 (1989) ................................................................. 17

*Small Bus. Assoc. of Mich. v. Yellen*,
   769 F. Supp. 3d 722 (W.D. Mich. 2025) ................................................................. 6

*Stanford v. Texas*,
   379 U.S. 476 (1965) ................................................................. 17

*Steagald v. United States*,
   451 U.S. 204 (1981) ................................................................. 17

*Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*,
   684 F.3d 1127 (11th Cir. 2012) ................................................................. 7

*United States v. Hansen*,
   599 U.S. 762 (2023) ................................................................. 2

*United States v. Miller*,
   425 U.S. 435 (1976) ................................................................. 16, 17

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................. 7

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*,
   586 U.S. 9 (2018) ................................................................. 4

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985) ................................................................. 18

**Statutes**

31 U.S.C. § 5318(a)(2) ................................................................. 5, 6

31 U.S.C. § 5318(g)(1) ................................................................. passim

**Regulations**

31 C.F.R. § 1031.320(j)(2) ................................................................................... 14

89 Fed. Reg. at 70,259 ............................................................................... passim

**Other Authorities**

Acres of Money Laundering: Why U.S. Real Estate is a Kleptocrat's Dream" (Aug.
2021), p. 26, *available at* https://gfintegrity.org/wp-content/uploads/2021/08/
Acres-of-Money-Laundering-Final-Version-2021.pdf ("GFI Report") ........................... 9

OMB Circular A-4 (Sep. 17, 2003), p. 27, *available at* https://www.whitehouse.gov/wp-
content/uploads/2025/08/CircularA-4.pdf .................................................................. 12

We began our motion for summary judgment by saying that this case presents a stark example of regulatory overreach, and nothing submitted by the government in defense of the Rule changes that assessment. The plain text of the statute limits FinCEN's authority to requiring financial institutions to report "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). Congress reinforced these limits by requiring expressly that FinCEN "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law." 31 U.S.C. § 5318(g)(5)(D)(ii)(I). FinCEN's interpretation effectively reads out of the statute these constraints. There is no support for FinCEN's "categorical" approach in the plain language of the statute, it is contrary to Eleventh Circuit case law, and it marks a departure from how FinCEN has proceeded in the past by now imposing a new requirement affecting over 800,000 additional transactions annually.

The Rule is also arbitrary and capricious, and the rationale now advanced by FinCEN either was not the rationale relied upon when the Rule was issued, or does not reasonably support the imposition of the Rule, or both. FinCEN admits it did not quantify benefits that could justify imposing annual costs of over $500 million on real estate sales. There are also serious Fourth and First Amendment concerns. While the intent to enhance enforcement of money laundering and terrorist financing is laudable, FinCEN, like all agencies of the government, must proceed in a lawful manner—consistent with its authorizing statute, with the APA, and with the Constitution.

I.    **The Rule Exceeds FinCEN's Statutory Authority.**

   A.    **FinCEN Had No Authority to Promulgate the Rule Under Section 5318(g).**

The Rule exceeds FinCEN's statutory authority under Sections 5318(g)(1) and 5318(g)(5) because it imposes a SAR requirement on a category of transactions that are neither inherently "suspicious" nor "relevant to a possible violation of law or regulation." FinCEN's arguments to the contrary are meritless.

**First**, FinCEN argues that "[n]othing in the BSA's text requires an individualized assessment of each transaction before a SAR is filed." Doc. 64 at 8-9. FinCEN ignores binding precedent from the Eleventh Circuit, interpreting the same language in a comparable provision, that a transaction is "relevant to a possible violation of law or regulation" for purposes of the BSA only if the reporting person has a "reasonable basis" for "believing there is a nexus between the suspicion of illegal activity" and the particular transactions about "which information is disclosed." *Lopez v. First Union Nat. Bank of Fla.*, 129 F.3d 1186, 1193, 1195–96 (11th Cir. 1997); *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353–54 (11th Cir. 2001). Determining whether that nexus exists will almost invariably require an examination of the particular transaction to assess whether it is itself illegal or is likely connected with other potentially illegal conduct.[1] This is consistent as well with the approach taken under the Fourth Amendment where "suspicious" has a "well-established legal meaning[]," *United States v. Hansen*, 599 U.S. 762, 774 (2023), and generally, "reasonable suspicion may not be based on broad profiles

---

[1] Further, by using the indefinite article "a" in the phrase "relevant to a possible violation of law or regulation," Sections 5318(g)(1) and 5318(g)(5) indicate that each reportable transaction must have a nexus with a "discrete, countable" action that could violate a law or regulation. *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021).

which cast suspicion on entire categories … without any individualized suspicion of the particular person." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016) (citation modified); *see also Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1256 (11th Cir. 2025) (en banc).

FinCEN notes that other SAR rules employ "an objective standard" that "sensibly permits the use of objective 'red flags,'" but those regulations adopt an individualized approach at odds with FinCEN's position here. Doc. 64 at 9 (quoting *SEC v. Alpine Secs. Corp.*, 982 F.3d 68, 84 (2d Cir. 2020)). Under FinCEN's other SAR regulations, a financial institution must file a SAR report if a "reasonable" reporting person "in similar circumstances would have suspected the transaction was subject to SAR reporting." *Alpine Secs.*, 982 F.3d at 84 (internal quotations and citation omitted). FinCEN guidance identifies "red flags" that may aid in that assessment, but "each SAR must, of course, be examined individually," not through "a mechanical or bright-line test" like that required by the Rule. *Id.* (internal quotations and citation omitted). FinCEN could have taken a similar approach here, by requiring financial institutions to report non-financed residential real estate transactions when certain "red flags" would lead a reasonable reporting person to believe the transaction might be "relevant to a possible violation of law or regulation," but it did not do so.

**Second**, FinCEN argues that Sections 5318(g)(1) and 5318(g)(5)(D) authorize it to "require the reporting of a class of transactions that are inherently suspicious as a class." Doc. 64 at 9. But even if FinCEN could, in theory, devise a regulation that defines a category of transactions that is inherently suspicious and relevant to a potential legal or regulatory violation, the Rule does not do so. To qualify as inherently suspicious, a

transaction would need to, by its nature, support something "more than a mere intuition that illegal activity is afoot." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003). To be inherently "relevant to a possible violation of law or regulation," a transaction must necessarily exhibit a "nexus" with that "suspicion of illegal activity." *Lopez*, 129 F.3d at 1196. But there is nothing inherently illegal about a non-financed transfer of residential real estate to a legal entity or trust. And the exceptions in the Rule do not limit the set of reportable transactions to those that inherently support a belief that the transaction in question may be "relevant to a possible violation of law or regulation."

For related reasons, FinCEN's GTO data clearly cannot show that the Rule regulates an inherently suspicious category of transactions. For a rule imposing a SAR requirement on a category of transactions to comport with the text of the statute, the rule would need to define the category so that at least most, if not every, transaction that must be reported is both inherently "suspicious" and "relevant to a possible violation of law or regulation." This follows from the plain text of those provisions. As Fidelity explained, the word "transactions" in Sections 5318(g)(1) and 5318(g)(5) is modified by the adjective "suspicious" and the adjective phrase "relevant to a possible violation of law or regulation." "Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018). But FinCEN has never claimed that all (or even most) of the transactions that the Rule covers are "relevant to a possible violation of law or regulation."

**Third**, Section 5318(g)(5)(D) does not authorize FinCEN to adopt overinclusive categorical SAR requirements, either. FinCEN claims "Congress explicitly directed FinCEN to consider imposing SAR requirements on a categorical basis" in Section

5318(g)(5)(D). Doc. 64 at 9. But Section 5318(g)(5)(D) only authorizes FinCEN to establish streamlined processes to "permit the filing of noncomplex categories **of reports**." 31 U.S.C. § 5318(g)(5)(D)(i)(I) (emphasis added). That provision says nothing about categories **of transactions**, except insofar as it requires FinCEN to "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law (including regulations)." *Id*. § 5318(g)(5)(D)(ii)(I). In so doing, this Section constrains rather than expands FinCEN's authority.

**B.    FinCEN Cannot Rely on § 5318(a)(2) to Save the Rule.**

FinCEN's belated attempt to rely on Section 5318(a)(2) is barred by *SEC v. Chenery Corp. ("Chenery I")*, 318 U.S. 80 (1943). FinCEN claims it invoked Section 5318(a)(2) by stating in a footnote that it "believes [this authority] also provides an additional basis for the reporting requirement adopted in this final rule." Doc. 64 at 11 (citing 89 Fed. Reg. at 70,259 n.11) (alteration added). But FinCEN never articulated any theory or analysis of how Section 5318(a)(2) authorizes the Rule, and under *Chenery I*, this Court "cannot sustain an action merely on the basis of interpretive theories that the agency might have adopted and findings that (perhaps) it might have made." *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 189 (D.C. Cir. 1990) (citations omitted); *see Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017). Courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1353 (11th Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Even if FinCEN were entitled to rely on Section 5318(a)(2), that provision cannot save the Rule. FinCEN interprets this provision to grant freewheeling authority to adopt any substantive reporting requirement it believes would be "highly useful in criminal, tax,

or regulatory investigations." Doc. 64 at 13. But by its terms, Section 5318(a)(2) only confers authority on FinCEN to require financial institutions to "**maintain appropriate procedures**" for compliance with the BSA and its implementing regulations. 31 U.S.C. § 5318(a)(2) (emphasis added). Such procedures can include "the collection and reporting of certain information." *Id.* But as the text of Section 5318(a)(2) makes plain, the collection and reporting requirements implemented through such "procedures" must be "prescribe[d] by regulation" using the provisions of the BSA that specifically grant the Secretary (and thus FinCEN) the authority to impose such requirements, like Section 5318(g)(1). *Id.* In other words, Section 5318(a)(2) simply confers authority on FinCEN to require financial institutions to adopt procedures for compliance with the BSA and "regulations prescribed under" it, including procedures for collecting and reporting information. It does not authorize FinCEN to override the "specific statutory directive[s]" in Section 5318(g) that define its powers in this "particular area." *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001) (citation omitted). But FinCEN's all-encompassing interpretation of Section 5318(a)(2) would render those specific grants of authority entirely superfluous.

FinCEN's stunningly broad interpretation of Section 5318(a)(2) would also render that  provision unconstitutional. FinCEN's interpretation would authorize "a broad, grab-everything collection of suspicionless data because some day, some way, somehow, someone in law enforcement might find it useful," in plain contravention of the Fourth Amendment. *Small Bus. Assoc. of Mich. v. Yellen*, 769 F. Supp. 3d 722, 735 (W.D. Mich. 2025). And although FinCEN claims there is no non-delegation problem with its interpretation, FinCEN's reading comes close enough to eliminating any "intelligible

principle" to guide FinCEN's exercise of authority to justify a narrower interpretation of Section 5318(a)(2). *Jarkesy v. SEC*, 34 F.4th 446, 460–61 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). At minimum, "the breadth of the authority" asserted by FinCEN and the "economic and political significance" of that assertion provide a "reason to hesitate before concluding that Congress" meant to confer such authority. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

## II.    The Rule Is Arbitrary and Capricious.

Independently, the Rule must be set aside as arbitrary and capricious.

### A.    FinCEN Failed to Provide Any Rationale to Show the Rule Is Tailored to Target Transactions Relevant to Potential Violations of Law.

FinCEN failed to provide any reasoned explanation identifying "data demonstrating that the type of transactions swept in by the Rule actually had a high incidence of being connected to money laundering." Doc. 35 at 15. None of FinCEN's responses are persuasive.

First, FinCEN offers the erroneous claim that it does not **need** evidence because it is "common sense" that residential real estate sales may be used to launder money (and that most non-financed transactions are not vetted through a financial institution's AML program). Doc. 64 at 14-15. FinCEN cannot, however, avoid its obligations to ensure that the Rule is "supported by substantial evidence," *Stone & Webster Constr., Inc. v. U.S. Dep''t of Labo*r, 684 F.3d 1127, 1133 (11th Cir. 2012), by simply asserting that the public should accept its *ipse dixit*. *See Leopold v. De'p't of Just.*, 94 F.4th 33, 38 (D.C. Cir. 2024) ("[T]he agency has the burden to submit evidence and offer reasoning based on that evidence.") (citation omitted). FinCEN's "unsupported assertion does not amount to substantial evidence." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 605 (D.C. Cir. 2007).

Second, perhaps realizing that the explanation provided in the Rule itself falls short, FinCEN tries to support the Rule by pointing for the first time to record material purporting to show that some percentage of persons who had a transaction covered in the GTO program were also separately the subject of an unrelated SAR. Doc. 64 at 15. Of course, it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *Chenery I*, 318 U.S. at 87). FinCEN cannot now roam through the Administrative Record and attempt to buttress the Rule through newly invoked authority.

Even if FinCEN could rely on this newly cited evidence, it still would not support the Rule. That data shows only that a **minority** of individuals involved in transactions covered by the targeted GTO program (46.1%) were also the subject of an unrelated SAR. *See* Doc. 64 at 15. The fact that an individual was the subject of a **separate** SAR does not mean that the transaction captured by the GTO program involved money laundering. *See* Doc. 35 at 18-19. Instead, the data shows only that **less than half** of the transactions flagged by the GTO program involved a **person** who was involved in **an entirely different transaction** that was merely deemed suspicious. *Id.* Fidelity already explained that such data is logically insufficient to support the sweeping demands of the Rule, *see id.*, and FinCEN offers no response.

Third, FinCEN fares no better by pointing to new data from third parties. It points to a report from the Financial Action Task Force ("FATF"), which found that "[d]isparities with rules surrounding legal structures across countries means property can often be acquired abroad by shell companies or trusts based in secrecy jurisdictions, exacerbating

8

the risk of money laundering." Doc. 64 at 16 (citing 89 Fed. Reg. at 70,259). But this comment by FATF about acquiring property **abroad** does not support a program targeting domestic residential real estate transactions. More importantly, the report offers no **data** to support the expansive approach FinCEN takes here. As FATF makes clear, having such data is a critical element to ensuring that its recommended "risk-based approach" (or "RBA") to money laundering is properly calibrated. As FATF explains in its report, "[a]ccess to accurate, timely and objective information on [money-laundering] and [terrorist-financing] risks **is a prerequisite** for an effective RBA." AR-D01752 (emphasis added). If anything, the FATF report undermines FinCEN's approach, because FATF called for an evidence-based approach to "design" measures to combat money laundering, AR-D01760, AR-D01763, while FinCEN opted for a data-free "report everything" Rule.

Fourth, as Fidelity explained in its opening brief, FinCEN's reliance on a Global Financial Integrity ("GFI") report is similarly misplaced. That report—based on a sample of publicly reported cases self-selected by GFI—shows only that a **minority** of cases in the study involved real estate transfers that occurred solely in counties **not** covered by the GTO Program.[2] FinCEN points to the number of cases that involved **both** GTO and non-GTO-covered counties to bolster its numbers, but the fact that each of those cases involved a GTO-covered transaction proves that the existing system works. The same principle applies to FinCEN's suggestion that 64% of GTO cases "occurred in states that

---

[2] *See* D02416 (incorporating by reference Global Financial Integrity, "Acres of Money Laundering: Why U.S. Real Estate is a Kleptocrat's Dream" (Aug. 2021), p. 26, *available at* https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-Money-Laundering-Final-Version-2021.pdf ("GFI Report")).

were **never** subjected to a GTO." Doc. 64 at 16 (citing GFI Report at 19). That figure includes cases that involved **both** GTO and non-GTO states.[3] And GFI's assertion that 91% of the cases in its study involved residential real estate is meaningless when the majority of transactions in the study were covered by the existing GTO program **that targets residential real estate**. *See* Doc. 64 at 17.

Fifth, FinCEN offers no meaningful response to Fidelity's point that the only real data FinCEN could point to in the Rule—twenty-one enforcement actions over a nineteen-year period—actually tended to show that there was no significant connection between residential real estate and money laundering. *See* Doc. 35 at 15-16. FinCEN now claims that these twenty-one cases should be understood as merely "examples," not "comprehensive" data showing the extent of money laundering in residential real estate transactions. Doc. 64 at 17. But that makes Fidelity's point. Where all FinCEN has is a handful of "examples," and no solid statistics to show the number of reports from the **targeted** GTO program that were actually relevant to a possible violation of law or regulation such that an enforcement action was initiated let alone successfully concluded, it has no rational basis for concluding that there is a "broader phenomenon" and certainly no basis for the wholly unlimited reporting obligations imposed in the Rule. Worse, FinCEN now tries to claim that its **lack** of any supporting data should be viewed as **support** for its Rule. FinCEN claims that "if previous prosecutions of residential real estate money laundering were in fact fairly rare, that would not illustrate [that] such money laundering was not occurring, but that law enforcement previously lacked the tools they

---

[3] *See, e.g.*, GFI Report at 19 (noting that the 64% included a case involving Alaska, Oregon, and Colorado (non-GTO states) and California (a GTO state)).

needed to effectively detect and prosecute it." *Id.* In other words, according to FinCEN, the absence of any evidence showing money laundering in residential real estate just means that FinCEN needs to impose sweeping new reporting obligations in order to get the data that (it believes) would support the Rule. That makes no sense.

## B.   FinCEN Failed to Conduct Any Rational Cost-benefit Analysis.

FinCEN also has no response to justify its failure to conduct a reasoned cost-benefit analysis. *See* Doc. 35 at 19-20. FinCEN does not dispute that it announced that "no attempt is made to quantify the net benefit of the Rule," 89 Fed. Reg. at 70,284, and that it failed to identify "a clearly quantified benefit" for the Rule, Doc. 64 at 18. Instead, it offers various rationales to excuse itself from conducting a cost-benefit analysis. None is availing.

FinCEN first points to cases calling for "deferential" review of an agency's cost-benefit analysis. *Id.* But those cases do not justify FinCEN's total abdication of its responsibility to make a reasonable estimate of the benefits of the Rule. To start, in those cases, there was some form of cost-benefit analysis to which a court could defer. Here, there is not. FinCEN never compared the costs and benefits of the Rule—even a **qualitative** estimate of benefits—and instead said only that a reader might "infer" the existence of a "tacit expectation" that there would be "intangible benefits" equal to the estimated costs of the Rule. 89 Fed. Reg. at 70,285. Suggesting that readers might feel free to make such an "inference" is not the same as announcing a reasoned decision showing how the agency reached a determination that "intangible benefits" would justify the costs of a rule. FinCEN never did that analysis.

The cases themselves demand more from FinCEN. In *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005), for example, the D.C. Circuit explained that the

difficulty of the task "does not excuse the [agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Id.* at 143. Other cases involve scenarios in which an agency relied on predictive judgments about the effects of a rule and are simply inapposite here. *See, e.g.*, *Interfaith Ctr. on Corp. Resp. v. SEC*, 786 F. Supp. 3d 97, 121 (D.D.C. 2025); *see also id.* at 120 (citing *Chamber of Commerce* for the proposition that an agency must "determine as best it can the economic implications of the rule it proposed") (citation modified).[4]

FinCEN also points to an OMB Circular to justify its failure to quantify the benefits of the Rule. Doc. 64 at 19. But that Circular cannot override the BSA's command for a cost-benefit analysis, and it does not support FinCEN's actions in any event. The Circular explains that agencies "should monetize quantitative estimates **whenever possible**," and "[i]f monetization is impossible, **explain why** and present all available quantitative information."[5] The Circular in no way excuses FinCEN's failure to even attempt to quantify the benefits of the Rule or meaningfully explain why it was unable to do so. FinCEN points to a line in the Rule declaring that the benefit arising from detecting money laundering "is not readily translatable to dollar figures." 89 Fed. Reg. at 70,284-85. But simply asserting that an estimate cannot be done is not a real attempt to "quantify" the benefits of the Rule as the OMB Circular recommends and the BSA requires.

---

[4] For similar reasons, cases involving the EPA's predictions about environmental effects are inapposite. *See, e.g., Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002) (considering rule concerning discharge levels for pollutants and observing that "[w]hile EPA must take seriously its statutory duty to consider cost, courts of review should be mindful of the many problems inherent in an undertaking of this nature"); *Chem. Mfrs. Ass'n v. U.S. EPA*, 870 F.2d 177, 251 (5th Cir. 1989) (challenging rule setting limits on discharge of pollutants).

[5] *See* OMB Circular A-4 (Sep. 17, 2003), p. 27, *available at* https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf.

Finally, FinCEN suggests that the societal harm from money laundering as a whole is "obvious," Doc. 64 at 20, without seeking to quantify specific harms related to the transactions that would be captured by the Rule. This general assertion is wholly insufficient to substitute for a cost-benefit analysis. There is no doubt that money laundering brings societal harms. The problem here is that FinCEN has failed to provide: (i) any assessment whatsoever of the magnitude of those harms; (ii) any plausible rationale explaining how **this Rule** is likely to address those harms to any significant degree; or (iii) any comparison showing how the admittedly enormous costs of this Rule can be justified by expected benefits in reducing money laundering.[6]

## C.    FinCEN Failed to Meaningfully Address Significant Comments.

FinCEN also fails to show that it meaningfully addressed all significant comments.

**First**, FinCEN cannot show that it provided an adequate response to comments calling for a monetary threshold on the reporting requirement. FinCEN points to its assertion in the Rule that "money laundering can occur at all price points." *Id*. at 23 (citing 89 Fed. Reg. at 70,269). The problem, as Fidelity has explained, is that FinCEN failed to cite any evidence to support that bare assertion. The Rule relies solely on vague references to "FinCEN's experience with administering the [GTO] program and discussions with law enforcement," 89 Fed. Reg. at 70,269, which are insufficient. *See* Doc. 35 at 22. FinCEN's only other response is to point to additional anecdotal materials in the Administrative Record that were never relied on in the Rule itself. *See* Doc. 64 at

---

[6] Fidelity has not challenged FinCEN's cost estimates and so does not address the agency's defense of those estimates. *See id.* at 21-22.

23-24. Such post-hoc rationalizations offered by counsel to belatedly fill in gaps in the rationale offered in the Rule should be ignored. *See Chenery I*, 318 U.S. at 87.

**Second**, FinCEN cannot point to any satisfactory response to comments urging the exclusion of trusts from the Rule. In response, FinCEN argues that there is no reason to believe that a "complex analysis of a trust would be required to comply with the Rule's reporting requirements for a typical residential real estate transferee trust." Doc. 64 at 25. But FinCEN provided no indication in the Rule of what constitutes a "typical" residential real estate transferee trust or what analysis of "typical" trusts it conducted to reach any conclusion about how complicated they are. Those are all more post-hoc rationalizations. At bottom, there is no basis for thinking reporting persons would not have to engage in the multi-part analysis described in the Rule. *See* Doc. 35 at 23. Nor does the reasonable reliance standard relieve the burden placed on reporting persons. *See* Doc. 64 at 26. There is an exception to the reasonable reliance provision where the reporting person has "knowledge of facts that would reasonably call into question the reliability of the information provided." 31 C.F.R. § 1031.320(j)(2). It is not at all clear the extent to which a reporting person may be charged with knowledge that could come from a review of trust documents included in a transaction.

## III.    **The Rule Violates the Fourth Amendment.**

FinCEN cites *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), for the proposition that organizations may be required to file reports dealing with "particular phases of their activities." Doc. 64 at 26. Of course. But FinCEN fails to even address the Fourth Amendment standards set by *Shultz*, which require that regulations be tailored to identify transactions with "**the greatest potential**" for **circumventing that law** and that involve

14

"**substantial amounts of money**." *Shultz*, 416 U.S. at 63 (emphasis added). FinCEN ignores the requirement for specific indications that a transaction is circumventing the law and addresses the "substantial amounts" standard by stating that "[n]othing in *Shultz* suggests that a threshold transaction amount is dispositive." Doc. 64 at 27.

However, there is explicit history supporting a financial threshold. The reporting requirements in *Shultz* survived scrutiny **because** they targeted "abnormally large transactions in currency." 416 U.S. at 67. Two of the six-justice majority further emphasized the importance of the threshold, warning that any "significant extension … would pose substantial and difficult constitutional questions." *Id.* at 78 (Powell, J., concurring in the judgment, joined by Blackmun, J.). Indeed, FinCEN's own practice aligns with this standard: its GTO Program has targeted transactions in high-risk geographic areas, with reporting limited to transactions "ranging from over **$1 million** to the current threshold of **$300,000**." 89 Fed. Reg. at 70,269 (emphasis added). Accordingly, FinCEN's claim that a **zero-dollar threshold** meets this standard defies precedent, common sense, and its own historical approach.

FinCEN also misconstrues the "closely regulated industry" standard. First, the Supreme Court has only identified four industries as "closely regulated," none of which include residential real estate transfers. *See City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015). Second, even in a closely regulated industry, there must be standards that are a "constitutionally adequate substitute for a warrant." *Id.* at 426 (citation omitted). The Rule fails that test by imposing an unprecedented nationwide dragnet that compels reporting and recordkeeping for all non-financed residential real estate transfers, regardless of any connection to illegal activity. Thus, the Rule lacks a "properly defined

scope" and fails to "limit the discretion of the inspecting officers." *New York v. Burger*, 482 U.S. 691, 703 (1987); *see Patel*, 576 U.S. at 427.

Next, FinCEN contends that Fidelity has no Fourth Amendment rights based on *United States v. Miller*, 425 U.S. 435 (1976).[7] But *Miller* is inapposite, as it concerns the rights of individuals who have voluntarily disclosed information to third parties. FinCEN also fails to even address the *Patel* case, which is directly on point.

It is indisputable that Fidelity has Fourth Amendment rights. *See G. M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977) ("Nor can it be claimed that corporations are without some Fourth Amendment rights.") (collecting cases). Fidelity has a constitutionally protected privacy interest in its business records. *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061–62 (9th Cir. 2013). In *Patel*, the court unambiguously held: "That the **hotel records** at issue contain information mainly about the hotel's guests does not strip them of constitutional protection." *Id.* at 1062 (emphasis added). "[T]he **guests** lack[ed] any privacy interest … in the hotel's records" only "because the records belong[ed] to the hotel" and "contain[ed] information that the guests have voluntarily disclosed to the hotel." *Id.* (emphasis in original). The hotel, by contrast, had "the right to exclude others from prying into the contents of its records, which is also the source of its expectation of privacy," and it "**retain[ed]** that expectation of privacy notwithstanding the fact that the records [we]re required to be kept by law." *Id.* at 1061–62 (emphasis added). Here, it is Fidelity's own records—which are not voluntarily disclosed to the government but are

---

[7] *Miller* held that a bank depositor—akin to the hotel guests in *Patel*—lacked a privacy interest in a bank's records containing "information **voluntarily conveyed** to the banks," because "[t]he depositor takes the risk, in **revealing his affairs to another**, that the information will be conveyed by that person to the Government." *Id.* at 442–43 (emphasis added).

instead produced under compulsion of law—that trigger Fourth Amendment protection.[8] *See Patel*, 738 F.3d at 1062 (distinguishing *Miller*).

Lastly, FinCEN wrongly asserts that its universal reporting requirement is not a general warrant. A general warrant is government collection of intrusive private information that is not targeted at individuals suspected of wrongdoing. *Steagald v. United States*, 451 U.S. 204, 220 (1981); *see also Stanford v. Texas*, 379 U.S. 476, 510–11 (1965). As such, the Rule imposes on Fidelity a blanket obligation akin to a general warrant to collect and disclose detailed business and personal information. *See* Doc. 31, Joint Stip. ¶¶ 49-61. Further, the Rule's reporting mandate encompasses virtually **every** non-financed residential real estate transfer to a legal entity or trust nationwide—over 800,000 transactions **annually**—without any individualized suspicion, monetary threshold, or geographic limitation. Without any sensible limitations baked into the Rule, FinCEN's approach amounts to an "unrestrained search for evidence of criminal activity" that mimics the "permeating police surveillance" the Fourth Amendment was designed to prevent. *Carpenter v. United States*, 585 U.S. 296, 303, 305 (2018).

## IV.    The Rule Violates the First Amendment's Prohibition on Compelled Speech.

The Rule should also be vacated because it compels speech in violation of the First Amendment. Because the Rule is a content-based compulsion of speech, it triggers (and cannot satisfy) strict scrutiny. Doc. 35 at 29-30.

---

[8] Additionally, the Rule compels Fidelity to create proprietary information of its own and collect information from its customers that otherwise would not be revealed in a real estate closing, for the sole purpose of passing that information to the government. In other words, the Rule implicates Fidelity's Fourth Amendment protections because it requires Fidelity to "act[] as an instrument or agent of the Government." *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 614 (1989).

Contrary to FinCEN's assertions, the Rule does not compel purely factual and uncontroversial commercial speech that would trigger only rational basis review. *Cf. Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). The Rule will require reporting persons like Fidelity to perform a complex legal analysis to determine and report beneficial ownership of trusts. This is not simply commercial speech that "does no more than propose a commercial transaction." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (citation modified). Nor is it "expression related solely to the economic interests of the speaker and its audience," as the court defined commercial speech in *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 309 (1st Cir. 2005), on which FinCEN relies, or "product-specific government reporting requirements" that "assists consumers and furthers the societal interest in the fullest possible dissemination of information," *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 2025 WL 2448851, at *15 (9th Cir. Aug. 26, 2025) (citation omitted). In addition, the information involves the privacy interests of third parties—meaning it is not simply an "uncontroversial" topic. *Cf. In re TextNow, Inc.*, 2024 WL 2804704, at *3 (D. Del. May 31, 2024) ("Certain categories of information, such as social security numbers, implicate well-established privacy concerns.").

FinCEN cites *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011), but that court did not decide whether the speech at issue was commercial. *See id.* at 1109 (concluding that the SEC disclosure requirement was entitled to a lower level of review because it was "indistinguishable from other … forms of disclosure the Government requires for its 'essential operations'") (citation omitted). This case has no relevance here where FinCEN's position is that the speech at issue is entitled to lesser scrutiny because

it is commercial speech. *See, e.g.*, Doc. 64 at 29 n. 9 (noting that the reports required by the Rule purportedly "communicate the terms of potential commercial transactions").

Even if rational basis review applied, FinCEN has not demonstrated that its burdensome disclosure requirements are reasonably related to preventing money laundering. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018) (disclosure requirement was "unjustified and unduly burdensome under *Zauderer*").

## **CONCLUSION**

Fidelity's motion for summary judgment should be granted and the Defendants' cross-motion for summary judgment should be denied.

Dated: October 10, 2025

Patrick F. Philbin (DCBN 453620)
Jeff Jensen (DCBN 1765723)
William P. Barr (DCBN 951202)
**Torridon Law PLLC**
801 Seventeenth Street NW, Suite 801
Washington, DC 20006
Telephone: (202) 249-6900
pphilbin@torridonlaw.com
jjensen@torridonlaw.com
wbarr@torridonlaw.com
*Admitted Pro Hac Vice*

Respectfully submitted,

By: */s/ Stuart H. Singer*
Stuart H. Singer (FBN 377325)
Jesse Panuccio (FBN 31401)
Jon L. Mills (FBN 148286)
Eric M. Palmer (FBN 1050210)
Lauren Amos (FBN 1026073)
**Boies Schiller Flexner LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
ssinger@bsfllp.com
jpanuccio@bsfllp.com
jmills@bsfllp.com
epalmer@bsfllp.com
lamos@bsfllp.com

David Boies (NYBN 2296333)
Alan Vickery (NYBN 1917590)
**Boies Schiller Flexner LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone:  (212) 446-2300
DBoies@bsfllp.com
avickery@bsfllp.com
*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2025, I filed the foregoing document via the

CM/ECF system which will send notification of such filing to all parties and their counsel

of record in this case.

By: <u>*/s/ Stuart H. Singer*</u>

Stuart H. Singer