UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FIDELITY NATIONAL FINANCIAL, INC. et al.,

    Plaintiffs,

v.

SCOTT BESSENT, et al.,                    Case No. 3:25-cv-00554-WWB-SJH

    Defendants.

_____/

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMMARY JUDGMENT (ECF 71)**

**I. The Rule is well within FinCEN's statutory authority.**

    **A. The plain language of § 5318(g) authorizes the Rule.**

FinCEN crafted the Rule within the statutory authority provided under § 5318(g) to require streamlined reporting of suspicious transactions relevant to a potential violation of law—specifically certain non-financed residential real estate transfers to legal entities or trusts that are of high risk for illicit financial activity. Using authority in 31 U.S.C. § 5318(g), as amended in 2020 by the AML Act, and after years of research and experience with similar GTOs, FinCEN created a narrowly tailored reporting requirement to address a key vulnerability in the government's efforts to combat money laundering and the financing of terrorism through residential real estate.  As Defendants previously explained (ECF 64 at 8), FinCEN reasonably determined that the class of transactions was categorically "suspicious" and "relevant to the potential violation of law or regulation" under § 5318(g) given the high risk of potential illegality such transactions pose by their very nature.

Plaintiffs misconstrue and attempt to rewrite § 5318(g)(1) to require a financial institution, before reporting a transaction as suspicious, itself subjectively identify a "nexus" between a particular transaction and a possible violation of law. Congress could have written the statute to require financial institutions to always themselves individually identify a such a nexus between a specific transaction and the institution's own reasonable suspicion of illegal activity but that simply is not in the statutory language. And Plaintiffs can find no support in the statute or case law to support their interpretation.

As the statute is actually written, the statute does **not** condition reporting on a financial institution itself identifying a transaction as having a nexus with a possible violation of law; the statute only requires that reportable transactions be "suspicious," with suspicion understood as indicating "relevance to a possible violation of law or regulations." Nothing in § 5318(g) requires that the financial institution itself always subjectively determine whether an individual transaction meets this standard; FinCEN can do so objectively and on a categorical basis.[1] And FinCEN did so in the Rule, logically determining that non-financed residential real estate transfers to legal entities and trusts (which are not covered by one of the Rule's eight exceptions) are "suspicious transaction[s] relevant to a possible violation of law or regulation" because they are "[a]

---

[1] In furthering their objection to the entire concept of an objective standard, Plaintiffs also misleadingly cite *SEC v. Alpine Secs. Corp.*, 982 F.3d 68, 84 (2d Cir. 2020) for the proposition that "each SAR must . . . be examined individually" in determining suspiciousness. ECF 71 at 3. But this is not what the court was saying. Rather, the court was referring to the district court's review of all SARs that were allegedly deficient before issuing its summary judgment ruling. *SEC v. Alpine Secs. Corp.*, 354 F.Supp.3d 396, 431 (S.D.N.Y. 2018).

typology of real estate transfers that present acute illicit finance risks and for which there is broad consensus that regulation is needed." 89 Fed. Reg. at 12,429.[2]

The appropriateness of such categorical reporting under § 5318(g) was reenforced by the 2020 amendments to the AML Act, which added language to section § 5318(g) expressly authorizing FinCEN to require the streamlined reporting of suspicious transactions, including the filing of "categories of reports." And FinCEN determined that such a categorical approach was more reasonable than a more individualized SAR requirement for those involved in real estate closings and settlements: although historically FinCEN's SAR regulations generally have imposed a greater requirement on filing financial institutions to conduct an individualized inquiry using risk-based judgments when filing SARs,[3] FinCEN recognized that persons involved in real estate transactions may have greater difficulty implementing an AML program capable of effectively and efficiently individually identifying suspicious transactions, making a categorical approach a sensible alternative. 89 Fed. Reg. at 12,428.

### B. Plaintiffs' erroneous interpretation of § 5318(g)(1) is not supported by Eleventh Circuit caselaw.

Plaintiffs misconstrue the case law in the Eleventh Circuit, particularly *Lopez v. First Union National Bank of Florida.*, 129 F.3d 1186, (11th Cir. 1997) and *Miranda de*

---

[2] Likewise, contrary to Plaintiffs' argument, this requirement is not improperly "over-inconclusive" simply because not every transaction reported will ultimately relate to a legal violation. A "suspicious" transaction is not necessarily an illegal one, and a reporting regime that only required reporting of a transactions clearly tied to illegal behavior would be too under-inclusive to be useful to law enforcement.

[3] Even so, these FinCEN regulations also describe certain types of transactions that categorically must be reported. *See, e.g.*, 31 C.F.R. § 1020.230(a)(2) (requiring banks to report a transaction of at least $5,000 that "involves funds derived from illegal activities" or "with no business or apparent lawful purpose").

3

*Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351 (11th Cir. 2001) (ECF 71 at 2), as imposing requirements on FinCEN they do not. These two specific cases do not concern FinCEN's authority under § 5318(g)(1); rather the court discusses the safe harbor defense at 31 U.S.C. § 5318(g)(3), most notably in the context of financial activity financial institutions **voluntarily** choose to report to FinCEN despite not being required to do so. And the standard for when a financial institution can take advantage of a safe harbor defense for reporting—especially voluntary reporting—has little relevance for the government's authority to expressly require reporting.

In *Lopez*, the court interpreted § 5318(g)(3) as providing three distinct safe harbor defenses to a claim that a financial institution improperly disclosed a customer's financial records to FinCEN: (1) a voluntary disclosure of a possible violation of law or regulation, (2) a disclosure required by § 5318(g) itself (including under FinCEN regulations adopted under its authority), or (3) a disclosure pursuant to any other authority. *See Lopez*, 129 F. 3d at 1191, 1193. Thus, the court in *Lopez* does hold that a financial institutional must have a "good faith basis for believing there is a nexus between the suspicion of illegal activity and the account or accounts from which information is disclosed," but **only** as a condition for qualifying for the first safe harbor defense—*i.e.*, only when FinCEN regulations and other authority do *not* require a SAR to be filed—not for filing a SAR more generally. *Id.* at 1195. This result makes sense: if no legal authority requires a SAR to be filed, then a financial institution typically will need to form its own belief as to whether a "possible violation of law or regulation" has occurred to satisfy the conditions of § 5318(g)(3)'s safe harbor defense. In contrast, where, as under the Rule, a FinCEN regulation or other law expressly requires a SAR to be filed, a determination by a financial

4

institution that there was or may be a violation of law is not necessary, as the law itself already provides the basis for submitting the SAR.

Thus, in *Lopez*, the "nexus" language on which Plaintiffs focus has nothing to do with the scope of § 5318(g)(1)—only the right to assert the first and voluntary safe harbor defense under § 5318(g)(3). *Lopez* merely stands for the proposition that if a party wishes to assert this defense—only relevant when FinCEN has not required a SAR to be filed—there must be some good faith basis for believing there is a nexus between the suspicion of illegal activity and the account. *Id.* at 1195.

*Miranda de Villalba* is, if anything, even less relevant to Plaintiffs' claims. In that case, the court analyzed whether a defense under 12 U.S.C. § 3403(c) was sufficiently like § 5318(g)(3) such that pleading the defense under § 5318(g)(3) was enough to put the plaintiff on notice of a defense under § 3403(c). *Miranda de Villalba,* 250 F.3d at 1353. In *Miranda de Villalba*, a disclosure to law enforcement was made when a depositor attempted to wire a large sum of money from an account that had been frozen by court order because of suspected money laundering. *Id.* at 1354. The bank was relying on defenses that required proof of suspicion of a possible violation of law or regulation, and *Miranda de Villalba* merely discusses whether that defense was available. It does not interpret § 5318(g)(1) at all.

Thus, the Eleventh Circuit's discussions of § 5318(g)(3) in *Lopez* and *Miranda de Villalba* have no bearing on FinCEN's authority to require reporting under § 5318(g)(1). Although Plaintiffs argue that § 5318(g)(1) and § 5318(g)(3) contain the "same language" and therefore are "comparable provisions," they clearly are not given their scope and purpose as well as their plain language.

5

### C. The BSA nowhere adopts the Fourth Amendment caselaw's "reasonable suspicion" standard in defining suspicion in § 5318(g)(1).

Plaintiffs encourage the court to read "suspicious" within § 5318(g)(1) as having the same meaning as "reasonable suspicion." "Reasonable suspicion," however, is a term of art with a meaning within specific Fourth Amendment contexts—generally, stop-and-frisks and similar circumstances, *e.g., Terry v. Ohio*, 392 U.S. 1 (1968)—highly distinguishable from the financial reporting the BSA requires. Thus, for example, the "reasonable suspicion" cases Plaintiffs cite (ECF 71) involve an arrest and strip search. *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016); *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1256 (11th Cir. 2025). Plaintiffs have given no reason to conclude that Congress, simply by using the word "suspicious," intended to incorporate this unrelated stop-and-frisk standard into § 5318(g)(1), especially given the radically different context.[4]

### D. The Rule is also authorized by § 5318(a)(2).

Defendants already explained (ECF 64 at 11) that their reliance on § 5318(a)(2) is nothing new: this provision is expressly cited in the Rule itself as an additional basis of authority. And, contrary to Plaintiffs' claims, Defendants' interpretation of § 5318(a)(2) as authorizing FinCEN to impose reporting requirements would not grant FinCEN unguided, "freewheeling" authority (ECF 71 at 5): by § 5318(a)(2)'s plain language, FinCEN may

---

[4] In a footnote, Plaintiffs contend that "[b]y using the indefinite article 'a' in the phrase 'relevant to a possible violation of law or regulation,' § 5318(g)(1) and (g)(5) indicate that each reportable transaction must have a nexus with a 'discrete, countable' action that could violate a law or regulation." ECF 71 at 2. This new textual argument raised for the first time should be rejected and, even if considered, it fails. Plaintiffs' argument ignores the word "any" that precedes "suspicious transaction" in § 5318(g)(1). And Plaintiffs have given no reason to conclude that Congress, merely by the word "a," intended to inject the substantive requirement of a "nexus" or an individualized inquiry into § 5318(g)(1).

only use this authority to impose reporting requirements "to ensure compliance with [the BSA] and regulations prescribed under [the BSA] or to guard against money laundering, the financing of terrorism, or other forms of illicit finance," a standard the Rule readily meets.  Otherwise, since Plaintiffs' reply added nothing to their argument regarding § 5318(a)(2), Defendants rely on their argument in the Cross-Motion for Summary Judgment (ECF 64 at 11-13).

## II. The Rule is not arbitrary and capricious.

### A. FinCEN clearly demonstrated that the Rule is reasonable and reasonably explained.

Plaintiffs allege that FinCEN improperly relied on common sense when formulating the Rule—specifically, the common sense conclusion that illicit actors are likely to use the money laundering opportunities presented by the residential real estate market absent regulation.[5]  But agencies may "[r]easonably rely on common sense and predictive judgments with [their] expertise 'even if not explicitly backed by information in the record,'" *Great Lakes Communication Corp. v. FCC*, 3 F. 4th 470, 476 (D.C. Cir. 2021) (internal citations omitted), and agencies are entitled to conduct a general analysis based on informed conjecture, *Melcher v. FCC*, 134 F. 3d 1143,1158 (D.C. Cir. 1998).  Moreover, in addition to such common sense, FinCEN cited a great deal of evidence in the rulemaking process, as well as Defendants' Cross-Motion for Summary Judgment and

---

[5]  In insisting an agency must rely exclusively on direct evidence, not common sense, Plaintiffs confuse the applicable standard of review.  In the rulemaking context, "[t]he substantial evidence test 'is identical to the familiar arbitrary and capricious standard.'" *Window Covering Manufacturers Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1286 (D.C. Cir. 2023) (internal citations omitted).  The standard here is whether the agency "[a]rticulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.*

7

underlying administrative record, to demonstrate why the Rule is needed. Plaintiffs simply make various arguments asking the court to ignore that evidence.

Plaintiffs argue that FinCEN cites to new evidence in the record (GTO/SAR match rates) and that FinCEN cannot rely on the administrative record generally to defend the rule against an APA challenge. ECF 71 at 8. This data is not "new evidence" because some GTO/SAR match rates were explicitly referenced in the Rule (89 Fed. Reg. at 70,260) as well as the NPRM (80 Fed. Reg. at 12,426). Also, even if FinCEN had not included these specific citations, its reliance on this match evidence—and any other evidence in the administrative record—is proper: a court's APA review "'requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record.'" *Sierra Club v. U.S. Army Corp of Engineers*, 464 F. Supp. 2d 1171, 1182 (M.D. Fla. 2006), *citing Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F. 3d 1209, 1216 (11th Cir. 2002).

Plaintiffs also again ask the court to ignore these high match rates—*i.e.*, the fact a large percentage of the entities or individuals reported to FinCEN under the real estate GTOs were also the subject of at least one financial sector SAR—arguing that a "minority" match rate of **46.1%** is "logically insufficient" to support the "sweeping demands" of the Rule. ECF 71 at 8. Plaintiffs "nothing to see here" position defies logic. Nearly half of entities reported under geographically limited GTOs were also reported under financial sector SAR regulations, buttressing FinCEN's conclusion that a non-trivial percentage of the transactions subject to the GTOs—and the Rule—may be used by illicit actors.

Plaintiffs also quibble with FinCEN's citation of FATF's concerns regarding money laundering through real estate, arguing the Rule does not fully follow FATF guidance that

8

real estate reporting regulations allow for access to accurate, timely, and objective information. ECF 71 at 9. But the Rule is generally consistent with the 2022 FATF Report, AR D01751, which recognized that "[c]riminals gravitate towards sectors that apply or are believe to apply less comprehensive regulation" and that "[n]on-financed transfers in particular carry a high risk for criminally complicit professionals." AR D01758–59. Moreover, reports submitted under the Rule will be housed in the same database as other BSA reports so FinCEN can cross-reference identifying information as it has done with GTOs, 89 Fed. Reg. at 70,260, facilitating timely and effective use of these reports.[6] And, of course, even if the Rule did not fully fulfill FATF's vision for combatting money laundering through real estate, FATF's concerns still support FinCEN's conclusion regarding the risks of such money laundering.

Plaintiffs' criticisms of FinCEN's reliance on the GFI Report (AR-D02416)[7] are likewise misplaced. Plaintiffs characterize the cases GFI analyzed as "self-selected," but Plaintiffs offer nothing beyond speculation and innuendo to suggest that the report's conclusions regarding the extent of money laundering through real estate do not support the Rule.[8] More generally, even if some of GFI's in-sample statistics may be of limited

---

[6] Prior to the Rule, law enforcement would have to search a patchwork of records of varying quality and availability to obtain the information required by the Rule, if such information was even available at all. *See* 89 Fed. Reg. at 12,430.

[7] 89 Fed. Reg. 70260, n. 15, available at https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-Money-Laundering-Final-Version-2021.pdf

[8] For example, Plaintiffs suggest GFI's findings should be ignored because a majority of transactions studied were covered by GTOs (ECF 71 at 10), but this is not correct. The GFI report demonstrated that 60.76% of the U.S. money laundering cases involved properties in one or more counties not covered by the GTO; and, as Defendants noted previously, 64% of reported money laundering cases evaluated occurred in states that never had a county included in the GTO. (ECF 64 at 16). Plaintiffs do not argue with the 60.67% figure and falsely attack GFI's calculation of the 64% figure. Plaintiffs are ignoring a key fact—at the time of the relevant case study cited by Plaintiffs, the GTO did not exist,

generalizability out of sample, this would do nothing to undermine GFI's broader conclusions about the "staggering" extent of money laundering or the need for a more comprehensive approach, given that the current approach was "woefully inadequate." AR-D02416 at 7.[9]

Plaintiffs argue the 21 enforcement actions cited in the Rule are the "only real data" FinCEN can point to regarding the extent of money laundering—an odd claim since Plaintiffs spend so much time criticizing the other data FinCEN relied upon. (ECF 71 at 10). Not only does this ignore the extensive evidence of money laundering through real estate reflected in the administrative record, these enforcement actions were provided as examples to demonstrate a discrete fact—that residential real estate is used to launder money. 89 Fed. Reg. at 70,259. At no point did FinCEN contend the 21 cases were the only prosecutions of money laundering involving residential real estate—and these 21 cases certainly do not reflect the true extent of money laundering through real estate, much of which has gone undetected in the past; rather, based on the other evidence in the record, these cases likely reflect only the tip of the proverbial iceberg of real estate money laundering in the United States.

Finally, Plaintiffs make a new argument in their opposition and reply that there is no rational basis for the Rule because FinCEN did not point to the number of reports from

---

and therefore the states mentioned were correctly counted as non-GTO locations. Additionally, the GFI Report was based on cases from the United States, the United Kingdom, and Canada, and the Report's conclusion that money launderers also exploit foreign residential real estate at or near the same rate undermines Plaintiffs' argument that GFI's findings are based solely upon GTO use.

[9] Relatedly, Plaintiffs' argument that the existing system "works" (ECF 71 at 9) ignores why the Rule was created. Even if the GTO is reasonably effective in the areas it covers, FinCEN determined that a permanent and nationwide reporting requirement was needed. 89 Fed. Reg. at 70,260, 70,279.

the GTO program that were proven to actually be relevant to a possible violation of law or regulation. ECF 71 at 10. Plaintiffs apparently believe that unless FinCEN conducts a study demonstrating that GTOs led to some specified number of prosecutions, there is no reasonable basis for a more comprehensive requirement. But this is not the APA's standard: "The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021); an agency instead need only make "a reasonable predictive judgment based on the evidence it had," *id.*, which is what FinCEN did here.

In sum, FinCEN relied on common sense, experience, predictive judgments, and evidence to determine a reasonable reporting requirement to help address money laundering in the residential real estate sector. Far from being a "data-free 'report everything' Rule" as Plaintiffs claim (ECF 71 at 9), the Rule was based on data and years of experience and was tailored to a small subset of real estate transfers vulnerable to misuse, with wide exceptions for common, lower-risk transactions.

### B. FinCEN conducted a rational cost-benefit analysis given the aim of the Rule.

The Rule's benefits, put as simply as possible, are the discipline and deterrence of money laundering through residential real estate: the Rule is expected to make law enforcement investigations into such money laundering and related crimes more effective and to reduce the social costs associated with illicit activity to the extent such activity is more effectively disciplined and deterred. 89 Fed. Reg. at 70,278. Plaintiffs concede that such results, when achieved through the real estate GTOs, are beneficial, arguing "the existing system works." ECF 71 at 9. FinCEN reasonably relied on these established

11

benefits when it promulgated the Rule, and FinCEN's inability to precisely quantify such benefits under the Rule does not render the Rule arbitrary or capricious.

In the Rule, FinCEN adequately explained why its benefits could not be definitively quantified: although the Rule is expected to address a variety of economic harms caused by residential real estate money laundering, the precise economic benefit of "address[ing] or ameliorat[ing] the economic problems . . . is generally inestimable." 89 Fed. Reg. at 70,284-85. After all, the true rate of money laundering, like that of all crime, is unobservable—indeed, the difficulty of detecting money laundering through real estate is one of primary rationales for the Rule—and "[t]he law does not require agencies to measure the immeasurable." *Investment Co. Institute v. Commodity Futures Trading Com'n*, 720 F. 3d 370, 379 (D.C. Cir. 2013) (rejecting argument that agency action was arbitrary and capricious because it failed to put a precise number on the benefit of data collection in preventing future financial crises). It was not necessary nor required that FinCEN further explain why successfully detecting, prosecuting, and deterring crimes—or other illicit activities that rely on money laundering to be profitable—and thereby reducing their harmful effects is not readily translatable to dollar figures.[10]

Plaintiffs cite *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) and *Interfaith Ctr. on Corp. Resp. v. SEC*, 786 F. Supp. 3d 97 (D.D.C. 2025) for the proposition that an agency should estimate a Rule's impact "as best it can," which is precisely what FinCEN has done in the Rule. In the absence of reliable data, there is no requirement

---

[10] While OMB Circular A-4 (2003) does recommend presenting "all available quantitative information," no such quantitative information is available as to the particular benefits at issue here, and Plaintiffs do not identify what specific quantitative information should be presented. The Circular also recognizes that "[s]ome important benefits . . . may be inherently too difficult to quantify or monetize given current data and methods." *Id.* at 27.

12

that FinCEN speculate regarding the number of investigations and prosecutions that may occur with the Rule in place or how many crimes it would prevent. FinCEN makes reasonable predictive judgments about the effects of the Rule, even if it was unable to assign precise monetary values to these effects, and courts give "[g]reat deference to an agency's predictive judgments about areas that are with the agency's field of discretion and expertise." *Zero Zone, Inc. v. United States Department of Energy*, 832 F.3d 654 (7th Cir. 2016) (internal citations omitted).

Similarly, Plaintiffs incorrectly claim FinCEN failed to adequately address the magnitude of harm that the Rule seeks to address. ECF 71 at 13. While FinCEN was unable to fully quantity the economic harms caused by money laundering through residential real estate—because, as discussed above, doing so is not reasonably possible—FinCEN did discuss in detail the multitude of harms caused by such money laundering and myriad criminal acts that money laundering enables. *Id.* at 12,444-46. Plaintiffs appear to demand FinCEN assign a dollar value to preventing foreign corrupt oligarchs from using the real estate market to "clean" their ill-gotten gains and evade sanctions[11], foreign corrupt judges who take bribes to influence judicial cases and launder their money in our country[12], or stopping drug traffickers who use residential real-estate to launder their money.[13] But, as already discussed, the APA does not require that FinCEN provide a detailed quantified accounting in dollars of the harms associated with

---

[11] 89 Fed. Reg. 70259, n. 12 *citing U.S.* v. *All the Lot or Parcel of Land Located at 19 Duck Pond Lane Southampton, New York* 11968, Case No. 1:23–cv–01545 (S.D.N.Y. Feb. 24, 2023).
[12] *Id. citing U.S. v. Maikel Jose Moreno Perez*, Case No. 1:23–cr– 20035–RNS (S.D. Fla. Jan. 26, 2023).
[13] *Id. citing U.S. v. Delgado*, 653 F. 3d 729 (8th Cir. 2011).

13

money laundering or the multiple harms identified by FinCEN, only show that FinCEN's decision to promulgate the Rule was reasonable based on the available information.[14] Plaintiffs thus have failed to demonstrate a serious flaw in the cost-benefit analysis sufficient to support their challenge under the APA.

### C. **FinCEN thoroughly addressed significant comments regarding dollar thresholds and the inclusion of trusts.**

Plaintiffs may not agree with FinCEN's responses to comments concerning a dollar threshold and inclusion of trusts, but there is no dispute that FinCEN addressed them in a reasoned manner, which is all that is required. *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) ("There is no requirement. . . that an agency respond to significant comments in a manner that satisfied the commenter."). Plaintiffs wrongly suggest FinCEN barely addressed the issue of a dollar threshold or responses to comments concerning the matter, where FinCEN thoroughly explained its reasoning. *See* 89 Fed. Reg. at 12,436 ("FinCEN believes that any dollar threshold would enable money launders to structure payments to avoid reporting requirements [ . . .] ALTA has indicated to FinCEN that a uniform reporting threshold, regardless of what the threshold is, would decrease compliance burdens."); 89 Fed. Reg. at 70,267-69 (discussing comments received recommending no dollar threshold and explaining why no dollar threshold was included). Plaintiffs ask the court to ignore the comments supporting no dollar threshold despite the fact they were cited in the Rule and are part of the administrative record. *Id.*

---

[14] *But see id.* at 12,445 (listing various direct and indirect costs of crime). FinCEN also cited GFI's conclusion that in the span of 5 years, at least $2.3 billion had been laundered through the domestic real estate market. 89 Fed. Reg. 12,425 *and* ECF 64 at 16. Because this figure is based only on reported or adjudicated cases, the actual amount is no doubt substantially higher.

14

at 70,267 ("FinCEN also received a range of comments related to whether a dollar threshold should be included . . . commenters representing transparency organizations supported the lack of a threshold . . .").

As to comments concerning the inclusion of trusts, the Rule is simpler than Plaintiffs suggest. Plaintiffs' argument assumes that reporting persons must independently determine trust information themselves, even though a reporting person more commonly would be expected to obtain this information from the transferee, given that the Rule allows for such "reasonable reliance" unless the reporting person has knowledge that would reasonably call the provided information into question. *See* Rule, 31 C.F.R. §1031.320(j); 89 Fed. Reg. at 70,270, 70,273. While some transfers may require a reporting person to ask more questions depending on how elaborately the transferee has structured their affairs, Plaintiffs have presented no reason to conclude the Rule would require a complex legal analysis in all or most cases, or that such unusually complex outliers undermine the overall reasonableness of the Rule's cost estimates.[15]

### III. The Rule does not violate Fourth Amendment standards for reporting requirements.

Plaintiffs have not raised any serious challenge to the Rule's constitutionality under the Fourth Amendment. Real estate transactions are voluntary, public, and far less private than a bank customer's interactions with a bank. When a party enters the real estate market, they choose to involve themselves in a legal system governing the transfer

---

[15] Likewise, Plaintiffs' concerns about determining whether transferee trusts are excepted (ECF 71 at 14) is misplaced because the reasonable reliance standard provides that "[t]he reporting person may reasonably rely upon information provided by others . . . including with respect to whether the transferee is exempt." 89 Fed. Reg. at 70,282.

15

of property rights and generally have no legitimate expectation of privacy concerning the information required by the Rule. Deeds are recorded in county clerk's offices, taxes are imposed, and rights are vested and recognized by law in property owners—the subject transfers clearly involve overt, voluntary, and public acts in exchange for public, non-private benefits. *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 440 (1976) (no reasonable expectation of privacy in information voluntarily disclosed).[16] As Defendants previously explained, Plaintiffs themselves can claim no right under the Fourth Amendment to withhold the information required by the Rule. Even if Plaintiffs have privacy interests in some information required by the Rule, that interest would not apply to all such information, and Plaintiffs have not stated what information of their own, that is required by the Rule, would be subject to heightened expectations of privacy.[17]

More broadly, to the extent some information required by the Rule is entitled to Fourth Amendment protection, any protection of such information is limited and, because the Rule is reasonable under the framework of *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) the Rule is constitutional under the Fourth Amendment.

---

[16] *Carpenter v. United States*, 585 U.S. 296 (2018), merely stands for the proposition that the sole act of sharing itself did not eliminate a privacy interest. *Id.* at 315 (considering a Fourth Amendment challenge to cell phone location records held by third parties.). In *United States v. Gratkowski*, 964 F.3d 307 (5th Cir. 2020), the Fifth Circuit reaffirmed *Miller's* validity after *Carpenter*, and holding that the information at issue and voluntariness of the exposure weigh against a privacy interest. *Id.* at 311–12.

[17] Plaintiffs cite to *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989). ECF 71 at 17, n.8. Plaintiffs do not specify what proprietary information is at issue and *Skinner* is distinguishable because, in that case, the Court was not evaluating a reporting requirement like the Rule but mandated blood and urine tests. *Id.* at 606. Further, even if the Rule required Plaintiffs to be agents of the government, it makes no difference. The Rule is reasonable under *Shultz* and financial institutions have, for years, completed SARs under other AML/CFT regulations.

Plaintiffs misinterpret *Shultz* as imposing requirements that it does not, in fact, impose. *Shultz* stands for the proposition that reasonable financial reporting requirements raise no Fourth Amendments concerns. *See id.* at 59–68. Although *Shultz* provides some guidelines for assessing such reasonableness—*e.g.*, whether the information sought is "sufficiently described and limited in nature," *id.* at 67—it does not impose any of the limitations Plaintiffs claim. As Defendants already discussed (ECF 64), *Shultz* does not only permit the reporting of large value transactions. Rather, in *Shultz* the $10,000 threshold was only relevant because of the "potential risk" of such high value transactions, buttressing the government's arguments the reporting requirements regarding such transactions were reasonable under the Fourth Amendment. *Id.* at 34, 63. Likewise, in the Rule, FinCEN explained how the real estate transfers at issue pose a high risk for money laundering and the financing of terrorism. Thus, as with the regulation at issue in *Shultz*, the Rule is sufficiently tailored to single out residential real estate transfers found to have the high potential for circumvention and misuse.[18]

Plaintiffs' reliance on *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), is misplaced and the case is easily distinguishable. First, *Patel* did not involve a reporting requirement: it concerned empowering police officers to enter hotels and inspect guest registers at any time of day or night, as often as they liked. *Id.* at 421. The Supreme Court focused on the physical nature of the searches, the risk that they could be used

---

[18] Plaintiffs are also wrong to suggest the Rule implicates the concerns of Justices Powell and Blackmun in their brief *Shultz* concurrence, which merely noted the hypothetical potential of particularly broad financial reporting requirements to "touch upon intimate areas of an individual's personal affairs" by revealing detailed information about "a person's activities, associations, and beliefs." *Id.* at 78-79. Plaintiffs have not shown that the Rule would require disclosure of such intimate details or, to the extent the Rule does require the disclosure of private information, that it does so unreasonably.

pretextually to harass hotel operators and their guests, and that the ordinance did not limit what guest data could be collected and could be used to reveal intimate information. *Id*. at 421–23.  *Patel's* limited constitutional holding was that on-demand access to hotel records, which penalized declining access without affording pre-compliance review violated the Fourth Amendment.  Plaintiffs do not claim, nor can they, that the particular circumstances which resulted in the finding that the *Patel* searches were unreasonable applies here. There is no reason to conclude that the Rule could "be used as a pretext to harass" or that police officers can harass those in the reporting cascade "10 times a day, every day, for three months, without any violation being found." *Id*. at 421.  Likewise, no one can be "arrested on the spot" for refusing to immediately produce a report under the Rule.[19]  *Id*.  If, anything, the contrast between the requirements at issue in *Patel* and those of the Rule only highlights the relative reasonableness of the Rule under the Fourth Amendment.

      Finally, Plaintiffs continue to ask this court to apply "general warrant" Fourth Amendment standards that do not apply here.  Plaintiffs cannot rely on *Steagald v. United States*, 451 U.S. 204 (1981), which involved the scope of an arrest warrant, or *Standford v. State of Texas*, 379 U.S. 476 (1965), which involved the scope of a search warrant, to make the Rule something it is not.

---

[19] Plaintiffs cite to *G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977), which does not concern a reporting requirement, nor does it support any argument that the Rule violates the Fourth Amendment.  While the case recognizes that corporations do have some Fourth Amendment rights, the only violation in *G.M. Leasing Corp.* involved the general standard applicable to a search of private property.  *Id.* at 354.

### IV. The Rule does not compel protected speech and does not violate the First Amendment.

Plaintiffs ask this court to apply strict scrutiny to a reporting requirement for real estate transfers. Plaintiffs offer no convincing argument as to why the Rule should be treated differently than the regulations involved in *Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005) or *Pharmaceutical Researchers & Manufacturers of America v. Stolfi*, 2025 WL 2448851 (9th Cir. Aug. 26, 2025). Plaintiffs position that the Rule constitutes compelled speech is meritless because the Rule does not "effect a forced association between the speaker and a particular viewpoint." *Rowe*, 429 F.3d at 316 (Boudin, J. and Dyk, J. concurring). The fact that the Rule may require reporting of certain non-public information does not change the First Amendment analysis. The information in *Rowe* called for the disclosure of information that the pharmacy groups asserted was confidential and proprietary. *Id.* at 306. The court in *Rowe* nevertheless concluded that the required disclosures were akin to commercial speech.[20] *Id.* at 310.

Contrary to Plaintiffs' claim, Defendants cited *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101 (D.C. Cir. 2011), not for the issue of commercial versus compelled speech, but to demonstrate that reporting requirements like the Rule are treated by courts as either not implicating the First Amendment at all or as triggering, and satisfying, rational-basis review. ECF 64 at 29. Defendants also addressed the rational basis standard, explaining that the Rule directly advances a substantial government interest, is not more

---

[20] Plaintiffs cite to an unpublished district court decision from Delaware, *In re TextNow, Inc.*, 2024 WL 2804704 (May 31, 2024), which concerned a discovery subpoena about cellular records in an employment dispute, and has no bearing on the First Amendment issues here.

19

extensive than necessary, and requires a streamlined report providing for reasonable reliance by the reporting person as to the information provided.[21]  ECF 64 at 30.

## CONCLUSION

Defendants' Cross-Motion for Summary Judgment should be granted, and Plaintiffs' Motion for Summary Judgment should be denied.

Dated: October 24, 2025.                Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

*/s/ Richard L. Lasseter*
RONNIE S. CARTER
Assistant United States Attorney
Florida Bar No. 0948667
KYESHA R. MAPP
Assistant United States Attorney
Florida Bar No. 0113006
RICHARD L. LASSETER
Assistant United States Attorney
Florida Bar No. 0060365
300 North Hogan Street, Suite 700
Jacksonville, FL 32202-4270
Telephone No. (904) 301-6300
Emails: Ronnie.Carter@usdoj.gov,
Kyesha.Mapp@usdoj.gov,
Richard.Lasseter@usdoj.gov
*Attorneys for Defendants*

---

[21] *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755, 778 (2018), involved a law compelling clinics to disseminate a government-drafted notice offering information about access to abortion, and is completely distinguishable. *Id.* at 763. The Court held *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), did not apply because the notice required offering information about abortion services of others and was "anything but 'uncontroversial.'" *Id.* at 768-69.