**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA**

*Fidelity National Financial, Inc. et al.,*

v.

*Bessent et al.*

NO. 3:25-cv-00554-WWB-SJH

November 18, 2025

# Hearing on motions for summary judgment

*Patrick F. Philbin*
*Torridon Law PLLC*

*Stuart H. Singer*
*Boies Schiller Flexner LLP*

1

# FinCEN's interest in combating money laundering does not justify the enforcement of an *unlawful* rule.

- **While FinCEN's goal of combatting money laundering is commendable, it does not give the agency carte blanche to exceed its statutory authority, run afoul of the APA, and violate multiple constitutional rights.**

- "[O]ur system does not permit agencies to act unlawfully ***even in pursuit of desirable ends***."
    - *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021).

- **FinCEN's interest in combating money laundering is not even being furthered by this unlawful Rule:**

    - FinCEN failed to cite *any evidence* showing that the Rule accomplishes its goal of preventing money laundering through the collection of information on suspicious transactions.

    - **<u>At most</u>, FinCEN can show that the *targeted* GTO program has resulted in a de minimis number of enforcement actions over 19 years.**

# FinCEN's new Rule is anything but "a narrowly tailored reporting requirement."

- The Rule has no geographic limit, no monetary threshold, and is "wider in scope of coverage and will collect … information not previously available through the Residential Real Estate GTOs."
  - (Joint Stip. ¶¶ 48, 67).

- FinCEN itself estimates that the Rule will cause a **4,000% increase** in reports required to be filed annually:
  - "In 2023, **20,411** reports were made to FinCEN under the residential real estate GTOs."
    - (Joint Stip. ¶ 69).
  - "FinCEN has estimated 'the number of potentially reportable transfers under the Rule will be between approximately **800,000 and 850,000** annually.'"
    - (Joint Stip. ¶ 71).

- FinCEN also estimates that the Rule will impose compliance costs of up to **$690 million** for the first year alone, and up to **$663 million** in costs for each subsequent year.
  - (Joint Stip. ¶¶ 72, 88).

# Count I

### *The Rule Exceeds*
### *FinCEN's Statutory Authority*

**Congress authorized reports only of transactions that are both "suspicious" and "relevant to a possible violation of law."**

## (g) Reporting of Suspicious Transactions.—

- "The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report **any suspicious transaction relevant to a possible violation of law or regulation**."
    - 31 U.S.C. § 5318(g)(1).

# The Rule is not authorized under the plain language of the Statute.

- **<u>FinCEN has no basis for its assertion that non-financed residential real-estate transfers to legal entities or trusts are inherently suspicious.</u>**

- The Rule identifies transactions as "suspicious" based on two criteria: (1) a transfer to a trust or legal entity; and (2) the absence of financing. These criteria cannot support a reasonable suspicion that a transaction is connected with illegal activity.

- The exceptions in § 1031.320(b)(2) of the Rule do not limit the class of reportable transactions to those that are inherently suspicious:
  - grant, transfer, or revocation of easement;
  - transfer resulting from death;
  - transfer incident to divorce;
  - transfer to bankruptcy estate;
  - transfers supervised by a court in the United States;
  - transfers in which an individual transferor (alone or with their spouse) transfers an interest to a trust for no consideration, in which at least one of them is a settlor or grantor;
  - transfer to a qualified intermediary for purpose of 26 C.F.R. 1.1031(k)-1; or
  - transfer for which there is no reporting person.

  **31 C.F.R. § 1031(b)(2)(i)-(viii).**

# Non-financed residential real estate transfers are not inherently suspicious.

- **There is no basis for saying that virtually all non-financed residential real-estate transfers to legal entities or trusts are inherently suspicious.**
  - FinCEN's Final Rule cites only the following for support:
    - 1. GTO data demonstrating that **less than half** of transactions captured by GTOs were related to **some** individual on which **a SAR had been filed**—not necessarily a case in which money laundering was found to have occurred.
      - 89 Fed. Reg. at 70,260.
    - 2. A GFI study demonstrating that **the majority of cases** raised a flag in a county **covered by the GTO Program.**
      - 89 Fed. Reg. at 70,260.

- **This data only shows that the *targeted* GTO program identifies *some* connection to suspicious activity *a minority of the time*.**
  - Just because a targeted program with a monetary threshold and limited to certain geographic areas identifies *some* connection to suspicious activity in a *minority of reported transactions* does not mean **every transaction** covered by a dramatically expanded program will be suspicious or connected with potentially illegal activity.
  - FinCEN already has the ability to expand GTOs to new geographic areas when justified, which they have done in the past.

- **FinCEN's logic would justify pervasive, all-encompassing regulation without any limits at all.**

# Congress authorized GTOs if necessary, geographically defined, with monetary threshold, and time limited.

- "If the Secretary of the Treasury finds … that **reasonable grounds exist** for concluding that **additional recordkeeping and reporting requirements are necessary** to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an **order** requiring any domestic financial institution … or group of domestic financial institutions in a **geographic area**" to obtain and report certain information concerning "any transaction in which such financial institution … is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), **the total amounts** and denominations of which **are equal to or greater than an amount which the Secretary may prescribe**[.]"
    - 31 U.S.C. § 5326(a)(1).
- "No order issued … shall be effective for more than **180 days** unless renewed pursuant to the requirements of subsection (a)."
    - 31 U.S.C. § 5326(d).

# Eleventh Circuit precedent interprets the same language to require an individualized inquiry.

*Lopez v. First Union Nat'l Bank of Fla.,* 129 F.3d 1186, 1192-93 (11th Cir. 1997):

> "The first safe harbor provision protects a financial institution's 'disclosure of any possible violation of law or regulation.' 31 U.S.C. § 5318(g)(3). As the use of the adjective 'possible' indicates, a financial institution's disclosure is protected even if it ultimately turns out there was no violation of law. **In order to be immune from liability, it is sufficient that a financial institution have a good faith suspicion that a law or regulation may have been violated,** even if it turns out in hindsight that none was."

- **This requires "some good faith basis for believing there is a nexus between the suspicion of illegal activity" and the particular account or transactions "from which [the] information is disclosed."**
  - *Id.* at 1195.

- **Section 5318(g)(1) should therefore be interpreted to authorize FinCEN to impose SAR reporting duties on transactions that support a "reasonable basis" for believing that the particular transaction has a "nexus" with illegal activity.**
  - *Lopez,* 129 F.3d at 1196; *see also Miranda de Villalba v. Coutts & Co. (USA) Int'l,* 250 F.3d 1351, 1353–54 (11th Cir. 2001).

# "relevant to a possible violation of law" should be given a consistent interpretation.

- *Lopez* construed "relevant to a possible violation of law" in 5318(g)(3) to require an objective nexus between the particular transaction and suspicion of illegality.

- The same language appears in 5318(g)(1), with only the word "suspicious" added, which reinforces the conclusion that transactions subject to a SAR duty must be suspicious and relevant to a possible violation of law or regulation.

- "We presume that words or phrases bear the same meaning throughout a text when a statute uses materially the same language."
  - *Sunshine State Reg'l Ctr., Inc. v. Dir*, 143 F.4th 1331, 1341–42 (11th Cir. 2025).

- Identical language should  be read consistently across the statute, and the safe harbor must be **coextensive** with FinCEN's authority.
  - If FinCEN can compel disclosure of a transaction under "relevant to a possible violation of law," then a **voluntary** disclosure of that same information by regulated parties is protected under the safe harbor.

# FinCEN never cites any authority supporting its claim that no individualized inquiry is required.

- **FinCEN does not cite any authority for either of its assertions that an individualized inquiry is not required.**

  - The only citation FinCEN provides in support of its assertions is to 89 Fed. Reg. at 70,259.

  - But that page merely points out that "[n]on-financed transfers to legal entities and trusts heighten the risk that such transfers will be used for illicit purposes," and in a footnote sets out examples.

  - But there is no legal authority discussed at page 70,259 that supports FinCEN's assertion that some elevated risk in a category of transactions eliminates the requirement of an individualized inquiry.

# Even if the statute supports a categorical approach to transactions, FinCEN's Rule fails.

- A categorical rule would only be permissible **to the extent** it isolates transactions that **necessarily** provide a reasonable basis to believe they are suspicious and relevant to a possible violation of law.
  - *Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1192-93 (11th Cir. 1997); *See Major League Baseball v. Crist*, 331 F.3d 1177, 1187-88 (11th Cir. 2003) (an agency "must have more than a mere intuition that illegal activity is afoot" and "an investigation predicated solely upon legal activity does not pass muster").

- FinCEN's category—all non-financed residential real estate transfers to legal entities or trusts, regardless of amount, location, or red flags—is not inherently suspicious.

- "[T]he government must do more than simply label a behavior as 'suspicious' to make it so."
  - *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011).
  - *see also United States v. Johnson*, 171 F.3d 601, 605 (8th Cir. 1999) ("None of the particularized facts relied upon by the government was inherently suspicious, and each can be readily characterized as 'conduct typical of a broad category of innocent people.'") (citation omitted).

**The Rule also violates Standard (I) of the streamlined SAR requirements because it does not "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law."**

- "In considering the means by or form in … reporting … the Secretary of the Treasury … shall … establish streamlined, including automated, processes to, as appropriate, permit the filing of noncomplex categories of reports that … reduce burdens imposed on persons required to report[.]"
  - 31 U.S.C. § 5318(g)(5)(D)(i)(I)(aa).

- In carrying out this authority, FinCEN "**shall** establish standards to **ensure** that streamlined reports relate to suspicious transactions relevant to potential violations of law."
  - 31 U.S.C. § 5318(g)(5)(D)(ii)(I).

# Section 5318(g)(5) constrains rather than expands FinCEN.

- **The words "shall" and "ensure" impose a *mandatory requirement* on FinCEN to "guarantee" that streamlined SAR rules comply with those requirements.**
  - *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 667 (2007); *see Murphy v. Smith*, 583 U.S. 220, 223 (2018); *Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36, 46 (1st Cir. 2024).

- Any "discretion" conferred on FinCEN is textually limited to the "means or form of reporting." Section (g)(5)(B) "directs the Secretary to consider '**the means or form** in which the Secretary shall receive such reporting,' including … 'burdens imposed by such **means or form of reporting**,' 'the efficiency of the **means or form**,' and the 'benefits derived by the **means or form of reporting**.'"
  - 89 Fed. Reg. at 70,259 (quoting 31 U.S.C. § 5318(g)(5)(B)(i)-(iii)).

- Section 5318(g)(5) does not authorize FinCEN to regulate categories **of transactions** that are neither suspicious nor relevant to a potential violation, as FinCEN claims. It provides that FinCEN "shall" establish "streamlined" processes for filing "**noncomplex categories of reports**" to "reduce burdens imposed on persons required to report."
  - 31 U.S.C. § 5318(g)(5)(D)(i)(I).

# Section 5318(a)(2) cannot support the Rule.

- FinCEN did not list this subsection in the portion of the Rule titled "Authority."
  - 89 Fed. Reg. at 70,262.

- FinCEN's lone reference to Section 5318(a)(2) came in a footnote attached to a comment in the Rule's "Background" section.
  - 89 Fed. Reg. at 70,259 n.11.

- "We cannot sustain an action merely on the basis of interpretive theories that the agency might have adopted and findings that (perhaps) it might have made."
  - *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 189 (D.C. Cir. 1990) (citation omitted); *see Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

- § 5318(a)(2) authorizes FinCEN only to "require … financial institutions … to **maintain appropriate procedures** ... to ensure compliance with" the BSA.

- § 5318(a)(2) *at most* allows FinCEN to adopt rules about "the procedural mechanism by which the regulated person complies with her legal duty … to report" a "transaction," not rules imposing a "substantive duty to disclose information."
  - *Cf. United States v. Solomon ex rel. Solomon*, 570 F. Supp. 3d 1195, 1204-05 (S.D. Fla. 2021).

# Even if Section 5318(a)(2) permitted substantive reporting duties, Section 5318(g)(1) specifically governs SARs.

- **Contrary to FinCEN's assertion, Section 5318(a)(2) does not exist independently of 5318(g).**
  - If this interpretation were true, there would be no standards *whatsoever* and Section 5318(g) would be superfluous.

- **FinCEN "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions" of the agency "in a particular area."**
  - *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001).

# The Rule's approach to transactions contradicts FinCEN's own "longstanding practice."

- FinCEN's other SAR regulations have uniformly required a financial institution to "file an SAR if it 'knows, suspects, or has reason to suspect' that a transaction is suspicious"—and not otherwise.
  - *Sec. & Exch. Comm'n v. Alpine Secs. Corp.*, 982 F.3d 68, 84 (2d Cir. 2020); *see also Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 580-81 (9th Cir. 2018).

- And, under *Loper Bright*, FinCEN's "longstanding practice" of defining "suspicious transaction" so that each SAR must be examined individually carries weight.
  - *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

# The meaning of "suspicious" should be read against the background of Fourth Amendment.

- "Reasonable suspicion may not be 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'"
    - *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016) (citation omitted); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (reasonable suspicion cannot be imputed to a "large category of presumably innocent" persons).

- FinCEN's claim that "suspicion" is a stop-and-frisk term of art misses the point. Under **even the most minimal** standard of Fourth Amendment scrutiny that could apply, the agency "must have more than a mere intuition that illegal activity is afoot" and "an investigation predicated solely upon legal activity does not pass muster." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003).

- The Bank Secrecy Act must be interpreted in line with the Fourth Amendment, which limits FinCEN's authority.
    - *See Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 67 (1974); *Small Bus. Assoc. of Mich. v. Yellen*, 769 F. Supp. 3d 722, 734 (W.D. Mich. 2025) (explaining that "protections baked into the BSA … explain why the BSA satisfies the Fourth Amendment").

- Congress carefully chose the words "suspicious" and "relevant to a possible violation of law" against the background of how reasonable suspicion has long been interpreted in the Fourth Amendment context and FinCEN's own historical practice.

# A contrary interpretation of Section 5318(g)(1) would raise "major questions" about the section's scope.

- **FinCEN historically identified suspicious transactions using *tailored* targeting orders and *individualized* inquiries.**

- The Residential GTO program is narrowly focused on transactions "above a specific price threshold by certain legal entities in select metropolitan areas."
    - 89 Fed. Reg. 70,259-60.

- The original SAR regulations defined "suspicious transaction" to mean those where the financial institution "knows, suspects, or has reason to suspect" certain activities.
    - 61 Fed. Reg. 4,326, 4,331-32 (Feb. 5, 1996).

- Since then, SAR regulations have required filing of a SAR if an institution "'knows, suspects, or has reason to suspect' that a transaction is suspicious."
    - *Sec. & Exch. Comm'n v. Alpine Secs. Corp.*, 982 F.3d 68, 84 (2d Cir. 2020).

# A contrary interpretation of Section 5318(g)(1) would raise "major questions" about the section's scope.

- Contrary to FinCEN's argument, the Rule is "transformative" in that it imposes an **unprecedented** expansion in reporting by over **4000%**.
  - This reporting is, for the first time, **unlimited** in geographic and monetary scope and untethered to **any** reasonable suspicion of illegal activity.
  - Congress would have set forth such an extreme expansion of FinCEN's authority clearly in the statute.
    - *West Virginia v. EPA*, 597 U.S. 697, 721 & 724 (2022).

- The new Rule will cost the real-estate sector **billions** over its lifetime, which echoes "economic impact[s]" that the Court has found sufficient to raise major questions.
  - *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021).

- As a result, the Court "[sh]ould not assume that Congress entrusted" FinCEN with the authority to enact such a sweeping reporting rule "without a clear statement to that effect."
  - *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

# Count III

## *The Rule Violates the Fourth Amendment*

# The Rule fails Fourth Amendment standards set by *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) for the BSA.

- A request for information will "withstand [a] Fourth Amendment challenge" only if the information is "**sufficiently related to a tenable . . . determination as to improper use of transactions of that type**" and **"[t]he inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant.**"
  - *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 67 (1974).

- "The regulations are **sufficiently tailored** so as to single out transactions found to have the greatest  potential for such circumvention and which involve substantial amounts of money."
  - *Id.* at 63.

- The Rule is not tailored in **any** fashion; there are no standards or limitations that narrow the universe of real estate transactions covered.

- FinCEN cannot engage in "a broad, grab-everything collection of suspicionless data because some day, some way, somehow, someone in law enforcement might find it useful."
  - *Small Bus. Ass'n of Michigan v. Yellen*, 769 F. Supp. 3d 722, 735 (W.D. Mich. 2025).

# Fidelity has a privacy interest in its own records.

- Fidelity categorically has a privacy interest in its **own** business records that triggers Fourth Amendment protection.
  - *Patel v. City of Los* Angeles, 738 F.3d 1058, 1062 (9th Cir. 2013) *aff'd,* 576 U.S. 409 (2015) (distinguishing *United States v. Miller*, 425 U.S. 435 (1976)).

- Fidelity is not invoking privacy interests of its customers, so *Miller*, 425 U.S. at 442, is irrelevant.
  - *See* Opp. 11 (citing *United States v. Miller*).

- *Miller* is further inapplicable  because Fidelity is not asserting Fourth Amendment protections over information it **voluntarily revealed to another**.
  - *See Miller*, 425 U.S. at 442.

- Information compelled by the Rule—like the identity of a trust's beneficial owner—<span style="color:red">**is private information not ordinarily collected in a given transaction, as parties have stipulated.**</span>
  - "Under the new Rule, settlement agents are required to collect and report certain **private, non-public information not regularly obtained** in non-financed real estate closings. This includes personally identifiable information from trustees of trusts and signers on behalf of legal business entities." Joint Stip. at ¶ 74.
  - FinCEN "acknowledges that the information required may be beyond what is normally available to the reporting person," 89 Fed. Reg. at 70,275, and is often "not available to law enforcement," *id.* at 70,278.

- *Patel* is directly on point:
  - The disputed statute "**require[d]** hotel and motel operators to collect and record detailed information about their guests in either paper or electronic form," which could later be accessed by the government. *Patel,* 738 F.3d at 1060.

# The Rule is equivalent to an unconstitutional general warrant.

- It is a core Fourth Amendment principle that officers cannot search or seize without *individualized* suspicion that a *particular* person committed a *particular* crime.
    - "The basic purpose of this Amendment … is to safeguard the privacy and security of individuals against arbitrary invasions by government officials. The Founding generation crafted the Fourth Amendment as a response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officer to rummage through homes in an unrestrained search for evidence of criminal activity."
        - *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (citations omitted); *see also Stanford v. Texas*, 379 U.S. 476, 481 (1965).

- FinCEN admits that the Rule compels reporting for the purpose of searching for criminal activity.
    - Joint Stip. at ¶¶ 76-77, 85-86.

- The Rule is a general warrant because FinCEN disregarded any need for particularized suspicion and rejected all sensible limits to target its information requests, resulting in an unlimited sweep that will gather information on 800,000-850,000 transactions a year.
    - *See* 89 Fed. Reg. at 70,283

# Count II
## *The Rule is Arbitrary and Capricious*

# Arbitrary and Capricious Review

- A rule is arbitrary and capricious if it is not "the product of reasoned decisionmaking."

  - *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

- "[A]n agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or has failed to provide "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"

  - *Id.* at 43 (citation omitted).

- An agency rule is arbitrary and capricious if the agency fails to "rebut 'vital relevant' or significant comments."

  - *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1343 (11th Cir. 2021).

# Arbitrary and Capricious Review: A rule fails if it is based on a factual premise that lacks factual support.

- "We have held that 'agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence.'"

    - *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025) (informal rulemaking case, citation omitted).

- The "substantial evidence" standard "is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings."

    - *Atlanta Gas Light Co. v. FERC*, 140 F.3d 1392, 1397 (11th Cir. 1998) (quoting *Maryland People's Couns. v. FERC*, 761 F.2d 768, 774 (D.C. Cir. 1985) (Scalia, J.)).

# There is no evidence the Rule is tailored to reach only transactions relevant to potential violations of the law.

- **No rational basis to think the Rule was properly tailored to target transactions "relevant to potential violations of law."**

  1. The only data FinCEN cited was **21 enforcement actions over 19 years** in the GTO program.

     - Suggests that only **0.00014%** of reportable transactions under the Rule have any demonstrated connection to illegal activity.

     - In other words, **99.99986%** of reportable transactions would **not** be relevant to violations of law.

  2. That the **narrowly targeted** GTOs identify participants named in unrelated SARs **less than half the time** and have yielded **de minimis enforcement actions** does not justify a conclusion that vastly broader, un-targeted reporting would be better.

     - Data showing that **less than half** the transactions flagged by GTOs have even a tenuous connection to other SARs does not justify **expanding** reporting requirements.

     - And FinCEN has never provided data from GTOs.

**There is no evidence the Rule is tailored to reach only transactions relevant to potential violations of the law.**

3. GFI study provides no rational basis supporting the Rule.

- No way to account for selection bias in GFI's sample or to assess whether the study has any statistical validity.

- If anything, the GFI study shows that GTOs already capture **most** suspicious residential real estate transfers.

# FinCEN conducted no rational cost-benefit analysis.

- **Congress directed FinCEN to consider "the burdens imposed … on persons required to provide such reporting" and "the benefits derived … by Federal law enforcement agencies and the intelligence community."**

  - 31 U.S.C. § 5318(g)(5)(B)(iii).

- **FinCEN failed to conduct any rational cost-benefits analysis:**

  - FinCEN: economic implications are "generally inestimable" and "**no attempt is** made to quantity the net benefit of the rule."

    - 89 Fed. Reg. at 70,284-85.

  - Difficulty determining benefits "does not excuse the [agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed."

    - *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005).

  - FinCEN's suggestion that benefits "might be inferred" to match the Rule's costs is the sort of "circular reasoning" that is the "hallmark[] of arbitrary and capricious decision-making."

    - *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 54 (1st Cir. 2025).

# FinCEN failed to address significant comments.

1. **Comments favoring a monetary threshold to reduce burdens:**

   - FinCEN invoked vague "**experience**" and claimed that "**discussions** with law enforcement shows that money laundering through real estate occurs at all price points."

     - 89 Fed. Reg. 70,269.

   - Courts reject as insufficient such invocations of "operational experience."

     - *D.C. v. U.S. Dep't of Agric.*, 496 F. Supp. 3d 213, 233, 244 (D.D.C. 2020).

# FinCEN failed to address significant comments.

**2. Comments that settlement agents lack expertise to determine whether a trust triggers reporting or to identify trust beneficial owners:**

- Beneficial ownership requires a complex legal determination.

- Exceptions to Rule and "reasonable reliance" standard do not meaningfully address the core concerns raised by comments.

  - Exceptions rarely apply.

  - Even under "reasonable reliance" standard, a reporting person can only rely on information if the person providing it is willing to certify its accuracy.

    - 31 C.F.R. § 1031.320(j)(2).

  - And the reporting person is still liable if he has knowledge of facts that would call into question "the reliability of the information provided."

    - *Id.*

# Remedy
## *Vacatur is the Proper Remedy*

# Vacatur is the "ordinary" remedy in an APA action.

- "Vacatur is the ordinary remedy for orders that violate the Administrative Procedure Act."

  - *Am. Sec. Ass'n, Citadel Sec. LLC v. U.S. Sec. & Exch. Comm'n*, 147 F.4th 1264, 1274 (11th Cir. 2025).

- "In the Eleventh Circuit, '[v]acatur ... is the ordinary APA remedy.' Vacatur typically operates to set aside a rule generally, not as a partial remedy for the plaintiffs."

  - *Fla. v. United States*, 660 F. Supp. 3d 1239, 1284 (N.D. Fla. 2023) (citations omitted).

## The Supreme Court expressly carved out APA cases from its holding on universal injunctions.

- "Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."

  - *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (citing 5 U.S.C. § 706(2)).

- "[A]s this is a case involving APA vacatur, not a universal or national injunction, the Supreme Court's recent decision in *Trump v. CASA, Inc.*,  does not apply."

  - *Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 1836009, at *22 n.17 (D.D.C. July 3, 2025) (citing *CASA*, 606 U.S. at 847 n.10).