UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FIDELITY NATIONAL FINANCIAL,
INC., et al.,

        Plaintiffs,

v.                                CASE NO. 3:25-cv-554-WWB-SJH

SECRETARY SCOTT BESSENT,
etc., et al.,

        Defendants.
_____/

## **REPORT AND RECOMMENDATION**

This is an action under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* ("APA"). Doc. 1. Plaintiffs, Fidelity National Financial, Inc. ("FNF") and Fidelity National Title Insurance Company ("FNTIC"), have sued Defendants, the United States Department of the Treasury ("Treasury"), Scott Bessent in his official capacity as Secretary of the Treasury ("Secretary"), the Financial Crimes Enforcement Network ("FinCEN"), and Andrea Gacki in her official capacity as Director of FinCEN ("Director"). *Id.*

Plaintiffs challenge a rule that, subject to several exceptions, generally requires reporting relating to any non-financed transfer of an ownership interest in residential real property to a transferee entity or transferee trust. 89 Fed. Reg. 70,258. Cross-motions for summary judgment ("Motions") by Plaintiffs ("Plaintiffs' Motion"), Doc. 35, and by Defendants ("Defendants' Motion"), Doc. 64, were referred to the

undersigned for a report and recommendation. The Motions are fully briefed. *See* Docs. 35, 64, 71, and 75. The parties also presented oral argument on the Motions on November 18, 2025, the record of which is incorporated herein. *See* Doc. 81.

The Motions address four challenges to the rule, raising competing arguments as to whether it (i) exceeds statutory authority, (ii) is arbitrary and capricious, (iii) violates the Fourth Amendment, and (iv) violates the First Amendment. Docs. 35, 64, 71, and 75. The undersigned respectfully **recommends** that the Court **grant** Defendants' Motion and **deny** Plaintiffs' Motion.

## I.    Background

The parties have filed a Joint Stipulation of Agreed Facts and Law ("Stipulation"), which includes both a Joint Stipulation of Agreed Facts ("SOF") and a Joint Stipulation of Agreed Law ("SOL"). Doc. 31. The Stipulation is incorporated herein,[1] with pertinent portions repeated to the extent useful for context.

---

[1] This incorporation is with limited exceptions. Given that the Motions do not raise any issues with respect to the Commerce Clause or the Necessary and Proper Clause, it is unnecessary to incorporate paragraphs 17–23 of the SOL. The undersigned also declines to incorporate paragraph 10 of the SOL. Though the parties agree that paragraph 10 of the SOL is not supported, Doc. 78 at 1, they disagree as to what role, if any, review for "substantial evidence" should play, *id.* at 2–8. The appropriate test is solely whether the rule at issue is arbitrary and capricious and not whether it is otherwise supported by substantial evidence. *Compare* 5 U.S.C. § 706(2)(A), *with* 5 U.S.C. § 706(2)(E); *see Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1573 (11th Cir. 1995); *see also Lopez-Martinez v. U.S. Att'y Gen.*, 149 F.4th 1202, 1206–08 & n.4 (11th Cir. 2025). Eleventh Circuit precedent precludes application of substantial evidence review to the extent such would invite closer scrutiny than, or invalidate a rule that survives, arbitrary and capricious review. *See Cisneros*, 53 F.3d at 1573; *see also* Doc. 81 at 116–17. And, although the standards may overlap, Plaintiffs are incorrect to the extent they may argue that an arbitrary and capricious review necessarily wholesale incorporates a full substantial evidence review. *See* Doc. 78 at 2–5. First, such would render 5 U.S.C. § 706(2)(E), and the limitations therein, superfluous. Second, for at least 30 years, the Eleventh Circuit has described arbitrary and capricious review as generally more deferential than substantial evidence review. *See Cisneros*, 53 F.3d at 1573. It reiterated that distinction this year. *See Lopez-Martinez*, 149 F.4th at 1210

FNF, which provides title insurance and transaction services to the real estate and mortgage industries, is the nation's largest title insurance company. SOF ¶ 2. FNTIC provides title insurance, underwriting, escrow, and closing services through a network of operations and agents. *Id.* ¶¶ 3–4.

The Bank Secrecy Act ("BSA") is codified at 12 U.S.C. §§ 1829b, 1951–60 and 31 U.S.C. §§ 5311–14, 5316–36. *Id.* ¶ 9. The Treasury, a department of the executive branch, is responsible for administration and enforcement of the BSA. *Id.* ¶ 5. The Secretary has delegated the authority to implement, administer, and enforce compliance with the BSA to the Director of FinCEN, which is a bureau within the Treasury and an "agency" under applicable law. *Id.* ¶¶ 7, 11. One section of the BSA, 31 U.S.C. § 5318(g)(1), permits the Secretary, and by delegation the Director, "to 'require any financial institution' or any of its agents 'to report any suspicious transaction relevant to a possible violation of law or regulation.'" *Id.* ¶¶ 10, 23.

The Anti-Money Laundering Act of 2020 ("AML Act") "states that it is intended to support FinCEN's mission 'to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.'" *Id.* ¶ 13 (citation omitted). The

---

n.6. Moreover, even where the two standards are otherwise substantively similar, the arbitrary and capricious standard is more flexible with respect to the allowable sources of factual support, permitting, for example, reliance on common sense, predictive judgments, and agency expertise. *See, e.g., Great Lakes Commc'n Corp. v. Fed. Commc'ns Comm'n*, 3 F.4th 470, 476 (D.C. Cir. 2021); *Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.*, 998 F.3d 999, 1005–06 (D.C. Cir. 2021). It is thus necessary to fully consider whether the Rule is arbitrary and capricious but not arguments, outside that review and its confines, as to whether "substantial evidence" supports the Rule.

AML Act "adopts various provisions designed to 'modernize' federal 'anti-money laundering' laws and those 'countering the financing of terrorism.'" *Id.* ¶ 12 (citation omitted).

The AML Act amended the BSA to provide, at 31 U.S.C. § 5318(a)(2), that the Secretary, through FinCEN, "may … require a class of domestic financial institutions … to maintain appropriate procedures, including the collection and reporting of certain information, as the Secretary … may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering." *Id.* ¶¶ 16, 27–28. Congress also directed, as codified at 31 U.S.C. § 5318(g)(5)(D)(i)(I), the establishment of "'streamlined … processes to, as appropriate, permit the filing of noncomplex categories of reports' of suspicious financial activity." *Id.* ¶ 14. Congress directed that "the Secretary 'shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law.'" *Id.* ¶ 15 (quoting 31 U.S.C. § 5318(g)(5)(D)(ii)(I)). Congress further directed that such streamlined reports should reduce burdens imposed on those required to report while not diminishing the usefulness of the reporting to law enforcement and intelligence officials in combating financial crime. *Id.* ¶ 36.

The BSA broadly "defines 'financial institution' to include 'persons involved in real estate closing and settlements.'" *Id.* ¶ 26 (quoting 31 U.S.C. § 5312(a)(2)(U)). But "FinCEN has generally exempted real estate transactions 'from comprehensive regulation under the BSA[.]'" *Id.* ¶¶ 29, 31 (citations omitted). Since 2016, however,

FinCEN has "'used a targeted reporting requirement' for certain real estate transactions known as Residential Real Estate Geographic Targeting Orders" or "GTOs." *Id.* ¶ 29 (citation omitted). GTOs are issued under 31 U.S.C. § 5326, which authorizes orders "requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area" to obtain information about certain transactions and the persons engaging in those transactions and "to maintain related records and submit related reports to FinCEN." *Id.* ¶ 30. GTOs are temporary, effective for no more than 180 days (subject to renewal). *Id.* ¶¶ 30, 63. And they "may only be issued if 'reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof[.]" *Id.* ¶ 30 (citation omitted).

FinCEN has used GTOs since 2016 to (i) "require certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States" and (ii) thereby "collect information on a subset of transfers of residential real estate that FinCEN considers to present a high risk for money laundering." *Id.* ¶¶ 32–33. GTOs are thus temporary, location-specific, and limited in transactional scope. *Id.* ¶ 63. For example, they (i) "cover limited markets (primarily major metropolitan areas) in 13 States and the District of Columbia"; (ii) are, with one exception where the threshold is $50,000, "limited to sales involving consideration of at least $300,000"; and (iii) are limited to transactions

5

"in which the purchaser of residential real property is a legal entity" (not including a trust). *Id.* From 2017 to early 2024, approximately 42% of non-financed transfers of real estate "reported under the GTOs were conducted by individuals or entities that were the subject of a suspicious activity report filed by another regulated financial institution." *Id.* ¶¶ 34, 70.

On December 8, 2021, FinCEN issued an Advanced Notice of Proposed Rulemaking addressing rulemaking relating to information concerning potential money laundering associated with non-financed real estate transactions. *Id.* ¶ 17. Following the comment period, on February 16, 2024, FinCEN proposed rulemaking "to create a nationwide and permanent regulatory system to 'capture a particular class of activity that Treasury deems high-risk and that warrants reporting on a transaction-specific basis.'" *Id.* ¶ 18 (citation omitted). Following the comment period, which included a comment from FNTIC, on August 29, 2024, FinCEN adopted the proposed rule with some modifications in response to public comments. *Id.* ¶¶ 18–20. The Final Rule, 89 Fed. Reg. 70,258 ("Rule") provided an effective date of December 1, 2025. *Id.* ¶¶ 20–21.[2] Plaintiffs, who are directly regulated by the Rule, SOL ¶ 4, filed this action to challenge the Rule, Doc. 1.

The Rule generally requires reports to FinCEN of a "reportable transfer," defined as "'a non-financed transfer to a transferee entity or transferee trust of an

---

[2] Reporting persons have been exempted from all requirements of the Rule until March 1, 2026. Doc. 68.

ownership interest in residential real property' subject to several exceptions, including transfers 'resulting from the death of an individual' or other types of transfers commonly used in estate planning." SOF ¶¶ 40, 42 (citing 31 C.F.R. § 1031.320(a)–(b)); *see also id.* ¶¶ 43–45.[3] "The text of the Rule does not require that the reporting person make any determination that any given transaction is connected with a potential violation of law." *Id.* ¶ 68.

The Rule regulates more broadly than GTOs. *Id.* ¶¶ 48–49. The Rule generally requires reporting of various information on the reporting person, the transferee and any beneficial owner, the transferor, transferor and transferee entities, the property being transferred, and the payment. *Id.* ¶¶ 49–61. In response to concerns related to costs and data security, the Rule removed the requirement to retain reports. *Id.* ¶ 75.

The Rule incorporates "a 'reasonable reliance' standard … under which the reporting person may 'rely upon information provided by other persons, absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person.'" *Id.* ¶ 62 (citing 31 C.F.R. § 1031.320(j)(1)). With respect to "reporting beneficial ownership information, the person providing the information must also 'certif[y] the accuracy of the information in writing to the best of the person's knowledge' for the reporting person to rely on

---

[3] The report must be made by the "reporting person," defined to include one of a number of persons playing a specific role in the closing and settlement; the specific person is generally determined using a "cascading" order specified in the regulations. *Id.* ¶¶ 40–41, 46–47.

their representations for purposes of complying with the Rule." *Id.* (citing 31 C.F.R. § 1031.320(j)(2)).

In response to public comments, including FNTIC's, FinCEN stated that it believes the Rule reflects "the appropriate balance between ensuring that reports filed under the rule have a high degree of usefulness to law enforcement and minimizing the compliance burden incurred by businesses, including small businesses." *Id.* ¶ 76. FinCEN stated in that regard that (i) "it 'regularly receives feedback from law enforcement partners that they use the information [received from GTO reporting] to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts'" and (ii) law enforcement has previously requested expansion of GTOs to new geographic areas, which FinCEN has done multiple times. *Id.* ¶ 77 (citation omitted).

Unlike GTOs, the Rule, subject to enumerated exceptions, generally includes trusts within reporting obligations. *Id.* ¶¶ 63, 66. FinCEN received comments on the proposed rule both supporting the general inclusion of trusts within the scope of reporting obligations and calling for the exclusion of transfers to trusts from the reporting requirements. *Id.* ¶ 78. FinCEN declined to exclude trusts "on the stated ground that 'non-financed residential real estate transfers to certain trusts present a high risk for money laundering' and 'the potential difficulties described by commenters, such as the need to review complex trust documents to determine whether a trust is reportable,'" would "be minimized by the addition of new exceptions and by the reasonable reliance standard" in the final Rule. *Id.* ¶ 79 (citation omitted).

8

To that end, in response to comments, the Rule includes exceptions for transfers required under trust terms, supervised by a court, and "in which an individual transferor (alone or with their spouse) transfers an interest to a trust for no consideration if the settlor or grantor of the trust is the transferor individual, that individual's spouse, or both of them[.]" *Id.* ¶ 80. As discussed, the Rule also includes a reasonable reliance standard. *Id.* ¶ 62.

Unlike GTOs, the Rule has no minimum dollar threshold and covers "non-financed real estate transactions that occur anywhere in the U.S. or U.S. territories, irrespective of the dollar value of the transaction." *Id.* ¶¶ 65, 67. FinCEN received comments on the proposed rule both supporting the lack of a minimum monetary threshold and proposing such a threshold. *Id.* ¶ 81. "FinCEN rejected a monetary threshold on the stated ground that '[l]ow value non-financed transfers to legal entities and trusts, including gratuitous ones for no consideration, can present illicit finance risks and are therefore of interest to law enforcement.'" *Id.* ¶ 82 (citation omitted). FinCEN further "stated that its 'experience with administering the program and discussions with law enforcement showed that money laundering through real estate occurs at all price points'" and that inclusion of a monetary threshold for reporting "could move illicit activity into the lower priced market, which would be counter to the aims of the rule." *Id.* ¶¶ 82–83 (citation omitted).

FinCEN conducted a regulatory impact analysis "to evaluate the anticipated effects of the Rule 'in terms of its expected costs and benefits to affected parties, among other economic considerations.'" *Id.* ¶ 84 (citation omitted). FinCEN stated therein

9

that "the Rule would enable law enforcement to combat 'two problematic phenomena': (i) the use of the residential real estate market to facilitate money laundering and illicit activity; and (ii) the difficulty of determining who beneficially owns legal entities or trusts that engage in non-financed transfers of residential real estate" in that "this data is not available to law enforcement or access is not sufficiently centralized to be meaningfully usable for purposes of market level risk-monitoring or swift investigation and prosecution." *Id.* ¶ 85 (citation omitted). FinCEN stated that the benefits generated by the Rule would be (i) mitigating these two phenomena and (ii) making investigations of illicit activity and money laundering more effective and less costly, thus adding value by reducing the societal costs with such illicit activity by making it more effectively disciplined or deterred. *Id.* ¶ 86.

In 2023, under the GTOs, 20,411 reports were made to FinCEN. *Id.* ¶ 69. Under the Rule, FinCEN estimates (i) there will be approximately 800,000 to 850,000 reportable transfers annually and (ii) "the costs to the real estate sector of compliance with the Rule for the first compliance year will be 'between approximately $428.4 and $690.4 million (midpoint $559.4 million)' and in subsequent years 'between approximately $401.2 and $663.2 million (midpoint $532.2) (current dollar value).'" *Id.* ¶¶ 71–72 (citations omitted).

## II.    Standard and Applicable Law

"Summary judgment is appropriate where the evidence 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Mendoza v. Sec'y, Dep't of Homeland Sec.*, 851 F.3d 1348, 1352 (11th Cir.

2017) (quoting Fed. R. Civ. P. 56(a)); *see also* SOL ¶ 5. Facts and reasonable inferences
are viewed in favor of the nonmoving party. *VHV Jewelers, LLC v. Wolf*, 17 F.4th 109,
114 (11th Cir. 2021). This standard applies to cross-motions for summary judgment,
which are considered separately. *Id.* at 113–14; *see also Daniels v. Exec. Dir. of Fla. Fish
& Wildlife Conservation Comm'n*, 127 F.4th 1294, 1301 (11th Cir. 2025); SOL ¶ 6.

Nevertheless, cross-motions for summary judgment "may be probative of the
non-existence of a factual dispute when, as here, they demonstrate a basic agreement
concerning what legal theories and material facts are dispositive." *United States v.
Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984) (citation omitted). Indeed, review in
an APA action is generally confined to the administrative record. *See Pres. Endangered
Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir.
1996); *see also* Doc. 18 at 1–2. In short, this case is particularly postured for summary
judgment. *See, e.g.*, *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1279 (11th Cir. 2007); *Fla.
Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1456, 1459 (11th Cir. 1985).

The APA requires courts to "hold unlawful and set aside agency action" in
certain specified circumstances, including where the action is (i) "arbitrary, capricious,
an abuse of discretion, or otherwise not in accordance with law" or (ii) "in excess of
statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C.
§ 706(2); *see also* SOL ¶¶ 7–8.

"Courts must exercise their independent judgment in deciding whether an
agency has acted within its statutory authority, as the APA requires." *Loper Bright*

*Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). If "a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413.

"Arbitrary and capricious review is 'highly deferential and presumes the validity of agency action,' its goal being to ensure that [the agency] engaged in reasoned decisionmaking." *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021) (citation omitted); *see also Wolf*, 17 F.4th at 114; *Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1572 (11th Cir. 1995). Indeed, on the spectrum of review of agency action, arbitrary and capricious review is "the most deferential standard[.]" *See Lopez-Martinez v. U.S. Att'y Gen.*, 149 F.4th 1202, 1210 n.6 (11th Cir. 2025). It thus gives "the least latitude in finding grounds for reversal." *Cisneros*, 53 F.3d at 1572 (citation omitted).

This deferential review applies even in the context of summary judgment. *See Astrue,* 495 F.3d at 1279; *Pres. Endangered Areas of Cobb's Hist.*, 87 F.3d at 1246. But it is not a mere rubber stamp. *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021); *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020). "To survive arbitrary and capricious review, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made"'"; thus, "[c]ourts must uphold rules that are 'rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute.'" *Nat'l Mining Ass'n*, 985 F.3d at 1321

(citation omitted); *see also Mendoza*, 851 F.3d at 1353 ("We set aside an agency action as arbitrary and capricious only where (1) the agency 'relied on factors which Congress has not intended it to consider,' (2) the agency 'failed to consider an important aspect of the problem,' (3) the agency explained its decision in a way 'that runs counter to the evidence,' or (4) the action 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (citation omitted)); SOL ¶ 9. A reviewing court may not "substitute its judgment for that of the agency." *Nat'l Mining Ass'n*, 985 F.3d at 1321 (citation omitted); *see also Mendoza*, 851 F.3d at 1353.

## III.   Discussion

The Motions address four challenges to the Rule, raising competing arguments as to whether the Rule (i) exceeds statutory authority, (ii) is arbitrary and capricious, (iii) violates the Fourth Amendment, and (iv) violates the First Amendment. Docs. 35, 64, 71, and 75. The undersigned addresses each issue in turn.

### a.  Statutory Authority

As always, statutory construction begins with the statutory text. *See Blanco v. Samuel*, 91 F.4th 1061, 1071 (11th Cir. 2024). If a term is not defined, courts "turn to its 'plain meaning at the time of enactment.'" *Id.* (citation omitted). "And one of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment." *Drazen v. Pinto*, 106 F.4th 1302, 1343 (11th Cir. 2024) (citation omitted); *see also Blanco*, 91 F.4th at 1071 & n.8. On the other hand, if "Congress uses terms that have accumulated settled meaning under ... the common law, a court must

infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Ins. Mktg. Coal. Ltd. v. Fed. Commc'ns Comm'n*, 127 F.4th 303, 313 (11th Cir. 2025) (citation omitted); *see also Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1260 (11th Cir. 2020) ("[W]hen the language at issue is a legal term of art, the phrase's 'ordinary legal meaning is to be expected .... As Justice Frankfurter eloquently expressed it: "[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."'") (citation omitted).

"[S]tatutory construction is a 'holistic endeavor[.]'" *Black Warrior Riverkeeper, Inc. v. Black Warrior Mins., Inc.*, 734 F.3d 1297, 1302 (11th Cir. 2013) (citation omitted). So courts "do not look at one word or term in isolation but rather look to the entire statute and its context." *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010); *see also Black Warrior Riverkeeper*, 734 F.3d at 1302; *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1266–67 (11th Cir. 2006). In short, in statutory construction, as with "all interpretive enterprises, 'context is king.'" *United States v. Hernandez*, 107 F.4th 965, 969 (11th Cir. 2024) (quoting *Wachovia Bank*, 455 F.3d at 1267). As a related principle, courts should "avoid interpreting a provision in a way that would render other provisions of the statute superfluous." *Black Warrior Riverkeeper*, 734 F.3d at 1303; *see also MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 775 (11th Cir.

2020).[4] And courts "ordinarily presume that instances of the same word in the same statute will have the same meaning." *Sunshine State Reg'l Ctr., Inc. v. Dir. United States Citizenship & Immig. Servs.*, 143 F.4th 1331, 1345 (11th Cir. 2025). But "[o]nly '*identical* words used in different parts of the same statute are generally presumed to have the same meaning[,]'" so courts must give effect to "'Congress' choice to include limiting language in some provisions but not others.'" *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1286 (11th Cir. 2025) (citations omitted). Again, context matters; even the same term may carry different meanings in different contexts or sections of a statute. *Id.* ("Even if a term has a 'plain meaning in the context of a particular section' of a statute, it does not necessarily have the 'same meaning in all other sections and in all other contexts.'" (citation omitted)); *see also Yates v. United States*, 574 U.S. 528, 537 (2015) ("In law as in life, however, the same words, placed in different contexts, sometimes mean different things. We have several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute.").

The Rule has three potential sources of statutory authority, 31 U.S.C. §§ 5318(a)(2), 5318(g)(1), and 5318(g)(5). The parties dispute whether any of these provisions authorizes the Rule and whether § 5318(a)(2) may be considered as a source of authority. The undersigned recommends the Rule is statutorily authorized.

---

[4] Courts "need not force independent meanings" if "the text surrounding the provisions could lend support for two independent meanings, but that interpretation would lead to a strained reading of at least one provision[.]" *Black Warrior Riverkeeper*, 734 F.3d at 1303.

### i. Sections 5318(g)(1) and (5)

By delegation, under 31 U.S.C. § 5318(g)(1), FinCEN may require financial institutions and their agents "to report any[5] suspicious transaction relevant to a possible violation of law or regulation." *See* 31 U.S.C. § 5318(g)(1); *see also* SOF ¶¶ 10–11. In turn, 31 U.S.C. § 5318(g)(5)(D)(i)(I) directs for the establishment of "streamlined, including automated, processes to, as appropriate, permit the filing of noncomplex categories of reports[.]" 31 U.S.C. § 5318(g)(5)(D)(i)(I); *see also* SOF ¶ 14. Among other requirements, however, the Secretary "shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law (including regulations)[.]" 31 U.S.C. § 5318(g)(5)(D)(ii)(I); *see also* SOF ¶ 15.

In short, under both the general authority of § 5318(g)(1) and the authority for streamlined categories of reports under § 5318(g)(5), rulemaking is limited to any "suspicious transaction relevant to a possible violation of law or regulation."[6] Plaintiffs contend that the Rule broadly captures transactions that are not suspicious and

---

[5] "[T]he word 'any' is a powerful and broad word, and … it does not mean 'some' or 'all but a few,' but instead means 'all.'" *United States v. Townsend*, 630 F.3d 1003, 1010 (11th Cir. 2011) (citation omitted). So the authority under § 5318(g)(1) extends to "all" suspicious transactions relevant to possible violations of law or regulation. *See id.*

[6] There is a slight variation in the terminology—*i.e.*, "possible" (§ 5318(g)(1)) versus "potential" (§ 5318(g)(5)(D)(ii)(I)) violations of law or regulation. The undersigned has been unable to discern any meaningful difference between the words "possible" and "potential" in this context, nor have the parties offered any. With the parties' agreement, the undersigned thus construes these provisions harmoniously. *See* Doc. 81 at 28–30. The undersigned also follows the parties' agreement that the statutory standard is objective. *See id.* at 30.

relevant to possible violations of law or regulation, while Defendants contend the Rule comfortably fits within the statutory language. Defendants have the better read.

The statute does not define the pertinent terms, so Plaintiffs (correctly) "[b]egin with the text" and look to the dictionary for the plain meaning of the word "suspicious." Doc. 35 at 5–6; *see also Drazen*, 106 F.4th at 1343; *Blanco*, 91 F.4th at 1071. As Plaintiffs note, "suspicious" transactions are thus transactions that "tend[] to arouse suspicion." Doc. 35 at 6 (quoting Merriam-Webster, https://www.merriam-webster.com/dictionary/suspicious).[7] But defining "suspicious" by reference only to "suspicion" is not particularly exhaustive, and Plaintiffs fail to complete the thought. The same dictionary—in a hyperlinked reference from the source Plaintiffs provide in their brief—in turn defines "suspicion" as "the act or an instance of suspecting something wrong without proof or on slight evidence" or "a state of mental uneasiness and uncertainty[.]" *See* https://www.merriam-webster.com/dictionary/suspicion. The plain and ordinary meaning of "suspicious transaction" thus captures transactions that "tend[] to arouse" "a state of mental uneasiness and uncertainty" or sense of "something wrong without proof or on slight evidence."

Plaintiffs continue their dictionary analysis by selectively quoting partial definitions. For example, they argue that the phrase "relevant to a possible violation of law or regulation" is limited to transactions "that are '[l]ogically connected' with

---

[7] Modern provisions, § 5318(g)(1) took effect in 1992, and § 5318(g)(5) took effect in 2021. Doc. 81 at 111–12. The parties agree that the material words have not changed meaning since enactment, such that reliance on current dictionaries for interpretation is appropriate. *See id.* at 31–33.

conduct that 'might plausibly' violate a statute or regulation." Doc. 35 at 6 (quoting BLACK'S LAW DICTIONARY (12th ed. 2024)). But the definition of "possibility" to which they partially cite, the fifth one listed, does not work in context, as it pertains to *events*. *See Possibility*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An event that may or may not happen; something that might plausibly occur or take place[.]"). More apt is the second definition ("[t]he chance that something is or might be true") or perhaps the first ("[t]he quality, state, or condition of being conceivable in theory or in practice; the character of perhaps being, of perhaps existing, or of comporting with physical laws or the laws of reason"). *See id.*[8]

Marshalling little support from dictionaries and plain meaning, Plaintiffs quickly eschew that approach. Doc. 35 at 4–10. They instead focus their arguments on case law. Contending that § 5318(g)(1) and a different statutory safe-harbor provision in § 5318(g)(3) use "[t]he same language[,]" Plaintiffs argue that the Eleventh Circuit's interpretation of the latter provision in *Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1192–93 (11th Cir. 1997) controls. *See* Doc. 35 at 5. *Lopez*, they argue, requires that § 5318(g)(1) be interpreted to authorize FinCEN to impose suspicious activity report ("SAR") reporting duties only "on transactions that support a 'reasonable basis' for believing that the particular transaction has a 'nexus' with illegal activity." *Id.*

---

[8] As for the word "relevant," Plaintiffs' "logically connected" definition, Doc. 35 at 6, seems appropriate, *see Relevant*, BLACK'S LAW DICTIONARY (12th ed. 2024). The undersigned notes, however, that this definition cited by Plaintiffs (i) is facially broad and (ii) could appear to include both inculpatory *and* exculpatory information. *See id.*; *see also Table de France, Inc. v. DBC Corp.*, No. EDCV 19-423-JGB, 2019 WL 6888043, at *4 (C.D. Cal. Aug. 1, 2019)

Imposing this requirement from *Lopez*, they liken § 5318(g)(1) to a regulatory *Terry*[9] stop, requiring "reasonable suspicion"[10] based on an "almost invariably … individualized inquiry." *Id.* at 7–9; *see also* Doc. 81 at 19–20, 30–31, 35–42.[11]

Plaintiffs' argument is unpersuasive. First, contrary to Plaintiffs' argument, the language in § 5318(g)(1) and § 5318(g)(3) is not "[t]he same[.]" Doc. 35 at 5; Doc. 71 at 2. Section (g)(1), recall, authorizes rulemaking requiring a financial institution "to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). Section (g)(3), on the other hand, provides a safe-harbor immunity from liability when, among other circumstances, a financial institution "makes a voluntary disclosure of any possible violation of law or regulation to a government agency[.]" 31 U.S.C. § 5318(g)(3). Though both provisions use the phrase "possible violation of law or regulation," they do not otherwise use identical language, and courts must respect "Congress' choice to include limiting language in [one] provision[] but not [the other]." *Glover*, 127 F.4th at 1286 (citation omitted). Section (g)(3) provides immunity for reporting only "*of* any possible violation of law or

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1968).

[10] For example, the following cases cited in Plaintiffs' Motion, Doc. 35 at 7–10, evaluate "reasonable suspicion," the term of art necessary for purposes of a *Terry* stop. *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015); *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016); *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *Gordon*, 231 F.3d at 757; *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1256 (11th Cir. 2025) (en banc); *United States v. Johnson*, 171 F.3d 601, 605 (8th Cir. 1999); *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). Plaintiffs further acknowledged relying on the *Terry* standard at oral argument. *See* Doc. 81 at 19–20, 30–31, 35–42.

[11] Plaintiffs nevertheless concede that § 5318(g)(1) does not "preclude[] FinCEN from ever adopting categorical SAR reporting requirements" so long as they are of suspicious transactions relevant to possible violations of law. Doc. 35 at 10.

regulation" while section (g)(1) more broadly authorizes rulemaking authority "to report any *suspicious transaction relevant to* a possible violation of law or regulation." *Compare* 31 U.S.C. § 5318(g)(1), *with* 31 U.S.C. § 5318(g)(3) (emphases added).[12] No presumption of synonymity applies to these differently worded provisions. *See Glover*, 127 F.4th at 1286.[13]

Regardless, and even if the contextual differences were glossed over such that *Lopez* or *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351 (11th Cir. 2001), another case cited by Plaintiffs,[14] applied, neither would be particularly useful to

---

[12] Neither provision requires an *actual* violation of law, but a transaction can be "suspicious" and "relevant to" a possible violation of law more readily than itself *being* a possible violation of law. Indeed, Plaintiffs' *Lopez*-inspired reading of §§ 5318(g)(1) and (5) would apparently render the word "suspicious" superfluous. *See MSPA Claims 1*, 950 F.3d at 775; *see also* Doc. 81 at 53–57.

[13] Even if it did, "context is king[,]" *Hernandez*, 107 F.4th at 969, meaning even the same phrase can carry different meanings in different contexts, *see Glover*, 127 F.4th at 1286; *see also Yates*, 574 U.S. at 537. Section 5318(g)(3) provides a safe-harbor immunity when a financial institution "makes a voluntary disclosure of any possible violation of law or regulation." But the contexts of that provision—the focus of which is most naturally individualized from the perspective of a financial institution in that it applies only to a financial institution's voluntary disclosure that is *not* otherwise required—and of §§ 5318(g)(1) and (g)(5)(D) are different. Indeed, § 5318(g)(5)(D) was added by Congress to expressly require that the Secretary "shall" "establish streamlined" processes, as appropriate for "the filing of noncomplex categories of reports[.]" 31 U.S.C. § 5318(g)(5)(D)(i)(I); *see also* SOF ¶ 14. The statute also requires that the Secretary "shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law (including regulations)[.]" 31 U.S.C. § 5318(g)(5)(D)(ii)(I); *see also* SOF ¶ 15. It would be incongruous to require streamlined processes for categories of reports, require the Secretary to ensure that such reports relate to suspicious transactions relevant to potential violations of law, and then to mandate that the requisite suspicion must be evaluated on an "almost invariably" individualized basis as argued by Plaintiffs. Indeed, if anything, the Rule's categorical approach comports with FinCEN's statutory requirement to reduce reporting burdens when promulgating streamlined reporting. *See* 31 U.S.C. § 5318(g)(5)(D)(i)(I)(aa).

[14] Plaintiffs cite *Miranda de Villalba*, which they acknowledge is even more removed than *Lopez*, Doc. 81 at 48, for the premise that 12 U.S.C. § 3403(c), another safe-harbor provision "sufficiently similar" to § 5318(g)(3), has been interpreted to require a "reasonable suspicion of illegal activity[.]" Doc. 35 at 5–6. And, to be fair, § 3403 does use "relevant to" language, but it does so in the negative; the actual safe-harbor language is separate. *See* 12 U.S.C. § 3403(c) ("Nothing in this chapter shall

Plaintiffs nor meaningfully change the contextual plain-language construction of
§ 5318(g) that the undersigned applies.

*Lopez* holds only that under the *Conley*[15] and pre-*Twombly*[16] standard for a
motion to dismiss,[17] dismissal was not warranted under the pertinent § 5318(g)(3) safe
harbor (i) in one instance, on the bare allegations of an unadorned "verbal" demand

---

preclude any financial institution … from notifying a Government authority that such institution, or
officer, employee, or agent has information which may be relevant to a possible violation of any statute
or regulation. Such information may include only the name or other identifying information
concerning any individual, corporation, or account involved in and the nature of any suspected illegal
activity."). Regardless, *Miranda de Villalba* does not purport to hold that § 3403(c) and § 5318(g)(3)—
let alone other provisions of § 5318(g) appearing in different contexts—must be construed identically.
*See Miranda de Villalba*, 250 F.3d at 1353–54. To the contrary, its statements that the safe harbor
provisions in § 5318(g)(3) and § 3403 are "sufficiently similar" to one another was to explain why a
plaintiff could not claim prejudice by the latter's consideration at summary judgment when the
defendant had raised only the former as an affirmative defense. *See id.* at 1353. The undersigned is not
inclined to read more into this analysis to change the requirements of §§ 5318(g)(1) and (5) beyond
their plain language, as discussed herein. Moreover, even to the extent the language was considered
sufficiently similar, the context, as discussed, lends to different meanings. Finally, *Miranda de Villalba*
is of particularly little value in statutory construction here because such was neither necessary nor
conducted there; indeed, the court in that case assumed, without deciding, "that subjective suspicion"
was required because the facts at issue satisfied each side's competing proposed construction of the
statute. *See id.* at 1353 n.2. Thus, the fleeting use of the word "reasonable" in that case appears to
merely address under the summary judgment standard a potential and *assumed* statutory requirement.
*See Hoffman v. Bank of Am., N.A.*, No. 8:02-cv-1780-T-27TGW, 2006 WL 1360892, at *5–7 (M.D. Fla.
May 16, 2006) (applying *Miranda De Villalba* to find disclosure fell within safe harbor as a matter of
law and explaining "[m]oreover, the plain language of § 3403(c) does not require that a financial
institution's suspicion regarding suspected illegal activity be 'reasonable'").

[15] *Conley v. Gibson*, 355 U.S. 41 (1957).

[16] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

[17] This standard was emphasized in *Lopez. E.g., Lopez*, 129 F.3d at 1193 ("The problem for First
Union at this stage of the litigation is that it is stuck with the allegations of the complaint."); *id.* at
1195 ("That argument sounds good, but we are required to construe the complaint in the light most
favorable to Coronado and not dismiss it unless there is no set of facts he could prove that would
entitle him to relief, i.e., which would deny BankAtlantic the immunity it seeks from the first safe
harbor.").

of law enforcement,[18] and (ii) in another instance, when the disclosing bank had a
legitimate suspicion of illegal activity but the allegations reflected no nexus between
that suspicion and the thousand-plus accounts as to which it made disclosures—in
other words, the bank did not "have free license to disclose information from any and
every account in the entire bank once it suspected illegal activity in any account at the
bank." *See Lopez*, 129 F.3d at 1189, 1192–93, 1195–96. And *Miranda de Villalba* holds
only that summary judgment *was* warranted because no reasonable jury could have
failed to find the disclosing person had enough suspicion[19] of illegal activity under the
facts presented—an alleged disclosure of a withdrawal attempt of a "very large" sum
of money ($500,000) from accounts as to which the Government had previously
alleged the funds were obtained from money laundering and a federal district court
had days before the alleged disclosure issued a civil arrest warrant. *Miranda de Villalba*,
250 F.3d at 1352–54.

 Phraseology aside, these holdings[20] are of little benefit to Plaintiffs here in

---

[18] This specific holding was driven by another contextual difference between the safe-harbor
provision discussed there and the statutory provisions here. *See Lopez*, 129 F.3d at 1193 ("[T]he second
and third safe harbors protect from liability in situations where the government has and exercises the
legal authority to demand disclosure of financial records. If we accepted First Union's premise that
Congress intended the first safe harbor to protect disclosures made pursuant to any and all government
demands, it would render the other two safe harbor provisions superfluous.").

[19] The level of necessary suspicion was not decided. *See Miranda de Villalba*, 250 F.3d at 1353
n.2; *see also supra* note 14.

[20] "[A] decision can hold nothing beyond the facts of that case." *United States v. Birge*, 830 F.3d
1229, 1233 (11th Cir. 2016) (quoting *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010)); *see
also United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("The holding of a case
comprises both 'the result of the case and those portions of the opinion necessary to that result.' But
the 'holding' of a prior decision can reach only as far as the facts and circumstances presented to the

attempting to show the Rule is not statutorily supported.

Nor does § 5318(g) incorporate *Terry* and its progeny.[21] As discussed, statutory construction of undefined terms turns on the plain and ordinary meaning of the text, *see Drazen*, 106 F.4th at 1343; *Blanco*, 91 F.4th at 1071, unless Congress uses a legal term of art or term that has "accumulated settled meaning under ... the common law[,]" *see Ins. Mktg. Coal. Ltd.*, 127 F.4th at 313; *Pinares*, 973 F.3d at 1260. The term Congress used—"suspicious transaction"—is not a legal term of art, term of accumulated common-law meaning, or invocation of *Terry*.

Under *Terry* and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *See United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). A so-called "'*Terry* stop'" is an exception to the general presumption under the Fourth Amendment against warrantless searches. *Id.* There is no reason to interpret the phrase "suspicious transaction" as a Congressional invocation of *Terry* as opposed to the phrase's plain meaning. To the contrary, *Terry* is a Fourth Amendment case about a

---

Court in the case which produced that decision.") (citation omitted). "All statements that go beyond the facts of the case" are *dicta*, which "is not binding on anyone for any purpose." *Edwards*, 602 F.3d at 1298; *see also Birge*, 830 F.3d at 1233.

[21] Neither *Lopez* nor *Miranda de Villalba* mentions or purports to incorporate *Terry*. *See generally Miranda de Villalba*, 250 F.3d 1351; *Lopez*, 129 F.3d 1186; *see also* Doc. 81 at 48. If anything, these decisions are inconsistent with *Terry*. For example, *Miranda de Villalba* assumed without deciding that a subjective standard applied, and *Lopez* used the phrase "good faith" (not "reasonable") suspicion. *See Miranda de Villalba*, 250 F.3d at 1353 n.2; *Lopez*, 129 F.3d at 1192–93. But the *Terry* "reasonable suspicion" standard is purely objective. *See United States v. Robinson*, 515 F. App'x 790, 792 (11th Cir. 2013); *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).

brief, investigatory warrantless stop; the standard for such a stop is "reasonable suspicion." *See Wardlow*, 528 U.S. at 121, 123. Indeed, "[r]easonableness is always the touchstone of Fourth Amendment analysis, because what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures[.]" *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019) (en banc) (quoting, among other authorities, *Terry*, 392 U.S. at 9) (internal quotation marks omitted); *see also* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]").

Thus, that § 5318(g) uses the phrase "suspicious transaction" but never connected to the word "*reasonable*" belies an intention to incorporate the *Terry* standard.[22] Contrary to Plaintiffs' premise, the word "'suspicious'" does *not* have a well-established meaning under the Fourth Amendment. Doc. 71 at 2. Instead, "suspicion" and "reasonable suspicion" have *distinct* meanings. *See Suspicion*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "suspicion" as "[t]he apprehension or imagination of the existence of something wrong based only on inconclusive or slight evidence, or possibly even no evidence" and "reasonable suspicion" as "[a] particularized and objective basis, supported by specific and articulable facts, for

---

[22] The undersigned does not suggest an "unreasonable" suspicion would fall within §§ 5318(g)(1) or (5); the point is that the statutes carry their plain meaning, not the body of law for a *Terry* stop. Moreover, the Rule must survive any Fourth Amendment scrutiny. As discussed below, it does.

suspecting a person of criminal activity"); *see also Gordon*, 231 F.3d at 754.[23]

Having settled on the proper interpretation—that is, the plain language of § 5318(g) governs—the undersigned now turns to application. Is the Rule directed to "any suspicious transaction relevant to a possible violation of law or regulation"? That is, does the Rule regulate transactions that: "tend[] to arouse" "a state of mental uneasiness and uncertainty" or sense of "something wrong without proof or on slight evidence" and are relevant or "logically connected" to "[t]he chance that something is or might be" illegal or "[t]he quality, state, or condition of" illegality "being conceivable in theory or in practice"; of illegality "perhaps being," "perhaps existing," or "comporting with physical laws or the laws of reason"? Yes. And was FinCEN's determination of as much arbitrary and capricious? No.[24]

---

[23] There are even more reasons not to find that §§ 5318(g)(1) or (5) incorporate the *Terry* standard. First, remembering that context is king, doing so is inconsistent with the structure and substance of the BSA. *Cf. United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 424–25 (S.D.N.Y. 2018) (rejecting argument that proffered standard for when a broker-dealer was required to file an SAR was invalid for "fail[ing] to establish the reasonable suspicion that exists in criminal law pursuant to the Fourth Amendment" because it "would make little sense" to apply this "Fourth Amendment concept" to "the SAR reporting framework" and further noting that "[t]he SAR reporting system was designed to allow law enforcement to monitor activity before any determination of unlawfulness is made"), *aff'd,* 982 F.3d 68 (2d Cir. 2020). Second, the statutes were enacted, *see supra* note 7, long after *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), which confirmed the materially *different* way in which the Fourth Amendment applies to reporting requirements under the BSA. *See, e.g., Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 & n.2 (11th Cir. 1987); *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 481 (E.D.N.Y. 2018), *as amended* (June 27, 2018); *see also* Doc. 81 at 40–41. To that end, "Congress is assumed to act with the knowledge of existing law and interpretations when it passes new legislation" and courts "presume that Congress 'expects its statutes to be read in conformity with [Supreme Court] precedents.'" *White v. Mercury Marine, Div. of Brunswick, Inc.*, 129 F.3d 1428, 1434–35 (11th Cir. 1997) (citation omitted).

[24] Plaintiffs make substantially overlapping arguments as to whether the Rule is statutorily authorized and is arbitrary and capricious. Doc. 35 at 4–12, 15–19. The undersigned addresses these arguments in tandem.

The Rule fits within the plain statutory language.[25] As FinCEN explained, while "[m]ost transfers of residential real estate are associated with a mortgage loan or other financing provided by financial institutions subject to AML/CFT program requirements[,]" with respect to the "non-financed transfers" subject to the Rule, as they "do not involve such financial institutions," they "can be and have been exploited by illicit actors of all varieties, including those that pose domestic threats, such as persons engaged in fraud or organized crime, and foreign threats, such as international drug cartels, human traffickers, and corrupt political or business figures[,]" a risk

---

[25] Beyond the plain statutory language already discussed in detail, 31 U.S.C. § 5311 reinforces the broad scope of § 5318. The former section provides the broad purposes of the subchapter in which the latter falls, *i.e.*:

> to--
> (1) require certain reports or records that are highly useful in--
> (A) criminal, tax, or regulatory investigations, risk assessments, or proceedings; or
> (B) intelligence or counterintelligence activities, including analysis, to protect against terrorism;
> (2) prevent the laundering of money and the financing of terrorism through the establishment by financial institutions of reasonably designed risk-based programs to combat money laundering and the financing of terrorism;
> (3) facilitate the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity;
> (4) assess the money laundering, terrorism finance, tax evasion, and fraud risks to financial institutions, products, or services to--
> (A) protect the financial system of the United States from criminal abuse; and
> (B) safeguard the national security of the United States; and
> (5) establish appropriate frameworks for information sharing among financial institutions, their agents and service providers, their regulatory authorities, associations of financial institutions, the Department of the Treasury, and law enforcement authorities to identify, stop, and apprehend money launderers and those who finance terrorists.

31 U.S.C. § 5311. To be sure, a statute's expansive preamble cannot add to the specific text that follows; it can, however, shed light on the meaning of what follows. *See Georgia v. President of the United States*, 46 F.4th 1283, 1298 (11th Cir. 2022). Notably, by its terms, § 5318(g)(5) *requires* consideration of § 5311 with respect to the imposition of streamlined reporting requirements. *See* 31 U.S.C. § 5318(g)(5)(B)(ii) (requiring consideration of "the purposes described in section 5311").

heightened when transfers are to trusts or legal entities that provide individual anonymity. 89 Fed. Reg. at 70,258–59. In short, because non-financed transfers to legal entities and trusts are unlike most residential real-estate transactions, outside the focus of other regulatory safeguards, and transferee-screening, they are, as a category, suspicious and relevant to potential violations of law. *See id.* Contrary to Plaintiffs' suggestion, an agency's reliance on "common sense" does not render its actions arbitrary and capricious. *See Nat'l Mining Ass'n*, 985 F.3d at 1323 n.11 ("We readily conclude that the record adequately supports the requirements … especially in light of the fact that the Agency's reasoned explanations for these requirements are so firmly rooted in common sense and common experience."); *see also Great Lakes Commc'n Corp. v. Fed. Commc'ns Comm'n*, 3 F.4th 470, 476 (D.C. Cir. 2021) ("And [the agency] could reasonably rely on common sense and predictive judgments within its expertise 'even if not explicitly backed by information in the record.'") (citation omitted).[26]

Regardless, FinCEN relied on more than common sense. For example, FinCEN cited, and properly relied on, its years of experience with GTOs. 89 Fed. Reg. at 70,258–60.[27] "Agencies are permitted to rely on their experience in the regulated

---

[26] In addition, and further supporting FinCEN's common-sense approach to target suspicious non-financed transactions outside the existing regulatory purview, the statute, in conjunction with ensuring that they be suspicious transactions relevant to potential violations of law, further requires consideration of transactions "designed to evade any regulation promulgated under this subchapter" in the establishment of streamlined reporting for noncomplex categories of reports. *See* 31 U.S.C. § 5318(g)(5)(D)(ii)(I)–(II).

[27] As discussed, the main differences between the GTOs and the Rule with respect to the categories of transactions captured are the Rule's nationwide geographic scope, its lack of a monetary threshold, and its inclusion of trusts. The undersigned discusses the latter two features in more detail

27

field, so long as they explain what their experience is and how that experience informs the agency's conclusion." *Nat'l Mining Ass'n*, 985 F.3d at 1322. As such, "[c]ourts have not permitted agencies to rely on their 'experience' only when the agency fails to actually explain what that experience was and how that experience supports the promulgated regulation." *Id.* (citation omitted). That GTO experience, FinCEN adequately explained, proved effective, including by regular feedback from law enforcement, but also insufficient; it was this experienced effectiveness, coupled with the experienced insufficiencies, that informed the need for a more comprehensive approach culminating in the Rule. 89 Fed. Reg. at 70,260.[28]

---

below with respect to Plaintiffs' arguments concerning a failure to properly address comments. With respect to geographic scope, FinCEN properly explained that money laundering is a nationwide problem, and that in its experience, the limited geographic scope of GTOs was a "significant shortcoming." *Id.* For example, the piecemeal approach led to multiple expansions of the geographic areas covered by GTOs, and FinCEN cited a study that, over a five-year period, nearly 61% of federal money laundering cases concerning residential real estate involved a county not covered by a GTO. *Id.* Plaintiffs attempt to poke flaws at the study cited by FinCEN, Doc. 35 at 17–18; Doc. 71 at 9–10. But to the extent Plaintiffs' arguments concerning the study do not overlap with others addressed herein, they do not convince that the report was so *clearly* flawed as to supply no rational basis for deeming money laundering through unfinanced resident real estate transactions to be a broader problem than covered by limited-market GTOs. *See Cisneros*, 53 F.3d at 1580; *Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992); *Brock*, 771 F.2d at 1460. Indeed, the question is not necessarily, as framed by Plaintiffs, the extent to which "the existing system works." Doc. 71 at 9. The question is instead whether the broader system that FinCEN adopted is lawful. Because, as discussed, it is, the wisdom of the system is for the agency, not a court. *See Nat'l Mining Ass'n*, 985 F.3d at 1321; *Mendoza*, 851 F.3d at 1353.

[28] FinCEN further explained that from 2017 to early 2024, approximately 42% of non-financed transfers of real estate "reported under the GTOs were conducted by individuals or entities that were the subject of a suspicious activity report filed by another regulated financial institution." SOF ¶¶ 34, 70. "In other words, individuals engaging in a type of transaction known to be used to further illicit financial activity—the non-financed purchase of residential real estate through a legal entity—are also engaging in other identified forms of suspicious activities." 89 Fed. Reg. at 70,260. Plaintiffs argue that this data is meaningless because (i) the mere fact that "the **people** involved in the transactions also had **another** transaction flagged somewhere else as **suspicious** (not necessarily illegal)" "does not mean that those transactions actually involved money laundering"; (ii) "[o]ne SAR on one transaction does not make **every** transaction that a person engages in relevant to a potential violation of the law";

In addition to common sense and its ample experience, *see Nat'l Mining Ass'n*, 985 F.3d at 1322–23 & n.11, FinCEN cited additional support for the Rule. That support included (i) representative examples of money laundering in transactions that would be subject to the Rule but otherwise evade existing regulatory review and (ii) conclusions from an international organization, the Financial Action Task Force, as to the exacerbated risks of money laundering in transactions if the transferee is not an individual. 89 Fed. Reg. at 70,259–60 & n.12.[29]

### ii. Section 5318(a)(2)

The Rule finds further statutory support in § 5318(a)(2), which authorizes the Secretary to

> require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance[.]

---

and, regardless (iii) the Rule cannot be justified by "data showing that **less than half** the transactions flagged by the GTO Program have even that tenuous connection to other SARs[.]" Doc. 35 at 18–19. But the cited data is not, as discussed, the *sole* support for the Rule, and Plaintiffs' arguments misapply the standard of §§ 5318(g)(1) and (5). As discussed, the statutes nowhere require any *actual* violations of law. Nor is the substantial correlation between transactions flagged, and tagged for flagging, as suspicious meaningless simply because it does not preponderate. After all, "suspicious" is a lesser showing than "reasonable suspicion," which itself requires "considerably less than preponderance of the evidence[.]" *Gordon*, 231 F.3d at 754.

[29] Plaintiffs argue that the Financial Action Task Force report "about acquiring property **abroad** does not support a program targeting domestic real estate transactions" and "offers no **data** to support the expansive approach" taken in the Rule. Doc. 71 at 9. But under the deferential arbitrary and capricious standard, experience with money laundering abroad is valuable in combating money laundering domestically, particularly when one concern within the regulatory purview relates to potential international terrorism. And contrary to Plaintiffs' position, the Rule addresses a subset of non-financed transactions to entities and trusts; it is not a "'report everything' Rule." *Id.*

31 U.S.C. § 5318(a)(2).[30]

Courts are "bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). Plaintiffs first argue that § 5318(a)(2) cannot be considered under this *Chenery* rule. Doc. 35 at 12–13; Doc. 71 at 5. Specifically, they argue that FinCEN cited to § 5318(a)(2) only in "a footnote" in the "Background" section and not in the "section of the Rule titled 'Authority[.]'" Doc. 35 at 12. This argument is unpersuasive.

First, as Defendants explain, the section of the Rule in which § 5318(a)(2) was cited plainly articulated the background, including statutory authority, for the Rule, whereas the "Authority" section cited by Plaintiffs was a subsection responding to specific comments. Doc. 64 at 11; *see* 89 Fed. Reg. at 70,258–59 & n.11, 70,261–62. Regardless, Plaintiffs' argument elevates form over substance. The *Chenery* rule "is not focused so much on the specific location of the agency's rationale as it is on the agency's articulation of its rationale *at the time* it takes its action so that a court is able to review that rationale." *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 942 (D.C. Cir. 2021); *see also* Doc. 81 at 88–89. Not only need not an agency's articulation fall under a particular heading, courts "have looked to explanations outside the precise

---

[30] Given the above discussion of §§ 5318(g)(1) and (5), analysis of § 5318(a)(2) is unnecessary. Nevertheless, because § 5318(a)(2) may provide additional support for the Rule, and has been fully argued, the undersigned will also briefly discuss application of § 5318(a)(2).

agency action at issue to evaluate whether to sustain that action." *MediNatura*, 998 F.3d at 942. And beyond citing § 5318(a)(2) contemporaneously, and expressly, in the final Rule, FinCEN cited that provision throughout the rulemaking process, including in the notice of proposed rulemaking. *See* 89 Fed. Reg. 12,424, 12,429 n.47; *see also Gatewood v. Outlaw*, 560 F.3d 843, 848 (8th Cir. 2009) ("When the agency has articulated and acted on a consistent rationale throughout the course of a lengthy informal rulemaking process, the final rule is not arbitrary and capricious because the rationale was not fully reiterated in the final agency action."). Finally, the *Chenery* rule does not mean an agency "must follow a particular formula or incant 'magic words' …. To the contrary, a reviewing court must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Garland*, 593 U.S. at 369 (citation omitted); *see also Press Commc'ns LLC v. Fed. Commc'ns Comm'n*, 875 F.3d 1117, 1122 (D.C. Cir. 2017); *People of the State of Ill. v. I.C.C.*, 722 F.2d 1341, 1348–49 (7th Cir. 1983) ("*Chenery* does not require futile gestures. … *Chenery* 'was intended only to establish the important point that a reviewing court could not affirm an agency on a principle the agency might not embrace—not to require the tedious process of administrative adjudication and judicial review to be needlessly dragged out while court and agency engage in a nigh endless game of battledore and shuttlecock with respect to subsidiary findings.'") (citation omitted). The Rule makes clear FinCEN's path, and intention to embrace § 5318(a)(2), so there is no *Chenery* bar.

Plaintiffs next argue that, even if considered, § 5318(a)(2) authorizes the adoption of only procedural rules, not substantive reporting. Doc. 35 at 13. But the

31

plain language of the statute authorizes the Secretary to require the "reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance[.]" 31 U.S.C. § 5318(a)(2).

Plaintiffs finally argue that § 5318(a)(2) cannot circumvent the limitations in § 5318(g) and/or that it violates the nondelegation doctrine. Doc. 35 at 13–14. But these arguments exaggerate. Under no construction does § 5318(a)(2) "authorize FinCEN to require reporting of **any** 'information' regarding **any** transaction." *Id.* at 14. The statute is instead restricted by the stated purposes of § 5311 and the regulatory limitation to "ensure compliance with" the ensuing subchapter and its regulations "or to guard against money laundering, the financing of terrorism, or other forms of illicit finance[.]" 31 U.S.C. § 5318(a)(2); *see also United States v. Brown*, 364 F.3d 1266, 1271 (11th Cir. 2004).

Nor does application of § 5318(a)(2) under the circumstances circumvent § 5318(g). As explained, the Rule survives, and is consistent with, each statutory subsection. To the extent resort to § 5318(a)(2) is necessary to support the Rule (rather than provide additional support for it), such is at most as a limited gap-filler. By way of example, one of Plaintiffs' arguments, discussed further below, is that the Rule is overbroad in that it lacks a monetary threshold. Among other responses, Defendants counter (as FinCEN stated) that including a monetary threshold would provide an obvious loophole and opportunity to undermine the Rule through structured low-value

laundering. *See* Doc. 64 at 23; 89 Fed. Reg. at 70,269. Though FinCEN has ultimately explained why even lower-value transactions are suspicious and relevant to possible violations of law, assuming *arguendo* that they are not, then § 5318(a)(2) fills any potential gap to allow regulations under §§ 5318(g)(1) and (5) to operate as intended, ensure compliance, and in turn "guard against money laundering, the financing of terrorism, or other forms of illicit finance[.]" 31 U.S.C. § 5318(a)(2).[31] That is not an end-round circumvention of § 5318(g), but an appropriate supplement. Under the circumstances, resort to § 5318(a)(2), to the extent necessary at all, is not improper.

### b. Arbitrary and Capricious

Plaintiffs argue that the Rule is arbitrary and capricious in three respects, contending that FinCEN failed to (i) tailor the Rule to reach only suspicious transactions relevant to potential violations of the law, (ii) conduct a rational cost-benefit analysis, and (iii) meaningfully address comments regarding a monetary threshold and the inclusion of trusts in the Rule. The undersigned recommends that the Rule is not arbitrary and capricious.

### i.  Tailored to Statutory Reach

For the reasons discussed, the undersigned recommends that the Rule is not arbitrary and capricious for failure to tailor to the authorized statutory reach.

---

[31] Plaintiffs' consolidated opposition/reply, which focuses only on the earlier "prescribe by regulation" language of the statute, entirely omits this phrase, which is preceded by the word "or." *See id.*; Doc. 71 at 6.

## ii.    Cost-Benefit Analysis

Plaintiffs next argue that the Rule is arbitrary and capricious for lack of an appropriate cost-benefit analysis. Courts must "review an agency's cost/benefit analysis deferentially." *Am. Trucking Associations, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013). Courts may not substitute their "views for those of the agency. Thus, while a 'serious flaw' or otherwise arbitrary and capricious reasoning can crash an agency's cost/benefit analysis," the "'burden to show error is high[.]'" *Id.* (internal citations omitted).

Here, § 5318 provides in pertinent part:

> **(B) Requirements.** --In imposing any requirement to report any suspicious transaction under this subsection, the Secretary of the Treasury, in consultation with the Attorney General, appropriate representatives of State bank supervisors, State credit union supervisors, and the Federal functional regulators, shall consider items that include--
> **(i)** the national priorities established by the Secretary;
> **(ii)** the purposes described in section 5311; and
> **(iii)** the means by or form in which the Secretary shall receive such reporting, including the burdens imposed by such means or form of reporting on persons required to provide such reporting, the efficiency of the means or form, and the benefits derived by the means or form of reporting by Federal law enforcement agencies and the intelligence community in countering financial crime, including money laundering and the financing of terrorism.
> …
> **(D) Streamlined data and real-time reporting.**--
> **(i)** Requirement to establish system.--In considering the means by or form in which the Secretary of the Treasury shall receive reporting pursuant to subparagraph (B)(iii), the Secretary of the Treasury, acting through the Director of the Financial Crimes Enforcement Network, and in consultation with appropriate representatives of the State bank supervisors, State credit union supervisors, and Federal functional regulators, shall--
> **(I)** establish streamlined, including automated, processes to, as

34

appropriate, permit the filing of noncomplex categories of reports that--

**(aa)** reduce burdens imposed on persons required to report; and

**(bb)** do not diminish the usefulness of the reporting to Federal law enforcement agencies, national security officials, and the intelligence community in combating financial crime, including the financing of terrorism;

**(II)** subject to clause (ii)--

**(aa)** permit streamlined, including automated, reporting for the categories described in subclause (I); and

**(bb)** establish the conditions under which the reporting described in item (aa) is permitted; and

**(III)** establish additional systems and processes as necessary to allow for the reporting described in subclause (II)(aa).

**(ii) Standards.**--The Secretary of the Treasury--

**(I)** in carrying out clause (i), shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law (including regulations); and

**(II)** in establishing the standards under subclause (I), shall consider transactions, including structured transactions, designed to evade any regulation promulgated under this subchapter, certain fund and asset transfers with little or no apparent economic or business purpose, transactions without lawful purposes, and any other transaction that the Secretary determines to be appropriate.

31 U.S.C. § 5318(g)(5)(B)–(D).[32]

Plaintiffs' position is overstated.[33] The statute directs agency consideration of

---

[32] The sole statutory provision on which Plaintiffs rely for their cost-benefit argument is 31 U.S.C. § 5318(g)(5)(B)(iii). Doc. 81 at 165.

[33] Plaintiffs' cost-benefit argument is partially in tension with their earlier statutory construction. *Compare* Doc. 35 at 19 (partially quoting 31 U.S.C. § 5318(g)(5)(B)(iii) to argue, "The BSA directs that, in creating any streamlined SAR requirement, FinCEN must consider 'the burdens imposed … on persons required to provide such reporting' and 'the benefits derived … by Federal law enforcement agencies and the intelligence community in countering financial crime.'"); *with* Doc. 35 at 11–12 (arguing that § 5318(g)(5)(B) does not expand the statutory rulemaking power beyond suspicious transactions relevant to potential violations of law with bold emphasis on the very language omitted through ellipses in the cost-benefit argument). In any event, Plaintiffs' earlier argument is helpful only so far as it goes. The undersigned agrees that, under §§ 5318(g)(1) and (g)(5), it is suspicious transactions relevant to possible violations of law that are regulatable. The undersigned further agrees that Congress meant what it said in directing the establishment of streamlined processes to permit the filing of noncomplex categories of reports and in directing the Secretary to "ensure that

costs and benefits—among other factors, including the national priorities established

by the Secretary and the purposes described in § 5311. 31 U.S.C. § 5318(g)(5)(B). But

it does not direct how. *Id.*; *see Cisneros*, 53 F.3d at 1577 ("The Act requires that the

agency 'consider' cost, which the manufacturers concede was done, but the Act does

not indicate precisely *how* HUD is to consider this factor, or how much weight the

agency should give cost in weighing it against other factors. When it prescribed the

factors HUD should consider, Congress did not establish a strict algebraic formula in

which the agency simply plugs in the numbers, as the manufacturers seem to suggest.

As this Court recently stated: 'we decline the ... invitation to require an agency to

accord greater weight to aspects of a policy question than the agency's enabling statute

itself assigns to those considerations.' As long as the agency gives fair consideration to

the relevant factors mandated by law, the importance and weight to be ascribed to

those factors is the type of judgment that courts are not in a position to make. Instead,

that judgment is for the agency[.]") (citation omitted); *see also Nat'l Ass'n of Home*

*Builders v. E.P.A.*, 682 F.3d 1032, 1039 (D.C. Cir. 2012) (explaining that mere

requirement to "consider" factors including economic consequences and societal

impact "does not mean that the regulation's benefits must outweigh its costs"); *cf. Ctr.*

*for Biological Diversity v. Env't Prot. Agency*, 141 F.4th 153, 171–72 (D.C. Cir. 2025).

FinCEN fairly, and reasonably, considered the Rule's costs and benefits, including in

---

streamlined reports relate to suspicious transactions relevant to potential violations of law (including
regulations)[.]" 31 U.S.C. § 5318(g)(5)(D)(i)–(ii). As discussed, the statutory language and context
reflect that Plaintiffs misapply the phrase "suspicious transactions relevant to potential violations of
law."

a regulatory impact analysis. SOF ¶¶ 84–86; 89 Fed. Reg. at 70,260, 70,277–78, 70,284–88.

Plaintiffs' main concern is that FinCEN failed to precisely *quantify* by economic estimate the Rule's benefits. Doc. 35 at 19–21.[34] But FinCEN considered benefits of the Rule. *See, e.g.,* SOF ¶¶ 85–86; 89 Fed. Reg. at 70,260, 70,277–78, 70,284–85. Plaintiffs' argument imposes requirements the statute does not. It would require that FinCEN not only consider, but also quantify, any benefits sufficiently to find that they economically outweigh costs. But if anything, the statute—which references "benefits derived by the means or form of reporting by Federal law enforcement agencies and the intelligence community in countering financial crime, including money laundering and the financing of terrorism"—speaks in *noneconomic* terms. *See* 31 U.S.C. § 5318(g)(5)(B)(iii).[35]

The statute does not impose an "algebraic formula" or otherwise constrict how costs and benefits are considered (individually, relative to one another, and/or relative to the other statutory considerations). *See Cisneros*, 53 F.3d at 1577. Moreover, nothing

---

[34] To the extent American Land Title Association, as *amicus curiae*, raises similar concerns, they are similarly unpersuasive. Doc. 49. To the extent American Land Title Association further quarrels with the Rule's cost estimates, *see id.*, Plaintiffs declined to raise any such issues, Doc. 71 at 13 n.6; *see also* Doc. 81 at 190. So they need not be further considered. *See Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 564 n.8 (1st Cir. 2021) ("[A] district court should not consider arguments raised by amici that go beyond the issues properly raised by the parties."); *Cellnet Commc'ns, Inc. v. F.C.C.*, 149 F.3d 429, 443 (6th Cir. 1998); *Coin Ctr. v. Yellen*, No. 3:22-cv-20375-TKW-ZCB, 2023 WL 7121095, at *4 n.6 (N.D. Fla. Oct. 30, 2023).

[35] To be sure, there may be circumstances in which an agency is directed only to consider costs and benefits but acts arbitrarily and capriciously because it regulates even if costs substantially outweigh benefits. But the Congressional directives in this statute reinforce that a strict algebraic formula or precise quantification of benefits or quantitative comparison was not required.

in § 5318(g) requires regulations "that will produce a net economic gain[,]" and in weighing a rule's benefits, an agency may rely on its evaluation of "'optimal societal interest'" such as avoiding injury. *See id.* at 1578, 1580–81 (finding HUD's explanation "that the need to increase safety and prevent future devastation to communities … justified increasing consumer prices for manufactured housing" to be "consistent with the agency's statutory mandate"); *see also Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013) ("But the law does not require agencies to measure the immeasurable. CFTC's discussion of unquantifiable benefits fulfills its statutory obligation to consider and evaluate potential costs and benefits.") (citations omitted); *Interfaith Ctr. on Corp. Resp. v. United States Sec. & Exch. Comm'n*, 786 F. Supp. 3d 97, 127 (D.D.C. 2025) ("The Commission, as is its obligation under the APA, 'provided substantial detail on the benefits of the rule, and the reasons why quantification was not possible.'") (citation omitted).[36]

---

[36] The undersigned notes that because of the Rule's anticipated financial impact, 2 U.S.C. § 1532(a) may require a more rigorous and quantitative cost-benefit review than is required under 31 U.S.C. § 5318(g)(5)(B) itself. But Plaintiffs rely only on 31 U.S.C. § 5318(g)(5)(B). And with good reason. The only remedy for any noncompliance with 2 U.S.C. § 1532(a) is to compel an appropriate written statement; noncompliance is *not* a basis for invalidating or otherwise affecting the Rule. *See* 2 U.S.C. § 1571(a)(1)–(4), (b); *see also Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 81 n.22 (D.C. Cir. 2000); *Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.*, 785 F. Supp. 2d 357, 369–70 (S.D.N.Y. 2011), *aff'd*, 501 F. App'x 16 (2d Cir. 2012); *Associated Builders & Contractors, Inc. v. Herman*, 976 F. Supp. 1, 15 (D.D.C. 1997). To that end, to the extent the agency offered a more economic-based cost-benefit analysis, such appears to have been prompted not by any justification for the Rule or requirements under § 5318(g)(5)(B)(iii), but rather by 2 U.S.C. § 1532(a) or by Executive Orders 12,866, 13,563, and 14,094. *See* 89 Fed. Reg. at 70,277, 70,284–89. But, like 2 U.S.C. § 1532(a), any purported conflict with the requirements of these Executive Orders is not a basis for invalidating the Rule; to the contrary, the latter is not even reviewable under the APA. *Nat'l Mining Assoc.*, 985 F.3d at 1326–27 ("Next, petitioners argue that the Final Rule violates Executive Orders 12,866 and 13,563, which direct agencies to conduct cost-benefit analyses of regulatory actions and alternatives to regulation, and to ensure that the regulations impose the 'least burden on society, consistent with

### iii.    Response to Comments

Plaintiffs argue that the Rule is arbitrary and capricious for failure to adequately respond to comments in favor of adding a monetary threshold for reporting and expressing concern with the Rule's inclusion of trusts. Doc. 35 at 22–24. "The purpose of notice-and-comment rulemaking is to 'give[ ] affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes' while 'afford[ing] the agency a chance to avoid errors and make a more informed decision.'" *Hewitt*, 21 F.4th at 1343 (citation omitted). As such, "the agency must rebut 'vital relevant' or significant comments[,]" and its rebuttal statements "must enable the reviewing court to see the objections and why the agency reacted to them as it did[.]" *Id.* at 1343, 1350 (citation omitted). But the agency need not "respond to comments which, in essence, reflect a policy-based preference for the most exacting guarantees of due process over the" competing interests promoted in an agency's action. *See Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992). So long as "significant objections raised by" a rule's opponents are "accounted for in the Agency's action and

---

obtaining regulatory objectives.' Petitioners argue that the cost-benefit analysis underlying the Final Rule is lacking, and fails to satisfy the standards set forth in the Executive Orders. … But in order to bring this challenge, petitioners must demonstrate that the APA permits judicial review of agency action that violates these two Executive Orders. … We conclude that neither Executive Order at issue here permits judicial review of inconsistent agency action. Both Executive Orders state that they do not 'create any right or benefit, substantive or procedural, enforceable by any party' against agencies. We thus hold that we cannot review whether the Final Rule is inconsistent with either Executive Order.") (citation omitted); *see id.* at 1320 (explaining in connection with other analysis that the agency simply acknowledged "that exact cost-benefit analysis in this area is difficult, and that it is unable to precisely quantify the benefits of the new standard"); *see also* Executive Order No. 14,094, § 4(c), 88 Fed. Reg. 21,879, 21,881 (amending Executive Orders 12,866 and 13,563 but similarly providing that it does not "create any right or benefit, substantive or procedural, enforceable" by any party against agencies), Executive Order No. 14,148, 90 Fed. Reg. 8,237, 8,239, 8,241 (revoking Executive Order 14,094 and continuing to provide no-creation-of-right-or-benefit language).

… fall far short of indicating any clear error of judgment by the Agency, the arbitrary and capricious standard provides no basis to set aside" a rule. *See id.*

Here, in response to public comments, including FNTIC's, FinCEN stated that it believes the Rule reflects "the appropriate balance between ensuring that reports filed under the rule have a high degree of usefulness to law enforcement and minimizing the compliance burden incurred by businesses, including small businesses." SOF ¶ 76 (citation omitted). FinCEN stated in that regard that (i) "it 'regularly receives feedback from law enforcement partners that they use the information [received from GTO reporting] to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts'" and (ii) law enforcement has previously requested expansion of GTOs to new geographic areas, which FinCEN has done multiple times. *Id.* ¶ 77 (citation omitted). Plaintiffs challenge the response to comments in favor of adding a monetary threshold for reporting and expressing concern with the Rule's inclusion of trusts. Doc. 35 at 22–24. FinCEN received competing comments both for and against the issues raised by Plaintiffs, that is, for and against a monetary threshold and inclusion of trusts. SOF ¶¶ 78, 81.

With respect to trusts, FinCEN declined to exclude trusts "on the stated ground that 'non-financed residential real estate transfers to certain trusts present a high risk for money laundering' and 'the potential difficulties described by commenters, such as the need to review complex trust documents to determine whether a trust is reportable," would "be minimized by the addition of new exceptions and by the reasonable reliance standard" in the final Rule. *Id.* ¶ 79 (citation omitted). To that end,

in response to comments, the Rule added exceptions for transfers required under trust
terms, supervised by a court, and "in which an individual transferor (alone or with
their spouse) transfers an interest to a trust for no consideration if the settlor or grantor
of the trust is the transferor individual, that individual's spouse, or both of them[.]" *Id.*
¶ 80.

With respect to a monetary threshold, "FinCEN rejected a monetary threshold
on the stated ground that '[l]ow value non-financed transfers to legal entities and trusts,
including gratuitous ones for no consideration, can present illicit finance risks and are
therefore of interest to law enforcement.'" *Id.* ¶ 82 (citation omitted). FinCEN further
"stated that its 'experience with administering the program and discussions with law
enforcement showed that money laundering through real estate occurs at all price
points'" and that inclusion of a monetary threshold for reporting "could move illicit
activity into the lower priced market, which would be counter to the aims of the rule."
*Id.* ¶¶ 82–83 (citation omitted).

Thus, unlike in *Hewitt*, the agency did not merely proclaim, without explanation
capable of review, that it had considered "all comments" to the Rule. *See Hewitt*, 21
F.4th at 1351. Rather, its responses adequately respond to the comments and reflect a
reasoned basis for the choices, among competing options and comments, adopted by
the agency. *See* SOF ¶¶ 78–83; 89 Fed. Reg. at 70,261, 70,266–70,270. That suffices.
*See Hussion*, 950 F.2d at 1554; *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222
(D.D.C. 2017) ("There is no requirement, however, that an agency respond to
significant comments in a manner that satisfies the commenter. Instead, to respond

adequately, the agency must only address significant comments 'in a reasoned manner,' that allows a court 'to see what major issues of policy were ventilated ... and why the agency reacted to them as it did[.]' In other words, the agency's responses must show that its 'decision was ... based on a consideration of the relevant factors.'") (citations omitted); *see also Higgins v. S.E.C.*, 866 F.2d 47, 49 (2d Cir. 1989) ("The SEC clearly considered and responded to the only comments it received on the proposed rule .... The Commission adequately weighed the competing interests of all those involved .... Its careful analysis of these competing interests is sufficient to withstand appellate review."); *cf. Nat'l Min. Ass'n*, 812 F.3d at 882; *Cisneros*, 53 F.3d at 1572.

With respect to monetary thresholds, FinCEN properly relied on its experience administering the GTO program and discussions with law enforcement. To be sure, as Plaintiffs note, the GTO program includes monetary thresholds. But FinCEN's experience can include both the positive results of that program *and* any perceived shortcomings. And Plaintiffs generally fail to acknowledge the reasonable concern that a monetary threshold could drive bad actors to a lower and unregulated price point. Doc. 35 at 22; Doc. 71 at 13–14.

With respect to trusts, FinCEN properly noted the suspicion and risks that trusts—like transferee-screening entities—pose as to money laundering. And the agency properly balanced the competing interests to ameliorate cost concerns with including trusts in the Rule by (i) adding additional exceptions and (ii) including a reasonable-reliance standard. At bottom, Plaintiffs' arguments in this respect amount to their contention that FinCEN did not do enough and that the Rule is overly complex

and costly in transactions involving trusts. Doc. 35 at 23–24; Doc. 71 at 14. But this contention does not suggest that the agency failed to consider the relevant factors or even reduce burdens, only that it should have come to a different result and reduced them more.[37] A quarrel with a line-drawing judgment call within the agency's purview is not a basis for APA relief. *See Nat'l Mining Ass'n*, 985 F.3d at 1321.

### c. Fourth Amendment

Plaintiffs argue that the Rule violates the Fourth Amendment due to its "highly intrusive and standardless demand for information without any connection to illegal activity" in that the Rule "demands sweeping disclosures of sensitive personal information without any rationale connecting the transactions to suspicious or unlawful activity that might render a search reasonable." Doc. 35 at 24–25.[38]

Plaintiffs' premise fails, however, because, as discussed, the Rule is properly tailored to suspicious transactions relevant to possible violations of law and to guard against money laundering.[39] *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59–60, 65–67 (1974) ("[R]eporting requirements are by no means per se violations of the Fourth Amendment. … [O]rganizations engaged in commerce [can] be required by the Government to file reports dealing with particular phases of their activities. …

---

[37] At that, a different result with respect to a portion of the Rule that FinCEN estimated would be rare and comprise a relatively small subset. 89 Fed. Reg. at 70,281.

[38] Plaintiffs' Fourth Amendment challenge is limited to their own records and expectations of privacy. *See* Doc. 81 at 208; *see also* Doc. 35 at 27; Doc. 71 at 16–17.

[39] Plaintiffs acknowledge that their constitutional arguments to some extent follow the premises underpinning their earlier arguments. *See* Doc. 81 at 209–10.

'[C]orporations can claim no equality with individuals in the enjoyment of a right to
privacy. They are endowed with public attributes. They have a collective impact upon
society, from which they derive the privilege of acting as artificial entities. The Federal
Government allows them the privilege of engaging in interstate commerce. Favors
from government often carry with them an enhanced measure of regulation. Even if
one were to regard the request for information in this case as caused by nothing more
than official curiosity, nevertheless law-enforcing agencies have a legitimate right to
satisfy themselves that corporate behavior is consistent with the law and the public
interest.' We have no difficulty then in determining that the Secretary's requirements
[in the BSA] for the reporting of domestic financial transactions abridge no Fourth
Amendment right of the banks themselves. The bank is not a mere stranger or
bystander with respect to the transactions which it is required to record or report. The
bank is itself a party to each of these transactions, earns portions of its income from
conducting such transactions, and in the past may have kept records of similar
transactions on a voluntary basis for its own purposes. … [A]s we have noted above,
'neither incorporated nor unincorporated associations can plead an unqualified right
to conduct their affairs in secret.' The regulations do not impose unreasonable
reporting requirements on the banks. The regulations require the reporting of
information with respect to abnormally large transactions in currency, much of which
information the bank as a party to the transaction already possesses or would acquire
in its own interest. To the extent that the regulations in connection with such
transactions require the bank to obtain information from a customer simply because

44

the Government wants it, the information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce, so as to withstand the Fourth Amendment challenge made by the bank plaintiffs.") (internal citations omitted).

The Rule satisfies *Shultz*. Though significant, it still regulates only a small fraction of the real-estate market—non-financed transactions to entities and trusts (not subject to an exclusion). It seeks discrete, sufficiently described information. And it does so in relation to the Congressional authority to guard against money laundering and other illicit activities and review suspicious transactions relevant to possible violations of law. Contrary to Plaintiffs' reading, *Shultz* does not invariably require a monetary threshold under the BSA or elevate the statute's regulatory focus—any suspicious transactions relevant to potential violations of law—to only high-dollar transactions. Doc. 35 at 26; Doc. 71 at 14–15. Rather, because the Rule is within the agency's authority, meets the statutory requirements, and is not too indefinite—and not a "grab-everything collection of suspicionless data" as Plaintiffs impute, Doc. 35 at 25–26—it is lawful.

### d. First Amendment

Finally, Plaintiffs argue that the Rule violates the First Amendment's prohibition against compelled speech. Doc. 35 at 29–30. They argue that the Rule requires strict scrutiny and, regardless, does not survive any level of scrutiny. *Id.*

"The compelled speech doctrine applies to ideological speech and purely factual, non-commercial speech." *McClendon v. Long*, 22 F.4th 1330, 1336 (11th Cir.

2022). The Rule falls within neither bucket. It is not ideological. *Cf. Coleman v. Miller*,
117 F.3d 527, 531 (11th Cir. 1997) ("Appellant has demonstrated no such
governmental compulsion in this case. He has pointed to no government action that
'requires affirmation of a belief and an attitude of mind.'" (citation omitted)). Plaintiffs
mainly argue that the Rule is non-commercial, citing *NetChoice, LLC v. Bonta*, 113 F.4th
1101, 1109 (9th Cir. 2024). Doc. 35 at 29. This argument is unpersuasive. *See Pharm.
Rsch. & Manufacturers of Am. v. Stolfi*, 153 F.4th 795, 818, 821, 825 (9th Cir. Aug. 26,
2025) (classifying regulatory reports that required communication of "the terms of
potential commercial transactions" as commercial; explaining that "[t]he mere fact
that a reporting requirement compels regulated entities to disclose information
reflecting the company's internal decisionmaking does not strip that speech of its
fundamentally commercial character"; and distinguishing *Bonta* and other authority
because "our application of strict scrutiny ultimately turned on the subjective and
political or ideological nature of the information that the regulations required" in those
cases, which "forced regulated entities to opine on fraught political issues, such as
what online content is 'harmful to children' or what content constitutes 'hate speech
or racism'") (citations omitted).

Ultimately, though their reasons for doing so may slightly vary, courts routinely
reject compelled-speech challenges directed to requirements like those in the Rule. *See,
e.g.*, *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101, 1108–09 (D.C. Cir. 2011) ("The
disclosure required under paragraphs 13(f)(2) and 13(f)(3) [of the Securities and
Exchange Act of 1934] does not raise … constitutional concerns. Here the

Commission—not the public—is [the challenger's] only audience. The Act is an effort to regulate complex securities markets, inspire confidence in those markets, and protect proprietary information in the process. It is not a veiled attempt to 'suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.' In this respect, paragraphs 13(f)(2) and 13(f)(3) are indistinguishable from other underlying and oft unnoticed forms of disclosure the Government requires for its 'essential operations.'") (citations omitted); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (rejecting attorney's First Amendment challenge to IRS summons requesting information about clients because "[t]here is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society,—as in the case of compulsion to give evidence in court'" and the summons at issue required the attorney "only to provide the government with information which his clients have given him voluntarily, not to disseminate publicly a message with which he disagrees" such that his "First Amendment protection against compelled speech does not prevent enforcement of the summons" (citation omitted)); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, C.J., and Dyk, J., concurring)[40] ("[The] First Amendment claim is completely without merit. So-called 'compelled speech' may under modern Supreme Court jurisprudence raise a serious First Amendment concern where it effects a forced association between the speaker and a particular viewpoint. What is at stake here, by

---

[40] This concurring opinion constitutes the opinion of the court. *See id.* at 297–98.

contrast, is simply routine disclosure of economically significant information designed to forward ordinary regulatory purposes—in this case, protecting covered entities from questionable … business practices. There are literally thousands of similar regulations on the books—such as product labeling laws, environmental spill reporting, accident reports by common carriers, SEC reporting as to corporate losses and (most obviously) the requirement to file tax returns to government units who use the information to the obvious disadvantage of the taxpayer. The idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken. [Supreme Court precedent] makes clear 'that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.' This is a test akin to the general rational basis test governing all government regulations under the Due Process Clause. The test is so obviously met in this case as to make elaboration pointless.") (internal citations omitted). For the reasons herein, whatever the ultimate level of review—and it appears to be akin to rational basis, and certainly no greater than intermediate, to the extent the First Amendment is even implicated—Plaintiffs' compelled-speech challenge also fails.

## IV.    Conclusion

Accordingly, the undersigned **respectfully recommends** that the Court:

1.    **Grant** Defendants' Motion (Doc. 64);

2.    **Deny** Plaintiffs' Motion (Doc. 35); and

3. **Direct** the Clerk of Court to enter judgment accordingly, terminate any pending motions and deadlines, and close the file.

## Notice

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations impacts the scope of review by a district judge and by an appellate court. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C); 11th Cir. R. 3-1. "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C). "A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation … waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]" 11th Cir. R. 3-1.

**DONE AND ENTERED** in Jacksonville, Florida, on December 9, 2025.

Samuel J. Horovitz
United States Magistrate Judge

Copies to:

The Honorable Wendy W. Berger

Counsel of Record