UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FIDELITY NATIONAL FINANCIAL,
INC. and FIDELITY NATIONAL
TITLE INSURANCE COMPANY,

    Plaintiffs,

v.                                        Case No.: 3:25-cv-554-WWB-SJH

SCOTT BESSENT, UNITED STATES
DEPARTMENT OF THE TREASURY,
ANDREA GACKI, and THE FINANCIAL
CRIMES ENFORCEMENT NETWORK,

    Defendants.
_____/

**<u>FIDELITY'S OBJECTIONS TO THE MAGISTRATE JUDGE'S<br>REPORT AND RECOMMENDATION (Doc. 82)</u>**

# **TABLE OF CONTENTS**

                                                                                   **Page**

TABLE OF AUTHORITIES ................................................................................................ii

I.    FinCEN Lacked Statutory Authority to Impose Suspicionless Reporting on an Entire Category of Lawful Real Estate Transactions. ............................................ 1

      A.    The Statutory Text Requires Reasonable Objective, Transaction-Level Suspicion Tied to a Possible Violation of Law. ............................................. 1

      B.    The Report Erred in Treating Section 5318(a)(2) as Authority. ..................... 4

      C.    The Report Ignores Statutory Limits Imposed on GTOs and the Major Questions Doctrine.......................................................................................... 5

II.   The Report's Arbitrary and Capricious Review Was Erroneous. ......................... 5

      A.    The Report Upheld a Rule Without Adequate Evidentiary Support. ............ 5

      B.    The Report Wrongly Allows a Rule Whose Costs Outweigh Benefits. ........ 8

      C.    The Report Erred in Holding That FinCEN Adequately Responded to Comments Calling for a Monetary Threshold. .............................................. 9

III.  The Report Failed to Give Adequate Consideration to Legitimate Fourth Amendment Concerns With the Rule. ................................................................. 9

CERTIFICATE OF SERVICE ........................................................................................ 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ................................................................................................ 5

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys. ("ADPSO")*,
  745 F.2d 677 (D.C. Cir. 1984) ................................................................................ 6

*Atlanta Gas Light Co. v. FERC*,
  140 F.3d 1392 (11th Cir. 1998) ............................................................................... 6

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ................................................................................................ 5

*Bittner v. United States*,
  598 U.S. 85 (2023) .................................................................................................. 4

*Brantley v. United States*,
  2025 WL 3635368 (M.D. Fla. Aug. 6, 2025) .......................................................... 8

*Brinklys v. Johnson*,
  175 F. Supp. 3d 1338 (M.D. Fla. 2016) .................................................................. 6

*Cal. Bankers Ass'n v. Shultz*,
  416 U.S. 21 (1974). ............................................................................................ 9, 10

*Ctr. for Biological Diversity v. EPA*,
  141 F.4th 153 (D.C. Cir. 2025) ............................................................................... 9

*Env't Def. Fund, Inc. v. EPA*,
  898 F.2d 183 (D.C. Cir. 1990) ................................................................................ 4

*Fields v. U.S. Dep't of Lab. Admin. Rev. Bd.*,
  173 F.3d 811 (11th Cir. 1999) ................................................................................. 6

*Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros*,
  53 F.3d 1565 (11th Cir. 1995) ................................................................................. 9

*Glover v. Ocwen Loan Servicing, LLC*,
  127 F.4th 1278 (11th Cir. 2025) ............................................................................. 4

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................................ 1, 2

*Lopez v. First Union Nat'l Bank of Fla.*,
   129 F.3d 1186 (11th Cir. 1997) ............................................................................... 3, 4

*Mendoza v. Sec'y, DHS*,
   851 F.3d 1348 (11th Cir. 2017) ..................................................................................... 6

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) ........................................................................................... 4

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ..................................................................................... 9

*Nat'l Small Bus. Admin. v. Treasury*,
   2025 U.S. App. LEXIS 32844 (11th Cir. Dec. 15, 2025) ............................................ 10

*Patel v. City of Los Angeles*,
   738 F.3d 1058 (9th Cir. 2013) *aff'd sub nom.*, *City of Los Angeles v. Patel*,
   576 U.S. 409 (2015) ..................................................................................................... 10

*SEC v. Alpine Sec. Corp.*,
   982 F.3d 68 (2d Cir. 2020) ............................................................................................. 2

*Sorenson Commc'ns Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) ....................................................................................... 6

*Sunshine State Reg'l Ctr., Inc. v. Dir.*,
   143 F.4th 1331 (11th Cir. 2025) .................................................................................... 3

*Tex. Indep. Ginners Ass'n v. Marshall*,
   630 F.2d 398 (5th Cir. 1980) ......................................................................................... 8

*United States v. Ayala*,
   711 F. Supp. 3d 1333 (M.D. Fla. 2024) ....................................................................... 4

*United States v. Bittner*,
   19 F.4th 734 (5th Cir. 2021) ......................................................................................... 4

*United States v. Solomon ex rel. Solomon*,
   570 F. Supp. 3d 1195 (S.D. Fla. 2021) ......................................................................... 4

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ....................................................................................................... 5

**Statutes**

28 U.S.C. § 636(b)(1)(C) ....................................................................................................... 1

31 U.S.C. § 5318 .................................................................................................................. 10

31 U.S.C. § 5318(a)(2) ............................................................................................. 4

31 U.S.C. § 5318(g)(1) .................................................................................... 1, 2, 10

31 U.S.C. § 5318(g)(3) ......................................................................................... 3, 4

31 U.S.C. § 5318(g)(5) ........................................................................................... 1, 2

31 U.S.C. § 5318(g)(5)(B) ......................................................................................... 8

31 U.S.C. § 5318(g)(5)(B)(iii) .................................................................................. 8

31 U.S.C. § 5326(a) ................................................................................................. 5

**<u>Rules</u>**

Fed. R. Civ. P. 72 ..................................................................................................... 1

**<u>Regulations</u>**

Amendment to the Bank Secrecy Act Regulations; Requirement to Report Suspicious Transactions,
   61 Fed. Reg. 4,326 (Feb. 5, 1996) ....................................................................... 2

Anti-Money Laundering Regulations for Residential Real Estate Transfers,
   89 Fed. Reg. 70,258 (August 29, 2024) .......................................................... 7, 8

**<u>Other Authorities</u>**

FinCEN, Year in Review for Fiscal Year 2024 at 2-3 (June 18, 2025),
   https://www.fincen.gov/system/files/2025-08/FinCEN-Infographic-Public-2025-508.pdf .................................................................................................................. 8

Press Release, FinCEN, FinCEN Issues Frequently Asked Questions to Clarify Suspicious Activity Reporting Requirements (Oct. 9, 2025),
   https://www.fincen.gov/news/news-releases/fincen-issues-frequently-asked-questions-clarify-suspicious-activity-reporting ........................................................... 8

*Suspicious*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/suspicious ................................................................................................................ 2

Fidelity National Financial, Inc. and Fidelity National Title Insurance Co. ("Fidelity") object under Rule 72 to the Report and Recommendation ("Report") dated December 9, 2025, Doc. 82, which is reviewed de novo. 28 U.S.C. § 636(b)(1)(C). Fidelity challenges FinCEN's Rule, which treats an estimated 800,000 to 850,000 lawful, non-financed home sales each year as "suspicious" and "relevant to a possible violation of law," compels title insurance companies to collect and report over a hundred data points for each transaction, much of which they do not otherwise collect, all at a government-estimated cost of half a billion dollars annually without any meaningful evidence of beneficial impact. The Rule violates the governing statute and the major questions doctrine, is arbitrary and capricious, and violates the Fourth Amendment. The Report upholding the Rule should be reversed.

I.  **FinCEN Lacked Statutory Authority to Impose Suspicionless Reporting on an Entire Category of Lawful Real Estate Transactions.**

The Report's first error was not determining "the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("In the business of statutory interpretation, if it is not the best, it is not permissible."). Based on this approach, the Report concluded that "because non-financed transfers to legal entities and trusts are … outside the focus of other regulatory safeguards, … they are, as a category, suspicious and relevant to potential violations of law." Doc. 82 at 27. Under this circular and incorrect reasoning, any transaction not otherwise subject to federal monitoring is automatically "suspicious" and "relevant to a possible violation of law."

A.  **The Statutory Text Requires Reasonable Objective, Transaction-Level Suspicion Tied to a Possible Violation of Law.**

Sections 5318(g)(1) and (g)(5) clearly state that FinCEN may compel reporting only when a transaction is "suspicious," and only where that suspicion relates to a

1

"possible violation of law or regulation." It is not enough for a transaction to occur in a category that criminals might exploit, or one where FinCEN believes more oversight would be useful. It requires suspicion at the transaction level, even if similar transactions could then theoretically be organized into "categories" of inherently suspicious transactions (e.g., sales using trusts or entities used by known felons). The Report erred in ruling otherwise.

**First**, the Report erred by reading "suspicious transactions" to refer to transactions that "tend to arouse" "a state of mental uneasiness and uncertainty" regardless of how little evidence supports that unease, or whether it is objectively reasonable. Doc. 82 at 17, 25. FinCEN's own "general definition of the term 'suspicious transaction'" requires that a financial institution "**knows, suspects, or has reason to suspect**" a transaction is "relevant to a possible violation of law or regulation." 61 Fed. Reg. 4,326, 4,328, 4,331 (Feb. 5, 1996) (emphasis added). This definition allows FinCEN to impose SAR requirements only where a "reasonable" person "in similar circumstances would have suspected the transaction was subject to SAR reporting." *SEC v. Alpine Secs. Corp.*, 982 F.3d 68, 84 (2d Cir. 2020) (citation omitted). Tellingly, the Report ignored that FinCEN had contradicted its own "longstanding" definition. *Loper Bright*, 603 U.S. at 386.

Although the Report claimed it did not "suggest an 'unreasonable' suspicion would fall within §§ 5318(g)(1) or (5)," Doc. 82 at 24 n.22, it is unclear what sort of "suspicion" is left that is not unreasonable if the statute does not require "reasonable" suspicion. Webster's first definition of suspicious is "giving good reason for being doubted, questioned, or challenged." *Suspicious*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/suspicious. Such "good reason"—if anything, a higher standard

2

than reasonableness—is essential lest FinCEN be allowed to demand reports based only on subjective "unease." A suspicion stripped of objective signs is just a feeling of unease.

**Second**, the Report erred in defining "relevant to a possible violation of law" so broadly that a transaction need only be "logically connected" to a "chance that something is or might be illegal," with the word "possible" requiring only that a violation be "conceivable in theory or in practice." Doc. 82 at 25. Under that approach, it is always "conceivable in theory" that criminals **might** transfer property without financing, thus making **every** non-financed purchase related to a possible violation of law. Of course, it is **equally** "conceivable in theory" that the vast majority of finance-free property purchases are lawful because, for example, cash buyers are preferred in competitive real estate markets. FinCEN fails to provide evidence that the Rule distinguishes between reporting possible legal transactions or those related to a possible violation of law. *See infra* Section II.

**Third**, the Report interpreted the phrase "possible violation of law or regulation" to have different meanings in Sections (g)(1) and (g)(5) and Section (g)(3), inconsistent with Eleventh Circuit precedent. *Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186 (11th Cir. 1997), held that a disclosure concerns a "possible violation of law or regulation" under the safe-harbor provision in Section (g)(3) only if a financial institution has "a good faith basis for believing there is a nexus between the suspicion of illegal activity" and the transactions "disclosed." *Id.* at 1195. "[M]aterially the same language" occurs in Sections (g)(1) and (g)(5), and should "bear the same meaning." *Sunshine State Reg'l Ctr., Inc. v. Dir.*, 143 F.4th 1331, 1342 (11th Cir. 2025). The Report interpreted that phrase to have distinct meanings because Section (g)(1) authorizes the rules requiring reporting while

3

Section (g)(3) "provides a safe-harbor" for "'a voluntary disclosure of any possible violation of law or regulation." Doc. 82 at 19.[1] But these differences do nothing to "limit" the phrase "possible violation of law," *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1286 (11th Cir. 2025), nor do they explain why the same phrase would require a "reasonable basis" for suspicion in Section (g)(3), *Lopez*, 129 F.3d at 1196, while requiring only bare theoretical possibility in Section (g)(1).

### B. The Report Erred in Treating Section 5318(a)(2) as Authority.

The Report also relied on Section 5318(a)(2), which "authorizes the Secretary to require 'the reporting of certain information as the Secretary … may prescribe by regulation.'" Doc. 82 at 32. But the Report erred by failing to acknowledge that provision addresses only the power to require financial institutions "**to maintain appropriate procedures, including the collection and reporting of certain information**." 31 U.S.C. § 5318(a)(2). It authorizes FinCEN to set **procedures** for complying with reporting requirements, not impose reporting requirements themselves.[2] FinCEN itself cited (a)(2) only in a single "unsupported statement" (in a footnote) that cannot provide "a reasoned basis for the Rule." Doc. 35 at 13 (citing *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 189 (D.C. Cir. 1990); *Mozilla Corp. v. FCC*, 940 F.3d 1, 82 (D.C. Cir. 2019)). Because the Report recognized that FinCEN cannot use Section (a)(2) to "circumvent" Section (g), it cannot support a Rule that contravenes Section (g)'s limits. Indeed, the Report's

---

[1] The Report tried to limit *Lopez* to its facts. Doc. 82 at 21-22. But *Lopez*'s reading of "possible violation" was "necessary to the reasoning of [the] case" and thus is a holding. *United States v. Ayala*, 711 F. Supp. 3d 1333, 1349 (M.D. Fla. 2024) (collecting cases).

[2] *See United States v. Solomon ex rel. Solomon*, 570 F. Supp. 3d 1195, 1204–05 (S.D. Fla. 2021); *United States v. Bittner*, 19 F.4th 734, 745 (5th Cir. 2021), *rev'd on other grounds by Bittner v. United States*, 598 U.S. 85 (2023) (the BSA and its regulations "consistently implement [a] distinction" between "substance" and "procedure").

4

interpretation of (a)(2) renders both (g)(1) and the GTO statute, discussed below, surplusage.

### C. The Report Ignores Statutory Limits Imposed on GTOs and the Major Questions Doctrine.

The Report's interpretation is inconsistent with statutory limits on GTOs. The GTO provision authorizes the Secretary to "issue an order" requiring financial institutions "in a geographic area" to comply with "additional recordkeeping and reporting requirements" upon a finding that such requirements "are necessary to carry out the purposes of this subtitle or to prevent evasions." 31 U.S.C. § 5326(a). FinCEN's Rule ignores the geographic area limitation, the time limitations, and the directive to impose a monetary threshold that Congress thought necessary for such a disclosure requirement.

The Report recognized that "the rule regulates more broadly than GTOs," Doc. 82 at 7, but does not explain why FinCEN may disregard limits on GTOs, especially given the major questions doctrine. A change in existing law which uses tailored targeting orders and will impose billions of dollars in costs and intrude on hundreds of thousands of private transactions each year is the type of policy decision that must be made by Congress. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (applying major question doctrine because of economic impact). This Court "should not assume Congress entrusted" FinCEN with authority for such a sweeping rule, in disregard of existing limitations on GTOs, "without a clear statement to that effect." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

## II. The Report's Arbitrary and Capricious Review Was Erroneous.

### A. The Report Upheld a Rule Without Adequate Evidentiary Support.

The Report's holding that arbitrary and capricious review does not "incorporate[] a

5

full substantial evidence review," Doc. 82, at 2 n.1, is incorrect. As many courts have held, "in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (hereinafter "*ADPSO*"); *see also* Joint Notice, Doc. 78 at 2-4 (discussing cases).

Multiple Eleventh Circuit cases explain that substantial evidence is "no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." *E.g.*, *Mendoza v. Sec'y, DHS*, 851 F.3d 1348, 1353 (11th Cir. 2017); *Atlanta Gas Light Co. v. FERC*, 140 F.3d 1392, 1397 (11th Cir. 1998).[3] Chief Judge Howard has made the same point: "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no **substantive** difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1350 n.4 (M.D. Fla. 2016) (emphasis added) (quoting *ADPSO*, 745 F.2d at 683–84), *aff'd sub nom.*, 702 F. App'x 856 (11th Cir. 2017).

The Report's mistaken arbitrary and capricious review reflects three errors.

**First**, the Report upholds the Rule based on FinCEN's use of "common sense" in lieu of evidence. Doc. 82 at 27. While an agency "may hoist the standard of common sense ... the wisdom of agency action is rarely so self-evident that no other explanation is required." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). The

---

[3] The Report's assertion, *see* Doc. 82 at 2 n.1, that the Eleventh Circuit consistently treats arbitrary and capricious review as more deferential than substantial-evidence review cannot be reconciled with multiple decisions like *Mendoza*. *See also, e.g.*, *Fields v. U.S. Dep't of Lab. Admin. Rev. Bd.*, 173 F.3d 811, 813 (11th Cir. 1999).

6

so-called "common sense" invoked here—the idea that criminals will use transactions not captured in existing anti-money-laundering regimes—would allow FinCEN to treat **every** transaction that is not already subject to reporting as "suspicious."

**Second**, the Report wrongly accepts FinCEN's vague invocations of "experience" without any explanation grounded in evidence. FinCEN justified the lack of any monetary threshold in the Rule based on "experience with administering the [GTO] program and discussions with law enforcement." Doc. 82 at 41 (citing SOF, Doc. 31 ¶¶ 82-83). But FinCEN provided no specifics. *See* Doc. 35 at 22. The Report also credits FinCEN's "representative examples" of covered transactions linked to illicit activity. Doc. 82 at 29. But FinCEN identified only 21 enforcement actions over a 19-year period, 89 Fed. Reg. 70,258, 70,259 n.12 (Aug. 29, 2024), or one in 770,000 transactions. That ratio proves these transactions are almost all legitimate, not suspicious. *See* Doc. 35 at 15-16. And FinCEN's supposed "experience" showing the geographic limitation of the GTOs was a problem, Doc. 82 at 27 n.27, cannot be squared with the data, which shows that most cases examined in the study involved at least one county under the GTO program. *See* Doc. 35 at 17-18.

**Third**, the Report credits FinCEN's claim that covered transfers were "suspicious" because 42% of non-financed real estate transfers reported under the GTO Program involved parties that were the subject of a suspicious activity report ("SAR"). Doc. 82 at 28 n.28. But the mere fact that people involved in 42% of GTO-flagged transactions were the subject of a SAR on some **other**, unrelated transaction does not even show that those **other** transactions were relevant to a potential violation of law. And the fact that **less than half** the transactions flagged by GTOs have even that weak link to other SARs provides

7

no support for **expanding** reporting requirements. *See* Doc. 35 at 19. FinCEN's use of that data would make sense only if being subject to a SAR showed a high probability of illegality. But FinCEN's data shows the opposite. Because SARs are vastly over-reported, only 0.5% of SARs are ever even used in an FBI investigation—never mind connected to a prosecution or conviction.[4] And FinCEN itself has acknowledged that overuse of SARs has been "overwhelming the system with noise." Press Release, FinCEN, FinCEN Issues Frequently Asked Questions to Clarify Suspicious Activity Reporting Requirements (Oct. 9, 2025), https://www.fincen.gov/news/news-releases/fincen-issues-frequently-asked-questions-clarify-suspicious-activity-reporting.

### B. The Report Wrongly Allows a Rule Whose Costs Outweigh Benefits.

Section 5318(g)(5)(B) requires FinCEN to consider both the "burdens imposed" and the "benefits derived" from reporting rules. 31 U.S.C. § 5318(g)(5)(B)(iii). Such language directing an agency to consider both costs and benefits requires the agency to ensure that benefits **outweigh** costs, because any other outcome would not be rational. "A requirement for formal cost-benefit analysis demands that regulatory benefits exceed their costs." *Tex. Indep. Ginners Ass'n v. Marshall*, 630 F.2d 398, 411 n.44 (5th Cir. 1980). Here, while FinCEN found the rule would **cost** over $500 million per year, it said that benefits were "inestimable" and that "no attempt [was] made to quantify the net benefit of the rule." 89 Fed. Reg. at 70,284. FinCEN offered only the oblique suggestion that "it might be inferred that a tacit expectation underlying this rulemaking is that the rule will

---

[4] *See* FinCEN, Year in Review for Fiscal Year 2024 at 2-3 (June 18, 2025), https://www.fincen.gov/system/files/2025-08/FinCEN-Infographic-Public-2025-508.pdf. (4.7 million SARs were filed in FY2024 but only 22,805 used in FBI investigations). The Court may take judicial notice of FinCEN's published data. *See, e.g.*, *Brantley v. United States*, 2025 WL 3635368, at *1 (M.D. Fla. Aug. 6, 2025) (Berger, J.).

8

generate intangible benefits worth over $500 million per year." *Id.* at 70,285. Leaving readers to draw their own inferences about costs and benefits is the opposite of a reasoned agency decision squarely addressing that issue. *See* Doc. 35 at 19-21.[5]

Where SARs are already "overwhelming the system with noise," *supra* p.8, requiring an estimated 800,000 to 850,000 new reports at a cost of half billion dollars a year, SOF ¶¶ 71-72, without any clear nexus to unlawful activity is both unlawful and contrary to FinCEN's own description of its mission.

### C. The Report Erred in Holding That FinCEN Adequately Responded to Comments Calling for a Monetary Threshold.

The Report also erred in holding that FinCEN adequately responded to comments calling for a monetary threshold on reporting. The Report credited FinCEN's claim that "experience" with GTOs and "discussions with law enforcement show[ed] that money laundering through real estate occurs at all price points." Doc. 82 at 41 (quoting SOF ¶ 82). But as explained above, that vague invocation of unexplained "experience" and unspecified "discussions" does not suffice as reasoned decision-making.

### III. The Report Failed to Give Adequate Consideration to Legitimate Fourth Amendment Concerns With the Rule.

The broad interpretation of the statute allows unconstitutional reporting of private and irrelevant information, violating *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). The

---

[5] Cases cited in the Report are not to the contrary. *Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1577 (11th Cir. 1995), did not hold that an agency can justify a rule without finding that benefits outweigh costs; it merely considered whether the agency had improperly **calculated** costs, thereby breaching the statutory requirement that it adequately consider costs. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039 (D.C. Cir. 2012), and *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 172 (D.C. Cir. 2025), considered situations where no cost-benefit analysis was statutorily required. And in *Nat'l Ass'n of Home Builders*, the court ultimately held that the agency performed a reasonable cost-benefit analysis anyway. 682 F.3d at 1041.

Report quotes *Shultz* extensively, Doc. 82 at 36-37, but omits this critical point: a request for information will "withstand [a] **Fourth Amendment challenge**" only if it is "sufficiently related to a tenable ... determination as to **improper use of transactions of that type**" and "[t]he inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought **is reasonably** relevant." *Shultz*, 416 U.S. at 67 (emphasis added). The Report's approach permitting compulsory reporting based on mere "apprehension" cannot be reconciled with *Shultz's* **"reasonably relevant"** requirement.[6] *See also Patel v. City of Los Angeles*, 738 F.3d 1058, 1060 (9th Cir. 2013) (holding unconstitutional a statute requiring hotels and motels "to collect and record detailed information about their guests," which could be accessed by the government). So too here: The Rule requires Fidelity to collect private information, including data not otherwise collected from its clients, solely to disclose it to FinCEN, and to disclose Fidelity's private corporate information as well.

FinCEN had choices. It could have targeted actual indicia of criminality, such as transactions involving felons. It could have asked Congress to expand the geographic and temporal limits on GTOs. It did neither. Instead, it declared millions of ordinary transactions "suspicious" simply because they exist and are not already subject to anti-money-laundering rules. The Report blessed this approach. Together, they authorize what *Shultz* forbids: mass collection of private information with no evidence of wrongdoing.

---

[6] *Nat'l Small Bus. Admin. v. Treasury*, 2025 U.S. App. LEXIS 32844, at *20, 24 (11th Cir. Dec. 15, 2025), upheld the Corporate Transparency Act ("CTA") because it based statutory authorization to collect information on congressional findings as to need. The decision is inapposite here because the provisions FinCEN relies on make no specific findings authorizing broad collection in non-financed residential real estate closings. Nor does § 5318 authorize the standardless, sweeping collection defined by the Rule.

| | |
|---|---|
| Dated: December 30, 2025 | Respectfully submitted, |
| | |
| Patrick F. Philbin (DCBN 453620)<br>Jeff Jensen (DCBN 1765723)<br>William P. Barr (DCBN 951202)<br>**Torridon Law PLLC**<br>801 Seventeenth Street NW, Suite 801<br>Washington, DC 20006<br>Telephone: (202) 249-6900<br>pphilbin@torridonlaw.com<br>jjensen@torridonlaw.com<br>wbarr@torridonlaw.com<br><br>*Admitted Pro Hac Vice* | By: */s/ Jesse Panuccio*<br>Stuart H. Singer (FBN 377325)<br>Jesse Panuccio (FBN 31401)<br>Jon L. Mills (FBN 148286)<br>Eric M. Palmer (FBN 1050210)<br>Lauren Amos (FBN 1026073)<br>**Boies Schiller Flexner LLP**<br>401 E. Las Olas Blvd., Suite 1200<br>Fort Lauderdale, FL 33301<br>Telephone: (954) 356-0011<br>ssinger@bsfllp.com<br>jpanuccio@bsfllp.com<br>jmills@bsfllp.com<br>epalmer@bsfllp.com<br>lamos@bsfllp.com<br><br>David Boies (NYBN 2296333)<br>Alan Vickery (NYBN 1917590)<br>**Boies Schiller Flexner LLP**<br>55 Hudson Yards, 20th Floor<br>New York, NY 10001<br>Telephone: (212) 446-2300<br>DBoies@bsfllp.com<br>avickery@bsfllp.com<br><br>*Admitted Pro Hac Vice* |

11

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2025, I filed the foregoing document via the CM/ECF system which will send notification of such filing to all parties and their counsel of record in this case.

By: <u>*/s/ Jesse Panuccio*</u><br>
Jesse Panuccio